# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAITLYN T.; DAVID THARALDSON; DIANE THARALDSON<br>**Plaintiffs**<br><br>v.<br><br>**THE CITY OF CHICOPEE Acting through The Chicopee Public Schools and MASSACHUSETTS DEPARTMENT OF EDUCATION**<br>**Defendants** | ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO. 05-30158-MAP

## COMPLAINT FOR JUDICIAL REVIEW

### INTRODUCTION

The Plaintiffs seek judicial review of the decision of the Bureau of Special Education Appeals (hereafter BSEA) dated June 8, 2005. *Please find a copy of the June 8th 2005 decision attached hereto as Exhibit A.* The Plaintiffs have been aggrieved by the final decision of the BSEA and seek judicial review of that decision pursuant to Mass. Gen Laws Chapter 30A §14(1)(7) and 20 U.S.C. Ch. 33 §1415 (i)(2)(A).

### PARTIES

1   The Plaintiff, Kaitlyn T., resides at 182 Poplar Street, Chicopee, Massachusetts and she is the minor child of Mr. David Tharaldson and Mrs. Diane Tharaldson.

2   The Plaintiff, David Tharaldson, is a natural person residing at 182 Poplar Street, Chicopee, Massachusetts and is a citizen of the United States.

3   The Plaintiff, Diane Tharaldson, is a natural person residing at 182 Poplar Street, Chicopee, Massachusetts and is a citizen of the United States.

3.   The Defendant, the City of Chicopee, is a municipality of the Commonwealth of Massachusetts and has ultimate responsibility for funding the school programs and associated costs in the City of Chicopee, namely the Chicopee Public Schools.

1

4.  The Defendant, Massachusetts Department of Education (the "DOE) is an agency of the Commonwealth of Massachusetts. The DOE is charged with operating the Bureau of Special Education Appeals ("BSEA")  the administrative hearing board charged with providing administrative due process hearing for special education matters pursuant to 20 U.S.C. Ch. 33 §1400 et al.  The DOE commissioner, David Driscoll, has been designated ad the DOE's agent for service of process with a usual place of business 350 Main Street Malden, Massachusetts.

## JURISDICTION

5.  This Honorable court has jurisdiction over this matter pursuant to Individuals with Disabilities Education Act (IDEA) 20 U.S.C. Ch. 33 §1415 (i)(2)(A) and Massachusetts General Laws Ann. Chapter 30A.

## FACTS

6.  In September 2003, Kaitlyn T. was unilaterally placed by her parents at the White Oak School in Westfield Massachusetts for the 2003-2004 school year, after rejecting the Chicopee Public Schools proposed IEP.

7.  On June 30, 2001, the Parents, via their attorney, filed a Request for Hearing with the Bureau of Special Education Appeals (BSEA) against the Chicopee Public Schools regarding the IEP and placement for the 2003-2004 school year.

8.  In the Request for Hearing the Plaintiffs make full mention Dr. Kemper's evaluation of Kaitlyn in April 2003. The Plaintiffs asserted that "Kaitlyn has a specific language-based learning disability and requires the services mentioned by Dr. Kemper in his evaluation." The Request for Hearing specifically stated as follows:

    A. "Dr. Kemper recommends that Kaitlyn be educated with the context of a substantially separate, multi-sensory, language-intensive program. The purpose of which would be to provide direct, remedial, instructional methodologies that allow

children with significant language disorders to learn effectively and efficiently via a multisensory presentation of information."

B. "That "Kaitlyn's multisensory, structured language program will need to be implemented within the context of a substantially separate school that is devoted to addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects. It is extremely important that all of Kaitlyn's teachers have the training necessary to provide instruction in a multisensory, structured language program setting."

C. "Kaitlyn will continue to require a daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language instruction."

9. The Plaintiffs also asserted in their Request for Hearing that the program offered for the 2003-2004 School Year by the Chicopee Public Schools, which would implement the IEP, was grossly inappropriate. The Plaintiff's specifically stated that the methodology relied on by the Chicopee Public School's program: "will be using the program READ 180 to remediate Kaitlyn's disability. The parents assert that the program offered by the School District is not intensive enough. The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has."

10. In January and February 2004, the BSEA heard the matter at a formal hearing presided over by Hearing Officer Lindsay Byrne.

11. On or about April 7, 2004, Lindsay Byrne, on behalf of the Bureau of Special Education Appeals issued a decision finding for Kaitlyn and her parents granting them all relief

3

requested in their Request for Hearing. *Please find attached hereto as Exhibit B, and incorporated by reference, a copy of the BSEA Decision dated April 7, 2004.*

12. The Hearing Officer held broadly in her Decision: "The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities."

13. The Hearing Officer held, with respect to the third enumerate request for relief in the Petitioner Request for Hearing, that "[t]here is no dispute that the program in which the Student is enrolled at the White Oak School provides all the elements recommended by Dr. Kemper."

14. On or about May 7, 2004 The Chicopee Public Schools filed a Request for Judicial Review of the Decision dated April 7, 2004 before the United Stated District Court in Massachusetts.

15. On or about July 12, 2004 a TEAM meeting was convened at the White Oak School in Westfield Massachusetts to discuss services for Kaitlyn for the 2004-2005 school year.

16. At the TEAM the parents were told by the Chicopee Public Schools personnel that they were creating a new program for September 2004. They stated it would be "awesome," however; they could not elaborate on who would be teaching the program, who would be in the program or where the program would be located. Most importantly, they could not articulate what methodologies would be used in the new program.

17. In September 2004, under "stay put" protection Kaitlyn T. started her 10th grade school year (2004-2005) at the White Oak School.

18. In September 2004, the parent learned that three White Oak teachers had been hired by the Chicopee Public Schools and were the basis of the new program that it had created at

Chicopee High School for language based learning disabilities called the "Brighter Beginnings" program.

19. In November 2004 the parents requested permission to have their expert Dr. Robert Kemper observe the Brighter Beginnings program. The parents received permission to have Dr. Kemper observe the program on November 17th 2004. The permission was subsequently revoked by the school district for administrative reasons.

20. On or about December 20, 2004, the Chicopee Public School filed with the BSEA requesting a Hearing against the parents regarding the "appropriateness" of the 2004-2005 school year IEP and program, along with permission the cease funding the White Oak placement.

21. The BSEA assigned hearing officer Joan Beron to the matter.

22. On February 16, 2005 the parents and Kaitlyn observed the Brighter Beginnings program with their advocate Andrea MacGovern.

23. On March 11, 2005, Dr. Kemper and the father David Tharaldson observed the Brighter Beginnings program.

24. On March 21, 2005 the parties appeared before Judge Ponsor of the United States District Court for oral argument on their motions for Summary Judgment regarding the matter on appeal regarding the April 7, 2004 Decision.

25. On March 23, 2005 Judge Ponsor issued a Judgment in favor of the Parents and upholding the decision of the BSEA April 7, 2004.

26. On April 13, 2005, Hearing Officer Joan Beron, during phone conference with all parties, was very clear as to how the case would proceed. She indicated that she would not need to rehear certain testimony and that as such the matter would proceed with two and a half days of hearing. This was confirmed by the Order of the BSEA April 15 and April 22, 2005. *Please find the Orders of the BSEA attached hereto as Exhibit C.*

27. On April 26, 2005 the parties were notified by Order of the BSEA that a new hearing officer, Hearing Officer William Crane, was being assigned to the case. *Please find the Orders of the BSEA attached hereto as Exhibit D.*

28. On May 2, 2005, the parties again were before the BSEA for a hearing regarding the appropriateness of the IEP and program offered by Chicopee of the 2004-2005 school year.

29. On May 2, 2005 Hearing Officer Crane stated that he had an entirely different expectation of what evidence he expected to hear from the parties which was drastically different from Hearing Officer Beron. Hearing Officer Crane specifically stated that he intended to retry all the issues as if the prior decision BSEA# 04-0093 never existed.

30. On May 2, 2005, the parents then requested additional time and another date to present testimony based on his statements. The hearing officer granted this request and issued and Order dated May 3, 2005 indicating that May 19th 2005 would be available.

31. On the second day of hearing, May 6, 2005, in response the Hearing Officer's statements regarding his unwillingness to consider the previous case as controlling, the parent's attorney filed with the BSEA a motion to put the burden of proof on the school district with respect to the READ 180 methodology in the event that no new evidence was presented on the issue. *Please find a copy of the RESPONDANT'S MOTION TO PLACE THE BURDEN OF PROOF REGARDING THE APPROPRIATNESS OF THE READ 180 PROGRAM ON THE PETITIONER AND ABSENT ANY NEW EVIDENCE ENTER FINDINGS FOR THE PARENTS ON THE ISSUE OF THE APPROPRIATNESS OF READ 180 FOR KAITLYN attached hereto as Exhibit E.*

32. The parent's attorney argued the substance of the motion before Hearing Officer Crane, asserting that parents were being sued by the school district without regard to money and as such they should not have to submit or make reference to any prior testimony

presented at the last hearing or any documentary evidence presented by the school district in the last case given that a decision was clearly rendered and given that the same READ 180 issues with respect to Kaitlyn were being litigated.

33. Parent's attorney also raised the issue that the school district was presenting the same evidence and that without any additional evidence or evaluations, if the hearing officer were to come to a different conclusion, this would contradict the very findings of the preceding case and create conflicting decisions in violation of *res judicata*. It would also be a public policy violation suggesting to all parties that after losing an issue at hearing, the party can bring the same issues back year after year and possibly get different outcomes in subsequent school years.

34. On May 6th 2005, the school district's attorney reinforced its position that READ 180 is appropriate for Kaitlyn. She stated on the record, while opposing the parent's motion to clarify the burden of proof regarding READ 180, that they have every right to retry the issue of READ 180 again, before a different hearing officer, and that with respect to findings about the READ 180 program from the 04-0093 Decision, that those findings were inconsistent with the evidence previously presented. The school district's attorney further stated that no one has ever looked at the evidence. She also stated that the federal court judge, who reviewed that decision, failed to provide a fair review of the underlying findings.

35. On May 6, 2005 after the break for lunch, the Parent's motion which specifically requested that "absent any new evidence regarding READ 180 that the hearing officer find for the parents that the READ 180 program is not appropriate for Kaitlyn based on the prior decision of the BSEA 04-0093" was denied by William Crane.

36. On May 6th upon the conclusion of the School District's case parents attorney was asked by hearing officer Crane the witnesses for the following day. The parents indicated that

David Drake would be presented on May 19th 2005. The Hearing Officer indicated that that date was no longer available. He proposed that he would allow certain transcripts into evidence from the prior case and that this evidence but that the case should be concluded on the following day.

37. The Parents presented all their witnesses on May 7th 2005 in one day.

38. On June 8, 2005 the BSEA, Hearing Officer William Crane, issued the decision of the BSEA finding that the IEP developed by the Chicopee Public School was appropriate to provide FAPE for Kaitlyn despite on page 18 of the decision referencing the previous decision of April 7, 2004 and acknowledging the similarity of the issues in the instant dispute.

## LEGAL CLAIM

39. The Plaintiffs repeat and reallege paragraphs 1 through 38 and incorporate them herein and assert that pursuant to MGLA 30A §14(7) the BSEA decision of June 8th 2005 is "unsupported by the substantial evidence thereby requiring the Court to set aside the decision pursuant to the Mass. General Laws 30A.

40. The decision rendered by the BSEA in the underlying matter is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, thereby requiring the Court to set aside the decision under Mass. General Laws 30A.

41. The Decision which breaks the case down into nine (9) different areas of discussion, ignored the prior case law with respect to READ 180, which we argue established precedent.

42. The Hearing Officer's decision is arbitrary and capricious in that he came to a different decision from the preceding hearing officer despite the fact that the school district did not present any new testimony regarding READ 180 or how the combination of READ 180 with some other factors make it different from before.

43. The Hearing Officer's decision is arbitrary and capricious in that he acknowledges that all the parties had recognized Dr. Kemper's recommendations and description of program, and that the Chicopee Public Schools was attempting to create a program for Kaitlyn based on Kemper's recommendations, yet he discredits Dr. Kemper testimony about his own recommendations for programming.

44. The Hearing Officer also failed to frame the issues for hearing and allow the parties to fully and fairly present testimony and exhibits.

45. The Decision is also arbitrary and capricious in that it is based on the Hearing Officer's assessment of competing levels of credibility, rather than on accepted methods of remediation for language based students, which should be within his knowledge as a hearing officer and expert dealing with special educations matters, and which should have been the subject of the hearing.

46. The Hearing Officer's decision is also factually in error and thus should be set aside.

47. The Hearing Officer should have found based on the testimony and exhibits that the Brighter Beginnings program was not appropriate based on the lack of an available Math, Science and History classes, suited for Kaitlyn as a tenth (10th) grade student. The testimony was clear the tutorials were not 1:1 tutorials (5x50 min) with rule based or remedial reading strategies as stated in the IEP. Finally, the program did not offer a separate Oral Expression class as stated in the IEP.

48. The Hearing Officer should have also found that based on the evidence, the students enrolled in the Brighter Beginnings class were not similarly situated both cognitively and behaviorally.

49. This court should find factually, based on all the testimony and documents pertaining to READ 180, that it is "...a computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence,

however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities." *See "Exhibit B" BSEA Decision dated April 7, 2004.*

50. The Hearing Officer ignored the testimony of the school districts own witnesses who testified that READ 180 is not a rule based methodology, and that it is an instructional program and <u>not</u> a remedial program.

51. The Decision of June 8, 2005 rendered by the BSEA in the underlying matter is unsupported by the facts on the record to be submitted for judicial review thereby requiring the Court to set aside the decision under Mass. General Laws 30A.

## **REQUESTED RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this honorable Court grant them the following relief:

A. Set aside the BSEA decision of June 8, 2005 in the matter of In re: Chicopee Public Schools, BSEA # 05-2930.

B. Hear additional evidence if necessary consistent with 20 USC §1415 and M.G.L.A 30A.

C. Grant such other relief as this honorable court deems necessary and proper.

Respectfully submitted,<br>
The Plaintiffs,<br>
By their attorney

July 1, 2005

Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103
BBO# 644185

**EXHIBIT A**



June 8, 2005

**COMMONWEALTH OF MASSACHUSETTS**
**BUREAU OF SPECIAL EDUCATION APPEALS**

---

**IN RE: CHICOPEE PUBLIC SCHOOLS**

**BSEA # 05-2920**

---

**WILLIAM CRANE, HEARING OFFICER**

**DEREK BEAULIEU, ATTORNEY FOR PARENTS**

**CLAIRE THOMPSON, ATTORNEY FOR CHICOPEE PUBLIC SCHOOLS**

# COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

**In Re: Chicopee Public Schools**                                    **BSEA # 05-2920**

# DECISION

This decision is issued pursuant to M.G.L. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. 794 and the regulations promulgated under those statutes. A hearing was held on May 2, 2005 at the offices of Catuogno Reporting Services in Worcester, MA; May 5, 2005 at the offices of Catuogno Reporting Services in Springfield, MA.; and May 6, 2005 at the offices of Catuogno Reporting Services in Worcester, MA. Those present for all or part of the hearing were:

| | |
|---|---|
| Mother | |
| Father | |
| Robert Kemper | Speech-Language Pathologist, Psycholinguistics Associates |
| Jeff Kimball | Teacher, Chicopee Public Schools |
| Terry Shotland | Teacher, Chicopee Public Schools |
| William Mattavi | Teacher, Chicopee Public Schools |
| Judith Souweine | Psychologist |
| Andrea Stolar | Special Education Supervisor, Chicopee Public Schools |
| Daniel Schreier | Director of Special Education, Chicopee Public Schools |
| Derek Beaulieu | Attorney for Parents |
| Andrea MacGovern | Advocate for Parents |
| Claire Thompson | Attorney for Chicopee Public Schools |
| William Crane | Hearing Officer, BSEA |

The official record of the hearing consists of documents submitted by both parties (joint exhibits) and labeled as exhibits J-1 through J-40; documents submitted by the Parents and labeled as exhibits P-1 through P-19; documents submitted by the Chicopee Public Schools (Chicopee) and labeled as exhibits S-1 through S-7; selected portions of a transcript of testimony of Daniel Schreier from the previous BSEA Hearing[1] (transcript of Schreier testimony);[2] selected portions of a transcript of testimony of David Drake from the previous BSEA Hearing (transcript of Drake testimony);[3] and three days of recorded oral testimony and argument. The parties submitted written closing arguments on May 27, 2005, and the record closed on that date.

