# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **DAVID T. As parent and next friend of KAITLYN T.** | ) ) ) |
| **Plaintiff** | ) |
|  | ) **CIVIL ACTION NO. 05-30158** |
| **v.** | ) |
| **CITY OF CHICOPEE acting through CHICOPEE PUBLIC SCHOOLS, and MASSACHUSETTSDEPARTMENT OF EDUCATION** | ) ) ) |
| **Defendants** | ) ) |

## MOTION FOR LEAVE TO FILE PLAINTIFF'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT IN EXCESS OF 25 PAGES

The Plaintiffs hereby request permission from the Court to file their Memorandum in Support of their Motion for Summary Judgment in excess of twenty five pages for the following reasons:

Plaintiffs assert that the matter is actually several matters which have corresponded now for several years. As such the issues and facts in order to be appropriately addressed required the document to extend beyond twenty five pages. The Plaintiffs have done their best to make the summary judgment as concise as possible in as few pages as necessary.

WHEREFORE, Kaitlyn T. and her parents respectfully request that this court grant the Plaintiffs permission to file a response greater than the twenty five page limit.

Respectfully submitted,
By their attorney

January 15, 2006                    **/S/DEREK M. BEAULIEU**
Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103
BBO#644185

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID T. As parent and next friend of KAITLYN T.<br><br>Plaintiff<br><br>v.<br><br>CITY OF CHICOPEE acting through CHICOPEE PUBLIC SCHOOLS, and MASSACHUSETTSDEPARTMENT OF EDUCATION<br>Defendants | )<br>)<br>)<br>)<br>) CIVIL ACTION NO. 05-30158<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This case is an appeal pursuant to Mass. General Laws Chapter 30A § 14(1)(7) and 20 U.S.C. §1415(i)(2)(A) Individuals with Disability Education Act, (hereinafter referred to as the "IDEA"), statutorily promulgated at 20 U.S.C. Ch. 33 § 1400 et al, of an underlying decision rendered by the Bureau of Special Education Appeals (hereinafter referred to as the "BSEA"), on June 8, 2005.

### STANDARD OF REVIEW

Although it is well settled that the review process at the trial-court level is 'one of involved oversight,' *Roland M., 910 F.2d at 989;* and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale. *Lenn v. Portland School Committee, 998 F.2d 1083, 1085 (1st Cir. 07/15/1993) citing Burlington, 736 F.2d at 792 However,* the question of whether an IEP is "adequate and appropriate" is a mixed question of fact and law and therefore like other mixed questions, measuring the adequacy and appropriateness of an IEP asks nisi prius to determine whether

certain facts possess, or lack, legal significance in a given case. *See, e.g., Pavlidis v. New England Patriots Football Club, Inc., 737 F.2d 1227, 1231 (1st Cir. 1984); Sweeney v. Board of Trustees, 604 F.2d 106, 109 n.2 (1st Cir. 1979) (collecting examples), cert. denied, 444 U.S. 1045, 62 L. Ed. 2d 731, 100 S. Ct. 733 (1980).* In short, the district court is required to make an evaluative judgment, applying "a legal standard to a particular set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976). Absent a showing that the wrong legal rule was employed, we have rather consistently taken the view that the district court's answer to a mixed fact/law question is reviewable only for clear error. *See, e.g., RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir. 1987); *Pavlidis*, 737 F.2d at 1231; *Sweeney*, 604 F.2d at 109 n.2. Our past decisions under the Act have implicitly followed this approach. *See David D.*, 775 F.2d at 415; *Burlington II*, 736 F.2d at 790; *Colin K.*, 715 F.2d at 6; *Abrahamson*, 701 F.2d at 227; *Doe v. Anrig*, 692 F.2d 800, 808 (1st Cir. 1982). The fact that district courts frequently decide these cases without live testimony, on the basis of the administrative record, does not detract from the wisdom of clear-error review. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985) (rationale underlying clearly erroneous rule applies unabated to findings "based . . . on physical or documentary evidence"); *In re Tully*, 818 F.2d 106, 109 (1st Cir. 1987) (clear-error standard applies "unconditionally to fact finding emanating from a 'paper' record"); *Custom Paper Prod. Co. v. Atlantic Paper Box Co.*, 469 F.2d 178, 179 (1st Cir. 1972) (the "appellate function does not differ" because no witnesses testified in person). We hold that, in the absence of a mistake of law, the court of appeals should accept a district court's resolution of questions anent adequacy and appropriateness of an IEP so long as the court's conclusions are not clearly erroneous on the record as a whole. Concord

## FACTS AND PROCEDUARAL HISTORY

Kaitlyn Tharaldson is a sixteen-year old young girl (date of birth 3/14/89) who resides with her parents in Chicopee, MA. At the time of the hearing, as well as the previous school year, she had been enrolled at the White Oak School, a private day school in Westfield, MA, providing educational services to students with language-based or specific learning disabilities.

Kaitlyn has been diagnosed with a language-based or specific learning disability that is manifested in difficulties with oral language expression, reading and written expression. Testing indicates that she has average cognitive abilities, with a discrepancy between her achievement and intellectual abilities.

On or about On June 30, 2003, the Parents, via their attorney, filed a Request for Hearing with the Bureau of Special Education Appeals against the Chicopee Public Schools. In their Request for Hearing the parents make full mention Dr. Kemper's evaluation of Kaitlyn in April 2003. The parents asserted that Kaitlyn has a specific language-based learning disability and requires the services mentioned by Dr. Kemper in his evaluation. The Request for Hearing specifically states as follows:

A. "Dr. Kemper recommends that Kaitlyn be educated with the context of a substantially separate, multi-sensory, language-intensive program. The purpose of which would be to provide direct, remedial, instructional methodologies that allow children with significant language disorders to learn effectively and efficiently via a multisensory presentation of information."

B. "That "Kaitlyn's multisensory, structured language program will need to be implemented within the context of a substantially separate school that is devoted to addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects, It is extremely important that all of Kaitlyn's teachers have the training necessary to provide instruction in a multisensory, structured language program setting."

3

C.  "Kaitlyn will continue to require a daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language instruction."

In the parent's Request for Hearing it was alleged that the IEP offered for the 2003-2004 School Year by the Chicopee Public Schools was grossly inappropriate.  The Plaintiff's specifically stated that:

"IEP seeks to place Kaitlyn in a program that will offer some reading pullout.  The School District will be using the program READ 180 to remediate Kaitlyn's disability.  The parents assert that the program offered by the School District is not intensive enough.  The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has."

The parents also asserted that:

"…the School District's program and IEP fail to provide real services, methodologies and the intensity Kaitlyn needs in order for her to achieve FAPE. The IEP offered continues the Chicopee Public School's pattern of placing Kaitlyn is academic situations where she will continue to lose academic ground and self-esteem."

Hearing was held before the Bureau of Special Education Appeals on January 29th and 30th and February 3rd and 4th of 2004 before Hearing Officer Lindsay Byrne.

On or about April 7, 2004, the Bureau of Special Education Appeals issued a decision finding for the parents granting all relief requested in their Request for Hearing. The Hearing Officer held, with respect to the request for relief in the Petitioner Request for Hearing, that:

"The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities."

The Hearing Officer also held, that "[t]here is no dispute that the program in which the Student is enrolled at the White Oak School provides all the elements recommended by Dr. Kemper." The Decision states in full:

> "The 2003-2004 IEP proposed by Chicopee is not reasonably calculated to provide a free, appropriate public education to [Kaitlyn]. The White Oak School meets the recommendations of the Evaluators in the record, and the Parents' unilateral placement of the Student there in 2003, was appropriate and justified. The Parents are entitled to reimbursement of all out-of-pocket expenses associated with the Student's placement at the White Oak School for the 2003-2004 school year."

On or about May 6, 2004, Chicopee Public Schools filed an Appeal of the BSEA Decision 04-0093, in the United Stated Federal District Court of Massachusetts asserting that the decision was arbitrary and capricious. (04-30087-MAP).

On March 21, 2005 the parties appeared before Judge Ponsor of the United States District Court for oral argument on their motions. On that same day Judge Ponsor issued a Judgment in favor of the Parents on all issues.

In December of 2004 the School District filed a Request for Hearing Against the Parents alleging that the IEP and program for her at Chicopee High School was appropriate. BSEA decision (BSEA 05-2029). This case was brought by the School District against the parents to litigate the appropriateness of the 2004-2005 school year.

On May 2nd, 5th and 6th 2005, the parties proceeded to hearing before the BSEA, William Crane presiding as Hearing Officer.

On June 7, 2005, Mr. Crane issued his decision which held for the School District finding that the IEP and methodology employed by the School District was appropriate. [1]

With thirty days of the June 7, 2005 BSEA decision, the parents appealed the decision of the BSEA case to this court (05-30158-MAP).

---

[1] Due to the date of hearing Kaitlyn remained at the White Oak School for the entire 2004-2005 school year pursuant to stay put protection 20 USC 1415(j) at the school district's expense.

Kaitlyn is still attending White Oak for the 2005-2006 school year as a Junior, and the parents assert that while the litigation is still pending the financial responsible for that placement is still on the school district.

## ARGUMENTS

I.    THE HEARING OFFICER MADE AND ERROR OF LAW BY FAILING TO FOLLOW LEGAL PRECEDENT ESTABLISHED PREVIOUS DECISIONS AND NOT FINDING FOR THE PARENTS IN VIOLATION OF STARE DECISIS

The parents assert that the decision of the hearing officer to ignore the precedent established in previous cases that entitled students such a Kaitlyn to methodologies that are proven was an error of law. Specifically, Mr. Crane erroneously held that READ 180 is an appropriate methodology for Kaitlyn who is a special education student with a Specific Learning Disability, despite no evidence that it is a proven methodology, and despite a plethora of evidence that it is not a proven methodology. The hearing officer also ignored the previous case which factually found READ 180 not to be a proven methodology with scientific or research basis for remediating language based learning disabilities. In essence his finding is a departure from established precedent of what is a proven methodology, and is clear error of law, which equates to a violation of stare decisis.[2]

---

[2] On May 2nd 2005, on the first day of hearing MR. BEAULIEU, on behalf of his clients asked ": I did have a question with respect to at one point I put in the case from last year and then I had a conversation with Attorney Thompson and then I just subsequently took it out, assuming that because it's at this point precedent or case law that it wouldn't need to be an exhibit. The HEARING OFFICER responded:" Correct, yes. As with a Yes, I would consider that the same as any other. Obviously it has particular relevance to this case because it's the same parties, the same student, but consider the same as any other decision, administrative or judicial decision that I can take administrative notice and would normally take administrative notice particularly of that decision, and I know it's essentially affirmed by Judge Ponsor as well, so both parties are welcome to rely on that in your arguments in terms of that decision. TR Vol. I at pg 30-31.