---

[1] The previous BSEA Hearing was between the same parties on January 29 and 30, 2004 and February 3 and 4, 2004, resulting in a decision by a BSEA Hearing Officer. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158 (April 7, 2004).

[2] The transcript of this witness admitted into the record is volume IV, pages 189-191, 204--210, 219-222, 227-230, 233, 235-243, 245-253, 262, 272-276, 284 -287, and 289-302.

[3] The transcript of this witness admitted into the record is volume III, pages 19-43, 64-66, 85-111, and 118-127.

**Issues**

1.  Whether the 2004-2005 individualized education program (IEP)[4] developed by Chicopee is reasonably calculated to provide a free, appropriate public education to Nelida[5] in the least restrictive setting?

2.  If not, whether additions or other modifications can be made to the IEP in order to satisfy this standard?

3.  If not, whether placement at the White Oak School would satisfy this standard?[6]

**Profile, IEP and History**

A.  Profile.

Student is a sixteen-year-old young woman (date of birth 3/14/89) who resides with her parents in Chicopee, MA.  During this school year, as well as the previous school year, she has attended the White Oak School, a private day school in Westfield, MA, providing educational services to students with language-based or specific learning disabilities. Student is currently completing her 10th grade.  Testimony of Parent; exhibits J-1, P-15.

Student has been diagnosed with a language-based or specific learning disability that is manifested in difficulties with oral language expression, reading and written expression. Testing indicates that she has average cognitive abilities, with a discrepancy between her achievement and intellectual abilities.  Testimony of Kemper, Souweine; exhibits J-1, J-40.

B.  Individualized Education Program (IEP).

Chicopee has proposed an individualized education program (IEP) for Nelida for the period 9/1/04 to 6/30/05.  The IEP calls for consultation services from a learning disabilities consultant for 30 minutes, once each week.  The IEP further calls for each of the following direct services to be provided by a special education teacher for 50 minutes, 5 times each week: reading tutorial, language arts, math, social studies, oral expression and science.  In addition, the IEP calls for speech/language services to be provided by speech staff for 30 minutes, once each week.  Exhibit J-1.

Chicopee's proposed IEP further explains the specially designed instruction to be provided Nelida, as well as accommodations to be provided, including multi-sensory instruction, multi-step tasks broken down, teacher prompts, mnemonics, study guide, webbing, template, use of word processor, word banks, semantic mapping, flashcards, visualization techniques,

---

[4] Exhibit J-1.
[5] Nelida is a pseudonym selected by the previous Hearing Officer to protect the privacy of the Student in publicly-available documents.  The use of this pseudonym is continued within this Decision
[6] During the Hearing, Chicopee stated that in the event Parents prevail on the first two of the above-stated three issues, it would agree that Parents should prevail regarding the third issue.  Therefore, no evidence or argument was provided relative to this third issue.

and vocabulary development in all areas of the curriculum. Parents have not accepted this IEP. Exhibit J-1.

It is this IEP for the 2004-2005 school year (Nelida's 10th grade year) that is the subject of the instant dispute.

C. Previous Hearing and Decision.

In January and February 2004, Parents and Chicopee (the same parties as in the instant dispute) litigated the appropriateness of the then-proposed IEP for Nelida for her 9th grade year. The BSEA Hearing Officer issued a decision, dated April 7, 2004, finding that Chicopee's IEP was not reasonably calculated to provide Nelida with a free, appropriate public education, and ordering Chicopee to reimburse Parents for expenses associated with their placement of Nelida at the White Oak School.[7] Chicopee appealed the BSEA decision to federal District Court, resulting in a decision favorable to Parents.

The subject of the previous dispute, as in the instant dispute, is a particular IEP proposed by Chicopee for Nelida. Each IEP is unique, reflecting the services and placement that Chicopee believes to be appropriate for Nelida for the particular period of time covered by the IEP. The IEP that was the subject of the previous Hearing is not before me, and neither party has requested that it be admitted into the record of the instant dispute.

Each BSEA decision is decided only on the basis of the evidentiary record and argument for that particular dispute. As I made clear to both parties at the outset of the Hearing in the instant dispute, other than these portions of the previous record that have been explicitly entered into the record of the instant dispute, I do not consider the evidentiary record of the previous dispute.[8]

Within the previous BSEA decision, there are several findings that relate to the instant dispute. I consider these findings below, and in several instances, I adopt them. However, for the reasons already explained, the previous findings cannot, by themselves, be determinative regarding the appropriateness of Chicopee's currently-proposed IEP.

**Summary of the Evidence**

1. Nelida's father: Parent testified that Chicopee proposed that his daughter be placed in a program (recently developed by Chicopee for learning disabled students) called the Brighter Beginnings program. He explained that he first became aware of this program at a Team meeting in the summer of 2004. He explained that although Chicopee staff spoke about the program, he did not receive enough information about the program to understand it. He noted that he asked about teachers and their qualifications, and was told that Chicopee did not yet have the teachers in place and that Chicopee was

---

[7] *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158 (April 7, 2004).
[8] In order to reduce the time of the testimony in the instant dispute and at my suggestion, each party requested that portions of the testimony of one of its witnesses from the previous Hearing be entered into the evidentiary record of the instant dispute where that testimony continues to be relevant to Chicopee's READ 180 program.

continuing to work on this. He stated that he rejected Chicopee's proposed IEP because he wanted to observe the program before deciding whether it would be appropriate.

2. Parent testified that after repeated attempts, he and his daughter (Nelida) visited Brighter Beginnings with Ms. MacGovern (Parents' advocate) on February 16, 2005; he also accompanied Dr. Kemper on his visit to the program. He explained that during the February visit, his daughter was at first "a bit" nervous, and then during the course of the visit became quite anxious. He stated that she told him that (1) she felt sorry for the students in the program, (2) she felt there would be a stigma attached to being with other children who do not have her learning disability, (3) the class would likely be distracting (because of students' talking to each other and students' not paying attention) and therefore would be a difficult environment within which to learn, and (4) she does better in a school with greater structure than she observed. Parent further testified that by the end of the visit, his daughter was highly agitated; by the end of the day, she was bothered by the whole experience.

3. Parent testified that a month after the February 16, 2005 visit to the Brighter Beginnings program, he again spoke with his daughter about the visit, and she explained to him that (1) her biggest fear was that she would not be able to learn in this program because the environment is highly distracting, (2) the program is not sufficiently structured for her, (3) the program does not utilize grammar templates which she needs, and (4) she would not fit into the program emotionally. Parent also noted that his daughter said that she benefits from a program where all the children have dyslexia.

4. Parent testified that his daughter is doing extremely well at White Oak, where she is popular and happy. Parent explained that she is making educational progress toward her goal of attending a four-year art college in order to pursue her goal of becoming an artist. He also stated that he is concerned that if Nelida attends the Brighter Beginnings program, she will fail to thrive and make progress, will not be able to access the curriculum, and will not be admitted to a quality college.

5. Andrea MacGovern: Ms. Andrea MacGovern testified that she is familiar with Nelida, having first been contacted by Parents at the end of Nelida's 4th grade to assist and advise them regarding additional testing and educational services for her. Ms. MacGovern explained that she has been providing this kind of assistance to over 1,000 students and their families over the past 16 years.

6. Ms. MacGovern testified that she is generally familiar with the Brighter Beginnings program through the program description and through one of her other clients. She testified that she observed the program for an entire day on February 16, 2005. During the visit, she spoke with several teachers.

7. In her testimony, she described the number of students and number of teacher(s) in each class that she observed. She also described her attempts to try out, as though she were a student, the reading program used by Brighter Beginnings (READ 180) during her visit.

4

8. David Drake: Parts of the transcript of Mr. David Drake's testimony from the previous BSEA Hearing were admitted into evidence in the current dispute.[9] When he testified in the previous Hearing, Mr. Drake was the Headmaster of White Oak School. The transcript does not describe Mr. Drake's education or work experience. Mr. Drake did not testify in the present dispute.

9. Mr. Drake's testimony was that he became familiar with the reading program used by Chicopee at its Brighter Beginnings program (READ 180) through review of (1) a demonstration compact disc, (2) written materials (including exhibits in the previous BSEA Hearing) and (3) the READ 180 website. Mr. Drake made clear that he is not familiar with the manner in which READ 180 would be implemented by Chicopee, nor is he familiar with the needs of Nelida, but rather he considered the appropriateness of this program more generally for use at his school (White Oak School).

10. Mr. Drake's testimony was that READ 180 appears, from the literature, to be most effective for students in regular education, next most effective for students with English as a second language, and, finally, of benefit for students with disabilities, but without indication of the specific nature of the disabilities of the students whom it would benefit. He further explained that READ 180 appears to help most with comprehension and vocabulary, which are areas where one would expect to see growth for educationally-deprived students. He concluded that READ 180 is best understood as a "wide-scale sort of public-health kind of response rather than a highly-targeted medical kind of response". Within READ 180, Mr. Drake "saw very little of what I would consider to be typical highly-recommended, state-of-the-art rule-based instruction or even rule-based analysis in this material."

11. In his testimony, Mr. Drake seemed most concerned by the inability of a computer to replicate what a teacher would (hopefully) do to listen to and analyze a particular student's successes and errors and then provide an appropriate response -- a response that requires "significant adaptability" on the part of the teacher and further requires an immediate response from the teacher in order to preserve the learning moment. Mr. Drake's testimony continued: "It's that individualization, that knowledge and insight that you get with training and sensitivity and experience of a teacher rather than the canned response of a cookbook, a page-turner manual or a machine-based instructional imitation".

12. Mr. Drake's testimony concluded that READ 180 "was not, at this point, even close to being a desirable program" for White Oak School, as compared to other, available programs.

13. Robert Kemper: Dr. Robert Kemper testified that since 1992 he has been President of Psycholinguistic Associates, Inc. where currently his exclusive work is performing psycholinguistic evaluations of children with a learning disability or dyslexia. Dr. Kemper also has provided consultation to programs serving learning disabled students,

---

[9] The parts of the transcript of this witness admitted into the record from the previous BSEA Hearing are volume III, pages 19-43, 64-66, 85-111, and 118-127.

including White Oak. Dr. Kemper has held a variety of other positions as reflected in his resume (exhibit J-41). Dr. Kemper holds a PhD in speech language pathology, which he received in 1985.

14. Dr. Kemper testified that a psycholinguistic evaluation is a comprehensive evaluation of all areas of language necessary to be successful in school. He explained that language can be understood as represented by a triangle, with the base of the triangle (and foundation of language) being listening comprehension, the middle level of the triangle (which is built upon the foundation of listening) being reading, and the top of the triangle (which is built on listening and reading) being written expression. He stated that this triangle model reflects the theoretical underpinnings of psycholinguistics.

15. Dr. Kemper testified (and his written evaluation report reflects) that he conducted a psycholinguistic evaluation of Nelida on April 22, 2003, administering a variety of oral language, reading and written expression tests, as well as a test of phonological processing. He testified (and his report reflects) that he concluded that Nelida presents with a language-based learning disability that is manifested in difficulties with oral expression, reading and written expression. He noted that his diagnosis of "language-based learning disability" indicates that the underpinning for Nelida's deficits is a disorder in language.[10]

16. Dr. Kemper testified that Nelida also has dyslexia, which is a more specific disorder than (and is included within) language-based learning disability. Dr. Kemper explained that his written report does not indicate a diagnosis of dyslexia because Nelida's test scores were not so low as to justify this diagnosis, and he has not evaluated Nelida since his original evaluation of April 22, 2003. He stated that he reached the conclusion that Nelida has dyslexia based upon his having "suspicions" (based upon testimony at the previous BSEA hearing between these parties) that Chicopee administered the Comprehensive Test of Phonological Processing (CTOPP) in a manner that was inappropriate with the result that there may have been a greater "practice effect" than he previously realized. As noted in Dr. Kemper's evaluation report, Chicopee administered CTOPP to Nelida shortly before Dr. Kemper administered this same test. Dr. Kemper testified that his scores for Nelida may therefore have been inflated. From this, Dr. Kemper concluded that Nelida should be diagnosed as having dyslexia.

17. Dr. Kemper's report states that Nelida would not likely be successful in accessing a typical ninth grade curriculum, even with "abundant" modifications and accommodations, and he therefore recommended that Nelida be educated in an alternative educational program. Dr. Kemper explained in his testimony and report that he recommended that this alternative educational program be a substantially-separate, multi-sensory, language-intensive program that includes the following components:

---

[10] The decision in the previous BSEA dispute considered the same evaluation report of Dr. Kemper as is being considered in the instant dispute. That decision provides a useful summary of the report. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 160, par. 7 (April 7, 2004).

- presentation of information that stimulates all sensory modalities;
- implementation within a substantially separate school that is devoted to addressing the needs of children who have significant language impairments;
- student/teacher ratio no greater than eight to one;
- direct teaching performed in a systematic manner;
- continuous review of previously learned information;
- teaching of skills across various contexts in order to facilitate generalization;
- all teachers trained sufficiently to provide instruction in a multi-sensory, structured language program setting;
- a daily, individual tutorial with a multi-sensory, code emphasis for reading, spelling and written language instruction.

18. Dr. Kemper's report made a number of more specific recommendations, including but not limited to the LiPS program, a code emphasis reading approach that uses an Orton-Gillingham methodology, and a reading comprehension program such as Visualizing and Verbalizing, in addition to the comprehension strand of Project Read.

19. Dr. Kemper testified that a language-based program with systematic, rule-based methodologies is important because children with a language-based learning disability have not been able to learn language through normal systems, and therefore language needs to be taken out of context and specific rules explicitly taught -- for example, rules as to how words are spelled, or how words are pronounced. He stated that these rules should be taught systematically and proactively, moving through a progression of rules.

20. Dr. Kemper testified as to what he meant when he stated that teaching should be systematic -- that is, using a scope and sequencing methodology, move from one skill to another building from what has been learned. He explained that teaching should be multi-sensory so that all senses are being activated and so that there is a redundancy of teaching that would not be necessary with typical students. He recommended the use of Project Read as it is structured and systematic in terms of scope and sequencing for students with a language learning disability or dyslexia.

21. Dr. Kemper testified that, in his opinion, his recommendations for Nelida from his April 2003 evaluation and report would be valid currently for the following reasons: as a "rule of thumb", with a student who has a language learning disability, after one year of appropriate instruction, one sees qualitative but not quantitative changes; by the end of the second year, one sees small quantitative changes; by the end of the third year, one sees statistically significant changes; and a fourth year is needed to coalesce the student's skills.

22. Dr. Kemper testified that the June 2004 test results reflected within the currently proposed IEP (exhibit J-1, page 2 of 26) are significantly above the test scores that he obtained but that the IEP test scores may be inflated because of a practice effect from his testing in April 2003. He also noted that he used a more recent version of the Gray Oral test (version # 4) than was used by White Oak in obtaining test scores reflected in the IEP (White Oak used version # 3), and because the two tests are normed on different

7

populations, the test scores may not be compared. He therefore discounted the more recent test scores and concluded, based on his general experience regarding the progress made by children with Nelida's profile, that Nelida's educational needs have not changed and the educational services recommended in his written evaluation report continue to be necessary and appropriate.