Hearing Officer Byrne stated in the previous decision: "A school is free to choose its own remediation methods, techniques and programs to address a student's documented need for service, so long as there is a **reasonable basis for such a choice**." Nelidia vs. Chicopee Public Schools, BSEA 04-0093 (April 7, 2004). (Emphasis added).  It is also been well recognized that reviewing "courts have also exhibited an understandable reluctance to overturn a state education agency's judgment calls in such delicate areas -- at least where it can be shown that "the IEP proposed by the school district is based upon an **accepted, proven methodology**." Roland M v Concord School Committee, 910 F.2d 983; 989, 1990 U.S. App. LEXIS 13170 (August 3, 1990) citing Lachman, 852 F.2d at 297.  (Emphasis added).

The best evidence of what constitutes a proven methodology comes in the form of the new federal laws and the regulations that were put into force and effect weeks after the decision was rendered, and while not in force and effect at the time of the hearing, these regulations are important to shed light on where Congress was going with the legal definition of what a proven methodology is.  The new IDEA 2004 has specifically adding that there must be a "scientific research based intervention." 34 CFR §300.309. The new regulations also state with respect to children who have specific learning disabilities that "in addition, the criteria adopted by the State – must permit the use of a process that determines if the child responds to scientific, researched based intervention as part of the evaluation procedures …." 34 CFR §300.307.  There should be no question based on a review of the IDEA 2004 and the No Child Left Behind Act that the new law mandates schools to use effective strategies that are scientifically proven and research based.

The first hearing officer factually found, "There is no evidence, however, that it [READ 180] is a targeted, rule-based, phonetic system designed to remediate individual reading disabilities. **Without showing of effectiveness with the language learning disabled**

**population**, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program." <u>Nelidia vs. Chicopee Public Schools</u>, BSEA 04-0093 (April 7, 2004). (Emphasis added). In making this ruling Hearing Officer Byrne applied the proper legal standard, properly holding that Kaitlyn was entitled to a program that had been proven to be effective on language based learning disabled children.  She specifically states "no evidence," was shown that this program "remediate(s) individual reading disabilities." <u>Id</u>.

Given that there was precedent in place which governs that the methodology must be proven, and given that READ 180 had been proven in the previous case not to be proven, Hearing Officer Crane should have limited his inquire specifically toward evidence that was new and that could establish that READ 180 was scientifically proven to work with language learning disabled students.  Instead, Hearing Officer William Crane made an error of law in choosing to review the matter as a new matter entirely, ignoring the legal standard. AR vol. I, pg 199. TR vol. I pg 16.  As stated in <u>H.W. Robinson Airfreight Corp. v. United States</u>, "There is a well-recognized exception to *stare decisis*, … A court will reexamine and overrule a prior decision that was clearly erroneous. <u>H.W. Robinson Airfreight Corp. v. United States</u>, 48 C.C.P.A. 148 (1961); Adolphe Hurst & Co. v. United States, 33 C.C.P.A. 96 (1946)."

There is also no question that an administrative agency, charged with the protection of the public interest, should not be precluded from taking appropriate action to that end the mistaken action on its part in the past. <u>Id</u>.  However, Hearing Officer Crane never asserted there was a mistake in the past. Instead he held that despite that fact that he was adopting the previous decision and its findings, which included the specific finding that that READ 180 is not designed for remediating individual reading disabilities, that there was new evidence submitted in the form of the two teachers and Dr. Souweine that allowed him to render a new decision. He stated:

8

The evidentiary record in the present dispute includes credible testimony in support of the above-quoted finding. Although there is also conflicting testimony, I have insufficient reason to depart from this finding, and therefore adopt it. In particular, I adopt this finding because I am persuaded that READ 180 is not rule-based, at least as that term is used by Dr. Kemper, Dr. Souweine and Mr. Drake. The evidence regarding the question whether READ 180 is "designed to remediate individual reading disabilities" is more complex since it appears that this may not have been the primary purpose of the program, but from the testimony of the two teachers and Dr. Souweine, discussed below, I conclude that READ 180 would likely provide •remediation for Nelida's individual reading deficits, Summary of the Evidence, pars. # 10, 11, 12, *25,* 26, 63, 64, *65."*AR vol. I, pg 220.

First, the parents assert that when an administrative agency statutorily created and given jurisdiction pursuant to M.G.L 30A, reverses a prior decision agency policy must be accompanied by some indication that shift is rational, or it is arbitrary and capricious.[3] Massachusetts Audubon Soc., Inc. v. Daley, 31 F. Supp. 2d 189 (D. Mass. 1998). The parents assert that his explanation fails to indicate a rational basis for holding that a non-scientifically proven methodology, that it is neither a rule based program or remedial, is "likely provide remediation for Nelida's individual reading deficits." AR vol. I, pg 220.

Moreover, the Hearing officer's duty to follow the legal precedent and recognize the facts found in previous case was increased given that the previous decision had been reviewed by a higher court and upheld. In harmony with this rule is the rule that after judicial review of an

---

[3] *See also* Catalina Yachts v. U.S. E.P.A., 112 F. Supp. 2d 965 (C.D. Cal. 2000). (While an agency may announce new principles in an adjudicatory proceeding, it may not depart, sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case. ); PDK Laboratories Inc. v. U.S. D.E.A., 362 F.3d 786 (D.C. Cir. 2004). ("An agency may alter its positions over time, but the agency acts arbitrarily when it departs from its precedent without giving any good reason."); National Federation of Federal Employees v. Federal Labor Relations Authority, 369 F.3d 548, 174 L.R.R.M. (BNA) 3256 (D.C. Cir. 2004).("Although an agency may depart from its precedent, an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."); Ninth Ave., LLC v. New York State Div. of Housing and Community Renewal, 778 N.Y.S.2d 35 (App. Div. 1st Dep't 2004). (Decision of administrative agency which neither adheres to its own prior precedent nor indicates its reason for reaching different result on essentially same facts is arbitrary and capricious.) Schucker v. F.D.I.C., 401 F.3d 1347 (Fed. Cir. 2005). (Federal agency is obligated to follow precedent; if it chooses to change, it must explain why.) ; Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Com'n, 810 N.E.2d 1179 (Ind. Ct. App. 2004).Tall Trees Const. Corp. v. Zoning Bd. of Appeals of Town of Huntington, 97 N.Y.2d 86, 735 N.Y.S.2d 873, 761 N.E.2d 565 (2001).

administrative decision, the administrative agency is bound to follow the law as laid down by the court, irrespective of its own precedents to the contrary.   United States Stacey Mfg. Co. v Commissioner (1956, CA6) 237 F2d 605, infra. *See also* Kirschenbaum v Commissioner, (1946, CA2) 155 F2d 23, 170 ALR 1389, cert den 329 US 726, 91 L ed 628, 67 S Ct 75.

Second, the parents concede that there was evidence submitted but assert that it was neither new evidence, nor substantial evidence, and thus Hearing Officer Crane did not have enough evidence to make a ruling that digressed so radically from the previous decision.  As stated in York Transport Co. v Railroad Com. of Texas, "the doctrine of stare decisis should be strictly applied given that the administrative agency heard **NO NEW AND SUBSTANTIAL EVIDENCE**." York Transport Co. v Railroad Com. of Texas (1958, Tex Civ App) 315 SW2d 313. (Emphasis added).

In this case it was not merely a different hearing officer hearing new evidence regarding differing facts and parties, the parties and the issues were the same, but most importantly the evidence showing that READ 180 is a proven or research based methodology for Dyslexic children is EXACTLY the same. AR Doc. Vol. II., pg. 601; 618; 667; 730; 737; 746.  Hearing Officer Crane ignored the research studies provided by the parties and instead states in his decision that he relied in the evidence as provided by Dr. Souweine and the two teachers.  He states:

"She opined that methods other than a rule-based program can lead to quicker generalization and acquisition of reading skills. She explained that methods using rapid word recognition techniques can be very effective in improving decoding skills and fluency. She noted and referenced a significant amount of literature that supports the use of rapid word recognition techniques and believes a significant advantage of the READ 180 program is that these techniques are embedded within it." AR Doc. Vol. I, pg 221.

First, the parents assert that the School District's witnesses, no matter how qualified, based on the fact that they had limited experience working with READ 180, and based on the fact that none of the witnesses had ever performed a research study, they could not show that READ 180 was proven methodology.  Dr. Souweine testified that her experience with READ 180 consisted only of her two observations of it.  TR Vol. I. pg 64-65. TR Vol. I pg 130-131. She had also only accessed information about READ 180 based on it via the Chicopee Public Schools.  TR Vol. I. pg 64 and TR Vol. I pg 211.  In other words, she had not performed research studies or even had experience with this program either through Scholastic, the author of the program, or independently. TR Vol. I. pg 68.   She never specifically said READ 180 was capable of achieving the results she described as seeing in UMASS laboratory or the literature she referred to. TR Vol. I. pg 132-134. With respect to the very general reference to rapid reading she was asked whether she heard the testimony of David Drake at the last hearing that Rapid Recognition moves too fast for overall generalization.  She stated "Yes." She then stated "I do remember him saying that. I don't think the research supports that position, quite frankly." TR Vol. I. pg 136. When asked what research, she named a research study at UMASS and several other programs that were not ready for the market.  TR Vol. I. pg 136. Again Hearing Officer Crane erred when he allowed her very general testimony about un-named programs and unsubstantiated claims to be credited to READ 180.  TR Vol. I. pg 132-137.

Most importantly, this testimony was not new.[4] Dr. Souweine testified at the previous hearing that research and literature existed to support her statements, yet this research has never

---

[4] Dr. Souweine testified "I had no prior knowledge of this program except for having read about it in Sally Shaywitz's book…but this was my first introduction to this program was when I saw it in Chicopee." TR vol. IV p.115.; "And I tried it out myself because that's the best way to learn about something." TR vol. IV p. 115.; "So my impression of the program both based on the research that – again, albeit it's new, there isn't that much research that accompanies it, but they did use it on large scale populations, and the fact that I saw it in operation with kids who you would not traditionally assume would be excited about doing this, and I saw them doing it." TR vol. IV pp. 116-117. "I saw it in operation, and I was totally impressed with how this group of youngsters, who are of a similar age –

been produced.    As the petitioner, the legal burden was on the school district to show that it had

a proven methodology.  It could not do this.