23. Dr. Kemper testified that for children with Nelida's educational needs, it would be important that a separate class be taught regarding oral expression, in addition to the teaching of oral expression being infused in the curriculum.

24. Dr. Kemper testified that he found that the amount of consulting time allocated in part A of the service delivery grid of the proposed IEP (exhibit J-1, page 20 of 26) to be insufficient. He recommended that there be at least two hours per week of consultation.

25. Dr. Kemper testified that he is familiar with READ 180 through a review of several exhibits in this dispute (S-4, S-5, S-6, S-7, P-17, P-18, P-19), through reading the READ 180 website, and observing the use of READ 180 during his visit to Brighter Beginnings program on March 11, 2005. Dr. Kemper concluded that READ 180 is designed primarily for inner city youths who do not have a neurological reading pathology but because of lack of exposure to reading and poor education, have not become good readers. He opined that READ 180 is used to help these students "catch up".

26. Dr. Kemper testified that his visit and observation of the Brighter Beginnings program on March 11, 2005 lasted four hours, including a half hour for lunch. Dr. Kemper testified regarding his observations. He found it "disconcerting" that what a student was learning on the computerized part of the READ 180 program was not related to what was being taught in that classroom. He noted that what he observed was insufficient continuity regarding scope and sequencing; rather, he saw more isolated teaching of skills, which is not consistent with principles of language-based teaching. He further noted that in his observation of a science class, he did not see any teaching that he would consider to be language-based. Dr. Kemper testified that he reached his conclusions regarding the Brighter Beginnings program on the basis of his observations during his visit on March 11, 2005, including "sporadic" conversations with Mr. Shotland and Mr. Kimball during the visit. He stated that he did not speak with others involved with the Brighter Beginnings program.

27. Dr. Kemper testified that earlier during the Hearing day, he had read the IEP of a student at the Brighter Beginnings program, as reflected in exhibit P-2. He stated that he had also been shown a neuropsychological evaluation of this student that indicated a full-scale IQ score of 75. Dr. Kemper said that he did not know when the neuropsychological evaluation was conducted. He concluded that a child with an IQ of 75 would not be an appropriate peer for Nelida.

28. Dr. Kemper testified that, in his opinion, the Brighter Beginnings program would be appropriate for a student who has difficulty with learning and who does not do well in a content-area class. He found that Brighter Beginnings is not a language-based program in that it is missing a number of essential ingredients, including certain criteria regarding

8

methodology, teaching techniques and student enrollment. He concluded that because the Brighter Beginnings program does not constitute a language-based program, it would not be appropriate for Nelida.

29. <u>William Mattavi, Terry Shotland and Jeffrey Kimball</u>: Three special education teachers from the Brighter Beginnings program – Mr. William Mattavi, Mr. Terry Shotland and Mr. Jeffrey Kimball – testified. Because of the similarities in their background and experience, their current responsibilities and their testimony regarding the Brighter Beginnings program, I summarize their testimony together, noting where their testimony differs.

30. All three teachers were employed as special education teachers of children with learning disabilities at the White Oak School in Westfield, MA, from September 1999 to June 2004. White Oak serves students in grades 4 through 12. The primary educational characteristic of students at White Oak is a significant language-based learning disability or a specific learning disability, despite average or above-average intellectual potential. Testimony of Mattavi, Shotland, Kimball; exhibit P-15.

31. All three teachers were then hired by Chicopee and have been teaching at the Brighter Beginnings program since September 2004. Additional information regarding their experience and background is provided in their resumes and licenses. Testimony of Mattavi, Shotland, Kimball; exhibits J-5, J-8, J-11.

32. This current school year (2004-2005) at Brighter Beginnings, Mr. Mattavi teaches a math course. Mr. Shotland teaches social studies, reading and language arts. Mr. Kimball teaches reading. All of the classes utilize small group instruction, with no more than five students in the classroom at a time. Testimony of Mattavi, Shotland, Kimball.

33. The teachers testified that at the Brighter Beginnings program, they use approaches and strategies similar to those that they learned and implemented in classrooms for learning disabled students at White Oak. These approaches and strategies include an emphasis on the following:

- teaching specific skills (e.g., note-taking, vocabulary, spelling and oral expression);
- use of organization tools (e.g., posting a daily agenda on the board so that students know what to expect, graphic organizers and web diagrams);
- consistent routines in the classroom, breaking down tasks into smaller steps and determining the specific parts of a task that an individual student does/does not understand;
- utilizing steps and sequencing in order to help students organize complicated tasks;
- individualizing expectations and assistance for each student, using manipulatives and models (i.e., hands-on teaching) in the classroom;
- giving multi-modal presentations (e.g., presenting material to the students orally and in writing);
- rule-based strategies (e.g., when teaching spelling);
- templates to provide a routine and to assist students to organize their thoughts;

- teaching at a slower, more methodical pace with greater opportunities for student participation; and
- spiraling back and forth between material currently being taught and material previously taught to ensure that a student understands, retains and can apply the learned material.

34. The teachers further testified that within the classroom, the following programs are utilized: verbalization/visualization elements of Orton-Gillingham, Story Grammar Marker, the Lindamood Phoneme Sequencing (LiPS) Program, and the READ 180 program. They explained that they teach oral expression as an integrated part of their classes rather than as a separate instruction block. Testimony of Mattavi, Shotland, Kimball.

35. The teachers testified that within their classrooms all of the students have learning disabilities, there are no students who present any significant conduct or behavioral issues, nor are there any students with any significant emotional issues. They noted that Brighter Beginnings has access to a school adjustment counselor and psychologist in the event difficulties arise in these areas. They further explained that all students appear to have average to above-average intelligence although one student's IQ scores are lower than average. Testimony of Mattavi, Shotland, Kimball.

36. All three teachers testified that they taught Nelida at White Oak during the 2003-2004 school year. They stated that Nelida has a similar profile to the students whom they teach this year at the Brighter Beginnings program. They opined that the Brighter Beginnings program would be able to meet all of her educational needs and that she would fit in well. Testimony of Mattavi, Shotland, Kimball.

37. Mr. Mattavi testified that Wanda Cronin (the science teacher at Brighter Beginnings) is teaching a curriculum that he developed. He explained that as with the other teachers in this program, Ms. Cronin teaches a skills-based program.

38. The three teachers testified that they (and the fourth teacher, Ms. Cronin) meet formally every Monday for 45 to 90 minutes to discuss individual students and curriculum, as well as to do problem solving.

39. Mr. Shotland and Mr. Kimball testified that they each teach a tutorial during which the READ 180 program is used. Mr. Shotland testified that the tutorial addresses reading, written language and spelling. Mr. Shotland and Mr. Kimball testified that at White Oak they had used another reading program (Let's Read) and when hired by Chicopee and introduced to READ 180, they both were skeptical of its appropriateness. Both teachers were trained on READ 180 for two days during the summer of 2004, and both teachers utilize this program as part of the reading instruction at Brighter Beginnings. Mr. Kimball stated that he has also tried out the program as though he were a student.

40. Mr. Shotland and Mr. Kimball testified that READ 180 is a comprehensive, rule-based instructional program that addresses reading comprehension, oral fluency, phonetics,

vocabulary, writing (through a separate component of the program) and independent reading. Part of the program is computer-based, with the teacher serving as facilitator, for 15 to 20 minutes during the reading tutorial. They explained that READ 180 is an instructional, rather than a remedial, program. They concluded that READ 180 and Let's Read (the reading program that they utilized at White Oak) are similar (for example, both programs are used to teach fluency, decoding and spelling) but use different approaches. They opined that both reading programs are effective for learning disabled students, although Mr. Shotland indicated that READ 180 would not likely be effective for a student whose reading level is not at least at the 4th grade level. Mr. Shotland added that Nelida's reading ability is significantly above the 4th grade level.

41. Mr. Kimball testified that the READ 180 program is more challenging than the Let's Read program, and that in his opinion, the READ 180 program would be more appropriate for Nelida than the Let's Read program at White Oak. Mr. Shotland and Mr. Kimball testified that based on testing of their students during the school year, all of the students except one are making significant reading progress. Mr. Kimball added that it is uncertain why the one student is not making progress.

42. Andrea Stolar: Dr. Andrea Stolar testified that she received her doctorate degree in education (EdD) in 2001, she worked as a tutor at Curtis Blake School (which is similar to White Oak School) for one year, she taught at the high school level in Springfield for eight years and she has been in her current position with Chicopee as Supervisor of Special Education for seven years. She explained that in her current position, she has been involved with the Brighter Beginnings program. See also exhibit S-2 (affidavit of Stolar).

43. Dr. Stolar testified that the Brighter Beginnings program was created for the purpose of educating students who have a language learning disability. She stated that she is part of a team that developed the Brighter Beginnings program, including its classes, so that it be would be appropriate for language learning disabled students. She noted that this team selects the students and teachers for the program. She stated that she is continually meeting with the Brighter Beginnings program teachers, Sue Fino (a consultant whom Chicopee brought in to assist with the development and implementation of the program) and others to determine how to improve the program.

44. Dr. Stolar testified that she frequently observes and checks to ensure that the instruction follows a cohesive model, including continuity, consistency and scope and sequencing of instruction. She added that she works to ensure that language-based instruction is infused throughout the curriculum. She noted that she has observed the Brighter Beginnings teachers use many of the strategies utilized at White Oak; and that classes are kept small in order to minimize distractibility.

45. Dr. Stolar testified that staff concluded, after significant discussion, that for high school students, it is more effective to infuse oral expression throughout the curriculum rather than to teach it separately. She explained that she and others concluded that it is too difficult for high school students to become interested and engaged in oral expression when it is taught separately.

11

46. Dr. Stolar testified that she is familiar with the student at Brighter Beginnings who has a full scale IQ of 75. She indicated that she has talked with the Brighter Beginnings teachers about how well this student is performing and has reviewed the student's IEP, including parts of the IEP that indicate that she is performing relatively close to grade level. She noted that she and the Brighter Beginnings teachers concluded that this student is appropriately placed within the Brighter Beginnings program.

47. Dr. Stolar testified that she believes that READ 180 is appropriate for language learning disabled students since it addresses areas of need, including spelling, comprehension and fluency. She also noted that READ 180 is a small component of the overall reading program (at Brighter Beginnings) that includes rule-based instruction in decoding, syllabication, Meta words, comprehension, oral reading and phonemic awareness.

48. Daniel Schreier: Mr. Daniel Schreier testified at the Hearing. In addition, portions of the transcript of his testimony from the previous BSEA Hearing were entered into the evidentiary record of the present dispute.[11] Mr. Schreier testified that for the past two and one-half years, he has been the Director of Special Education for Chicopee. Previously, he worked for the state Department of Education in Program Quality Assurance. He holds a masters degree in student personnel administration and a law degree (JD).

49. Mr. Schreier testified that he has done a significant amount of research and review regarding reading programs. He stated that READ 180 is an engaging, interactive and motivating reading program that provides continuing feedback on how a student is performing with his or her spelling, decoding phonemic awareness and comprehension. He explained that the program is instructional in that it includes what would normally be taught within an English language course. He noted that research indicates that students with specific learning disabilities have made progress using this program.

50. Mr. Schreier testified that READ 180 identifies material for each student to read that is at that particular student's reading level, allowing continuing mastery to occur through the process of reading. He noted that READ 180 is a remedial program in that it targets the needs of the struggling reader. He also noted that with an older reader (for example, a high school student), it becomes quite important to find a reading program that is motivating and not demeaning in order to engage the student sufficiently. He explained that this is a strength of READ 180.

51. Mr. Schreier testified that READ 180 would not be appropriate for a student whose reading ability is so low that he or she has not mastered any of the concepts or underpinnings of reading – for example, a student who is struggling with the ability to understand a phoneme (such as the "k" sound in the word "cat"). He noted that Nelida's reading level is not so low as to make READ 180 inappropriate for her.[12]

---

[11] The parts of the transcript of this witness admitted into the record from the previous Hearing are volume IV, pages 189-191, 204--210, 219-222, 227-230, 233, 235-243, 245-253, 262, 272-276, 284 -287, and 289-302.

[12] The decision in the previous BSEA dispute provides a useful summary of Mr. Schreier's prior testimony regarding READ 180. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 161, par. 12 (April 7, 2004).

52. Judith Souweine:  Dr. Judith Souweine testified, and her resume reflects, that she worked for several years as a special education teacher prior to beginning her practice as a psychologist and neuropsychologist in 1984. She received her EdD in 1977. She explained, and her resume reflects, that since 1986 she has been a psychologist at the Children's Clinic in Northampton, MA. She noted that during the past 25 years, she has observed approximately 100 programs for students with language-based learning disabilities. She added that as a psychologist and neuropsychologist, she is regularly asked to consult both to school districts and to parents regarding students with language-based learning disabilities. She has also taught college-level courses regarding language-based learning disabilities. Exhibit J-3 (resume).

53. Dr. Souweine testified that prior to the previous BSEA Hearing between these parties, she reviewed all prior evaluations and school records, including IEPs, and observed Nelida at the White Oak School on October 31, 2003. She explained that in preparation for the present hearing, she reviewed all of the joint exhibits (J-1 through J-41), the progress reports from White Oak School, an initial testing report administered in June 2004, and all of the Parents' exhibits (P-1 through P-16). She noted that she has never evaluated Nelida.

54. Dr. Souweine testified that Nelida's particular special education needs, as reflected within the evaluations, are weaknesses primarily in the language area formulating oral and written expression, with some needs in reading decoding, and additional difficulties with math computation and concepts. She noted that Nelida's deficits are moderate, not severe.

55. Dr. Souweine testified (and her observation report reflects) that on November 10, 2004, she spent the day at the Brighter Beginnings program, observing all of the special education classes to which Nelida would have been assigned (had she attended this program pursuant to the current IEP) and spoke with staff, including Mr. Kimball, Dr. Stolar and Mr. Schreier, as well as Susan Fino (the consultant to the program). She stated that her impressions of Brighter Beginnings were very positive. Exhibit J-2 (Dr. Souweine's observation report).

56. Dr. Souweine testified that in order for a program to be successful with students with a language-based learning disability, a program needs to be well-organized and paced in a way that ensures that the students have a number of different opportunities to understand and learn the same material. She explained, in general, that for students with core deficits with language learning disabilities, the Brighter Beginnings program, as designed and implemented, was particularly strong and included all of the elements she expect to see in a program for these students.

57. Dr. Souweine's testimony and observation report indicated that the curriculum approach is individualized, with small class sizes of 4 or 5 students in each class. She observed a significant amount of remedial instruction in all core academic areas (including the use of READ 180 and the Lindamood Bell program). She noted that the students were well invested in their academic work, with instructional materials that the students found

13

engaging (particularly, READ 180). She testified that she found the teaching materials to be appropriate for learning disabled students and the staff to be well versed in the students' learning deficits. She concluded that the program was organized and well thought-out for purposes of meeting the needs of students with learning disabilities. Exhibit J-2 (Dr. Souweine's observation report).

58. Dr. Souweine testified, more specifically, that during her visit to the program, she observed that the teachers were proficient at providing experiences and materials that allowed the students to learn using a variety of formats (including a significant amount of multimodal presentations) in a variety of contexts (for example, orally, on the board and in homework). She noted that the teachers used techniques (for example, cuing, opportunities for students to ask questions and reviewing) to ensure that that the students successfully learned the material presented so that they could do the work independently, and other techniques typical of a program for learning disabled children (including, for example, templates and organizational tools, review of previous materials and connecting previously learned material with currently taught material).

59. Dr. Souweine testified that there was continuity of teaching (that is, using the same methodology, skill content and approach) from one class to another throughout the day -- for example, each class was observed to include techniques of modeling, cueing and reviewing. She noted that continuity is enhanced through the program's consultant (Ms. Fino) who works with all of the teachers, providing them feedback.