         With respect to the two teachers, in no way possible were they qualified to single

handedly rehabilitate READ 180 and prove it was a proven methodology.   The two teachers

testified they had no prior history with this READ 180 prior to September 2004. TR Vol. II pg

239.  Neither teacher testified, nor even qualified as an expert, to show that READ 180 is proven

research based methodology.   This fact was even admitted in the decision, when Hearing Officer

Crane stated, "I do not suggest that these teachers have the same depth of understanding as other

witnesses regarding the reading needs of the learning disabled students in general and how those

needs should be met in general." AR Vol. I. pg 221. Yet oddly enough in the next sentence he

says these teachers are qualified to testify as the key ultimate opinion of the entire case based on

four or five months of experience with READ 180, and with general educational backgrounds in

History and English.  AR Doc. Vol. III. Pgs 800, 824, 880.

---

and I don't know their exact level of functioning, but I could see what they were reading, so they weren't reading at
the highest level, they were engaged in this process and making progress." TR vol. IV pp. 117-118. "Those children
in that class I saw were all children who struggled with reading, writing, spelling. So it certainly was a group of –
I'm not going to opine about the similarity of their IEPs or of their diagnosis, because I didn't read those things
particularly." TR vol. IV p. 118. "Where all the children in the Read 180 program on IEPs?" She answered: "I
believe so. I don't know to a child, but my recollection of my conversation with the teacher was that they were on –
all on IEPs. And my understanding again, I think the SPED director would be a better person to ask this question to
– is that the licenses, the way they purchased the program from Scholastic was specifically for children with learning
disabilities, and therefore I would imagine those would be people on IEPs." TR vol. IV p. 123.
         On direct examination Dr. Souweine was asked "Can you learn it (referring to Dyslexic children) without
the rules?" (meaning without rule based methodologies) She testified "I believe they can, and there is some research
that supports that approach." TR vol. IV p. 38. This research was never produced or identified.  Not only this
research was general research that did not include READ 180.  This line of questioning was followed up on cross
examination. When asked about the research she previously mentioned for non-rule programs, Dr. Souweine stated
that she was aware of some programs being developed at UMASS and possibly being used in Gilmontague Schools.
TR vol. IV p. 93. Ultimately, when questioned about this program and how it is utilized by school districts, she
testified, "I can't really tell you how school districts are using it, that goes beyond my knowledge of how it is used,
but I have seen it used in [UMASS] lab in the absence of rule based programming." TR vol. IV p. 93.
In essence, Dr. Souweine is a psychologist and not a speech and language pathologist. She even testified "I wouldn't
call myself a reading specialist, meaning a reading teacher, but I do consider myself a specialist in terms of
diagnosing reading disorders." It should be noted again that the diagnosis was never in dispute. The issue was
whether READ 180 could remediate dyslexia.

The parents assert that Hearing Officer Crane again erred in weighing their testimony so heavily in determining it was substantial enough to reverse prior precedent. At best the testimony of the teachers was demonstrative of how to administer the program in the classroom on a day to day basis. The testimony was about basic observations about how the children liked the program. Neither teacher could testify that READ 180 has been proven to work with dyslexic children. In fact, at the time of testimony they had not even completed one school year with the same group of children. Neither teacher was involved in a research study. In fact, no data, which supposedly READ 180 collects, was presented. In fact, the testimony they presented proved the collection of Data was flawed in that one student guessed correctly and his scores are not accurate. TR Vol. II. Pg 236. If anything the testimony of these teachers bolstered Dr. Kemper's observations that the program was splintered and fragmented. These teachers testimony also demonstrated how little they had understood about how rule based programming works, even though as the hearing officer pointed out they had been previously at White Oak.

Finally, the Hearing Officer in weighing their credibility never took into account that they were potentially biased based on the fact that they had only recently quit their jobs at the White Oak School and were testifying in an effort against White Oak, to bolstering a program they had defected to, all in an attempt by their employer Dan Schreier to get Kaitlyn out of White Oak.

The hearing officer also failed to consider the testimony of Dan Schreier, as admitted into evidence in this case and from the pervious case which specifically showed that READ 180 was not a proven methodology. In the prior case he stated on page 296, when asked by the hearing officer about signing up for a Scholastic Study, "I think it's a little too early, because I wouldn't want to sign up and then not have good results." This testimony speaks for itself as an admission

that this program is not a research based program and that specifically Chicopee does not know whether it will be successful.

Given that Hearing Officer Crane's decision did not follow the legal precedent established in prior case law, his decision was clearly erroneous, and has done a great deal to disturb the definition as to what the common understanding of a proven programming is for dyslexic children.  As such, Hearing Officer Crane's decision should be reversed as failing to follow established precedent and as clearly erroneous.

II. THE HEARING OFFICER MADE AND ERROR OF LAW IGNORING THE PREVIOUS DECISION AND NOT FINDING FOR THE PARENTS IN VIOLATION OF RES JUDICATA

The parents argue that the issue of methodology as presented in the case by the School District before William Crane was identical to the previous case and thus was already decided and that therefore precluded by the doctrines of res judicata and collateral estoppel. Massachusetts Gen. Hospital v. Weiner, 569 F.2d 1156 (1st Cir. 1978), and St. Elizabeth's Hosp. of Boston v. Weiner, 577 F.2d 722 (1st Cir.), cert. denied, 439 U.S. 965, 99 S. Ct. 452, 58 L. Ed. 2d 423 (1978),

 Before either res judicata or collateral estoppel to apply to bar litigation of a claim or issue in a subsequent case, "three factors must be present: (1) An [**32] entry of a final judgment on the merits in the first action; (2) identity of the causes of action adjudicated (res judicata), or identity of the issues actually determined (collateral estoppel); and (3) identity or privity of parties in the two actions. Walsh v. Int'l Longshoremen's Ass'n, 630 F.2d 864 at 870 (1st Cir. 1980); Black Voters v. McDonough, 421 F. Supp. 165, 168 (D.Mass.1975), aff'd, 565 F.2d 1 (1st Cir. 1977).

With respect to the first prong the decision of the BSEA (04-0093) was binding. The BSEA is an administrative agency statutorily given express jurisdiction over the federal special education laws as well as the state statues and regulations.   Subsequent to 04-0093 decision the School District was ordered and as a result paid for the placement at the White Oak School for the 2003-2004 school year, as well as the 2004-2005 school year.  As further evidence of the finality of the first BSEA ruling, even though it was reviewed on appeal, pursuant to stay put protection, the BSEA's ruling was left undisturbed while on appeal and then ultimately upheld.

Pursuant to the second prong the identity of the issues were identical.  It was repeatedly asserted by all the District's witnesses that READ 180 was appropriate for Kaitlyn.  It is also unclear whether Brighter Beginnings was a new program or the same program as before (Thompson TR. Vol. II. pg. 43,  Kimball TR Vol. II pg. 248. ).  Whether it was a new program or not should be undisputed in that READ 180 was the core methodology employed by the two programs disputed last year and this year case.  AR Documents Vol. II. At pg 122.  However, if the whole program is relying on READ 180 than the issue of whether the  program and/or READ 180 are the same issue. Attorney Thompson agued that the READ 180 program was just one component of the new program, but in reality the remedial reading program is the program.  The parents disagree with her assessment of what is a program.   The other techniques are accommodations, and supplemental teaching strategies that she mentions are not methodologies or rule based remediation, they are plain and simple just good teaching.  In any even the issue of what methodology was appropriate for Kaitlyn had already been decided.

Under the third prong it should be undisputed the parties were reversed but identical in that the school district was the petitioner.

Based on the criteria as discussed above the BSEA as an administrative agency subject to the procedures prescribed by M.G.L. Chapter 30A is required to recognize the doctrine of res judicata.[5] <u>Massachusetts Hospital Association Inc., v. United States District Court for the District of Massachusetts</u>, 500 F. Supp. 1270; 1980 U.S. Dist. Lexis 9466 (October 29, 1980) "Thus, chapter 30A provides sufficient guaranties of full and fair litigation under the *res judicata* law of Massachusetts to justify treating decisions rendered under chapter 30A [**21] as claim preclusive." This Court later states, "We have held that the federal common law rules of preclusion described in Elliott extend to state administrative adjudications of legal as well as factual issues, even if unreviewed, so long as the state proceeding satisfies the requirements of fairness outlined in <u>Utah Construction</u>, 384 U.S. at 422." <u>Guild Wineries and Distilleries, v. Whitehall Co., LTD</u>., 853 F.2d 755; 1988 U.S. App. Lexis 10706 (August 5, 1988). *See <u>Eilrich v. Remas,</u>* 839 F.2d 630, 632-35 & n.2 (9th Cir. 1988); *see also* <u>Plaine v. McCabe</u>, 797 F.2d 713, 719 (9th Cir. 1986) The Utah Construction requirements are as follows: "When an administrative agency [acts] in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." <u>Massachusetts Hospital Association Inc., v. United States District Court for the District of Massachusetts</u>, 500 F. Supp. 1270; 384 U.S. at 422. In the present case both parties were afforded the opportunity to present evidence and testimony, submit written argument as well as be represented by legal counsel.

In this case when Chicopee presented its case against the parents, arguing READ 180 was appropriate for Kaitlyn, without substantial new evidence as an offer of proof, the BSEA should have recognized the doctrine of res judicata and barred further litigation.

---

[5] The Massachusetts Supreme Judicial Court has applied ***res judicata*** to decisions resulting from unreviewed agency adjudications conducted under standards less rigorous than or equal to those in chapter **30A.** *See* <u>Almeida v. Travelers Ins. Co.</u>, 383 Mass. 226, 229-31, 418 N.E.2d 602, 604-05 (1981).