60. Dr. Souweine testified that three of the four teachers in the program have a significant amount of experience working with learning disabled students, while the 4th teacher (Ms. Cronin) has less experience. She noted that Ms. Fino (the program consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area. She also noted that Ms. Cronin teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students. Dr. Souweine concluded that with Ms. Fino's assistance to Ms. Cronin, all four of the teachers are sufficiently qualified and experienced to teach learning disabled students at the Brighter Beginnings program.

61. Dr. Souweine testified that the teachers were working together as a team and there was an opportunity (built into the schedule) for staff to meet together on a regular basis for planning and coordination.

62. Dr. Souweine testified with respect to the READ 180 program that is used at Brighter Beginnings. She noted that she has not been trained on this program but has observed it and learned about it during both of her visits to the Brighter Beginnings program.

63. Dr. Souweine testified that READ 180 is a reading instructional program that begins with an assessment of the student and then provides the student with a variety of reading material at his/her level with accompanying word study materials on the computer, advancing a student sequentially as the student learns skills. She explained that READ 180 includes oral reading, silent reading, reading comprehension, phonological awareness and spelling all in one program. She also noted how engaged, invested and enthusiastic

14

the students were when she observed them participating in the reading instruction at the Brighter Beginnings program, something that is difficult to achieve with high school students learning the "tedious work of remediating spelling and reading comprehension". She concluded in her observation report that READ 180 provides an effective remedial approach for learning disabled students. Exhibit J-2.

64. Dr. Souweine testified that READ 180 is not a rule-based program but explained that adding a rule-based program is something that is done when a student is not able to gain the information in a more intuitive or more natural way, but it is not recommended that a rule-based program be used when it is not needed since it is an additional layer. She opined that methods other than a rule-based reading program can lead to quicker generalization and acquisition of reading skills. She explained that methods using rapid word recognition techniques can be very effective in improving decoding skills and fluency. She noted and referenced a significant amount of literature that supports the use of rapid word recognition techniques and believes a significant advantage of the READ 180 program is that these techniques are embedded within it.

65. Dr. Souweine concluded that she has no doubts regarding the appropriateness of READ 180 for Nelida, and believes READ 180 to be an appropriate and strong part of the language reading component of the Brighter Beginnings program.

66. Dr. Souweine testified that the Brighter Beginnings program allows for the opportunity for the special education students in the program to participate in regular education activities (for example, after school activities and lunch) and regular education electives and/or core academic courses (when able to do so) in the Chicopee High School. She noted the importance of these opportunities so that the program would be the least restrictive appropriate to meet a student's special education needs.

67. Dr. Souweine testified that her "impression" (from reviewing IEPs) was that all of the students currently in the Brighter Beginnings program have average intellectual ability and have learning disabilities that manifest themselves in reading, writing and/or math. She did not find any primary emotional or behavior disorders with these children, nor did she observe any of these disorders when she visited the program. She further noted that students in the Brighter Beginnings program may have social, emotional and/or behavioral issues as these normally would occur as a secondary disability with students at this age with learning disabilities – that is, it is not an entirely homogeneous population nor would one expect it to be in a learning disability program -- but that there are no areas of concern that would be disruptive to the program. She further noted that there is some difference in ages and grade levels of the students in Brighter Beginnings, but because of the very small size of the classes at the program, the instruction can be easily individualized, particularly in the core academic areas of language arts and math.

68. Dr. Souweine concluded, after reviewing Chicopee's proposed IEP for the current school year, that the proposed services within the IEP would provide Nelida with an appropriate and comprehensive program that would address each of her particular special education needs. She further opined that these proposed services and program would likely result in "substantial" progress regarding her special education needs. By "substantial"

15

progress, she stated that Nelida would likely acquire the skills needed to be successful in high school. She explained that Nelida would likely be able to be mainstreamed into regular education classes at the Chicopee High School as her skill level increases.

69. Dr. Souweine testified that only in one area did she have any concerns regarding the appropriateness for Nelida of the program that she observed at Brighter Beginnings. She explained it is possible that the science class that she observed at Brighter Beginnings would not be appropriate for Nelida with respect to the content of and skills taught, given the science classes that Nelida has already taken at White Oak.

70. Dr. Souweine testified that she has reviewed the recommendation section of the evaluation conducted by Dr. Kemper (exhibit J-40, page 12) and concluded that (1) the Brighter Beginnings program is substantially separate because all academic classes are taught separately in small classes of special needs students by special education teachers; (2) the program is language intensive as there is a great deal of attention given to the way information is delivered linguistically, together with remedial strategies and methodologies that ensure that students understand and are able to manipulate the material taught; and (3) using a variety of approaches and modalities (including multi-sensory presentation of information) the program provides direct remedial instruction (for example, the language arts class uses templates and organizational tools, the math class uses multi-sensory approaches, the reading class uses READ 180, Lindamood Bell, repeated reading methods and oral reading methods, and the science class uses a multi-sensory game task to teach science vocabulary).

71. Dr. Souweine further testified with respect to Dr. Kemper's recommendations that she observed in Brighter Beginnings that (1) the student:teacher ratio is better than the 8:1 ratio recommended by Dr. Kemper; (2) teaching is performed in a systematic manner (that is, it is provided in an appropriate sequence and paced in a way that students can gain information and gain mastery); (3) the teachers provide review of previously learned material and overtly connect previously learned information and new information in a variety of ways; (4) the program teaches skills in a variety of contexts in order to promote generalization (that is, the same skills are used in different classes so that the information is generalized from one class to another); and (5) all of the teachers are adequately trained to provide the above-described instruction to learning disabled students. She further noted that the program utilizes an individual tutorial for each student for language arts.

72. Dr. Souweine testified that, in her opinion, the Brighter Beginnings program is in substantial conformance with Dr. Kemper's recommendations as described above. She explained that the only significant differences are where Dr. Kemper makes additional, specific recommendations (pages 13 to 17 of his report), the Brighter Beginnings program utilizes, in certain instances, different teaching methodologies which Dr. Souweine believes to be appropriate.

73. READ 180: The record includes a number of articles and other materials regarding READ 180. These include the following. Exhibit S-3 describes how READ 180 correlates to Massachusetts English Language Arts. Exhibit S-4 provides a course

16

description of READ 180. Exhibit S-5 is a study of the results of READ 180 being used with special education students in Iowa from 2000-2002. Exhibit S-6 is an excerpt from a book by Sally Shaywitz, MD, which makes reference to READ 180 as an appropriate reading program for students with dyslexia. Exhibit S-7 is material prepared by the makers of READ 180 relative to READ 180 in general, as well as its appropriateness with students who have special education needs. Exhibit P-17 is materials developed by the maker of READ 180 describing the research, testing and development of the program. Exhibit P-18 is materials developed by the maker of READ 180 describing, in detail, the various components of the program. Exhibit P-19 is a summary of efficacy studies using READ 180 dated January 2002 and prepared by Policy Studies Associates.

## Findings and Conclusions

Nelida is an individual with a disability, falling within the purview of the Individuals with Disabilities Education Act[13] and the state special education statute.[14] As such, Nelida is entitled to a free appropriate public education (FAPE).[15] Neither her eligibility status nor her entitlement to FAPE is in dispute.

In general, FAPE is intended "to open the door of public education to handicapped children"[16] rather than to require the "best" educational services for a student.[17] More specifically under state and federal special education law, FAPE requires that a student's individualized education program (IEP) be tailored to address the student's unique needs in a way reasonably calculated to enable the student to make meaningful and effective educational progress in the least restrictive environment.[18] The question of whether the student's educational progress is meaningful or effective is gauged in relation to the potential of the particular student.[19]

---

[13] 20 USC 1400 et seq.

[14] MGL c. 71B.

[15] MGL c. 71B, ss. 1 (definition of FAPE), 2, 3.

[16] Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043 (1982).

[17] See, e.g., Lt. T.B. ex rel. N.B. v. Warwick Sch. Com., 361 F.3d 80, 83 (1st Cir. 2004) ("IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law.").

[18] For a more complete explanation of this standard and the legal authorities upon which it is based, see In re: Arlington, 37 IDELR 119, 8 MSER 187, 193-195 (SEA MA 2002). See also the following regulations not referenced in Arlington: 603 CMR 28.05(4)(b) (Student's IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum"); 603 CMR 28.02(9) ("An eligible student shall have the right to receive special education and any related services that are necessary for the student to benefit from special education or that are necessary for the student to access the general curriculum."); 603 CMR 28.02(18) ("Progress effectively in the general education program shall mean to make documented growth in the acquisition of knowledge and skills, including social/emotional development, within the general education program, with or without accommodations, according to chronological age and developmental expectations, the individual educational potential of the child, and the learning standards set forth in the Massachusetts Curriculum Frameworks and the curriculum of the district.").

[19] Deal v. Hamilton County Board of Education, 104 LRP 59544 (6th Cir. 2004) ("IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue"); In re: Arlington, 37 IDELR 119, 8 MSER 187, 194, nn. 18, 19 and 20 (SEA MA 2002) (collecting authorities).

17

The initial issue presented is whether the programming and specialized services embodied in the Chicopee's proposed IEP for Nelida for the 2004-2005 school year are consistent with this legal standard. Chicopee has the burden of proof with respect to this issue.[20]

A. Recommended educational services for Nelida.

I note, at the outset, that the BSEA Hearing Officer in her Decision from the previous Hearing with these same parties reached the following conclusion regarding the recommended educational services and placement for Nelida for her 9th grade year (the 2003-2004 school year):

> The only comprehensive set of recommendations available to the Team for this Student's 9th grade special education program are found in the evaluation report of Dr. Kemper. His findings were consistent with the findings of the school psychologist, and were not seriously challenged by other Team members. (P-4, S-5) He recommended that [Nelida] be placed in a substantially separate, language based, multi-sensory program geared to meeting the learning needs of students with specific language learning disabilities, including dyslexia. He wrote that [Nelida] needed small class sizes, of no more than eight students, with direct and consistent instruction by teachers trained to remediate language learning disabilities. Dr. Kemper also found that [Nelida] required a daily tutorial that focused on instruction in a rule based, systematic reading program. (See ¶ 7) There are no contrary or alternate recommendations in the record.[21]

With the exception of the reference to the rule-based reading program (which will be addressed separately below in the discussion regarding READ 180), I find this statement of the previous BSEA Hearing Officer to be consistent with the evidence in the instant dispute relevant to what services and placement are recommended for Nelida's 10th grade IEP (the 2004-2005 school year). Therefore, the present dispute, as was the previous dispute, will be resolved on the basis of whether Chicopee's IEP proposes services and placement that satisfy these recommendations.

B. Credibility of the witnesses.

I begin with a consideration of the credibility and persuasiveness of Dr. Kemper's expert testimony, in comparison with the expert testimony of Dr. Souweine – the two learning disability experts in this proceeding.

On the basis of Dr. Kemper's testimony, evaluation report and resume, I conclude that he has substantial expertise regarding the educational needs of students who are diagnosed with a language-based or specific learning disability, and how those educational needs should be

---

[20] The federal First Circuit Court of Appeals has explained that "the school district always bears the burden in the due process hearing of showing that its proposed IEP is adequate." *T.B. v. Warwick School Committee*, 361 F.3d 80, 82 n.1 (1st Cir. 2004) and cases cited therein. The school district bears this burden even when a change in a Student's IEP is sought by the parents. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034-1035 (3rd Cir. 1993), cited with approval in *T.B. v. Warwick School Committee*, 361 F.3d 80, 82 n.1 (1st Cir. 2004).

[21] *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).

18

addressed in order that the student will likely make effective and meaningful educational progress. Also, of all the expert witnesses, Dr. Kemper was the only person who has evaluated Nelida although the relevance of this consideration is lessened somewhat by the fact that Dr. Kemper's evaluation occurred April 22, 2003, which is more than two years prior to his testimony. I found Dr. Kemper to be a very intelligent, articulate and gracious witness.

Notwithstanding his expertise, in combination with his knowledge of Nelida, I found that Dr. Kemper's testimony raised concerns relative to his credibility.

Perhaps most troublesome was Dr. Kemper's diagnosis of Nelida as having dyslexia. This diagnosis does not appear in Dr. Kemper's evaluation report (exhibit J-40). Dr. Kemper has not evaluated Nelida since April 22, 2003 when he conducted his evaluation of Nelida.

Dr. Kemper testified that a diagnosis of dyslexia was justified subsequent to his evaluation on the basis of his later "suspicion" that Chicopee administered a test in an inappropriate manner, thereby possibly leading to a greater practice effect, thereby likely resulting in an inflated score when Dr. Kemper administered this same test at a later time. With all due respect to Dr. Kemper, I suggest that he has made a diagnosis important to Nelida's educational without sufficient credible basis.

Dr. Kemper does not know whether Chicopee in fact administered the test improperly (he has only a "suspicion"), nor does he know with any certainty what the impact, if any, might be on his own testing if in fact the test was administered inappropriately by Chicopee. At most, Dr. Kemper may call into question the validity of the scores that he obtained on a particular test, with the result that he may no longer be able to rely on this test in determining Nelida's deficits and needs.

For Dr. Kemper to predict that his scores on this test would have been sufficiently lower so as to change his diagnosis of Nelida and on the basis of this projected test score, conclude she has dyslexia is, I suggest, speculative. Yet, Dr. Kemper testified with apparent certainty as to Nelida's having dyslexia. Dr. Kemper's diagnosis of dyslexia is not supported by any other part of the record. I find his diagnosis to be not credible.

Second, Dr. Kemper testified that Nelida's special education needs are no different on May 6, 2005 when he testified in the instant dispute than on April 22, 2003 when he evaluated her. The basis for this conclusion was his "rule of thumb" that after one year of appropriate instruction, one sees qualitative but not quantitative changes in a student with a language-based learning disability, and by the end of the second year, one sees small quantitative changes. It is not disputed that Nelida has a language-based learning disability, and is now in her second year of receiving appropriate special education services at White Oak School.

On cross-examination, Dr. Kemper was shown test scores (apparently for the first time) reflected in Nelida's current IEP. The test scores were obtained from tests (several of which are the same as those administered by Dr. Kemper in April 2003) administered by White Oak in June 2004, which would have been at or near the end of her first year there (her 9th grade). A comparison of the test scores indicates that Nelida may have made significant growth in

19

her language skills. For example, the scores from the Gray Oral Reading Tests given by Dr. Kemper and White Oak reflect an improvement from 5.2 grade equivalent to 9.2 grade equivalent in comprehension. Scores from the Slosson Oral Reading Test given by Dr. Kemper and White Oak reflect an improvement from 5.7 grade equivalent to 7.5 grade equivalent.

In his testimony, Dr. Kemper correctly pointed out the difficulty of relying on grade equivalent scores, and he further noted correctly that White Oak used an earlier version (and normed on a different population) than his version of the Gray Oral Reading Test. Instead of factoring these test scores into his understanding of Nelida's current educational deficits and needs (or even acknowledging the possibility of their relevance), he preferred to rely solely on his (above-stated) "rule of thumb" to support his conclusion that Nelida's educational deficits and needs had remained unchanged over the course of two years. What was concerning was Dr. Kemper's apparent intent to disregard completely the relevance of the White Oak test scores, thereby allowing him to conclude that her learning needs had not changed.

Dr. Souweine has significant experience and expertise regarding students with a language-based learning disability.[22] She also has the advantage of consulting both to school districts and parents. Dr. Souweine has the disadvantage (as compared to Dr. Kemper) of not having evaluated Nelida, but has the advantage of having reviewed more recent test scores from June 2004 (as explained above, Dr. Kemper did not take into consideration these more recent test scores) and of having observed Nelida at the White Oak School on October 31, 2003 (Dr. Kemper has not observed Nelida in an academic setting).