On May 4th 2005, the parent's attorney submitted a motion to clarify the burden of proof asserting "Absent any new evidence submitted by the school district regarding Read 180 The hearing officer should uphold the decision of the previous hearing officer that READ 180 is not an appropriate remedial methodology for Kaitlyn."  AR Documents Vol. I pg 120.  On May 5th 2005, after the lunch break on the second day of hearing, the hearing officer took oral argument on the motion.  The parents attorney argued that the evidence submitted by the school district was not different than in the previous case, and unless there was going to be some new evidence the decision should be already made regarding READ 180. AR TR Vol. II pg 121.   The school district's attorney reinforced its position that READ 180 is appropriate for Kaitlyn.  TR Vol. II pg 122.  However, she asserted that the program does contain rule based programming. TR Vol. II pg 122.  She then states that she "strongly disputes the sentence (in the motion) that there's allegedly no evidence that it is a targeted rule based phonetic system designed for immediate individual reading disabilities. That would be entirely contrary to the documentary evidence and the testimonial evidence and if anything would support the appeal that we've already gone through, so I don't want to re-litigate that issue."  TR Vol. II pg 124. The hearing officer asked her do you agree with your witness Ms. Souweine who testified it was not rule based.  She replied "I believe she testified it's not rule based in the sense that Orton-Gillingham is rule based. Is Brighter Beginnings program rule based? You bet." AR TR Vol. II pg 124.     She then states "I noticed the same thing in the last hearing where the parents tried to turn it into a hearing relative to READ 180 and that's really not what it's about."[6] AR TR Vol. II pg 124.

---

[6] Hearing Officer Byrne stated in the previous decision: "Chicopee argued that its reading class, using the READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. A school is free to choose its own remediation methods, techniques and programs to address a student's documented need for service, so long as there is a reasonable basis for such a choice. The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency, in disadvantaged students attending large public school systems. (P-14, 15; S-3, 4, 7, 29, 27, 31; Schreier; Souweine; Drake) There is no evidence, however, that it is a targeted, rule-based, phonetic system designed to remediate individual reading

Not only did Hearing Officer ignore his obligation to consider this previous ruling regarding READ 180, he was specifically put on notice of his obligation when the parent's attorney filed its Motion to Place the Burden on the School District. AR TR Vol. II pg 125. In their motion the parents also warned the hearing officer "that if the school district is allowed to present the same evidence within such a short period of time without any additional evidence or evaluations, and the hearing officer does come to a different conclusion, this would contradict the very findings of the preceding case and create conflicting decisions. It would also suggest that after losing a hearing the losing party can bring the same issues back year after year and possibly get different outcomes in subsequent school years." AR Documents Vol. I pg 120. Unfortunately, this warning was not headed and we have as a result drastically conflicting decisions.

Hearing Officer Crane asserts that he heard new evidence which allowed him to conclude differently. However, as stated above, this was not substantive evidence regarding whether READ 180 had been proven to work, it was speculative at best. Similarly, at no time was any documentary evidence presented regarding READ 180 which differed from the previous case, which would demonstrate the appropriateness of READ 180 for Kaitlyn.[7]

In his decision the Hearing Officer Crane specifically credited the new testimony of Judith Souweine as allowing him to conclude READ 180 was now appropriate for Kaitlyn. He ignored the fact that her testimony in the previous case was identical. Once again she testified that READ 180 is appropriate for Kaitlyn despite having no real personal or professional

---

disabilities. Without showing of effectiveness with the language learning disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program."

[7] The parent assert that the exhibits pertaining to READ 180 are the same evidence presented last year and that there is no information anywhere in the READ 180 information which states that this is a program designed to be used on children who present with language based learning disabilities. (S4, S5, S6, S7, P 17, P 18, P19).

experience with the program.  Ms. Souweine testified that she is a psychologist and has vast experience testing children with language based learning disabilities.  Ms. Souweine stated the READ 180 was one of the components of the program that was particularly strong.  TR Vol. I pg 71.  After she states that the p[rogram itself is remedial in that it is comprised of Reading/Organizational Skills, that is Linda-mood Bell, the writing experience, the READ 180, those are all the components which make it remedial program for children with learning disabilities." TR Vol. I pg 85.   She later opines "we don't even know what really works with kids, you know that well. You know our research on remediation is not a strong as our research on diagnosis…." TR Vol. I pg 93.     She then states she saw remedial instruction in English Language using "templates or organizational tools in order to help with the writing process." TR Vol. I pg 98.  Every teacher in America in today's classrooms use graphic organizers.  Then she states in the Reading, Language Arts block I was the teachers using the READ 180 program, the Lindamood-Bell Program, repeated reading and oral reading programs – methods, and in science I saw the teacher using a multi-sensory and game program, game task in order to engage the students around vocabulary." TR Vol. I pg 98. As she states she saw methods used.  Again this is just good teaching, it is not specialized instruction designed to teach a child with Dyslexia to overcome that disability.  Additionally, the multisensory game program was the science teacher playing Bingo with the two boys in her class. TR Vol. I pg 104.     Again this is not going to remediate her dyslexia.  These are strategies, and accommodation, but these are not remedial methodologies being implemented.  This is also not a systematic organized delivery of a remedial program.

Mostly her testimony regarding Brighter Beginnings was specifically regarding her observations.  She specifically stated that according to her observation the students were invested

in READ 180.  TR Vol. I pg 75.  She testified that they jumped to get working on the computers.  TR Vol. I pg 76.  She saw students who were excited and having fun. TR Vol. II pg 76.  She also testified that she observed a student working on a READ 180 word study, who upon finishing asked the teacher to generate a report so that he could show his parents. TR Vol. II pg 77.  Query, if these reports have merit why were no examples submitted as evidence? Again this is rather non-scientific evidence that this is a proven program.  It is also the same testimony she gave the previous year.

However, on cross examination, Ms. Souweine testified that her only prior familiarity with the READ 180 program was from observing it in Chicopee's Program last year. TR Vol. I. pg 64-65. TR Vol. I pg 130-131. Again, She had also only accessed information about READ 180 based on it via the Chicopee Public Schools.  TR Vol. I. pg 64 and TR Vol. I pg 211.  In other words, she had not performed research studies or even had experience with this program either through Scholastic, the author of the program, or independently. TR Vol. I. pg 68.  Ms. Souweine testified that she observed READ 180 again during her observation on November 10, 2004, in preparation for her testimony in the this case, but that she had not used the program at any time in between or since seeing it in use at Chicopee High in 2003. TR Vol. I. pg 131-134.  She did not perform any of her own testing.  TR Vol. I. pg 131-137. Her only observation of Kaitlyn had taken place one year before at White Oak on Halloween in 2003.  TR Vol. I. pg 65

Ms. Souweine testified READ 180 was a remedial program. TR Vol. I. pg 98. She stated it was her belief that READ 180 is remedial reading program. However, her testimony regarding her belief was later proven wrong in light of Dan Schreier and Mr. Shotland's later testimony, correcting that statement, that the READ 180 program is an instructional program and NOT a remedial reading program.  (Schreier TR Vol. II. pg 268 and 250)(Shotland  Vol. II. pg 191) (See

also Kimball TR Vol. II pg 234, where he described READ 180 teaching a student about the space shuttle explosion.)

Judith Souweine as the school districts expert witness was the only person qualified to discuss methodology.  However, she had neither personal experience with this program, and she never endeavored to perform a study to prove READ 180 is effective with this population of students.  Same as in the previous year her testimony barely scratched the surface and pertained only to basic observations he made about observing the program in use in the classroom.

The Hearing officer also credited the testimony of three teachers who were hired away from White Oak to make of the basis of the new Brighter Beginnings Program as giving him evidence to conclude differently.  The parents argue that this testimony did not provide the substantive evidence the hearing officer would have needed in order to find the previous decision's regarding READ 180 erroneous.  For example, Mr. Shotland testified when asked by Hearing Officer Crane whether READ 180 was the formal reading program, he said "Yes."  TR Vol. II. pg 180. First, this evades the question as to whether READ 180 is a rule based remedial reading program.  Second, Mr. Shotland was in no way qualified to discuss the underlying foundations of READ 180 and whether it is a reading program as all. AR TR Vol. II pg 131.  In fact, the testimony showed that he and the two other teachers had only two days of training in READ 180 in August 2004 just prior to the school year starting.  AR TR Vol. II pg  239

The next witness for the school district was Jeff Kimball who was hired to teach reading at Brighter Beginnings.  Again he had only become familiar with READ 180 at the beginning of the school year and did so by playing with the computer.  TR Vol. II pg 223. Mr. Kimball testified that he teaches the first half of the Brighter Beginnings 100 minute "READ 180 block." He stated that they listen to a recording of the book on tape.  This is the "book-speak' part of the

READ 180 program.  TR Vol. II pg 240.  Moreover, Mr. Kimball described a program whereby the student is read to or listens to a video or audio tape. AR TR Vol. II pg  226 and  228.  Then answers comprehension questions. This is anything but reading instruction.  He then describes how the program catches spelling mistakes.  TR Vol. II pg 226.   Thus, it only works randomly, this is not systematic introduction of remediation, namely the rules.

Mr. Kimball's testimony was simple and demonstrative of the usage of the READ 180 program as the main stay of the reading class. The parents do not dispute that Mr. Kimball and Mr. Shotland know what the rules are and recognize them when they see them and even do a lesson from time to time on a rule, but this is not rule based programming.  It is as stated by Dr. Kemper program is fragmented and splintered. TR Vol. III. Pg 72.  It provided no clarity regarding the scientific basis of how the program teaches children to learn or what reading disabilities it rehabilitates.   Furthermore, no scores or date he claimed he collected in the classroom was ever presented in full, modified or redacted form. In fact he stated that they do testing every two months. TR Vol. II. Pg 236.  This was never submitted.  However, even if this data as synthesized by an analyst, we would argue that the SRI is manufactured by the same manufacturer as READ 180, Scholastic Inc.. TR Vol. II. Pg 236 Similarly, the Lexile scores are generated from READ 180.  Again no data or research was submitted to show proven results. TR Vol. II. Pg 236 and 244

Mr. Schreier again testified for the school district. His testimony again revealed that he selected the methodology READ 180 for the district despite having no background which would qualify him for such an important task. TR Vol. II. Pg 249, 271 In fact the hearing officer even questioned him whether he had the requisite knowledge to choose the proper methodology. TR Vol. II. Pg 253 He stated that he hopes to employ more strategies for next year. TR Vol. II. Pg

258, 265, 266  Most importantly, Mr. Schreier admits that READ 180 is an instructional methodology and not a remedial reading methodology. TR Vol. II. pg 268  This means that it is a program that teaches information.  A remedial reading program is one that is designed to remediate a particular reading disability.  When Mr. Schreier was asked by the hearing officer whether READ 180 was remedial he also testified:

> "Well its kind of hard to say because we all have different impressions of what words are. I think this is for students – this really this is designed for student for struggling readers…but at the same time (inaudible) remediate skills to the Read 180, all at the same time it is an instructional program which I mean is the fact that they are accessing the curriculum, so in that regards we don't need to do Read 180 and then do an English period as well because you can double them up. HEARING OFFICER: But it is remedial from your point of view in what respect? THE WITNESS: The fact that it's targeted towards struggling readers, students who are not reading at grade level. TR Vol. II. Pg 167-168.