I also found Dr. Souweine to have a more detailed and more complete understanding of the Brighter Beginnings program than Dr. Kemper. Her observation was for a longer period of time and (as compared to Dr. Kemper's sporadic discussions with two teachers), Dr. Souweine had substantive discussions with Mr. Kimball (a teacher), Dr. Stolar (supervisor of special education at Chicopee), Susan Fino (the consultant to the program) and Mr. Schreier (director of special education for Chicopee) regarding the Brighter Beginnings program. I found Dr. Souweine to be an intelligent, thoughtful and careful witness with sufficient understanding of Nelida. I fully credit her testimony.

C. The parties' disagreements.

There is relatively little significant difference between the two competing learning disability experts (Dr. Kemper and Dr. Souweine) as to what kind of a program Nelida needs, including the various ingredients of that program. Both experts recommend a substantially separate, language-based program with qualified teachers, small class sizes to ensure individualized instruction and an appropriate grouping of student who have a learning

---

[22] Parents do not dispute Dr. Souweine's credentials and qualifications regarding students with language-based learning disabilities. See Parents' closing written argument, page 1.

disability, average to above-average cognitive abilities, and no significant emotional or behavioral deficits.[23]

There is virtually no dispute that the Brighter Beginnings program has qualified teachers who teach all academic courses in small classes (no more than five students).

The principal disagreements between the parties are as follows: (1) whether the Brighter Beginnings program is, in fact, a language-based, substantially-separate program, (2) whether READ 180 is an appropriate program for Nelida, (3) whether there is an appropriate grouping of students, (4) whether oral expression must be taught as a separate class, and (5) whether there is sufficient consultation provided to the program. Each of these disagreements will be addressed separately below.[24]

D. Whether the Brighter Beginnings program is a substantially-separate, language-based program.

Parents argue that the instruction is not provided within a substantially-separate learning environment. However, the undisputed facts are that all of the students with whom Nelida would be placed at Brighter Beginnings are learning disabled, and that all of the academic courses are taught by special education teachers. Notwithstanding Parents' arguments to the contrary, the substantially-separate nature of the Brighter Beginnings program does not change when one or more students in the program take some of their courses with mainstream students in the high school – that is, outside of the Brighter Beginnings program. Summary of the Evidence, pars. # 35, 43, 67.

I now turn to the more substantive dispute as to whether the instruction is language-based.

The learning disability experts (Dr. Kemper and Dr. Souweine) do not disagree regarding the following basic ingredients of a language-based program: (1) teaching is performed in a systematic manner (that is, it is provided in an appropriate sequence and paced in a way that students can gain information and gain mastery); (2) presentation of information is done so that it stimulates all sensory modalities; (3) teachers provide review of previously learned material and overtly connect previously learned information and new information in a variety of ways; (4) the program consistently teaches skills in a variety of contexts in order to promote generalization (that is, the same skills are used in different classes so that the information is generalized from one class to another); and (5) there is sufficiently

---

[23] By comparison, in the previous BSEA Hearing, the principal dispute was what kind of educational services and program Nelida needs. In that dispute, Parents argued for essentially the same services and program as they are seeking in the current dispute. Chicopee, however, proposed an inclusion model of services, with academic courses to be provided to Nelida in mainstream 9th grade classes with modifications to be provided by a special educator. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).

[24] There is also a possible disagreement as to whether the content of the science and math courses at Brighter Beginnings would have been appropriate for Nelida, and Dr. Souweine (in par. 69 of the Statement of Evidence) shares this concern. However, I do not view this as a substantive dispute in light of Chicopee's apparent willingness to adjust the content of these courses, as necessary, and its ability, through a very low student:teacher ratio to individualize instruction. Testimony of Schreier, Mattavi.

individualized instruction with additional remediation in core academic areas. The principal dispute in this case is whether the Brighter Beginnings program includes these ingredients.[25]

The testimony of the three teachers (Mattavi, Shotland and Kimball) provided a detailed description of what occurs within their classrooms on a day-to-day and week-to-week basis. Their testimony was supported by the testimony of the supervisor of the program (Dr. Stolar) as well as the testimony of Dr. Souweine based on her observations and discussions with staff, including a discussion with the consultant to the program (Ms. Fino). It is apparent that the Chicopee witnesses have a comprehensive picture of what is occurring within the program. I have no reason to doubt the accuracy or completeness of their testimony regarding what is being taught (and more importantly, how it is being taught) within the Brighter Beginnings program.

This testimony made clear that each of the above-stated five ingredients of a language-based program are present within the classes taught by Mr. Mattavi, Mr. Shotland and Mr. Kimball. Summary of the Evidence, pars. # 33, 34, 37, 43, 44, 57, 58, 59, 70, 71, 72.

What is also noteworthy was the ability of the three teachers (Mattavi, Shotland and Kimball) to comment on the appropriateness of this language-based program for Nelida specifically. All three have significant experience teaching learning disabled students (all three taught at White Oak, in a language-based learning environment, for five years before being employed by Chicopee to teach learning disabled students). All three teachers actually taught Nelida at White Oak during the 2003-2004 school year, which is the year that the previous Hearing Officer determined White Oak to be an appropriate placement for Nelida. And, all three opined that the language-based program at Brighter Beginnings would appropriately address all of her special education needs. I fully credit their testimony. Summary of the Evidence, pars. # 30, 31, 36, 60.

Dr. Kemper disagreed that Brighter Beginnings is language-based. He found it "disconcerting" that what a student was learning on the computerized READ 180 program was not related to what was being taught in that classroom. He noted that what he observed in the teaching was insufficient continuity regarding scope and sequencing; rather, he saw more isolated teaching of skills, which is not consistent with principles of language-based teaching. He further noted that in his observation of a science class, he did not see any teaching that he would consider to be language-based. Summary of the Evidence, pars. # 26, 28.

Dr. Kemper's conclusions as to what is (and is not) occurring within the Brighter Beginnings program were based on a 3½ hour observation of the classrooms on March 11, 2005, including sporadic conversation with two of the teachers and no discussions with anyone else connected to the program. As I find the testimony of the Chicopee witnesses (in particular, the three teachers) to be consistent and credible, I conclude that where Dr. Kemper has

---

[25] It appears that the only substantive area of disagreement between these two experts with respect to what should be included in a language-based program is the extent to which rule-based instruction is required. Parts of the Brighter Beginnings program are rule-based – for example, rule-based reading instruction using Lindamood Bell methods and strategies relative to syllabication and suffixes – but the reading program (READ 180) is not. I address the appropriateness of READ 180 separately below.

drawn factual conclusions regarding what is actually occurring within the classrooms at this program and where those factual conclusions are at odds with the testimony of the three teachers (and where the teachers' testimony is consistent with the testimony of Dr. Stolar and Dr. Souweine), then Dr. Kemper's factual conclusions are not as reliable and not as persuasive as those of the Chicopee witnesses.

I note, more specifically, that Dr. Kemper's particular concerns (from his observation) regarding scope and sequencing, and consistency of teaching, as well as his generally-stated concern that teaching is not being done according to language-based principles were effectively rebutted by the testimony of the Chicopee witnesses. Summary of the Evidence, par. # 33, 44, 57, 58, 59.

Accordingly, I discount Dr. Kemper's criticisms regarding the classes taught by Mr. Mattavi, Mr. Shotland and Mr. Kimball. However, I credit his observations of the science class taught by Ms. Cronin. It is not disputed that Ms. Cronin does not have the experience or expertise of the other three teachers. Clearly, this is a weakness of the Brighter Beginnings program. However, I do not view it as a fatal weakness. As Dr. Souweine credibly explained in her testimony, Ms. Cronin, who is a certified special education teacher, teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students. Also, Ms. Fino (the program consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area. Exhibit J-14. Summary of the Evidence, par. # 60.

For these reasons, I find that Brighter Beginnings provides language-based instruction in a substantially-separate learning environment, and that the instruction and environment are appropriate for Nelida.

E.   Whether READ 180 is an appropriate program for Nelida.

Perhaps the most contentiously disputed issue is whether the READ 180 program is appropriate for Nelida. The question, at the outset, has been phrased more generally by the parties – that is, whether this particular program is effective for language learning disabled students, and there was significant testimony and documents relative to this point. Although I will address this more general question, ultimately the only relevant issue is the appropriateness of the READ 180 program for Nelida.

I note, at the outset, that this is a disagreement regarding the methodology utilized as one part of the overall program of instruction at Brighter Beginnings. A school district is generally given discretion to determine the appropriate methodology so long as the selected methodology is likely to allow the student the opportunity to receive FAPE. Chicopee need not persuade me that READ 180 is the best or even the preferred reading program for Nelida, but only that this reading program is consistent with Chicopee's overall responsibility to provide Nelida with an education program that is tailored to address her unique needs in a

23

way reasonably calculated to enable her to make meaningful and effective educational progress – that is, to provide her with FAPE.[26]

Part of the evidentiary record in the instant dispute relevant to READ 180 is taken from the previous BSEA Hearing – in particular, parts of the previous testimony of David Drake and parts of the previous testimony of Daniel Schreier. In addition, a number of documents were admitted in the instant dispute are the same as in the previous dispute. There was also live testimony in the present dispute from Dr. Kemper and Dr. Souweine regarding READ 180, both of whom testified in the previous BSEA Hearing.

The previous BSEA Hearing Officer made the following finding regarding READ 180:

> The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. (P-14, 15; S-3, 4, 7, 29, 27, 31; Schreier; Souweine; Drake) There is no evidence, however, that it is a targeted, rule-based, phonetic system designed to remediate individual reading disabilities.

The evidentiary record in the present dispute includes credible testimony in support of the above-quoted finding. Although there is also conflicting testimony, I have insufficient reason to depart from this finding, and therefore adopt it. In particular, I adopt this finding because I am persuaded that READ 180 is not rule-based, at least as that term is used by Dr. Kemper, Dr. Souweine and Mr. Drake. The evidence regarding the question whether READ 180 is "designed to remediate individual reading disabilities" is more complex since it appears that this may not have been the primary purpose of the program, but from the testimony of the two teachers and Dr. Souweine, discussed below, I conclude that READ 180 would likely provide remediation for Nelida's individual reading deficits. Summary of the Evidence, pars. # 10, 11, 12, 25, 26, 63, 64, 65.

I turn now to the question of whether Chicopee may utilize the READ 180 program as part of its proposed educational services for Nelida notwithstanding the fact that it is not rule-based and that it may not have been designed with the primary purpose of remediating individual reading disabilities.

I note, at the outset, that none of the above-named witnesses (other than the teachers) who testified regarding READ 180 (that is, Mr. Drake, Mr. Schreier, Dr. Kemper and Dr. Souweine) has ever actually used this reading program, nor has any of them received formal training regarding the program. Their opinions are derived from reading literature, reviewing a demonstration compact disc and/or observing (for a brief time) it's being utilized at Brighter Beginnings. I do not doubt their ability to assess this program generally – for example, to determine whether it is rule-based or whether it is instructional or remedial, but I consider none of these witnesses to have extensive knowledge or expertise regarding READ

---

[26] Compare *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004) ("there is a point at which the difference in outcomes between two methods can be so great that provision of the lesser program could amount to denial of a FAPE") with *E.S. v. Independent School District, No. 196*, 135 F.3d 566 (8th Cir. 1998) ("As long as a student is benefiting from her education, it is up to the educators to determine the appropriate methodology.").

24

180. I turn to the testimony of other witnesses to provide more specific guidance regarding its appropriateness for Nelida within the context of the Brighter Beginnings program.

There were two witnesses in the present dispute who demonstrated extensive knowledge and understanding of this reading program – they are two teachers (Mr. Shotland and Mr. Kimball) at Brighter Beginnings. Mr. Shotland and Mr. Kimball were trained on this reading program for two days in the summer of 2004. They have been implementing this program on a daily basis with learning disabled students in the Brighter Beginnings classroom during the 2004-2005 school year. Summary of the Evidence, pars. # 39, 40, 41.

I do not suggest that these teachers have the same depth of understanding as other witnesses regarding the reading needs of learning disabled students in general and how those needs should be met in general. However, the two teachers have sufficient experience and expertise to judge the usefulness and effectiveness of READ 180, in combination with the other educational techniques and programs, for the learning disabled students that they have been teaching at White Oak for five years and now at Brighter Beginnings.

Both teachers are also familiar with the educational deficits and needs of Nelida, having taught her at White Oak School during the 2003-2004 school year, and are able to have an informed opinion regarding the appropriateness of READ 180, again in the context of an overall program, for Nelida. Both teachers have the further advantage of having used another reading program at White Oak (which presumably was an appropriate reading program), and thus have a point of reference for purposes of judging the appropriateness of READ 180. Mr. Shotland and Mr. Kimball left no doubt in their testimony that they believe that READ 180 would be an appropriate and effective reading program for Nelida, when combined with the other parts of the Brighter Beginnings program. Summary of the Evidence, pars. # 36, 39, 40, 41.

I find their testimony to be persuasive.

In addition, I note that there is an underlying methodological dispute regarding READ 180. Dr. Kemper and Mr. Drake believe that an effective and appropriate language-based program requires the systematic teaching of rules in a specific order of progression. A principal concern of Dr. Kemper and Mr. Drake regarding READ 180 is that, as the formal reading program utilized at Brighter Beginnings, it is not rule-based. Summary of the Evidence, pars. # 10, 11, 12, 25, 26.

Dr. Souweine disputes this contention. She takes the position that adding a rule-based reading program is something that is done when a student is not able to gain the information in a more intuitive or more natural way, but it is not recommended that a rule-based program be used when it is not needed since it is an additional layer. She opined that methods other than a rule-based program can lead to quicker generalization and acquisition of reading skills. She explained that methods using rapid word recognition techniques can be very effective in improving decoding skills and fluency. She noted and referenced a significant amount of literature that supports the use of rapid word recognition techniques and believes a significant advantage of the READ 180 program is that these techniques are embedded within it. In particular, Dr. Souweine opined that, on the basis of her understanding of

25

Nelida's language deficits, READ 180 would be appropriate for her. Summary of the Evidence, pars. # 63, 64, 65.

Dr. Souweine had the advantage of considering Nelida's most recent test scores (June 2004) that Dr. Kemper did not consider, and the advantage of having observed Nelida in an academic setting. I also note that Mr. Drake was careful to testify regarding the appropriateness of READ 180, in general, rather than its appropriateness for Nelida in particular. Summary of the Evidence, pars. # 9, 15, 53.

I conclude that Dr. Souweine's testimony provides additional, persuasive support for the appropriateness of READ 180 as implemented within the Brighter Beginnings program for Nelida.

For these reasons, I find READ 180 to be an appropriate part of Nelida's proposed IEP.

F.  Whether there is an appropriate grouping of students.

There is no disagreement between Dr. Kemper and Dr. Souweine that an appropriate grouping of students for a language-based program for Nelida would be that all students have a learning disability, all students have average to above-average cognitive abilities, and no student has a significant emotional or behavior deficit that would likely interfere with the learning of the other students.

The testimony of Mr. Mattavi, Mr. Shotland, Mr. Kimball, Dr. Stolar and Dr. Souweine, as well as the redacted IEPs of the students in this program, support the contention that each of the students in the Brighter Beginnings program has a learning disability, and that the students otherwise reflect an appropriate grouping for a language-based program. Exhibits J-1 through J-9; Summary of the Evidence, pars. # 35, 36, 46, 67.

Parents argue to the contrary for several reasons. Parents note that there is one student in this program with an IQ of 75 and that, on the basis of Dr. Kemper's testimony, a student with this IQ would not be an appropriate peer in the Brighter Beginnings program. Dr. Kemper reviewed the IEP of this student (exhibit P-2) as well as an evaluation indicating an IQ of 75. Dr. Kemper testified that he did not know when the IQ test was administered. Summary of the Evidence, par. # 27.