Mr. Schreier's testimony should speak for itself as to his understanding of how to remediate a language based learning disability.

> "Q. Any other reasons why you selected Read 180 other than its correlation to Massachusetts Curriculum Frameworks? Absolutely. A couple things come to mind. The first is not every program in the Chicopee public schools is blessed to have three former teachers from a private special education school who have a background in learning disabilities, but recognizing that, we still needed a program, we needed to specialize our instruction using methodology that's going to attack what I think  virtually everyone knows, No Child Left Behind, Dr. Shaywitz's book, just general good practice of what it takes to have an essential and a good reading program not only for students who are okay in reading but students who are expecting and experiencing difficulties in reading, and by that I'm talking about phonemic awareness, spelling, decoding, reading comprehension. You need something that attacks all those areas so that the student can be successful because if you're a master of phonemic awareness skills but you can't —- when you read something you don't understand what it means because you can't put an image in your mind, you're just reading for reading and there's nothing —- it makes no sense. For an example in that situation, we have a lot of students we say who live in Chicopee, you ask them can you tell us how to get to Springfield, which is the next town over from Chicopee, and they can't do it because they can't put that image in their head, and that's why we need individualizing, verbalizing, or other aspects that help build that mental image when you read so that you read to comprehend. Versus other students have very good imaging but when you

put words in front of them it takes them so long to put the syllables together in a word that it's impossible for them to read that fast enough because they're always focusing on the different syllables of the words and when that happens it's too much of a choppy process, it's too excruciating, it's very slow and it makes it very difficult for them to read, so you need a program that addresses all those different areas, so that's one of the reasons why we chose Read 180 because it does a lot of those areas. Now mind you, Read 180 is not the prefect program for all students. Some students who are significantly, significantly low who don't have basic skills, we need to do more heavy-duty interventions. TR Vol. II. Pg 151 -153

At which point the Hearing officer stopped him and asked:

"Can you tell us what - I'm just going to interrupt just for a second because I need to establish some foundation in terms of what your knowledge and expertise is in general regarding reading programs. I understand your academic background which includes a law degree and a Master's degree, but I don't really have any sense as to what your knowledge or expertise is to begin with in terms of reading and addressing reading deficits, particularly for language impaired, learning disabled students." TR Vol. II. Pg 153-154

To which he responds:

"Sure. A bunch of things, both educationally and experientially. My minor at the University of Connecticut was in English education, so clearly we took a lot of courses in reading instruction, the backgrounds in reading. Since then of course I've done extensive research both prior to coming to the Chicopee public schools…." TR Vol. II. Pg 154

Dr. Kemper later testified that an instructional reading program is dangerous to use with children who have trouble learning to read.  TR Vol. III pgs 29-38 and 57-59, 69-72 The emphasis in a remedial reading program is on learning reading strategies.  As such the reading subject matter can be boring and unchallenging as testified to by the teachers because the subject matter should not get in to way of the lesson which is to learn how to read.  As testified to by Dr. Kemper this is not the correct was to remediate a disability, and it is demonstrative of the Mr. Schreier and the teacher's lack of understanding as to how to remediate a language based learning disability.

24

In addition the testimony taken from the Hearing Officer, the majority of testimony regarding READ 180 was submitted in the form of the transcripts from the previous case.    Again the parents assert that pursuant to res judicata the facts were not similar, the facts were actually the same testimony. AR Vol. I pgs 228-360  The testimony from the previous case was already decided and should not have been subject to reinterpretation which it was. The parents also assert that given that a majority of evidence regarding this issue was submitted in the second case via transcripts, Mr. Crane should have given more deference to Hearing Officer Byrne's decision because she heard the witnesses testify in person, and was able to judge their demeanor and elicit questions from them.    However, the parents assert that even if looked at again in transcript form the testimony of Daniel Schreier from the previous case: pages. AR Vol. I pgs 300-302: demonstrates Mr. Schreier's understanding about what the purpose of READ 180 is and how it is designed to collect data.  He testified that teachers who are not even trained in READ 180 can use the information.  This testimony specifically shows Mr. Schreier understanding of the program and its intended use which is not for disabled children.  In Vol. I on pages 301-302 the previous hearing officer specifically asks him whether training in READ 180 encompasses the same strategies as Orton-Gillingham programs or Benchmark programs, (rule based programs) and Mr. Schreier responds, "No".

The testimony on page 313 is specifically relevant in that that the manufacturer recommends 90 minutes of READ 180 a day.  Many of the witnesses tried to make it seem as if READ 180 was only 20 minutes a day.  If so they were not even using READ 180 correctly. This information is also contained in the READ 180 documents provided in the present case. AR Vol. I  pg 601. This testimony demonstrates Mr. Schreier's lack of understanding of READ 180 program's intended use and how Dyslexic children should learn to read.  After all Mr. Schreier

testified in the present case that he chose the program for the District despite not educational background to do so. AR Vol. I. Pg 271

The testimony in pages 347-360: discusses many facets that have not changed from last year to this year. AR Vol. I. Pg 347-360. This testimony is relevant in that it shows that School District was administering READ 180 last year to various types of student, some who did not have IEPs which means they did not have documents special education learning disabilities. This is especially relevant in light of the issues in the current case, where the parents are asserting that children with varying different disabilities are getting READ 180 with no specific rational for its administration and no IEPs.

Finally on page 354 Mr. Schreier testifies that READ 180 has not proven itself. His testimony is extremely relevant. AR Vol. I. Pg 354. He specifically stated when asked by the hearing officer about signing up for a Scholastic Study, "I think it's a little too early, because I wouldn't want to sign up and then not have good results." AR Vol. I. Pg 354. This testimony speaks for itself as an admission that this program is not a research based program and that specifically Chicopee does not know whether it will be successful. The parents also point out that the school district failed to present any of these finding and data in the later case.

Dr. Andrea Stolar's testimony was presented as a rebuttal witness after the close of the parent's case. Dr. Stolar testified she has experience working at the Curtis Blake Program which employs all the techniques the parents stress are important in creating a language based program, namely tutorial, and rule based programming presented in a systematic sequential manner. However, it was clear she did not create Brighter Beginnings Program. As stated above, Dan Schreier chose the methodologies. It was apparent that Dr. Stolar was pushed forward at the last witness in a last ditch effort to show that someone who was qualified was the brains behind

creating this program. However, her testimony failed to achieve the desired result. She even testified that she was skeptical of READ 180, after Mr. Schreier purchased it. Once again, the only professional observation she has, like her follow colleagues, is that the "kids really seem to like it." TR Vol. III. Pg 262. Furthermore, Dr. Stolar stated that she is only in that building two days a week. TR Vol. III. Pg 250 Based on that testimony she can hardly be considered in charge of the program. Dr. Stolar is not the architect of the program and therefore failed to show a rational hierarchal structure that is always associated with real language based schools. TR Vol. III. Pg 242 She was not involved in the choosing of the core methodologies of the program.

Finally, she testified that she had only limited use and knowledge with READ 180. According to her own testimony, Dr. Stolar was recommending a program she knew little about. Query, how can any of the school district staff recommend a program without having any expert knowledge of it.

Once the school district concluded its case the parents presented its case. The parent's case consisted of documentary evidence submitted, as well as the testimony of Dr. Robert Kemper from Psycholinguistic Associates; the parent's advocate Andrea MacGovern, the father David Tharaldson's testimony; and the prior testimony of the headmaster of the White Oak School, David Drake submitted in the form of transcripts from the previous case.

In the prior transcripts, Mr. Drake discussed his familiarity with READ 180. Mr. Drake also discusses his background and his credentials for being able to qualify as an expert to testify regarding READ 180. There should be no question that David Drake is a nationally recognized speaker, member of several national associations regarding Dyslexia and language based learning disabilities. David Drake and his father have been pioneers in creating programs and schools for language disabled children, including the Landmark Schools, which have benefited

thousands of children with language, based learning disabilities.  David Drake is also the only person who has actually designed and is running a program/school for remediating language based learning disabilities.

In the transcripts from the previous case submitted, David Drake described his own investigation into the READ 180 literature's claim that it was research based. AR Vol. I pgs 228-229.  David Drake testified how READ 180 has no real basis for its claims, because of the variant population of readers it was tested on.  He described how he learned that READ 180 was used in cities where truancy, delinquency and English as a second language were the main problem the school districts were dealing with.  He discussed how READ 180 uses slick marketing and industry "buzz words" to appeal to school districts; but that the program really lacks an understanding of how language disabled children learn. AR Vol. I pgs 241 The parents assert that Mr. Drake's testimony is self evident regarding READ 180 and its use on the language based student population.

The hearing officer should have limited his inquiry into the core methodology employed by the Brighter Beginnings Program which had not changed.  The fact that the Brighter Beginnings program hired three teachers who where previously employed by and trained by the White Oak School had no relevance in that they were not using the same rule based methodologies they were trained to use as White Oak.  The testimony was also clear that these teachers are operating according to their own agendas and that the strategies they are using are random and not connected to a larger framework.  Granted these teachers are using certain strategies they learned at White Oak, and Chicopee was using some Linda-Mood Bell Programs, however, many of these are strategies are merely accommodations and not remediation.  Thus, without the rule based programming presented in a systematic manner within the tutorial setting,

and connecting it to the classrooms, where it is practiced and reinforced, the Brighter Beginnings program is merely a shell of a program without a heart or any core substance and defiantly not capable of remediation.

In essence, the school district's case shows that the school district intended on retrying the same issue as the pervious year, despite losing at hearing and on appeal. The school district intended on showing that READ 180 was a methodology that is appropriate for Kaitlyn and students with language based learning disabilities, and as such the School District upon admitting its position the READ 180 was appropriate for Kaitlyn, should have been precluded from re-litigating that issue.