Dr. Stolar made clear in her testimony that she is familiar with this student whose IEP is exhibit P-2. Her responsibilities include review of each student prior to admission to Brighter Beginnings to determine appropriateness of placement. She explained that achievement testing indicates that he is one year (or less) behind his grade level in reading. The IEP indicates that his most significant weaknesses are in math skills, which were over a year delayed. The IEP does not reflect any significant cognitive limitations. Dr. Stolar further testified that there was an IEP Team meeting regarding this student that reviewed his placement. She has spoken to his teachers who believe that he is appropriately placed. Dr. Stolar concluded that she believes this student's cognitive level of functioning is appropriate for this program. Summary of the Evidence, pars. # 43, 46.

I find Dr. Stolar's testimony (together with a reading of the student's IEP) to be more persuasive than Dr. Kemper's conclusion that is based solely on a single IQ score from a test of unknown date.

Parents have also raised concerns that several of the IEPs of students at Brighter Beginnings reflect goals and objectives relative to emotional or behavioral needs. For example, Parents point to exhibit P-2, which includes a goal addressing social skills and objectives relative to awareness and understanding of emotional issues. However, the IEP makes no reference to any significant behavioral or emotional issues, nor do there appear to be any specialized services in the IEP to address emotional or behavioral deficits. Rather, the IEP indicates that this student is polite and respectful, and interacts appropriately with others. Exhibit P-2.

Parents also point to exhibit P-6, which includes a behavior goal, as well as a number of related objectives. This IEP reflects potential difficulties regarding occasional behavior in class. However, I note that the IEP expired 12/9/04. Exhibit P-6.

I conclude from the testimony by the Chicopee witnesses (referenced above) that none of the students, including the students reflected in exhibits P-2 and P-6, has a primary emotional or behavioral deficit, that none of these students has emotional or behavioral needs that are disruptive to the program, and that it is not unusual that leaning disabled students will develop emotional or behavioral deficits secondary to their learning deficits as a result of frustration at not being able to learn in the same way as other students.

For these reasons, I find that there is an appropriate grouping of students for a language-based program for Nelida at the Brighter Beginnings program.

G.  Whether oral expression must be taught as a separate class.

The IEP calls for oral expression to be taught by a special education teacher for 50 minutes, 5 times each week. Exhibit J-1. There was testimony that this does not occur within the Brighter Beginnings program. Oral expression is taught as an integrated part of their classes rather than as a separate instruction block. Summary of the Evidence, par. # 45.

Dr. Kemper testified that for children with Nelida's educational needs, it would be important that a separate class be taught regarding oral expression, in addition to the teaching of oral expression being infused in the curriculum. Summary of the Evidence, par. # 23.

Dr. Stolar testified that staff concluded, after significant discussion, that for high school students, it is more effective to infuse oral expression throughout the curriculum rather than to teach it separately. She explained that she and others concluded that it is too difficult for high school students to become interested and engaged in oral expression when it is taught separately. Dr. Stolar presented as a credible witness with expertise in this area. Summary of the Evidence, par. # 45.

It appears that Chicopee has carefully considered what approach is appropriate for teaching oral expression to its high school learning disabled students, and has made a decision that is reasonable likely to succeed with Nelida.

27

For these reasons, I find that oral expression may be taught as an integrated part of the classes, rather than as a separate instruction block, and the IEP may be modified accordingly.[27]

H.  Whether there is sufficient consultation provided to the program.

The IEP calls for consultation services from a learning disabilities consultant for 30 minutes, once each week.  Exhibit J-1 (page 20 of 26).

Dr. Kemper testified that he found this amount of consulting time allocated in part A of the service delivery grid of the proposed IEP to be insufficient.  He recommended that there be at least two hours per week of consultation.  Summary of the Evidence, par. # 24.

I am not persuaded for the following reasons.

The Brighter Beginnings program is fortunate to have three teachers who have significant experience teaching students with learning disabilities (Mattavi, Shotland, Kimball).  These three teachers are responsible for all of the most important academic courses.  The fourth teacher, Ms. Cronin, teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students.  Ms. Fino (the consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area.  Ms. Cronin is a certified special education teacher.  Exhibit J-14.

The four teachers meet every Monday for 45 to 90 minutes to discuss individual students and curriculum, as well as to do problem solving.  The teachers have the further support and participation of Dr. Stolar who frequently observes and checks to ensure that the instruction follows a cohesive model, including continuity, consistency and scope and sequencing of instruction, and who works to ensure that language-based instruction is infused throughout the curriculum.  Summary of the Evidence, pars. # 30, 31, 38, 43, 44, 60, 61.

Within this context, I find that it is sufficient to have a half hour per week of consulting from a learning disabilities consultant (Susan Fino) for Nelida, as reflected in Chicopee's IEP.[28]

I.  Nelida's and her Parents' perspectives.

Nelida's father (Parent) provided testimony describing why he and his wife rejected the most recently-proposed IEP.  He also testified in some detail regarding Nelida's reactions to her observation of the Brighter Beginnings program and, in particular, her concerns regarding the structure, methodology (grammar templates) and students.  She expressed some anxiety to her father that she found the program so distracting that she would not be able to learn.  Summary of the Evidence, pars. # 2, 3.

---

[27] In their written closing argument, Parents do not argue to the contrary.
[28] In their written closing argument, Parents do not argue to the contrary.

I do not discount this testimony. For obvious reasons, the perspective of a sixteen-year-old student may be the most important consideration with respect to how easily she might adjust to and feel comfortable in a new learning environment. However, my responsibility is to seek to ensure that the services and placement offered by Chicopee are reasonably likely to address satisfactorily Nelida's educational needs in the least restrictive environment even though they may not fully address her educational desires.

J. Conclusion.

In the previous dispute, Parents sought an educational program consistent with the recommendations contained within Dr. Kemper's April 2003 evaluation report – that is, a substantially separate, language based, multi-sensory program with small class sizes of no more than eight students, and direct and consistent instruction by teachers trained to remediate language learning disabilities, all geared to meeting the learning needs of students with specific language learning disabilities. Chicopee, however, then proposed an inclusion model of services, with academic courses to be provided to Nelida in mainstream 9th grade classes with modifications to be provided by a special educator. The BSEA Hearing Officer in that dispute agreed with Parents, finding that their proposed model of services should be provided.[29]

Subsequent to that decision, Chicopee developed its own substantially separate program for learning disabled students – that is, the Brighter Beginnings program.

For the reasons explained throughout this Decision, I conclude that Chicopee has succeeded in developing an IEP that is generally consistent with the recommendations contained within Dr. Kemper's evaluation report and that is tailored to address Nelida's unique needs in a way reasonably calculated to enable her to make meaningful and effective educational progress in the least restrictive environment.

### Order

I find the 2004-2005 IEP[30] developed by Chicopee to be reasonably calculated to provide a free appropriate public education to Nelida in the least restrictive setting, with the following modification. Oral expression may be taught as an integrated part of the classes, rather than as a separate instruction block. The IEP may be modified accordingly.

By the Hearing Officer,

William Crane
Dated: June 8, 2005

---

[29] *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).
[30] Exhibit J-1.

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### EFFECT OF THE DECISION

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

## Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A. *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

## Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

## Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.

**EXHIBIT B**



April 7, 2004

# COMMONWEALTH OF MASSACHUSETTS

## Bureau of Special Education Appeals

---

### Nelida[1]
### vs.
### Chicopee Public Schools

### BSEA # 04-0093

---

BEFORE

LINDSAY BYRNE, HEARING OFFICER

DEREK BEAULIEU, ATTORNEY FOR PARENTS
CLAIRE THOMPSON, ATTORNEY FOR CHICOPEE PUBLIC SCHOOLS

---

[1] Nelida is a pseudonym selected by the Hearing Officer to protect the privacy of the Student in publicly available documents.

# COMMONWEALTH OF MASSACHUSETTS

### *Bureau of Special Education Appeals*

In Re:  Nelida[1]
        &
Chicopee Public Schools

                                    BSEA#04-0093

## DECISION

This decision is issued pursuant to M.G.L. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. 794 and the regulations promulgated under those statutes.  A hearing was held on January 29th and 30th, and February 3rd and 4th, 2004, at the offices of Catuogno Reporting Services in Springfield, MA.  Those present for all or part of the hearing were:

| | |
|---|---|
| | Mother |
| | Father |
| Jodi Rosol | Therapist, Mt. Tom Mental Health Center |
| Robert Kemper | Speech-Language Pathologist, Psycholinguistics Associates |
| David Drake | Headmaster, White Oak School |
| Susan Edgerly | Admissions Director, White Oak School |
| Tiffany Drumm | Tutorial Teacher, White Oak School |
| Judith Souweine | Psychologist |
| Andrea Cameron | Inclusion Teacher, 8th Gr., Chicopee Public Schools |
| Debra Schneeweis | Middle School Special Education Supervisor, Chicopee Public Schools |
| Janice Walsh | Special Education Teacher, Chicopee High School |
| Andrea Stolar | Special Education Supervisor, Chicopee High School |
| Daniel Schreier | Director of Special Education, Chicopee Public Schools |
| Andrea McGovern | Advocate for Parents |
| Derek Beaulieu | Attorney for Parents |
| Claire Thompson | Attorney for School |
| Lindsay Byrne | Hearing Officer, BSEA |

---

[1] Nelida is a pseudonym selected by the Hearing Officer to protect the privacy of the Student in publicly available documents.

The official record of the hearing consists of documents submitted by the Parents labeled P-1 through P-23, documents submitted by the School labeled S-1 through S-23 and S-25 through S-33, and approximately 24 hours of recorded oral testimony. Both parties submitted written closing arguments by February 27, 2004, and the record closed on that date.

## Issues

1. Whether the 2003-2004 Individualized Education Plan developed by Chicopee was reasonably calculated to provide a free, appropriate public education to Nelida in the least restrictive setting?

2. If not, whether the Parents are entitled to retroactive reimbursement of expenses associated with the unilateral placement of the Student at the White Oak School for the 2003-2004 school year?

## Summary of the Evidence

1. Nelida is a 15 year old resident of Chicopee. She was identified as a student with special learning needs in elementary school and received special education through the Chicopee Public Schools. In the 6th grade at the Fairview Middle School the Student was placed in an "inclusion" classroom ("staff" was designated as responsible for providing all academic services) with instruction in English and reading to take place in a self-contained classroom (again by "staff")[2]. No objective current performance levels nor measurable annual goals are listed on the 6th grade IEP. (P-23). For the 7th grade year, 2001-2002, the Student was placed in a regular education classroom. The IEP, which was developed in January 2002, lists "modified curriculum" as the only special education service. Though handwritten notes in the IEP allude to results on the IOWA test[3] there are no objective current performance levels nor measurable annual goals in the IEP. (P-22) The Student continued in a regular 8th grade program during the 2002-2003 school year under the IEP developed in January 2002. (P-1)

2. On December 4, 2002, as part of her 3 year re-evaluation, the school psychologist, Melissa Manello, conducted a routine psychological evaluation of the Student. She found the Student to have average cognitive potential and weak overall reading skills. On the Wechsler Individual Achievement Test the Student's reading composite scored fell at the 6th%. This placed her in the "borderline" range. Ms. Manello reported:

---

[2] The designation "staff" makes it impossible to determine which, if any, of the intended services were to be "special education".

[3] The IOWA test results were reported in grade equivalents as: Reading-5.6; Written-4.5, M. -4.8. The record does not show when or how the IOWA test was administered. (P-22)

Academically, [Student]'s basic reading and decoding skills, when presented with everyday words, falls at a beginning fourth grade level. Her ability to sound out unfamiliar or nonsense words is less developed and falls at an ending 2nd grade level.  Her basic math numerical reasoning skills fall between a beginning 5th and ending 6th grade level. These comparisons though are simply the number of correct answers compared to other children [Student's] age. They do not take into account level of difficulty.  Her teachers reported that at times she needs materials broken down and/or explained again. [Student]'s retention is poor unless the new concepts are reinforced.  Test taking and study skills are also weak.  She is hesitant about engaging in new tasks and demonstrates little self-initiative or self-motivation.  She is making some progress with a modified 8th grade curriculum.

(P-5)

Ms. Manello concluded that the Student had a specific learning disability, and would benefit from reduced reading assignments.  She recommended that the Student's basic decoding and phonetic skills be addressed. (P-5)

3.  The Parents were alarmed at the low test scores reported by Ms. Manello. The Student's father testified that the scores were the same or lower than ones the Student had achieved during her previous three year evaluation in the fifth grade.[4]  In addition, the father reported that the Student was "a mess" emotionally during the 8th grade.  She was unhappy, anxious, quarrelsome, and reluctant to go to school.  The Parents asked for more intensive small group academic instruction to address the Student's weaknesses and school anxiety.  (Father)

4.  Andrea Pickard Cameron, (BA Ed., certified Moderate Special Needs) described the schedule and mechanics of the 8th grade program she was responsible for delivering to the Student.  Ms. Cameron, along with a paraprofessional, provided special education services to 24 students divided between 2 inclusion classes.  Ms. Cameron did not know the educational background of the paraprofessional.  They provided co-teaching or accommodations as necessary to the special education students.  The Student attended reading, math and language arts class with Ms. Cameron and science and social studies with the paraprofessional.  Ms. Cameron testified that she did not provide any direct instruction in reading to the Student.  The inclusion reading program consisted of providing "easier material".  If Ms. Cameron noticed the Student "struggling" she would help with comprehension by paraphrasing or chunking assignments.  Ms. Cameron did not know the instructional level for the Student.  She did not test the Student or keep a running portfolio of her work.  She testified that, based on "observation", the

---

[4] Those re-evaluation results are not in the record.