### III. THE HEARING OFFICER ERRED IN CONSIDERING SERVICES THAT COULD HAVE AND SHOULD HAVE BEEN IN PLACE, BUT THAT WERE NOT IMPLEMENTED IN A TIMELY MANNER.

The parents assert that the hearing officer erred in considering evidence of the services that could have been provided, rather than considering what services were actually available when the IEP was offered, thus incorrectly considering evidence relevant to whether the IEP and placement were appropriate.

The IDEA specifically requires school districts to provide parents "a formal written offer before either initiating a placement for a disabled child or otherwise providing a FAPE to the child." See 20 U.S.C. § 1415(b)(1)(C). In discussing the importance of the formal written offer requirement, the Ninth Circuit has noted "that the requirement is not merely technical, but rather serves the important purpose of creating a clear record of the educational placement and other services offered to the parents. See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1526 (9th Cir. 1994). "The written offer requirement should therefore be enforced rigorously." Id.

In the present case the School District made a formal written offer, drafting an IEP and presenting it to the parents one month prior to the beginning of the school year.  That offer included placement at its new program called Brighter Beginnings.  The parents assert that hearing officer considered only the IEP and failed to consider the failure of the school district to carry through on its offer in real and practical manner.

Similar to the present case, the district court in <u>Knable, v. Bexley City School District</u>; 238 F.3d 755; 2001 U.S. App. Lexis 902; 2001 Fed App. 0027P (6th Cir.) began the hearing process attempting to address the question of whether the school district's proposed IEP offered an appropriate program for the student.  In <u>Knable</u>, the administrative agency found for the school district and the parents appealed.  The District Court on review agreed with the administrative hearing officer's decision that the proposed IEP and the Harding School program, "**could have** provided a free appropriate public education to meet Justin's specific needs . . . ." (Emphasis added). The district court suggested that any unanswered questions resulting from deficiencies in the  proposed IEP were the parents' fault inasmuch as "[school district] offered 'continuing and abundant opportunities to the Knables to be involved in fashioning an IEP."  On appeal from the District Court, the Sixth Circuit Court of Appeals held that "The district court erred in relying on the [administrative hearing officer's] finding that Bexley had the capacity to offer Justin an appropriate program. The district court should have limited its assessment to the terms of the draft IEP document itself."  The Sixth Circuit Court of Appeals concluded stating:

> "Although there was evidence in the record indicating what could have been provided at Harding, only those services identified or described in the draft IEP should have been considered in evaluating the **appropriateness of the program** offered. The district court erred in assessing the **appropriateness of the program** offered by Bexley based on what Bexley might have provided..." <u>Knable, v. Bexley City School District</u>; 238 F.3d 755; 2001 U.S. App. Lexis 902; 2001 Fed App. 0027P (6th Cir.)

In as much as the school district is held to the offer it makes in the IEP, the inverse must also be true, that the program proposed in the IEP must deliver the services it offers.  It must be made clear that the IEP includes a placement page and thus placement is part of the offer.  If this were not true, hypothetically, a School District could offer a perfectly well drafted IEP, without ever having to implement the proposed IEP.

In the present case the IEP offered a multitude of services that were later proven not to be available at the Brighter Beginnings Program.  On page 4 of the IEP under Present Levels of Education, under *What types of specially designed instruction is necessary for the student to make effective progress?* It states: "Through the school day, **remedial, rule based**, multisensory instruction for language based skills needs to be **provided concurrently with Curriculum Frameworks** based contextual instruction." (Emphasis added).  As stated in great detail herein, and admitted by the school district, READ 180 is not a Rule Based program. AR Vol. III pg. 765.

The hearing officer also heard testimony demonstrating that the services offered in several core subjects were not available to Kaitlyn as tenth grader.  For example, the IEP offers specialized services within the Brighter Beginnings Program, in science, math, social studies, and Reading and English language arts. AR Vol. III pg. 781. The IEP also states that Kaitlyn will have a separate Oral Expression class. AR Vol. III pg. 781 Most importantly, the IEP states that she will have a 1:1 tutorial.  (see page 20 of 26 Service Grid). AR Vol. III pg.  781  When the parents performed their observations of Brighter Beginnings Program in February 2005, approximately half way through the school year, no 1:1 tutorials were in place, and no tenth grade math, science or social studies existed. ( See Parents testimony, Kimball, Shotland Matavi.)  The program also did not have the Oral Expression class as promised. It was the

testimony of Mr. Schreier that had Kaitlyn come to the program they would have found other kids to create these classes for her. TR Vol. II pg 265. Query, if these other children exist and are in the school district it is a direct violation of Child Find[8] 20 U.S.C. § 1412(2)(C) not to already be providing them these services. In essence, these children should have already been found.

The hearing officer heard the direct testimony of Mr. Mattavi, the math teacher in the Brighter Beginnings program and how he was attempting[9] to teach his first year teaching math and that he had formally taught science at White Oak School. TR Vol. II pg 9. Mr. Mattavi was just in the process of getting his special education certification and he was creating the curriculum. TR Vol. II pgs 10 and 85. Mr. Mattavi was also asked on cross examination about the students in his Geometry class. According to discovery materials and the schedules provided (P1 to P 9) during discovery there were only three students in that class. He testified that two of the students are ninth graders. It was asked of Mr. Mattavi whether it was advanced for two ninth graders to be taking Geometry and contrary to the curriculum frameworks. He responded that he believed Algebra was a prerequisite to Geometry. He was then asked if the two ninth graders had taken Algebra? TR Vol. II pgs 93, 94 He responded he did not know. He also

---

[8] In exchange for federal funding, the IDEA requires states to identify, locate, and evaluate "all children residing in the State who are disabled . . . and who are in need of special education and related services . . . ." 20 U.S.C. § 1412(2)(C) (1994). States must provide all such disabled children a "free appropriate public education" ("FAPE"), 20 U.S.C. § 1401(a)(18), and school districts receiving funds under the IDEA must establish an IEP for each child with a disability, see 20 U.S.C. § 1414(a)(5).

[9] Mr. Mattavi's testimony consisted solely of describing the varying strategies and accommodations the students receive in his geometry class. He also testified that he is currently not a certified math high school teacher. He discussed three ring binders and spot checks. He discussed warm up routines and work sheets the students do before class. He discussed tape recordings and highlighting as well as other organizational strategies. He discussed how he uses open book quizzes and photocopied materials as well as giving the students extra time. However, he failed to discuss how his class is connected to the program in general. In fact, he testified that he leaves the building for a large part of the day to go to Chicopee Comprehensive High School. He never discussed how even in math he is supporting and reinforcing remedial instruction learned in the READ 180 class. In fact, Mr. Mattavi stated that he expects they will give 1:1 tutorials next year. He testified generally about a number of things that they hoped to have for next year. As the hearing officer is aware the IEP and program in question are for this past year.

admitted that the goals for math in Kailtlyn's IEP's were not correct, however he later stared that he was not wedded to the IEP.  TR Vol. II pgs 93 and 114

The Hearing Officer should have concluded that based on the grade level of the students in that class, that this class could not be a real tenth grade level Geometry class wherein all students have successfully taken and passed Algebra.  The Hearing Officer should have found that this was a low level math class which is not appropriate for Kaitlyn.[10]

When asked on cross examination about the rule based instruction called for in the IEP, Mr. Mattavi stated: "… again, yah, I would make sure I'm hitting that. If I wasn't hitting that part of the IEP then I got to make sure I'm hitting that." TR Vol. II pg 116 Again, this demonstrates his understanding of how rule based methodologies are to be administered.  As later testified by Dr. Kemper, the rules are introduced in and presented systematically at different stages, and not in a piecemeal fashion consistently all day long, over a long period of time.  TR Vol. III pg  29-32. When a teacher merely reminds a student of a rule, or quickly touches on it for a day, this is not an example of the correct implementation of rule based programming.  As testified by Dr. Kemper, the rule based programs are specifically designed to introduce information and advance the students to higher levels systematically in a specific order of progression.  He also testified that this process of systematically introducing rules is the end result and the product of years of research.   TR Vol. III pg  29-32.

Finally, Mr. Mattavi was asked to discuss the science class on behalf of Ms. Cronin.  The testimony was clear that the science class, which was made up of the same two ninth graders

---

[10] This leads to the fact that the actual IEP goals and objectives stated for Kaitlyn in math are for Algebra. (See J1).  Mr. Mattavi was made aware that she completed this subject last year and is currently enrolled in tenth grade Geometry.  Mr. Mattavi stated when asked if he would follow the Algebra math goals, despite that fact that he was supposedly teaching Geometry, that he was "not wedded to the IEP."

from his math class, was not appropriate for Kaitlyn based on the fact that she had previously completed Chemistry at White Oak and was now in Physics at White Oak.  Mr. Mattavi could only testify that next year they hope to have more options. TR Vol. II pg  29-32. 107.  The Hearing Officer should have concluded that no science class was available for Kaitlyn as stated in her IEP.

The hearing officer also heard the testimony Mr. Terry Shotland.  Mr. Shotland testified that he had also been previously employed at the White Oak School but that he had recently left to teach at Brighter Beginnings.  Mr. Shotland was asked to describe the READ 180, 100 minute reading block, which he co-teaches with Mr. Kimball.  He testified this is the class period when Kaitlyn would have received a 1:1 tutorial as it is stated in her IEP.  However, according to Mr. Shotland's testimony period 5 contains many students who rotate throughout stations during the period.  TR Vol. II pg  139.  He described a classroom with five students and two teachers.  The students work with the teacher for approximately 20 minutes, then read independently or work on the computers with READ 180. TR Vol. II pg  141. There was no testimony that the students are given any remedial instruction during their time working with the teacher.  Furthermore, there was no testimony that during that 1:1 time, which we argue isn't really 1:1 since the teacher is responsible for the other students in the classroom, that students were introduced to new information. TR Vol. II pg 178  For that matter, there was no testimony presented that each tutorial was part of an ongoing tutorial which followed some orderly or systematic approach to learning a remedial reading program.  As he stated its "basically shared reading." TR Vol. II pg 137.

Mr. Shotland's testimony also contradicted the testimony of the others in that he stated that READ 180 was the only formal reading program (TR Vol. II pg 180) then he stated it is rule

based program. TR Vol. II pg 191. However, he then said it is an instructional program. TR Vol. II pg 191.