3

Student made progress in reading and written language. Ms. Cameron attributed any difficulties the Student had in school to her anxiety. Ms. Cameron did not recommend any different or additional special education services for the Student during her 8th grade year. (Cameron)

5.   During the winter, 2003, the Parents met with Ms. Cameron to request special education services targeted to the Student's reading and language weaknesses. At the meeting Chicopee offered a remedial reading program which was available to all 8th grade students. Enrolling in the remedial reading course would require the Student to eliminate a regular content course from her schedule. Chicopee also offered a self contained academic support class. This class focused on note taking, test taking, preteaching and reinforcement activities. There was no direct reading instruction in the academic support class. Chicopee also offered before and after school homework assistance and MCAS preparation. In addition, Chicopee stated that the Student could see a school guidance counselor or a peer mediator to address her anxiety and interpersonal concerns. The Parents did not accept any of these services as they believed the classes and interventions offered by Ms. Cameron did not address the Student's true learning needs. All were regular education services and none of the proferred services appeared on an IEP. (Cameron, Parent)  On February 24, 2003, the school proposed an extended evaluation consisting of retesting by Ms. Manello. No additions or modifications to the Student's 8th grade inclusion program were to take place during the 8 week evaluation period. (P-2)

6.   Ms. Manello retested on the Student on April 9, 2003. On the WIAT the Student's Basic Reading Score remained in the borderline range with a percentile rank of 8 and a grade equivalent of 4-9. Another reading subtest yielded a score in the average range: reading comprehension with a percentile of 32 and a grade equivalent of 6-5. The reading composite rose to a 13% with a grade equivalent of 5-7. Overall, the Student's standardized reading scores remained 2 to 4 years below grade level. Other reading measures reported by Ms. Manello were inconsistent with the comparable results obtained on two administrations of the WIAT, not explained fully in her evaluation report, and discounted by 2 reviewing psychologists. Therefore I give them little weight. Ms. Manello made no changes to her earlier recommendations as a result of the new testing information. (S-18; See also testimony of Souweine)

7.   Robert Kemper, a licensed speech and language pathologist, conducted a "psycholinguistic evaluation" of the Student on April 22, 2003. On standardized measures of overall language functioning, the Student's scores ranged from average to poor. On tests targeted to assess the Student's reading functioning the results were uniformly below average ranging from a 9-6 to a 10-7 age equivalent or a 3.0 to a 6.4 grade equivalent with scores clustered at the late 4th to early 5th grade level. Dr. Kemper concluded that the Student has a language based learning

disability which includes a specific disorder of reading and written expression. He testified that because of the significant gap between her current language skill levels and the language expectations of the regular ninth grade curriculum, the Student would be unable to access ninth grade content classes, even with significant modifications and accommodations. Moreover, he stated, an inclusion program would not provide the direct, remedial instruction the Student needs to address her disabilities in foundational language skills. Dr. Kemper recommended that the Student be placed in a substantially separate, multisensory, language-intensive program with a small student-teacher ratio (no more than eight to one). He stated that the program should be based on direct instruction by teachers who are trained to provide multisensory, language based instruction to students with significant language learning needs.    He emphasized that in addition to the overall intensive program the Student would need a "daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language instruction."   (Kemper; P-15; P-4, S-S)

8.    The Team reconvened on June 17, 2003, to discuss the evaluations of Ms. Manello and Dr. Kemper, and to plan the Student's 2003-2004 9th grade program. The Student's father testified that the Team accepted Dr. Kemper's evaluation results as they were similar to the findings of Ms. Manello.    The Parents received the report of Ms. Manello's April 2003 testing for the first time at the Team meeting. (Stolar, Father) The Team did not explain how Dr. Kemper's recommendations would be implemented in the 9th grade.    Instead Chicopee discussed the new, computer-based, reading program called READ 180 that would be available to the Student. (Father) Andrea Stolar, supervisor of special education at Chicopee High School, testified that her role at the Team meeting was to explain the 9th grade program to the Parents.    She described the "Academy" program at the high school as a supportive, geographically separate stream having smaller classes and more intensive instruction than had been available in the middle school inclusion program.    The Academy program uses a co-teaching model, in which special education teachers teach classes alongside content-area certified regular education teachers. All students also take a learning skills class which focuses on developing the students' note-taking, study and organizational skills. Ms. Stolar told the Parents that the reading program to be used at Chicopee High School starting in September 2003, was READ 180. The Team did not discuss any other systematic reading instruction for this Student.    Ms. Stolar offered to have the Student participate in a course designed to introduce students to the READ 180 system over the summer, 2003.    She did not give the Parents any documents about the "Academy" program or about the summer READ 180 class. (Stolar)

9.    At the Team meeting on June 17, 2003, Chicopee proposed an IEP calling for the Student's placement in the 9th grade "Academy" program for the

5

2003-2004 school year. According to the proposed IEP, the Student would attend daily special education classes of 45 minutes each in reading, learning skills and math. She would attend the regular 9th Grade "Academy" program for English, Science and Social Studies. She would see the speech-language therapist once per week. The proposed IEP does not provide any counseling or therapeutic services. The proposed IEP does not contain any tutorial services. It does not identify any specific, systematic reading program that will be used with the Student. (P-3, S-1) The Parents rejected the proposed plan on June 18, 2003. (S-2)

10.    On June 19, 2003, the Parents received a letter from Denise Freisberg, FVMMS summer school facilitator, placing the Student on a waiting list for summer services. (P-20) The father testified that he understood this letter to concern Ms. Stolar's offer of summer READ 180 services and made no further inquiries of the school. I credit his testimony. (Father) No other written information concerning summer services was sent to the Parents by Chicopee.

11.    At the time of the Team meeting, June 2003, the READ 180 program was not being used by Chicopee. None of the Chicopee staff had been trained in its use or supervision. The Parents could not have observed a READ 180 program in use, nor talked to any staff, parents or students with experience with READ 180 in operation. (Father, Stolar, Schreierer, Walsh)

12.    Dan Schreirer, the Director of Special Education for Chicopee, described the READ 180 program. READ 180 is a comprehensive, systematic reading skill development program developed by Scholastics. It is designed for struggling and/or disadvantaged readers. Although it has been used with "special education" populations, READ 180 was not developed specifically for students who have a primary language or reading disability. Using student-driven, computer based instruction the program identifies individual student weaknesses and responds with instruction and practice drills that are engaging, multisensory and effective. The program also has a teacher component that proposes lessons and strategies building upon the weaknesses identified through the Student's computer use, a literature component that allows students to read or listen to good, mainstream literature at their own reading level and a written language component. It is designed to be delivered in daily 90 minute blocks. The students rotate through 3 time blocks: a whole group direct instruction period of 20 minutes; a sixty minute block divided evenly among use of READ 180 software, independent reading of READ 180 audio books and literature, and small group instruction using READ 180 provided materials; and a final ten minutes of whole group direct instruction. (Schreirer; S-3, 4, 7, 15, 27, 29, 31; P-14; See also testimony of Drake; Souweine)

Mr. Schreirer testified that he chose the READ 180 system for use in the Chicopee Public Schools based on its impressive results in improving reading levels across the board when newly introduced in school systems. He was also impressed with the enthusiasm of the students for the system and their willingness to persevere in what is at times a tedious learning task, particularly for older students. He stated that the READ 180 program would be appropriate for this Student and would provide the tools, the interesting material, and the daily practice she needed to improve her reading level. When combined with the supportive atmosphere, strong teachers, and flexibility of the 9th grade Academy, Mr. Schreirer stated that Chicopee High School could appropriately meet the Student's special education needs. (Schreirer)

13. At a prehearing conference held in August 2003, Chicopee offered to expand the Student's reading instruction from the 45 minutes listed on the IEP to the full 90 minutes recommended by the READ 180 program. In addition, Chicopee offered to provide an Orton-Gillingham tutorial after school. (Schreirer, Father) This offer was not reduced to writing and no Amendment to the IEP was ever proposed to the Parents.  (Father; Administrative Record) The only written information the Parents received from Chicopee subsequent to the proposed IEP concerning the 9th grade Academy program was a mid term progress report which listed the Student as "well organized and prepared" despite 3 class absences[5]. (P-12)

14. Janice Walsh, special education teacher at Chicopee High School, described the 9th grade "Academy" program proposed for Nelida. The 9th grade "Academy" program at Chicopee High School is the entire 9th grade of approximately 300 students. The students are divided into 4 teams. One team is the "inclusion team". It has 16 students with special learning needs. Those students are split into two groups of eight and assigned to one special education teacher who follows the students through their regular classes and teaches a daily learning skills class to them separately. Ms. Walsh would have been Nelida's special education teacher. She stated that the inclusion classes typically have twenty students, five to eight of those being students with IEPs. The daily schedule proposed for this Student consists of: reading; social studies (inclusion); learning skills (separate); English (inclusion); math (inclusion); science (inclusion) and gym. The Student's reading class would take place in the READ 180 computer classroom. Ms. Walsh would have been the special educator in the Student's inclusion English, social studies and science classes. A different special educator would have been present in the Student's inclusion math class. In the learning skills class Ms. Walsh would provide academic support and learning strategies instruction such as vocabulary preparation, highlighting, paraphrasing and test preparation. Ms. Walsh stated that she has not been trained in READ 180 and has not

---

[5] At this time the Student was attending the White Oak School.

observed the program. She has not met the speech/language pathologist or the learning styles consultant, both listed on the IEP proposed for this Student. Ms. Walsh does not provide Orton-Gillingham or other similar systematic, rule-based reading instruction to any student. Ms. Walsh never provided any information about the 9th grade program to the Student's parents. (Walsh) Ms. Stolar, the special education supervisor, did not observe the inclusion classrooms, nor the READ 180 computer classroom, until she accompanied Dr. Souweine on her observation in November 2003. (Stolar)

15.     The Parents enrolled the Student at the White Oak School beginning in September 2003. White Oak is a ch. 766 approved private school which provides special education to a homogeneous population of students in grades 4 through 12 with learning disabilities.     David Drake, the Headmaster, testified that the academic program, which parallels the Massachusetts Curriculum Frameworks, is language intensive multi-sensory, and self-reinforcing. The maximum number of students in any class is eight, though most classes have fewer. Students are grouped by age, reading level and remediation need. All teachers use the same language based approach. All students participate in a daily 50 minute one-to-one tutorial which focuses on providing a rule based, systematic, progressive program of reading development and extends skills into spelling and written language skills. In addition students take daily classes in: language arts, oral expression, science, social studies, math, physical education, computers/art/shop. (Drake; Souweine, P-10, 16)

In placement testing administered by White Oak when the Student began the 9th grade in September 2003, the Student's reading scores fell between the mid-third and beginning 6th grade levels. Her math scores ranged from mid-4th to late 5th grade level. Mr. Drake testified that the Student was appropriately placed at White Oak and was making progress in the program. The father testified that, for the first time in years, the Student appeared happy and engaged in school and reported learning new things at White Oak. (Drake; Father; S-19)

16.     Judith Souweine, an independent psychologist, reviewed the Student's evaluation records, visited the White Oak School and observed the learning skills class and the READ 180 program in operation at Chicopee High School in the fall, 2003. She testified that she was impressed with the READ 180 program because it was engaging and mulitsensory. She also stated her opinion that the proposed IEP would be appropriate for the Student because she had prior success in the mainstream environment, the 9th grade inclusion program was carefully designed and there was a strong remedial component. (Souweine) I give Dr. Souweine's opinion in this matter little weight because she did not personally evaluate the Student and found the testing results in the record "confusing". Furthermore Dr. Souweine's knowledge of the READ 180 program came

solely. through the materials presented to her by Chicopee and her observation of Chicopee's use of the program.

## Findings and Conclusions

There is no dispute that this Student has special learning needs as defined by 20 U.S.C. § 1401 et seq. and is entitled to receive a free, appropriate public education. The issue presented here is whether the 2003-2004 IEP proposed by Chicopee is reasonably calculated to provide that appropriate public education. Answering that question involves a multilayered analysis tailored to the specific facts of the matter. In the instant appeal the analysis has both a procedural and a substantive component.

A. Procedural Issues

Though not raised separately by the Parents, I discuss these issues apart from the substantive analysis as I find they are central to the resolution of this matter.

The parental role in planning and implementing an educational program for a student with a disability is fundamental to both the federal and state special education scheme.[6] To assert that role intelligently parents must, at a minimum, be provided with all relevant information the school generates or relies upon concerning the student and the student's educational program, be able to express their perspectives to the school, receive reasonable responses from the school, and be able to rely upon the school to follow through on its commitments. In this case the Parents have shown that Chicopee failed to include them meaningfully in the educational planning process. The result was an inappropriate IEP.

Beginning in the winter of 2003, during the Student's eighth grade year, the Parents asked Chicopee for additional academic assistance. Although Chicopee's own testing revealed academic achievement scores 4 to 6 years below her 8th grade placement, Chicopee asserted that the Student's school difficulties were social/emotional in nature. The documentary record shows, however, that Chicopee did not offer any therapeutic services to the family, an offer which would have been a logical result of its position. Nor did it offer any additional academic special education, as requested by the Parents. Chicopee's only documented response to the Student's poor academic performance and markedly changed appearance was the proposal for further academic testing. This response alone was not reasonable under the circumstances, and served to buttress the Parents' perception that Chicopee could not, or would not, address their concerns.

---

[6] 34 CFR 300.501(c) and 300.552(a)(1); 603 CMR 28.05(6) and 28.06(2); 48 Fed. Reg. 12473 (first column) (March 12, 1999) ("parents of a child with a disability are expected to be equal participants...in deciding...what services the agency will provide to the child and in what setting")

At the June 2003 Team meeting Chicopee provided the results of its extended evaluation to the Parents for the first time two months after it had been conducted, with no intervening Team meeting. This unexplained delay particularly when Chicopee was on notice of the Parents' dissatisfaction with the Student's current program, further contributed to the marginalization of the Parents. (603 CMR 28.05(I); 603 CMR 28.05(2)(b)

The Team's response to the new information it had about the Student is equally curious. The Team had the results of two recently conducted psychological evaluations with consistent findings. Both called for direct instruction in basic decoding skills. The IEP developed at that meeting includes no such service.

The Team discussed summer services to prepare the Student to enter the 9th grade, but despite the Parents' ready acceptance of those services, Chicopee failed to provide the Parents with any information necessary to access supposedly available summer services for the Student.

Finally at a prehearing conference held in August 2003, Chicopee orally offered to provide a direct, decoding tutorial and to double the READ 180 class sessions to conform to the publisher's recommended 90 minutes per day. Yet Chicopee failed to formalize this offer in a form the Parents could accept. This failure led directly to the unilateral placement of the Student just a few weeks later. This pattern of inaction continued throughout the fall, 2003. Though it had noted the importance to these Parents of ongoing communication on the proposed IEP, Chicopee did not communicate with the Parents, did not provide any materials used by the proposed Academy program (S-16, 17), and in fact did not fully explain the proposed program to them until the hearing in February 2004. While each of these lapses, considered alone, would not constitute the type of serious procedural irregularity contemplated by the court in Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990) cert. den. 499 U.S. 912 (1991), when it determined that procedural violations could form the basis of an equitable award under the IDEA, the pattern of nonresponsiveness established by this evidence provides support for the Parents' belief that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placement.

B. Substantive Issue

The only comprehensive set of recommendations available to the Team for this Student's 9th grade special education program are found in the evaluation report of Dr. Kemper. His findings were consistent with the findings of the school psychologist, and were not seriously challenged by other Team members. (P-4, S-5) He recommended that the Student be placed in a substantially separate, language based, multisensory program geared to meeting the learning needs of students with specific language learning disabilities, including dyslexia. He wrote that the Student needed small class sizes, of no more than eight students, with direct and consistent instruction by teachers trained to remediate language

learning disabilities. Dr. Kemper also found that the Student required a daily tutorial that focussed on instruction in a rule based, systematic reading program. (See ¶ 7) There are no contrary or alternate recommendations in the record.

Chicopee did not incorporate any of these uncontradicted recommendations into the IEP it developed for the Student. Instead Chicopee proposed an IEP that called for the Student's academic instruction in mainstream 9th grade classes with modifications provided by a special educator. First I note that the is no showing in this record that the Student had made effective progress commensurate with her potential in previous "inclusion" placements with similar services. I further note that there is no information in this record which could support a finding that any of the proposed teachers, apart from Ms. Walsh, have training or experience in teaching students with language learning disabilities, including dyslexia. The proposed class sizes would range from 12 to 20 students. The IEP did not include a reading tutorial. (P-3, S-1)

Chicopee argued that its reading class, using the READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. A school is free to choose its own remediation methods, techniques and programs to address a student's documented need for service, so long as there is a reasonable basis for such a choice. The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. (P-14, 15; S-3, 4, 7, 29, 27, 31; Schreirer; Souweine; Drake) There is no evidence, however, that it is a targeted, rule-based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the language learning disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program. That skepticism grew into a reasonable objection when the proposed IEP failed to provide the full 90 minutes daily of READ 180 instruction recommended by the program's developers, and again when Chicopee failed to follow through on its offer to introduce the Student and her Parents to the READ 180 system during the summer, 2003.

Considering the proposed 2003-2004 IEP as a totality I find that neither the setting, nor the services, proposed by Chicopee meet the recommendations outlined in Dr. Kemper's report. While a school is not bound to accept all, or even any, of the findings and recommendations of an outside evaluator, there must be some alternate credible information to support its choice of a different educational model. Here there is none. It appears that Chicopee offered the Student an IEP for the program it had already in place, rather than one tailored specifically to the unique needs of this Student. This approach is not permissible under state and federal law.[7] I conclude, based on a preponderance of the credible evidence in the hearing record, that Chicopee failed to develop a special education program for the 2003-2004 school year tailored to meet this Student's

---

[7] For a helpful discussion of FAPE requirements please see Arlington Public Schools. 8 MSER 187, 195 Fn. 23.

needs, as identified by Dr. Kemper and Ms. Manello, and therefore that Chicopee did not propose an IEP that was reasonably calculated to provide the Student with a free, appropriate public education.