It was also clear that this class time, during 5th period, was in fact part of the READ 180 rotation as described in the literature. (AR Vol. II. Pg 601 and P17). TR Vol. II pg 141. The students work on the computer, read from the scholastic books purchased with the program and selected by the computer, then have some time reading with the teacher. TR Vol. II pg 240. As Mr. Shotland testified, the computer time "frees me up" to work with other students. TR Vol. II pg 144 However, what about the students working on the computer alone? As his testimony demonstrates, the students are working alone for the majority of the period. This is not only not a 1:1 tutorial, it is the antithesis of a 1:1 tutorial given that students are working alone. Ms. Souweine was also asked about whether she observed a 1:1 tutorial. She stated that she saw a code emphasis **group** lesson, but that it was consistent with her understanding of what that meant, despite the fact that it was not 1:1. TR Vol. I pg 111 Again the Hearing Officer should have concluded the program failed to offer services as described in the IEP.

The Hearing Officer also heard Mr. Shotland testified about the social studies class he teaches, which again was comprised of the same two ninth grade boys, one of who has a 75 IQ according to testing performed in 2001 by Dr. Lois Carra. TR Vol. II pg 150-153. The hearing Officer should have concluded that given that this class was a general social studies class consisting of two ninth graders, it was not appropriate for Kaitlyn who as a tenth grader and according to the curriculum frameworks was enrolled in US History II.

At the end of the hearing it was the testimony of Mr. Schreier with respect to all of the missing science, social studies, math, tutorial and oral expression class, that if Kaitlyn had come to the Brighter Beginnings program they would have created the appropriate classes. TR Vol. II

pg 265. Mr. Schreier never elaborated on where he would find the other students to comprise those classes.   Mr. Schreier repeatedly testified that the program will be available "next year." TR Vol. II pg  258,265, 266.  Considering that he was talking about "next year" and where "next year" is now this year, it is relevant. It should also be noted that Mr. Schreier is also no longer employed by the Chicopee Public Schools, this year.

The Hearing Officer failed to consider that even basic classes such as math, science and history would not have been available to Kaitlyn should she had been attending the Brighter Beginnings program.  Ultimately, Hearing Officer Crane concluded that the absence of the Oral Expression Class was not critical and that those services could be rolled into other classes throughout the day.  With respect to the absence of a 10th grade Math, Science and Social Studies classes, he also concluded in footnote 24 that had Kaitlyn come to Chicopee, he takes the word of the school that they would have created the other classes. AR Doc Vol. I pg 217   In making these determinations the Hearing Officer failed to consider the scope and timeliness of the offer made by the IEP.

The hearing officer should have made his decision based on the services that were offered to parents, the services that were observed by the parents, and the services that were actually available for Kaitlyn, not on what could have been provided at some point in the future.

IV. THE HEARING OFFICER MADE AN ERROR OF LAW IGNORING THE REQUIREMENT THAT STUDENTS BE EDUCATED WITH PEERS THAT HAVE SIMILAR DISABILITIES AND PROFILES AS STATED IN THEIR IEPS

The Hearing Officer failed to consider the evidence that the students were of varying types of disabilities, with very different mental and emotional profiles in violation of the Massachusetts Regulations which specifically regulate instructional grouping.

States have consistently taken steps to implant standards, beyond the scope of the federal floor, in order to protect those special education students who require placement outside of mainstream classrooms in substantially separate programs.   The obvious reason for the regulations are the same as for the creation of the IDEA itself, which was to protect students with disabilities from being lumped together and "warehoused" away in remote parts of the school away from the general population of students.   Massachusetts is no exception, enacting regulations designed to protect students who fall into this exception.   The regulations in Massachusetts are promulgated at 603 CMR 28(6)(b) and state that "size and composition of instructional groupings for eligible students receiving services outside the general education classroom shall be compatible with the methods and goals stated in each student's IEP." 603 CMR 28(6)(b).The following section holds that: "Instructional grouping size requirements are maximum sizes and school districts are expected to exercise judgment in determining appropriate group size and supports for smaller instructional groups serving students with complex special needs."  603 CMR 28(6)(c).  See also 8 N.Y.C.R.R. § 200.6(3) [11]

In the instant case, Hearing Officer Crane held, "There is no disagreement between Dr. Kemper and Dr. Souweine that an appropriate grouping of students for a language-based program for Nelida would be that all students have a learning disability, all students have average to above-average cognitive abilities, and no student has a significant emotional or behavior deficit that would likely interfere with the learning of the other students."  However, after stating this and after hearing evidence that demonstrated low cognitive functioning,

---

[11] 8 N.Y.C.R.R. § 200.6(3) requires students with disabilities to be grouped by similarity of individual needs. Essentially, this regulation requires that: (1) students share a similar range of academic or educational achievement; (2) the social development of each student be considered prior to placement in an instructional group; (3) the students' physical needs be considered prior to placement in an instructional group; and (4) the opportunities of other students to benefit from instruction are not consistently diminished by the presence of any one student.

emotional problems, and differing abilities and disabilities, he found the grouping to be appropriate.  He states:

> "[The] testimony of Mr. Mattavi, Mr. Shotland, Mr. Kimball, Dr. Stolar and Dr. Souweine, as well as the redacted IEPs of the students in this program, support the contention that each of the students in the Brighter Beginnings program has a learning disability, and that the students otherwise reflect an appropriate grouping for a language-based program." Exhibits JI through *J-9;* Summary of the Evidence, pars. # 35, 36, 46, 67.  AR Doc. Vol. I pg 222.

Dr. Souweine stated that she saw the IEPs of the students in the Brighter Beginnings Program, but that she did she review any of the educational files of the students in the Brighter Beginnings program.   TR  Vol. I pg 159. As such. At the time of her observation she was unaware of their primary disabilities or their cognitive functioning levels.  Of the many IEPs she was shown several were expired. TR Vol. I pg 163.   She was shown Student A's IEP which identified him as 9th grade student. The IEP states right in it that the family is not sure about READ 180. The IEP also states that he may be getting services from Curtis Blake Center. This was something she knew nothing about.  She was next shown Student B's IEP.  The IEP Expired 11-24-04. TR Vol. I pg 161. She was asked if she had reviewed any of the Tufts evaluations referred to in the IEP. TR Vol. I pg 166. She had no knowledge of this testing or the students low IQ.  TR Vol. I pg 166. Moreover, she was asked about the numerous social emotional goals and issues in the IEPs and whether it had an effect on her opinion.  She stated it did not. She was next asked about Student C, who's IEP revealed his grades as 60, 69, 75, and 71. TR Vol. I pg 143. She was next asked to review Student D's IEP who is a full inclusion student who only enters Brighter Beginnings for English. TR Vol. I pg 151. She was next asked to review Student E's IEP. This IEP reveals possible low "cognitive functioning…" concerns. AR Doc Vol. II pg 436. She was next asked to review Student F's IEP.  This is also an IEP that expired on 12/9/04. AR Doc Vol. II pg 450.  This IEP revealed many behavior goals, career skills program/vocational

and emotional deficits. The IEP states "cognitive functioning is at level such that intense instruction outside gen. ed. environment facilitates more effective participation…" AR Doc Vol. II pg 450.   She was next asked to review Student G's IEP.  This IEP states he is "passing most classes" "displayed relative weakness in anticipation of consequences and interpretation of social situations." AR Doc Vol. II pg 470.    The IEP is checked as partial inclusion.   She was next asked to review Student H's IEP.  Her grades are listed in the IEP as follows, (Eng (9) 66 – Algebra 64 – Science 62).  AR Doc Vol. II pg 483.  She is also a partial inclusion student. Finally she was asked to review the IEP of Student I.  His IEP reveals he was on an extended evaluation for a possible (Non Verbal Learning Disability) which expired 11/04. AR Doc Vol. II pg 496.   It ever explained if this student was ever found eligible for services.

Andrea Stolar stated that she did not admit the students into the program.  She testified that in fact there was no admissions criteria for acceptance in Brighter Beginnings.  TR Vol. III pg 267. The hearing Officer states in his decision, "Dr. Stolar made clear in her testimony that she is familiar with this student whose IEP is exhibit P-2. Her responsibilities include review of each student prior to admission to Brighter Beginnings to determine appropriateness of placement." The testimony was not such. She stated: when questioned about one of the ninth graders who has an IQ of 75, and whether she had seen the educational testing that stated this, she indicated that she had not seen it until she received it from his lawyer.[12] TR Vol. III pg 257.

The hearing officer properly states that "Parents have also raised concerns that several of the IEPs of students at Brighter Beginnings reflect goals and objectives relative to emotional or behavioral needs. AR Doc Vol. I pg 223.  For example, Parents point to exhibit P-2, which includes a goal addressing social skills and objectives relative to awareness and understanding of

---

[12] The particular child is represented by Derek M. Beaulieu, the same lawyer as the parents in the present case who presented the school district with this information prior to the hearing.

emotional issues…Parents also point to exhibit P-6, which includes a behavior goal, as well as a number of related objectives. AR Doc Vol. II pg 383 and 450.  This IEP reflects potential difficulties regarding occasional behavior in class. AR Doc Vol. II pg 450.   The hearing officer somehow finds this evidence not relevant based on the fact that it was contained within an expired IEP.  "However, I note that the IEP expired 12/9/04. Exhibit P-6."  AR Doc Vol. I pg 223.  This was the second expired IEP of the group.  Ms. Stolar's testimony also revealed that another student had been removed from the program. TR Vol. III pg 268. However, she did not know to what program this student was sent to.  TR Vol. III pg 268.

Mr. Mattavi also spent a great deal of time testifying that Kaitlyn would fit in at the Brighter Beginnings program despite the fact that only one other female student was enrolled in the entire program and that female was only in one class within the program.  TR Vol. II. 47, 63, 78, 94.  Based on the gender of the peers in the group alone this grouping should have been deemed inappropriate

The ill suited logic of the instructional grouping of the Brighter Beginnings program was also demonstrated though Mr. Shotland's testimony of the English (hereinafter ELA) class he teaches.  According to his testimony there are four students enrolled in that class.   However, according to the documents, the ELA class is apart of the Brighter Beginnings program. However, none of the students in the ELA class are enrolled in the READ 180 reading class portion of the program which employs READ 180 program. AR Doc. Vol. II  pgs 364-496. The testimony and the schedules of the students (P1 to P9) clearly show that with the exception of one student, who goes to the math class, all the students in the ELA class come into the Brighter Beginnings program for one ELA period then leave Brighter Beginnings for mainstream classes. Id. The parents question the logic of this considering this is supposed to be a substantially

separate program for students with language disabilities, yet these students only need one intensive language based class a day.