## C. Reimbursement

Parents may be reimbursed for the costs of providing special education and related services for their eligible children if they demonstrate that the program and services offered by the school district are inappropriate, and that the program and services that they obtain privately are appropriate. School Committee of Town of Burlington, Mass. v. Dept. of Education of Mass., 471 U.S. 359 (1985). Here they have done both.

There is no dispute that the program in which the Student is enrolled at the White Oak School provides all the elements recommended by Dr. Kemper. It is an intensive, language based, multisensory educational program specifically geared toward remediating language learning disabilities, including dyslexia. It provides small class sizes, consistent instructional and interventional techniques, and a daily, rule based phonetic reading tutorial. I find therefore that the Parents selected an appropriate alternate educational program for the Student. I further find that they did so only after months of unsatisfactory communication with Chicopee resulted in presentation of an inappropriate IEP for their daughter. Therefore the law and the equities permit an award of full reimbursement for all out of pocket expenses associated with the Student's enrollment at the White Oak School for the 2003-2004 school year.

## Order

The 2003-2004 IEP proposed by Chicopee is not reasonably calculated to provide a free, appropriate public education to Nelida. The White Oak School meets the recommendations of the evaluators in the record, and the Parents' unilateral placement of the Student there in September 2003, was appropriate and justified. The Parents are entitled to reimbursement of all out-of-pocket expenses associated with the Student's placement at the White Oak School for the 2003-2004 school year.

April 7 2004
Date

Lindsay Byrne
Lindsay Byrne, Hearing Officer

# COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must seek such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

## Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision.  20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A.  *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

## Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court.  See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990).  If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

## Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request.  Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.

**EXHIBIT C**



COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

BSEA #05-*2920*

RE:    **CHICOPEE PUBLIC SCHOOLS** v
       **KAITLYN T.**

NOTICE OF HEARING

A hearing will occur on this matter on April 29, 2005 at the Bureau of Special Education Appeals, 350 Main Street, Malden MA at 10:00 a.m. The hearing will continue at the Catougno Worcester offices from 9:00 a.m. to 4:30 p.m. on May 5, 2005 and May 6, 2005. Joint documents and each party's witness lists must be filed no later than April 22, 2005.

Any requests for postponements shall be made in writing. Should the Parties reach a settlement agreement, the moving party (Parents) must file a written withdrawal of the proceeding.

By the Hearing Officer,

Joan D. Beron
Dated: April 15, 2005

COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

BSEA #05-2920

RE:    **CHICOPEE PUBLIC SCHOOLS** v
       **KAITLYN T.**

NOTICE OF HEARING

On April 19, 2005 the Hearing Officer received from Parents, through their Counsel, a 2nd motion to compel. Chicopee's opposition to the request was received on April 21, 2005. After consideration of the arguments of both parties Parent's Motion to Compel is denied. Chicopee's Opposition to the Motion is granted in part.[1]

Chicopee filed its hearing request on December 20, 2004. On February 16, 2005 hearing dates were set for April 4-5, 2005. Parents' Counsel has had the discovery information that he requested from Chicopee since March 22, 2005. On March 25, 2005 Parents' motion to continue the matter was granted to allow Parents' Counsel to receive and review supplemental responses to discovery prior to hearing. Parents' Counsel was directed to file a motion to compel the additional discovery Parents were seeking by March 28, 2005. Chicopee was directed to file any objections by March 31, 2005. A conference call was set for April 13, 2005 to address discovery issues and hearing dates were set for May 5-6, 2005.[2]

On April 13, 2005 Parents' Counsel indicated that discovery was received from Chicopee and would be accepted. Parent's 2nd motion to compel was received on April 19, 2005, ten days before the first scheduled day of hearing. Discovery is used to obtain additional information but cannot be used to delay either party's right to proceed to hearing. Parents' 2nd request is not timely and is not allowed.

Both Parties, through Counsel, can at hearing, question witnesses to obtain information they believe to be relevant to the issues to be decided at hearing.

Those issues are:

Does Chicopee's proposed program for Kaitlyn at the Brighter Beginnings program provide Kaitlyn with a free appropriate public education (FAPE) in the least restrictive environment (LRE)?

If not, does the White Oak school provide Kaitlyn with a FAPE in the LRE?

---

[1] Chicopee requests an order for costs and fees. The Hearing Officer does not have jurisdiction to award fees and costs.

[2] On April 15, 2005 an additional day (April 29, 2005) was added to accommodate one Chicopee's witnesses with the assent of Parents, through their Counsel. On April 19, 2005 the first day of hearing was moved from April 29, 2005 to May 2, 2005 due to the unavailability of a contracted room in Worcester, MA on April 29, 2005. Both parties agreed to the one-day date change.

Both parties have the right to object to any information that is not relevant to those issues. If an objection is raised the Hearing Officer will rule on the issue and allow any evidence that is relevant to the issues regarding the appropriateness of Kaitlyn's proposed program or the appropriateness of White Oak for Kaitlyn.

The hearing will occur on May 2, 2005 at the Catougno Court Reporting Office on May 2, 2005 at 9:30 a.m. to 4:30 p.m. The hearing will continue at the Catougno Worcester offices from 9:00 a.m. to 4:30 p.m. on May 5, 2005 and May 6, 2005. Joint documents and each party's witness lists filing will be extended until April 25, 2005. Counsel will confer by telephone regarding joint document submission on April 21, 2005 at 10:30 a.m.

No postponements will be allowed absent exigent circumstances or mutual request of the Parties and approval of the Hearing Officer. Any requests for postponements shall be made in writing. Should the Parties reach a settlement agreement, the moving party (Chicopee) must file a written withdrawal of the proceeding.

By the Hearing Officer,


Joan D. Beron
Dated: April 22, 2005

**EXHIBIT D**



COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

**BSEA #05-2920**

RE:    **CHICOPEE PUBLIC SCHOOLS v**
       **KAITLYN T.**

## RULING

Due to a conflict this matter will be assigned to another Hearing Officer Crane. The hearing will occur on May 2, 2005 at the Catougno Court Reporting Office in Worcester[1] MA on May 2, 2005 at 9:30 a.m. to 4:30 p.m. The hearing will continue at the Catougno Worcester offices from 9:00 a.m. to 4:30 p.m. on May 5, 2005 and May 6, 2005.

No postponements will be allowed absent exigent circumstances or mutual request of the Parties and approval of the Hearing Officer. Any requests for postponements shall be made in writing. Should the Parties reach a settlement agreement, the moving party (Chicopee) must file a written withdrawal of the proceeding.

By the Hearing Officer,

Joan D. Beron
Dated: April 26, 2005

---

[1] The Catougno Court Reporting Office in Worcester MA requires proof of identification upon entrance.

**EXHIBIT E**



EXHIBIT E


Case 3:05-cv-30158-MAP   Document 1-4   Filed 07/01/2005   Page 7 of 13



**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF EDUCATION**
**BUREAU OF SPECIAL EDUCATION APPEALS**

CHICOPEE PUBLIC SCHOOLS )
)
v. )     BSEA No. 05-2920
)
KAITLYN T. )

### RESPONDANT'S MOTION TO PLACE THE BURDEN OF PROOF REGARDING THE APPROPRIATNESS OF THE READ 180 PROGRAM ON THE PETITIONER AND ABSENT ANY NEW EVIDENCE ENTER FINDINGS FOR THE PARENTS ON THE ISSUE OF THE APPROPRIATNESS OF READ 180 FOR KAITLYN

The Respondent, Kaitlyn T., requests that the Hearing Officer place the burden of proof regarding the appropriateness of the Scholastic Inc., reading program READ 180 squarely on the petitioner and absent any new evidence enter a finding for the parents for the following reasons:

On or about On June 30, 2001, the Parents, via their attorney, filed a Request for Hearing with the Bureau of Special Education Appeals against the Chicopee Public Schools. In their Request for Hearing the parents make full mention Dr. Kemper's evaluation of Kaitlyn in April 2003. The parents asserted that Kaitlyn has a specific language-based learning disability and requires the services mentioned by Dr. Kemper in his evaluation. The Request for Hearing specifically states as follows:

A. "Dr. Kemper recommends that Kaitlyn be educated with the context of a substantially separate, multi-sensory, language-intensive program. The purpose of which would be to provide direct, remedial, instructional methodologies that allow children with significant language disorders to learn effectively and efficiently via a multisensory presentation of information."

B. "That "Kaitlyn's multisensory, structured language program will need to be implemented within the context of a substantially separate school that is devoted to

addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects, It is extremely important that all of Kaitlyn's teachers have the training necessary to provide instruction in a multisensory, structured language program setting."

C. "Kaitlyn will continue to require a daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language instruction."

The parents also asserted in their Request for Hearing that the IEP offered for the 2003-2004 School Year by the Chicopee Public Schools was grossly inappropriate. The Plaintiff's specifically stated that:

"IEP seeks to place Kaitlyn in a program that will offer some reading pullout. The School District will be using the program READ 180 to remediate Kaitlyn's disability. The parents assert that the program offered by the School District is not intensive enough. The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has."

The parents also asserted that:

"...the School District's program and IEP fail to provide real services, methodologies and the intensity Kaitlyn needs in order for her to achieve FAPE. The IEP offered continues the Chicopee Public School's pattern of placing Kaitlyn is academic situations where she will continue to lose academic ground and self-esteem."

Hearing was held before the Bureau of Special Education Appeals on January 29th and 30th and February 3rd and 4th of 2004 before Hearing Officer Lindsay Byrne.

On or about April 7, 2004, the Bureau of Special Education Appeals issued a decision finding for the parents granting all relief requested in their Request for Hearing. The Hearing Officer held, with respect to the request for relief in the Petitioner Request for Hearing, that:

"The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a

targeted, rule based, phonetic system designed to remediate individual reading disabilities."

The Hearing Officer also held, that "[t]here is no dispute that the program in which the Student is enrolled at the White Oak School provides all the elements recommended by Dr. Kemper." The Decision states in full:

> "The 2003-2004 IEP proposed by Chicopee is not reasonably calculated to provide a free, appropriate public education to [Kaitlyn]. The White Oak School meets the recommendations of the Evaluators in the record, and the Parents' unilateral placement of the Student there in 2003, was appropriate and justified. The Parents are entitled to reimbursement of all out-of-pocket expenses associated with the Student's placement at the White Oak School for the 2003-2004 school year."

On or about May 6, 2004, Chicopee Public Schools filed an Appeal of the BSEA Decision 04-0093, in the United Stated Federal District Court of Massachusetts asserting that the decision was arbitrary and capricious. On March 21, 2005 the parties appeared before Judge Ponsor of the United States District Court for oral argument on their motions. On that same day Judge Ponsor issued a Judgment in favor of the Parents on all issues.

## ARGUMENT

### ABSENT ANY NEW EVIDENCE SUBMITTED BY THE SCHOOL DISTRICT REGARDING READ 180 THE HEARING OFFICER SHOULD UPHOLD THE DECISION OF THE PREVIOUS HEARING OFFICER THAT READ 180 IS NOT AN APPROPRIATE REMEDIAL METHODOLOGY FOR KAITLYN.

In the present case the School District is the petitioner and has the burden of proving its program and services are appropriate. The school district has presented a considerable amount to evidence that its new program "brighter beginnings" uses the same READ 180 program that pursuant to BSEA Decision 04-0093 was already found not appropriate for Kaitlyn. It has not presented any new evidence regarding the appropriateness of READ 180 for Kaitlyn. It has also not demonstrated in any way why the hearing officer should come to a different conclusion

regarding the appropriateness of that program for Kaitlyn this year. Based on this logic, the parents should not have to re-prove that READ 180 is not an appropriate reading methodology for Kaitlyn.

The School District, via letter earlier today, has agreed to have favorable testimony and documents from the prior case submitted as evidence for consideration in the present case. The submission of this evidence places the parents on the defense. In the event that the parents fail to submit evidence regarding READ 180 favorable to their position, the parents question whether a different out come is possible? The parents assert that they should not have to submit or make reference to any prior testimony presented at the last hearing or any documentary evidence presented by the school district in the last case given that a decision was clearly rendered. The parents assert that the same READ 180 issue with respect to Kaitlyn was litigated and therefore they should not be forced to defend the decision that was entered on their behalf.

The parents also assert that if the school district is allowed to present the same evidence within such a short period of time without any additional evidence or evaluations, and the hearing officer does come to a different conclusion, this would contradict the very findings of the preceding case and create conflicting decisions. It would also suggest that after losing a hearing the losing party can bring the same issues back year after year and possibly get different outcomes in subsequent school years.

Wherefore, the parents respectfully request that absent any new evidence regarding READ 180 that the hearing officer find for the parents that the READ 180 program is not appropriate for Kaitlyn based on the prior decision of the BSEA 04-0093.

Respectfully Submitted
THE RESPONDENT
BY HER ATTORNEY

May 3, 2005

Derek M. Beaulieu, Esq.

1242 Main Street, Suite 306
Springfield, MA 01103
BBO# 644185
(413) 733-1824
Fax (413) 567-7746

### CERTIFICATE OF SERVICE

I, Derek M. Beaulieu, Attorney for Kaitlyn T. hereby certify that on this day of May, 2005, I delivered via facsimile and regular mail a copy of **RESPONDANT'S MOTION TO PLACE THE BURDEN OF PROOF REGARDING THE APPROPRIATNESS OF THE READ 180 PROGRAM ON THE PETITIONER AND ABSENT ANY NEW EVIDENCE ENTER FINDINGS FOR THE PARENTS ON THE ISSUE OF THE APPROPRIATNESS OF READ 180 FOR KAITLYN** to Claire Thompson, Esq., Doherty, Wallace, Pillsbury & Murphy, P.C., One Monarch Place Suite 1900, Springfield, MA 01144-1900

May 3, 2005

Derek M. Beaulieu, Esq.

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DAVID T. AS PARENT AND NEXT FRIEND OF KAITLYN T.

**DEFENDANTS**

CITY OF CHICOPEE, ACTING THROUGH THE CHICOPEE PUBLIC SCHOOLS AND MASSACHUSETTS DEPT. OF EDUCATN

(b) County of Residence of First Listed Plaintiff _____ HAMPDEN
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____ HAMPDEN
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

DEREK M. BEAULIEU
1242 MAIN STREET, SUITE 306
SPRINGFIELD MA 01103  733 1824

Attorneys (If Known)

CLAIRE THOMPSON
1414 MAIN STREET SUITE 1900
SPRINGFIELD MA 01004-1900
733-3111

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☒ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

THIS IS A COMPLAINT FOR JUDICIAL REVIEW OF A BUREAU OF SPECIAL EDUCATION APPEALS DECISION PURSUANT TO  20 USC § 1415

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** SET ASIDE DECISION

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE  June 30, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

305986

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) __DAVID T.  v. CITY OF CHICOPEE__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

___  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_X_  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
           740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

___  V.    150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                          YES [X]        NO [ ]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
                                                          YES [ ]        NO [X]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                          YES [ ]        NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                          YES [ ]        NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                          YES [X]        NO [ ]

   A.  If yes, in which division do all of the non-governmental parties reside?
       Eastern Division [ ]        Central Division [ ]        Western Division [X]

   B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
       Eastern Division [ ]        Central Division [ ]        Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
                                                          YES [ ]        NO [X]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME __DEREK M. BRAULIEU__
ADDRESS __1242 MAIN STREET, SUITE 306, SPFLD MA 01103__
TELEPHONE NO. __(413) 733-1824__