Given the nature of Kaitlyn's disability she requires language based instruction in English Language Arts and Reading, her two greatest areas of difficulty, as well as her other core subjects. It should stand to reason that if the other students enrolled in the program have similar disabilities to Kaitlyn they would also be enrolled in language based classes across the curriculum. It should also stand to reason that if these other students in the Brighter Beginnings program are enrolled in the same in ELA class, they should at least be receiving remediation in the READ 180 reading class. The fact that none of the students from the ELA class go the READ 180 class shows a real disconnect, not only in the in the program, but the type of students who are receiving the services. This demonstrates that the children in the ELA class are not similarly situated to Kaitlyn.

The Hearing Officer failed to find that the instructional grouping was appropriate, and thus hold true the promise of a fair and equitable an appropriate substantially separate program for Kaitlyn.

II.   IN THE EVENT THAT THIS COURT FINDS THE BSEA DECISIONS CONTRADICT ONE ANOTHER AS TO WHAT IS APPROPRIATE PROGRAMMING FOR KAITLYN, THE PARENTS ASSERT THAT ADDITIONAL EVIDENCE SHOULD BE TAKEN.

The hearing officer's decision completely undermined and contradicted the decision of the prior hearing officer.[13]  The first hearing officer found Judith Souweine's credibility lacking and

---

[13] The parents speculate that Hearing Officer Crane did not have the requisite background knowledge with respect to rule based programming in order to understand the gravity and seriousness of the decision he rendered. The practical effect is that under his decision Kaitlyn would be getting programming that was not designed to remediate language based learning disabilities. This program has not been scientifically proven as an appropriate methodology for language based disabled students. The evidence is very clear that no one testified that READ 180 was a remedial reading program. This appears to be a supposition that Hearing Officer Crane made a dramatic leap to. This leap was so proclaimed by Hearing Officer Crane off the shoulders of the testimony of Mr. Shotland, and Mr. Jeff Kimball, both who have no expertise, no educational background or clinical background in diagnosing,

accredited Dr. Kemper's testimony.  The second hearing officer stated the opposite to be true. However, several serious legal errors were committed in Hearing Officer Crane's decision, which make it fatally flawed.  However, given the differing opinions the parents assert that if this Court does not reverse the later decision on a ruling of law, then perhaps additional testimony should be taken to clarify which expert is correct.

While it is true that the reviewing court "As a means of assuring that the administrative process is accorded its due weight and that judicial review does not become a trial *de novo*" a party may still "introduce additional evidence at the district court level." Roland M v Concord School Committee,  910 F.2d 983; 1990 U.S. App. Lexis 13170 (August 3, 1990). The standard for introducing evidence is to "provide some solid justification for doing so."  To determine whether this burden has been satisfied, judicial inquiry begins with the administrative record. A district court:  *See* <u>Burlington II</u>, 736 F.2d at 791.

Given that the decisions conflict one another regarding the appropriateness of READ 180, the Parents assert that there is definite confusion amongst the hearing officers within the BSEA. Ironically, in the realm of special education, the term "rule based programming" is well understood and need no further explanation.  In the last decision, the terms were taken apart and separated to confuse the hearing officer.  For example, the READ 180 program and the teachers may have pointed out rules of the English language.  Similarly, the teachers practice repetition of learned lessons.  And the lessons they teach are according to their testimony systematically introduced.  Finally, they claim all of these terms together make it a language based classroom. This is anything but rule based programming.

---

researching, or understanding the in depth nature of how these programs remediate dyslexia.  Both were teachers at White Oak and according to their testimony showed a lack of understanding of how rule based programming works.

Rule based programming as described by Dr. Kemper, is based on the research of Orton Gillingham,[14] two early pioneers who developed and research language based learning disabilities.  Rule Based programs today are the grandchildren of early Orton Gillingham programs and as a rule they deconstruct the English language and systematically re-introduction it to them thorough general rules that apply to the English language.  In his evaluation, Dr. Kemper recommended this type of structured rule based language programming to provide direct remediation to Kaitlyn for her specific learning disability.  In both cases, Dr. Kemper spent a great deal of time discussing what rule based programming is and how a set of principles or rules help children encode and decode and make sense out of language. Unlike the other witness who where asked "What is a rule based language program, and what is meant by multi sensory, code emphasis instruction presented in a   systematic and structured manner?"  Dr Kemper was actually able to answer the question and in great detail. He testified that a number of rules govern how the English language operates. TR Vol. III. In general.  He discussed, using a pyramid analogy, of how the acquisition of literacy is gained and how children such as Kaitlyn are missing vital pieces of the foundation of their pyramid. He described how these foundational underpinnings in the spoken language and acquiring an understanding of sounds to symbol relationship are necessary before a child can acquire higher order functioning, namely reading and writing.  In essence, he discussed how rule based programming seeks to take the child back to the basic symbols, namely the letters, and show them how these symbols represent sounds. Rule based programming then seeks to teach the child the language all over again from the core

---

[14] The rule based programs begin at the basic level of understanding that there a twenty six letters in the alphabet, each letter capable of making two sounds.  However, when combined in blends or with vowels other these letters are capable of making additional sounds. Children with Dyslexia do not naturally process language and even once the rules are explained, similar to learning a foreign language, they must be practiced in all curriculum areas, all day, so that these skills become automotive.  Eventually, the rules do not so much focus on individual letter sound symbol relationships, but move into more complicated areas of understanding language so as to increase rate and fluency while also maintaining comprehension of what one has read.

rules of decoding and encoding, to showing patterns in language, all the way up to being competent fluent and automatic readers. He then testified how the rules are introduced systematically or in stages according to a predetermined plan depending upon the particular rule based reading program. He described the Let's Read program, which he stated is an Orton Gillingham rule based program that has several series or levels which the student progresses through. He indicated this is the type of remedial reading program he recommends. He did also testify that he does also recommend that certain Lindamood Bell programs, such as visualizing and verbalizing, should be used to compliment or support the rule based program. However, Lindamood Bell programs were not intended, nor should they be used as the sole reading strategy.

Dr. Kemper also described the significance of the individual tutorial. He described that role of the tutor a one who would provide Kaitlyn with direct systematic instruction, namely the Lets Read – or other Orton Gillingham programming. This is the main place where she is taught her new remedial skills. He testified that the tutorial is not just simply a place for reviewing home work or reading together. He then described the purpose of the tutorial within the hierarchy of the substantially separate language based program. He likened the tutorial to the hub of the wheel where new strategies are learned then supported and reinforced in the classrooms across all academic domains. He also testified that the purpose of the substantially separate classroom allows the child keep up with her peers by getting new language skills while simultaneously maintaining in the content areas of instruction. He specifically described instruction across the board in all classes, with a lot of redundancy throughout the day. He testified using three words "inundated" and "total immersion."

44

He also testified that it takes time to learn the rules. He estimated approximately three years. He also emphasized that it is hard work to learn the rules, but that it is the only proven methodology. He also poignantly stated that the student will have dyslexia for life, and there is no quick fix.

Dr. Kemper also discussed his familiarity with the Scholastic's Program READ 180. He testified that READ 180 is not a rule based program in that it does not provide information in rules or patterns or in a systematic fashion. Dr. Kemper also testified that it was his opinion, based in large part on the manufactures own literature, that READ 180 is a program for children who lack a background in reading due to lack of access to language. He was clear however, in asserting that READ 180 is not a program for students, like Kaitlyn, who present with a pathology or specific language based learning disabilities, like dyslexia.

Dr Kemper also testified about his observation of Brighter Beginnings program on March 11, 2005. Dr. Kemper testified that he observed four classes of the Brighter Beginnings program. Dr. Kemper testified that based on his observation of READ 180 as used by Mr. Kimball and Mr. Shotland in period 4, he found the presentation of information too advanced in some aspects. He testified that the lesson should be focused on the learning of the new lesson and not the acquisition of new information. He pointed out that he was concerned that the information presented in the story, which pertained to artists Georgia O'Keefe and Claude Monet, and referenced such terms such as pointillism, would cause many students problems because the information was outside of their realm of knowledge. Therefore, the student would be working twice as hard to figure out the story, or be confused by the story and not get the underlying language lesson. Thus, what the school district presented as exciting and high interest materials, according to Dr. Kemper hampers the acquisition of the underlying language lesson.

Dr. Kemper also testified that he found that the lessons presented in period 4 were not followed up on with practice in period 5 and that the program lacked cohesion. He testified that he saw the teachers introduce a lesson on syllabication then not follow it up. He testified how the student went directly from that lesson to the computer where he worked on something entirely different.

The principles that were introduced by the Dr.'s Orton and Gillingham in the 1940 are the only methodology with a lengthy history of proven results for language based students. Moreover, for families with language based disabled children this is the closest thing to a cure. While there may be other ways to remediate language based learning disabilities, such as through an eclectic approach of combining rule based programming with other proven strategies, READ 180 had no basis at all. In fact, it was Dr. Kemper's testimony that using an instructional program can actually be shown to cause damage.

The parents close by asserting that Dr. Kemper and David Drake clearly testified at the hearings, however, if there is any doubt, the parents are so confident as the correctness of their position, that what they are saying about the dangers of the BSEA sanctioning programs like READ 180 for Kaitlyn and other students like her, that they will secure a nationally recognized speaker from the National Dyslexia Association, or Orton Gillingham Society to educate this judge as to what it means to be remedial, rule based systematic program based on the principles of Orton Gillingham and why parents are desperate to ensure that their children receive it.

Moreover, this decision is clearly erroneous, it flies in the face of those who have spent lifetimes developing real rule based programs, it is harmful to children who need this type of programming in order to remediate their disability and it must be reversed.

## CONCLUSION

The parents assert that for the reasons stated above the United States District Court, as the reviewing body should reverse the last BSEA decision in that the Hearing officer erred as a matter of law and that his decision was clearly erroneous.

WHEREFORE, the Plaintiffs, respectfully move this Court to support their motion for summary judgment and enter summary judgment for them.

Respectfully submitted,
The Plaintiffs
By their attorney

January 15, 2006                    **/S/DEREK M. BEAULIEU**

Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103
BBO#64418