# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### WESTERN DIVISION

DAVID T. As Parent and next friend of
Kaitlyn T.,
    Plaintiff

v.

CITY OF CHICOPEE, Acting through the
Chicopee Public Schools, and
MASSACHUSETTS DEPARTMENT OF
EDUCATION,
    Defendants

**Case No: 05-30158**

## CHICOPEE'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

The Defendant, the City of Chicopee acting through the Chicopee Public Schools

("Chicopee"), respectfully submits this memorandum of law in support of its motion for

preliminary injunction seeking an order that Chicopee is not required to fund the

Plaintiffs' unilateral private placement at the White Oak School for the 2005-2006 school

year unless and until this Court overturns the Bureau of Special Education Appeals

("BSEA") hearing officer's decision and rules in favor of the Plaintiffs on the merits of

the Parents' appeal.  Chicopee also requests that the Court hear argument on the pending

cross-motions for summary judgment in this case on an expedited basis.  This Motion for

Preliminary Injunction, brought pursuant to 20 U.S.C. § 1415(i)(2)(C) of the Individuals

with Disabilities Education Act ("IDEA"),[1] should be granted where, as here, the Parents

---

[1]  20 U.S.C. § 1415(i)(2)(C) provides that, when an action is brought in the District Court, the Court:
(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the
request of a party; and (iii) basing its decision on a preponderance of the evidence, shall grant such
relief as the court determines is appropriate.

have unreasonably protracted this dispute and the facts of the case establish the well-settled elements for a Preliminary Injunction.

## BACKGROUND

This matter arises out of a Complaint for Judicial Review (the "Complaint") instituted by Kaitlyn T. (the "Student") and her Parents (the "Parents"), which, along with the parties' cross-motions for summary judgment, is currently pending before this Court . In their Complaint, the Parents ask this Court to overturn BSEA hearing officer William Crane's decision relative to the appropriateness of the Student's Individualized Education Plan ("IEP") calling for the Student's placement in the Brighter Beginnings Program at Chicopee High School for the 2004-2005 school year.

The IEP at issue was first discussed by the parties, when, after several meeting cancellations, the Student's special education TEAM convened at the White Oak School on July 12, 2004 for the purpose of developing the 2004-2005 IEP.  At the meeting, the Parents and their counsel were provided with a description of the Brighter Beginnings Program ("Brighter Beginnings"), a copy of which is attached as Exhibit A.  Brighter Beginnings, which was developed by Chicopee in the spring of 2004, is a secondary program for students diagnosed with language-based learning disabilities.  *See Exhibit A*. Brighter Beginnings was designed to serve the needs of students with average to above average intellectual functioning who have been diagnosed with a language-based disability, or specific learning disability, and/or dyslexia.  *See Exhibit A*.  It is a substantially separate program within the new Chicopee High School and is staffed with three former White Oak School teachers, all of whom previously taught the Student at White Oak School and are certified in special education and trained in remedial reading

techniques.  Each student is provided with a one to one tutorial and an additional class in learning strategies and organizational skills.  *See Exhibit A.*

The 2004-2005 IEP, a copy of which is attached as Exhibit B, called for the Student's placement in Brighter Beginnings with the provision of rule-based multi-sensory instruction for language-based skills throughout the school day.  Unlike prior IEPs, the Brighter Beginnings model proposed to provide the Student with an individualized tutorial and small group specialized instruction in language arts, math, social studies, oral expression, science, and speech and language skills in addition to the services of a learning disabilities consultant to the program.  *See Exhibit B.*

The Parents rejected the IEP and unilaterally enrolled the Student at the White Oak School for the 2004-2005 school year.  Chicopee appealed the Parents' rejection to the BSEA and sought to have hearing officer William Crane adjudicate the appropriateness of the 2004-2005 IEP.  That decision was rendered by hearing officer Crane on June 8, 2005, a copy of which is attached as Exhibit C.  Hearing officer Crane affirmed the appropriateness of Brighter Beginnings for the Student and stated:

> "I conclude that Chicopee has succeeded in developing an IEP that is generally consistent with the recommendations contained within Dr. Kemper's evaluation report and that is tailored to address [Student's] unique needs in a way reasonably calculated to enable her to make meaningful and effective educational progress in the least restrictive environment."

*See Exhibit C at 29.*

In July of 2005, the Parents filed their Complaint for Judicial Review of hearing officer Crane's decision.  As required by law, Chicopee convened the Student's TEAM and, once again, developed an IEP for the Student's placement in Brighter Beginnings, the appropriateness of which has been affirmed by hearing officer Crane.  *See Exhibit D.* Once again, the Parents rejected the 2005-2006 IEP and unilaterally enrolled the Student

at White Oak School for the 2005-2006 school year.  The Parents have not initiated a BSEA hearing to determine the appropriateness of the 2005-2006 IEP.

With the end of the 2005-2006 school year fast approaching, Chicopee files this Motion for Preliminary Injunction, seeking relief from any financial obligation for the Student's unilateral placement at the White Oak School for the 2005-2006 school year unless and until the Court overturns hearing officer Crane's decision and requesting that the Court hear argument on the pending cross-motions for summary judgment on an expedited basis.

## ARGUMENT

### I.    IDEA AUTHORIZES THIS COURT TO GRANT THE REQUESTED RELIEF

IDEA specifically authorizes courts to enforce its provisions by awarding "such relief as the court determines is appropriate."  20 U.S.C. §1415 (i)(2)(C)(iii).  *See, e.g., Roland M. v. Concord*, 910 F.2d 983, 999 (1st Cir. 1990) (reimbursement is a matter of equitable relief, committed to the sound discretion of the district court).  Moreover, the First Circuit Court of Appeals has held that a motion for preliminary injunction is the proper procedure for determining which party will bear the interim costs for maintaining a private placement.  *See Doe v. Brookline*, 722 F.2d 910, 916-17  (1st Cir. 1983) (reaffirming preliminary injunction approach).  As the Supreme Court stated in *Honig v. Doe*, the party seeking such an injunction bears the burden of demonstrating entitlement to such relief under the standards generally governing requests for preliminary injunctive relief.  484 U.S. 305 (1988).  Because Chicopee can demonstrate that it is likely to prevail on the merits of the Parents' appeal, and meet the other standards for issuance of a preliminary injunction as well, the Court should grant its motion.

## II.    CHICOPEE CAN SATISFY THE STANDARDS GOVERNING INJUNCTIVE RELIEF

To obtain a preliminary injunction, the moving party bears the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest. *McGuire v. Reilly,* 260 F.3d 36, 42 (1st Cir. 2001); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996).   It is not necessary to consider each element of the test independently of the other three. *See Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir. 1988).   Thus, if the "likelihood of success" weighs very strongly in the moving parties' favor, the balancing of the harms exercise is less necessary.   This process has been described as "…not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection Ltd. v. West Seven*, 812 F.2d 1215, 1217 (9th Cir. 1987).

### A.  Chicopee Is Likely To Succeed On The Merits Of The Parents' Appeal.

Over time, the First Circuit has developed a quadripartite test for determining whether litigants are entitled to preliminary injunctive redress. *Weaver v. Henderson*, 984 F.2d 11 (1st Cir. 1993) (citing *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991)).   The First Circuit has also opined that "[t]he *sine qua non* of that formulation is whether the plaintiffs are likely to succeed on the merits." *Id.*; *see also Narragansett Indian Tribe*, 934 F. 2d at 6 (labeling this factor "critical"); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir. 1981) (stating that "the

probability-of-success component has loomed large" in most cases), *cert. denied,* 455 U.S. 921 (1982). For the reasons set forth fully in Chicopee's Opposition to the Plaintiff's Motion for Summary Judgment and in support of the Defendant's Motion for Summary Judgment (the "Cross-Motion"), Chicopee's arguments on the Parents' appeal will likely succeed because the Plaintiffs cannot offer a convincing argument for this Court to overturn hearing officer Crane's determination that the 2004-2005 IEP proposed by Chicopee was appropriate.

     1.     Standard of Review on the Parents' Appeal

The Court's principal function is reviewing the Plaintiffs' Complaint has been described by the First Circuit as "involved oversight." *Roland M.,* 910 F.2d at 989. "The required perscrutation must, at one and the same time, be thorough yet deferential, recognizing 'the expertise of the administrative agency, ⋯ consider[ing] the [agency's] findings carefully and endeavor[ing] to respond to the hearing officer's resolution of each material issue.' Jurists are not trained, practicing educators. Thus, the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from 'imposing their view of preferable educational methods upon the States.'" *Id.* (citations omitted).

     2.  Hearing officer Crane's decision was consistent with evidence and law.

Utilizing this standard, this Court will find that hearing officer Crane's decision was not arbitrary or capricious but consistent with the evidence and applicable law. Mr. Crane made highly detailed factual findings relative to each of the conclusions that he reached regarding Chicopee's 2004-2005 IEP for the Student. Mr. Crane's findings are also consistent with state special education regulations set forth at 603 CMR 28.00 et.

seq.. Mr. Crane credited the testimony of Chicopee's teachers, administrators, and experts relative to the elements of the Brighter Beginnings Program and the services proposed for the Student in the 2004-2005 IEP. Quite simply, Mr. Crane concluded that Chicopee had succeeded in designing an appropriate secondary language-based learning disabilities program for the Student and delineating specifically designed instruction tailored to meet the Student's needs in the 2004-2005 IEP.

    3. The Plaintiffs' arguments based on res judicata also fail.

    Throughout their Memorandum in Support of Summary Judgment, the Plaintiffs appear to rely upon an earlier BSEA decision relative to the student's 2003-2004 IEP as though it were binding precedent. This is true despite the fact that Mr. Crane expressly stated:

> "Each BSEA decision is decided only on the basis of the evidentiary record and argument for that particular dispute. As I made clear to both parties at the outset of the hearing in the instant dispute, other than those portions of the previous record that have been explicitly entered into the instant dispute, I do not consider the evidentiary record of the previous dispute. . . The previous findings cannot, by themselves, be determinative regarding the appropriateness of Chicopee's currently-proposed IEP."

*See Exhibit C.*

For reasons set forth more fully in Chicopee's Cross-Motion, any decision regarding a previous and separate IEP was not relevant to Mr. Crane's adjudication of the 2004-2005 IEP, and it remains irrelevant in the instant judicial review.

    Because the Court must accord deference to hearing officer Crane's well-reasoned decision—and because the Plaintiffs' other arguments are unavailing—Chicopee is likely to succeed on the merits of the underlying claim. Thus, Chicopee can establish the most critical factor in the preliminary injunction analysis—the "likelihood of success" component. *See, e.g., Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 362 (1st Cir. 1985)

(stating that the first of these four factors, substantial likelihood of success on the merits, is "critical in determining the propriety of injunctive relief."); *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981) (same).

**B.  There Is A Risk Of Irreparable Harm To Chicopee If The Relief Is Withheld.**

A "plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons,* 102 F.3d at 15 (citing *Narragansett Indian Tribe,* 934 F.2d at 6-7; *Public Serv. Co. v. Town of W. Newbury,* 835 F.2d 380, 383 (1st Cir.1987)).  Here, Chicopee faces the real and substantive burden of depleting public funds to continue to pay for a private unilateral placement[2] where it has already demonstrated—and hearing officer Crane has confirmed—that its Brighter Beginnings Program is appropriate to address the Student's needs.  Moreover, with the end of the 2005-2006 school year fast approaching—and in view of the fact that Parents have rejected two successive IEPs calling for the Student's placement in Brighter Beginnings—Chicopee faces the prospect of this dispute carrying over into the 2006-2007 school year.  Finally, should the injunction not issue, Chicopee faces the prospect of continued and costly litigation where, as here the Parents have unreasonably protracted this dispute and misused the judicial process to avoid funding their unilateral placement of the Student at the White Oak School.

In considering whether to issue injunctive relief, the Court does not evaluate this risk of irreparable harm in a vacuum; it must be juxtaposed and weighed in tandem with the likelihood of success on the merits.  *Ross-Simon*, 102 F.3d at 15; s*ee also Gately v.*

---

[2]  Chicopee has already paid for the Student's unilateral placement at White Oak for the 2003-2004 and 2004-2005 school years pursuant to an earlier decision rendered by the BSEA and upheld by this Court in connection with a dispute over the 2003-2004 IEP.

*Commonwealth of Mass.,* 2 F.3d 1221, 1232 (1st Cir.1993) (noting that the greater the likelihood of success on the merits, the less that is required in the way of irreparable harm and suggesting that irreparable harm is subject to a "sliding scale" analysis), *cert. denied,* 511 U.S. 1082 (1994). In so doing, the Court should find that these two factors—taken together—provide sufficient support for granting Chicopee its requested relief.

C.  **The Balancing Of Relevant Equities Weighs In Favor Of The Defendants.**

The balancing of the equities factor has been described as a weighing of the hardship to the nonmovant if the injunction issues as contrasted with the hardship to the movant if interim relief is withheld. *See, e.g.*, *New Comm Wireless Services v. SprintCom, Inc.,* 287 F.3d 1, 8-9 (1st Cir.2002).  Without relief from this Court, Chicopee faces the prospect of utilizing public funds which may never be recovered.  The end result is that "less and less services are available for the students who desperately need them."  *Pachl v. Sch. Bd. of Indep. Sch. Dist. No. 11*, 2005 WL 428587, at *21 (Feb. 23, 2005 D. Minn.) ("While the Court is strongly empathetic to [the parents'] objective, the means to an end of engaging in highly contentious, protracted litigation is troubling. … Whether this misdirected advocacy is counsel's or the [parents'] strategy, this practice ultimately achieves no gain for [the student] and causes scarce public education resources to be stretched even further.")  On the other hand, nothing—including the hearing officer's decision, this Court's issuance of the requested injunctive relief, or the Court's ultimate determination as to the appropriateness of the IEP—precludes the Student from continuing to attend White Oak School.  Indeed, the Parents are free to continue her there, and should they ultimately prevail on their Complaint, they would be entitled to

seek reimbursement. *See, e.g.*, *Doe v. Brookline*, 722 F.2d at 921 (holding that reimbursement of tuition and related services is available to a prevailing party).

### D. The Granting Of The Preliminary Injunction Fits With The Public Interest.

Granting an injunction under the circumstances presented here fits with the public policy underlying IDEA. IDEA's regulations specifically state that a school district is not required to pay the cost of a private placement, where—as here—that agency made a free, appropriate, public education available to the child and the parents elected to place the child in a private school or facility. *See* 30 C.F.R §300.403.

In addition, Congress has recognized that there are instances in which parents' complaints are brought for improper purposes, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation. This is one such instance. Indeed, IDEA 2004 includes a provision whereby a prevailing school district can seek its attorneys' fees from the parent if the due process action or subsequent court case is "frivolous, unreasonable, or without foundation," or the parent's attorney continues to litigate after it clearly became frivolous. *See* 1415(i)(3)(B)(i) of IDEA 2004.

Finally, granting Chicopee's request that it not be required to fund the Plaintiffs' unilateral private placement at the White Oak School for the 2005-2006 school year unless and until this Court overturns the BSEA hearing officer's decision is in keeping with the purpose and policy of IDEA as described by the First Circuit. The First Circuit has concluded "that permitting reimbursement promotes the purpose and policy of the Act. If the parents are incorrect in their claim that the IEP provides an inappropriate education for their child, they, like any other parents, should bear the financial burden of giving their child a private education. If the school committee's proposed public

placement is held inappropriate, then through reimbursement all parties are restored to

the position the Act sought to achieve." *Doe v. Brookline*, 722 F.2d at 921.

## **CONCLUSION**

Based on the foregoing reasons, Chicopee respectfully requests that this Court

grant its motion for an Order:

(1)     setting a hearing date at the Court's earliest convenience on the cross-

motions for summary judgment currently pending in this case.

(2)     determining that it is not required to fund the Plaintiffs' unilateral

placement at the White Oak School for the 2005-2006 school year,

unless and until the Court overturns the BSEA hearing officer's

decision and rules in favor of the Plaintiffs on the merits of the

Parents' appeal.

THE DEFENDANT CHICOPEE,
BY ITS ATTORNEY,

*/s/ Claire L. Thompson*
By_____
Claire L. Thompson, Esq.
Doherty, Wallace, Pillsbury & Murphy, P.C.
One Monarch Place
1414 Main Street, 19th Floor
Springfield, MA  01144
Phone:  (413) 733-3111
Fax:     (413) 734-3910
B.B.O. No:  550262

## CERTIFICATE OF SERVICE

I, Claire L. Thompson, Esq., certify that this document has been served upon all counsel of record in accordance with the F.R.C.P. on April 26, 2006.

Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103

James Whitcomb
Assistant Attorney General
Western Massachusetts Division
1350 Main Street, 4th Floor
Springfield, MA 01103

*/s/ Claire L. Thompson*
_____
Claire L. Thompson

A

## BRIGHTER BEGINNINGS

The Chicopee Public Schools' Secondary Language Learning Disabled (LLD) Program's primary purpose is to provide a learning environment where struggling readers in grades 9 through 12 receive instruction, support and strategies necessary for academic success at the high school level.  The program is designed for students with average to above average intellectual functioning who have been diagnosed with a significant language based or specific learning disability and/or dyslexia.  Students follow the Chicopee Public School's calendar and are provided with 990 hours of direct instruction annually excluding any recommended summer programming.

The LLD Program serves the needs of students functioning on average one or more levels below actual grade placement in reading, writing, and/or math.  All teachers are certified in special education and highly trained in remedial reading techniques. Since most students entering the LLD Program are struggling readers, initial reading instruction centers on decoding, phonemic awareness, and phonological processing skills. Instruction in all subject areas is individualized according to each student's needs.  Each class consists of a maximum of 12 students with a certified special education teacher and one or more support staff.  Each student is provided with a one-to-one tutorial and an additional 45 minute daily period during which students are taught learning strategies and assisted with organizational skills, study skills and an opportunity to practice pragmatics.

The course work is interdisciplinary to permit students to understand the interconnectedness of the world and apply it to their academic learning.  The students access the Massachusetts curriculum frameworks through a sequence of courses that are taught in a hands-on and collaborative approach.  Students are encouraged, not only to

find solutions, but also to understand all facets of the problems presented. Since all students have their own unique abilities and learning issues, teaching is customized to meet the needs of the individual student at his/her own pace.

A typical schedule in the LLD Program would include:  English/Language Arts, Math, Science, Social Studies, Reading, one-to-one and/or small group tutorials, pragmatics/study skills, electives, related arts and career technical courses.

The Brighter Beginnings Program includes counseling professionals and language pathologists who both consult to teachers and staff and provide direct services to students and parents individually and in small group settings.  We strive to develop social and pragmatic skills and to foster respect for peers, family members, and the community at large.  In addition to Chicopee's own full time staff, the program also utilizes the services of out-of-district consultants as needed.



**School District Name:**    Chicopee Public Schools
**School District Address:**    180 Broadway Chicopee, MA 01020
**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Administrative Data Sheet

**STUDENT INFORMATION:**

Full Name:  Kaitlyn Beth Tharaldson                    Local ID #:  15821         SASID:  1092212303

Birth Date:  3/14/1989     Place of Birth:  SPRINGFIELD                    Age:  15      Grade/Level:  10

Primary Language:  267 - English                    Language of Instruction:  267 - English

Address:  182 Poplar  Chicopee, MA 01013

Home Telephone:  413-592-0471                    Sex:  ___ Male   X Female

If 18 or older:      Acting on Own Behalf        Court Appointed Guardian:  _____

Shared Decision-Making        Delegate Decision-Making

**PARENT/GUARDIAN INFORMATION:**

Name:  DAVID/DIANE THARALDSON            Relationship to Student:  Parent

Address:  182 Poplar  Chicopee, MA 01013

Home Telephone:  413-592-0471        Other Telephone:  413-785-6313

Primary Language of parent/guardian:  267 - English

**PARENT/GUARDIAN INFORMATION:**

Name: _____            Relationship to Student:  _____

Address: _____

Home Telephone: _____        Other Telephone:  _____

Primary Language of parent/guardian: _____

**MEETING INFORMATION:**

Date of Meeting:  7/12/04      Type of Meeting:  IEP Development-Annual Review, Placement,

Next Scheduled Annual Review Meeting:  7/11/05        Next Scheduled Three Year Reevaluation Meeting:  6/11/06

**ASSIGNED SCHOOL INFORMATION: (Complete after a placement has been made.)**

School Name:  Chicopee High                    Telephone:  413-594-3534

Address:  650 Front St.  Chicopee, MA 01013

Contact Person:  Marisa McCarthy            Role:  Team Chairperson        Telephone:  413-594-1857

Cost-Shared Placement:    [X] No   Does not apply
                          [ ] Yes   Does not apply

---

**After a meeting, attach to an IEP, an IEP Amendment or an Extended Evaluation Form.**

**School District Name:** Chicopee Public Schools

**School District Address:** 180 Broadway  Chicopee, MA  01020

**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

| Student Name: Kaitlyn Beth Tharaldson | DOB: 03/14/1989 | ID#: 15821 | Grade/Level: 10 |
|---|---|---|---|

### Parent and/or Student Concerns
*What concern(s) does the parent and/or student want to see addressed to enhance the student's education?*

Mr. and Mrs. Tharaldson are concerned with Kaitlyn's learning disability and how that interfers with her inability to read.  The parents would like Kaitlyn to be serviced so that the impact of her reading disability (educationally, socially and emotionally) may be mitigated as much as possible.

### Student Strengths and Key Evaluation Results Summary
*What are student's educational strengths, interest areas, significant personal attributes and personal accomplishments?*
*What is the student's type of disability(ies), general education performance*
*including MCAS/district test results, achievement towards goals and lack of expected progress, if any?*

Kaitlyn's team meets today to review progress, discuss parent concerns, update her IEP as mandated by state guidelines, and to develop a plan of services that will provide support through the coming year.
Kaitlyn is scheduled to take the MCAS, with modifications,this upcoming school year.

Cognitively, standardized test results indicate that Kaitlyn has solidly average cognitive abilities (performance=106, and full scale IQ=96, and verbal IQ=88). Kaitlyn has been diagnosed with specific learning disability.  WISC testing shows her to be functioning in the average range cognitively.  There is a discrepancy between Kaitlyn's achievement and intellectual ability.  This discrepancy requires specially designed instruction.  Stanford achievement Test in June of 2004 report the following:
Total Reading:   Grade Equiv. 8.5
Reading Voc:    Grade Equiv. PHS
Reading Comp:   Grade Equiv. 7.3
Total Math:     Grade Equiv. 6.5
Concepts of Num:Grade Equiv. 6.2
Math Comp:      Grade Equiv. 5.3
Math App:       Grade Equiv. 7.7
Slosson Oral Reading Test;
Grade Equivalent: 7.5
Gray Oral Reading Test;
Comp. Grade Equiv. 9.2
Passage Grade Equiv. 8.4
Kaitlyn is described as a friendly, hardworking young lady who has made gains in her skill development this past school year at White Oak.  Kaitlyn consistently passes in all of her homework, participates in class discussions, is proactive in seeking out help with difficult classwork and has overall made a smooth and positive transition to White Oak.
According to teacher reports Kaitlyn confuses syllables, has difficulty with grammar and its usage, and needs to be guided through a reading passage.  Kaitlyn reads novels,is able to identify plots, details and main ideas.  Kaitlyn can get meaning from the context and can self correct at times. She is not successful with making predictions and she is not able to transfer isolated skills into more global content areas.  Kailtyn has difficulty summarizing and knowing what important information to extract from given reading passage.
Kaitlyn makes use of strategies that increase reading skills such as teacher prompts, modeling, leading questions, given repeated assignments directions to follow, word lists, webbing, outlines, study guides, mnemonic devises and works best with a rule based, multi sensory approach.

### Vision Statement: What is the vision for this student?
*Consider the next 1 to 5 year period when developing this statement. Beginning no later than age 14,*
*the statement should be based on the student's preferences and interests,*
*and should include desired outcomes in adult living, post-secondary and working environments.*

**School District Name:** Chicopee Public Schools

**School District Address:** 180 Broadway  Chicopee, MA  01020

**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

| | | | | | |
|---|---|---|---|---|---|
| Student Name:  Kaitlyn Beth Tharaldson | DOB:  03/14/1989 | ID#:  15821 | | Grade/Level:  10 |

Kaitlyn was not at the meeting and therefore the Team did not have her input as to what her goals and vision maybe.  However, Mr. and Mrs. Tharaldson stated that Kaitlyn is very creative and artistic and they would like to see her go to college to pursue her interest in theatre, the arts, and graphic design.

Mr. and Mrs. Tharaldson want Kailtyn to be able to read and pass the MCAS test to earn her High School diploma.  Their hope is that Kailtyn will become a well rounded person, independent, and to enjoy all cultural activities that are available to her.

# Individualized Education Program

IEP Dates: from     9/1/04     to     6/30/05

Student Name:  Kaitlyn Beth Tharaldson          DOB:    03/14/1989    ID#:  15821          Grade/Level:    10

## Present Levels of Educational Performance
### A: General Curriculum

Check all that apply.

**General Curriculum Area(s) affected by this student's disability(ies):**

| | | |
|---|---|---|
| [X] | English Language Arts | Consider the language, composition, literature (including reading) and media strands. |
| [X] | History and Social Science | Consider the history, geography, economic and civics and government strands. |
| [X] | Sciences and Technology | Consider the inquiry, domains of science, technology and science, technology and human affairs strand. |
| [X] | Mathematics | Consider the number sense, patterns, relations and functions, geometry and measurement and statistics and probability strands. |
| [ ] | Other Curriculum Area | Specify:    Oral Expression |

---

**How does the disability(ies) affect progress in the curriculum area(s)?**

The severity Kaitlyn's specific learning disability with grade-appropriate reading, writing, and organizational skills interfers with her ability to access skill and content in Massachusetts Curriculum Frameworks, and thus negatively affects progress through the curriculum areas.

---

**What type(s) of accommodation, *if any*, is necessary for the student to make effective progress?**

Kaitlyn works best with a multisensory approach to instruction; repeated directions, multistep tasks broken up into manageable steps, teacher prompts, mnemonics, study guide, webbing, template, use of word processor, word banks, semantic mapping, use of flashcards, use of visualization techniques, vocabulary development in all areas of the curriculum.

---

**What type(s) of specially designed instruction, *if any*, is necessary for the student to make effective progress?**

Throughout the school day, remedial, rule based, multisensory instruction for language-based skills needs to be provided concurrently with Curriculum Frameworks-based contextual instruction. Kaitlyn requires that information be presented in small, incremental units to assist with organization and overall acquisition of newly learned skills.

Check the necessary instructional modification(s) and describe how such modification(s) will be made.

[X] Content:
A phonetic approach to reading, written expression, and math will be taught at Kaitlyn's instructional level.

[X] Methodology/Delivery of Instruction:
Remediation, rate of instruction, and repetition of Massachusetts Curriculum Frameworks is needed for instruction so that Kaitlyn is able to develop and maintain newly learned skills and incorporate that into her overall knowledge base.

[X] Performance Criteria:

In those areas of instruction relating to remediation of language-based disabilities, performance criteria are identified in the goal/objective benchmark pages which follow this page. With reference to a specific language-based skills, the criterion by which performance is assessed is typically the degree to which the student can demonstrate master of a skill when working independently on grade-appropriate material.

**Use multiple copies of this form as needed.**

**Individualized Education Program**

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson     DOB: __03/14/1989__     ID#: __15821__     Grade/Level: __10__

# Present Levels of Educational Performance
## B: Other Educational Needs

**Check all that apply.**

*General Considerations*

| Left | Center | Right |
|---|---|---|
| ☐ Adapted physical education | ☐ Assistive tech devices/ services | ☐ Behavior |
| ☐ Braille needs (blind/visually impaired) | ☒ Communication (all students) | ☐ Communication (deaf/hard of hearing students) |
| ☐ Extra curriculum activities | ☐ Language needs (LEP students) | ☐ Nonacademic activities |
| ☐ Social/emotional needs | ☐ Travel training | ☐ Skill development related to vocational preparation or experience |
| ☐ Other | | |

*Age-Specific Considerations*

☐ For children ages 3 to 5 - participation in appropriate activities

☐ For students ages 14+ (or younger if appropriate) - student's course of study

☐ For students ages 16 (or younger if appropriate) to 22 -transition to post-school activities including community experiences, employment objectives, other post school adult living objectives and, if appropriate, daily living skills.

How does the disability(ies) affect progress in the indicated area(s) of other educational needs?

Kaitlyn demonstrates low average receptive and expressive language skills. She demonstrates weakness in her knowledge of synonyms, antonyms and temporal relationships. Kaitlyn appears to have a delay in her written language skills. She had difficulty with self generated composition.

What type(s) of accommodation, *if any*, is necessary for the student to make effective progress?

Please see previous page for accommodations, methodology/delivery of instruction and performance criteria.

What type(s) of specially designed instruction, *if any*, is necessary for the student to make effective progress?

Check the necessary instructional modification(s) and describe how such modification(s) will be made.

☐ Content:

☐ Methodology/Delivery of Instruction:

☐ Performance Criteria:

**Use multiple copies of this form as needed.**

## Individualized Education Program

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson    DOB: __03/14/1989__  ID#: __15821__    Grade/Level: __10__

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 1 | Specific Goal Focus:  Tutorial |
|---|---|---|

**Current Performance Level:   What can the student currently do?**

As reflected in her final report card and based on classroom effort, classroom completion, classroom accuracy, homework completion, homework accuracy and classroom behavior Kaityln earned the following year end grades:

Tutorial: A-
Language Arts: A-
Math:  A-
Science: B
Social Studies: B
Oral Expression: A-

tutorial:  Specifically, Kaitlyn is currently reading 'We all Fall Down' by Robert Cormier as a class reader.  She reads one-to-two pages to the teacher's three.  She requires reminders to slow down when reading to observe punctuation. throughout the reading Kaitlyn is asked factual comprehension questions about the reading. She is able to answer the questions buther answers are simple and lacking detail. Kailtyn requires reminders to maintain her homework assignment book and reread her work and to use punctuation.  When writing she tends to either write incomplete or run-on sentences.
Kaitlyn

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's decoding skills will improve as measured by 75%increased reading fluency during oral expression.  This goal is in support of the Language Arts Curriculum literature strand, learning standard 8.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

Massachusetts DOE/Individualized Education Program                IEP4

# Individualized Education Program

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: _Kaitlyn Beth Tharaldson_    DOB: _03/14/1989_  ID#: _15821_    Grade/Level: _10_

## Current Performance Levels/Measurable Annual Goals

Given a specific single-syllable word with a vowel digraph, Kaitlyn will decode and read the word with minimal teacher assistance and 75% accuracy.

Given a specific single syllable word with a diphthong, Kaitlyn will decode and read the word with moderate teacher assistance and 75% accuracy.

Given a specific single syllable word containing silent-e,  Kaitlyn will decode and read the word with decreasing teacher assistance and 75% accuracy.

Given a specific single syllable word containing the CV pattern, Kaitlyn will decode and read the word with moderate teacher assistance and 75% accuracy.

Given a specific single syllable word with a vowel-r pattern, Kaitlyn will decode and read the word with minimal teacher assistance and 75% accuracy.

Given a specific word which contains the vc/cv syllable pattern, Kaitlyn will decode and read the word with decreasing teacher assistance with 75% accuracy.

Givenn a specific word which containsthe Cle syllable pattern, Kaitlyn will decode and read the word with faded teacher assistance with 75% accuracy.

Given a specific word which contains the vc/v syllable pattern,Kaitlyn will decode and read with faded teacher assistance with 75% accuracy.

Given a specific word which contains the v/cv syllable pattern, Kaitlyn will decode and read with faded teacher assistance with 75% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

**Individualized Education Program**

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson        DOB: ___03/14/1989___  ID#: __15821__                Grade/Level: __10__

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 2 | Specific Goal Focus: Oral Reading |
|---------|---|-----------------------------------|

**Current Performance Level:  What can the student currently do?**

Kaitlyn struggles with oral reading as evidenced by substitutions, omissions, confusions of visually similar words.  Kaitlyn's reading has included 'The Chessman of Doom' and 'The Hardy Boys Dead of Night' by Franklin W. Dixon.  She also incorporates lessons from 'worldly Wise 3000 Book 2 to address objectives.

**Measurable Annual Goal: What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?**

Kaitlyn's oral reading skills will improve by 80% oral reading fluency.  This goal is in support of the Language Arts Curriculum literature strand, learning standard 8.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives: What will the student need to do to complete this goal?**

Given a specific passage of text at Kaitlyn's instructional level,Kaitlyn will reduce insertions by 80% in contextual reading with decreasing teacher assistance.

Given a specific passage text at Kaitlyn's instructional level, Kaitlyn will reduce omissions by 80% in contextual reading with decreasing teacher assistance.

Given a specific passage at Kaitlyn's instructional level, Kaitlyn will reduce transpositions in contextual reading with 80% success and with faded teacher assistance.

Given a a specific passage at Kaitlyn's instructional level, Kaitlyn will reduce substitutions with 80% success with faded teacher assistance.

Given a specific passage at Kaitlyn's instructional level, Kaitlyn will observe and apply punctuation rules when orally reading with 80% success with minimal teacher assistance.

Given a specific passage at Kaitlyn's instructional level, Kaitlyn will us appropriate rate of speed when orally reading with 80% fluency and moderate teacher assistance.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from     9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:     03/14/1989     ID#:  15821              Grade/Level:  10

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 3 | Specific Goal Focus:  Reading Comprehension |
|---|---|---|

**Current Performance Level:  What can the student currently do?**

Kaitlyn has difficulty with identifying main ideas, details, characters and answering literal and interpretive questions.  Kaitlyn has been working out of 'Wordly Wise 3000 Book 2' and oral reading from 'The Chessmen of Doom'.  Kaitlyn has difficulty in this area because she tends to rush through her work and does not refer back to the text to ensure accuracy in her responses.

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's reading comprehension skills will improve so that she will be within two grade levels of her expected grade placement (10) as evidenced by achievement test.  This goal is in support of the Language Arts Curriculum literature strand, learning standards 9, 10, and 11.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a class discussion or written text, Kaitlyn will identify the main idea of the text with 80% accuracy with minimal teacher assistance.

Given a passage at her instructional level, Kaitlynwill identify details and characters with 80% accuracy and minimal teacher assistance.

Given a passage at  her instructional level, Kaitlyn will summarize and make accurate conclusions with 80% with minimal teacher assistance.

Given a reading passage at her instructional level, Kaitlyn will make predictions with 80% accuracy with faded teacher assistance.

| | |
|---|---|
| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |

**Use multiple copies of this form as needed.**

**Individualized Education Program**

IEP Dates: from    9/1/04   to   6/30/05

Student Name: Kaitlyn Beth Tharaldson     DOB:    03/14/1989    ID#:   15821      Grade/Level:   10

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 4 | Specific Goal Focus: Spelling |
|---|---|---|

**Current Performance Level: What can the student currently do?**

With reference to vocabulary development, Kaitlyn has difficulty with syllabication and getting meaning from the text. In spelling Kaitlyn uses and can explain rules of language, yet is not able to carry these rules over into her everyday writing. Curriculum material includes vocabulary words from 'Wordly Wise 3000 Book 2' and 'Solving Language Difficulties' Amey Steere, Caroline Z. Peck, and Linda Kahn.

**Measurable Annual Goal: What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?**

Kaitlyn's vocabulary and spelling skills will improve so that she will be withing two grade levels of her expected grade (10). This goal is in support of the Language Arts Curriculum language strand, learning standards 4, 7, and 8

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives: What will the student need to do to complete this goal?**

Given vocabulary words at her instructional level, Kaitlyn will  be able to define the word using both context and dictionary skills with 80% accuracy and minimal teacher assistance.
Given vocabulary words at her instructional level, Kaitlyn will correctly use the word in context orally with 90% accuracy with faded teacher cuing.
Given words with a diphthong pattern, Kaitlyn will spell with 85% accuracy.
Given words which follow the K/CK rule, Kaitlyn will spell with 85% accuracy.
Given a specific word with a VCE syllable pattern, Kaitlyn will spell with 85% accuracy.
Given the cardinal numbers, Kaitlyn will spell them in sequence with 80% accuracy.
Given words with a vowel digraph syllable pattern, Kaitlyn will spell words with 85% accuracy.
Given words which follow the GE/DGE rule, Kaitlyn will spell with 85% accuracy.
Given  words which follow the CH/TCH rule, Kaitlyn will spell with 85% accuracy.
Given the months of the year, Kaitlyn will spell each month in sequence with 85% accuracy.
Given the seasons of the year, Kaitlyn will spell the seasons and align them with the months of the year with 85% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:    03/14/1989    ID#:  15821          Grade/Level:  10

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 5 | Specific Goal Focus:  Written Language |
|---|---|---|

**Current Performance Level:   What can the student currently do?**

Kaitlyn's narrative summaries include appropriate topic, detail and concluding sentences; however, she needed to proofread her story for errors and elaborate more on the stories. Kaitlyn has difficulty with self editing skills, correctly using punctuation, capitalization and spelling skills.  Passages from 'The Kim Marshall Reading Series Book 1' and 'The Chessmen of Doom' are incorporated to facilitate the acquisition of skills.

**Measurable Annual Goal: What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?**

Kaitlyn's written compostions skills will improve as evidenced by an 80% increase in proper use of narrative and language writing skills as compared to current skill level.  This goal is in support of the Language Arts Curriculum composition strand, learning standards 19, 20, and 21.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives: What will the student need to do to complete this goal?**

Given a writing assignment, Kaitlyn will use a charting devise to compose sentences with faded teacher assistance and 85%accuracy.

Given a writing assignment, Kaitlyn will compose paragraph topic sentences with faded teacher assistance and 85% accuracy.

Given a writing assignment, Kaitlyn will compose paragraph sentences  with decreasing teacher assistance and 85% accuracy.

Given a writing assignment, Kaitlyn will compose a narrative summary with 80% detailed information with minimal teacher assistance.

Given a writing assignment, Kaitlyn will compose a narrative summary in writing with all components of writing with minimal teacher assistance.

Given a writing assignment, Kaitlyn will compose a written narrative with 80% accuracy.

Given a writing assignment, Kaitlyn will edit for grammatical errors (run on sentences, capital letters, punctuation, and spelling) with 80% accuracy.

| | |
|---|---|
| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? <br> 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:    03/14/1989    ID#:  15821          Grade/Level:  10

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 6 | Specific Goal Focus:  Organizational Skills |
|---------|---|---------------------------------------------|

**Current Performance Level:  What can the student currently do?**

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn will improve her ograniztional skills as evidenced by homework completion and approriately maintained all subject binder.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Kaitlyn will maintain, in correct organizational manner, a three-ring binder with all subjects, with decreasing teacher assistance.
Given a specific homework assignment book, Kaitlyn will write down all homework assignments on a daily basis.
Given a specific homework assignment, Kaitlyn will complete the assignment legibly and accurately 100% of the time.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:    03/14/1989    ID#:  15821          Grade/Level:  10

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 7 | Specific Goal Focus:  Mathematics |
|---------|---|-----------------------------------|

**Current Performance Level:  What can the student currently do?**

Math - Algebra

Kaitlyn can recognize and order integers and compute basic equations with teacher modeling.  She can identify and name variables and use algebraic symbols with increasing independence.  Kaitlyn is able to use order of operations with leading questions and prompting to simplify a given expression, but continues to have difficulty when negatives are involved.  Kaitlyn is able to solve multi-stepped equations using integers and variables, but makes more frequent errors as the number of steps increases.

Kaitlyn is able to copy teacher-generated notes form the board, but needs teacher prompting to utilize them to complete her classwork.  Given mathematical vocabulary words, Kaitlyn can usually give an example and spell them; however, she sometimes has difficulty with specific definitions.  Kaitlyn rarely uses self-advocacy skills to seek assistance with difficult material.

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's mathematical and vocabulary skills will  improved as evidenced by an increase in grade level in achievment test.  This goal is in support of the Mathematics Curriculum Frameworks strands on number sense, operations, patterns,relations and algebra.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson    DOB:    03/14/1989    ID#:    15821    Grade/Level:    10

## Current Performance Levels/Measurable Annual Goals

Given a class activity, Kaitlyn will identify and name mathematical symbols with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will identify and name variables with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will identify relationships between numbers with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will identify, name, and describe parts of the whole with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will identify and name ways to organize and analyze data with 80% accuracy with minimal teacher assistance.

Given a class activity, Kaitlyn will identify relevant information to solve problems with 80% accuracy and faded teacher assistance.

Given a class activity, Kaitlyn will identify and name simple formulas with 80% accuracy and faded teacher assistance.

Given a class activity, Kaitlyn will organize data to solve a problem with 80% accuracy and faded teacher assistance.

Given a class activity, Kaitlyn will sequence and compare parts of a whole with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will sequence and organize data using charts, tables, and grids with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will describe change and relationships between groups of data with 80% accuracy and moderate teacher assistance.

Given a class activity, Kaitlyn will estimate when completing basic operations with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will compute operations with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will compute operations with variables with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will compute operations using formulas with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will compute conversions of various forms of numbers with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will compute multiple calculations in a problem with 80% accuracy and minimal teacher assistance.

Kaitlyn will orally sequence the step of a computation with 85% accuracy.

Given a class activity, Kaitlyn will translate mathematical language into symbolic form with 80% accuracy and minimal teacher assistance.

Given a class activity, Kaitlyn will use mathematical terminology to describe relationships and patterns with 85% accuracy and intermittent teacher assistance.

Given a class activity, Kaitlyn will explain reasoning used to solve a problem orally with 85% accuracy and decreasing teacher assistance.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

## Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:    03/14/1989    ID#:    15821          Grade/Level:    10

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 8 | Specific Goal Focus:  Science |
|---------|---|-------------------------------|

**Current Performance Level:  What can the student currently do?**

In Science, Kaitlyn's class is studying Chemistry for the academic year 2003-2004.  While studying this discipline, Kaitlyn will learn how Chemistry is related to her everyday life and the world around her, as dictated by the Massachusetts Curriculum Frameworks.  In order for Kaitlyn to be able to fully comprehend and utilize the content of this discipline, it is necessary for the instruction of the skill acquisition to be incorporated into her daily class instruction.  Thus, Kaitlyn's educational needs in the field of Science incorporate both content and skill acquisition.

Kaitlyn is currently learning about a variety of Chemistry concepts (ie. matter, elements, and substances).  When prompted by the teacher, Kaitlyn participates during class discussions and demonstrates a general understanding of the material. When a lecture is given, Kaitlyn is able to stay focused with teacher prompting.  She can copy teacher-generated notes from the board and organize them into the two-column format given teacher modeling.  When given comprehension questions as a homework assignment, Kaitlyn is able to use her two-column notes as a resource to help her find the answers these questions with teacher assistance such as helping her locate the appropriate section in her notes that contains the information pertinent to the questions.  When Kaitlyn is asked questions during classes, she is able to give accurate answers given teacher cues and leading statements.  When given an assignment to write a five-paragraph essay, kaitlyn benefits from a structured template to aid her with organizing her thoughts and writing.  Kaitlyn has currently gathered information about pirates for her research paper.  She needs teacher assistance to identify the notecards.  During laboratory experiments, Kaitlyn is able to follow directions when they are explained orally and in written form. Kaitlyn is able identify and construct selected parts of a lab report with teacher guidance such as providing her assistance, and modeling Kaitlyn is able to construct graphs or data tables related to specific labs, and can interpret this information.  Kaitlyn needs some teacher reminders to use complete sentences when answering questions orally or in written form.  To date, Kaitlyn has handed in all of her homework assignments on time.

**Measurable Annual Goal:  What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?**

When given Science concepts, lab work, research, scientific method and notetaking, Kaitlyn will increase her knowledge base in all areas of the science curriculum as measured by achievement test and passing final grades.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:  What will the student need to do to complete this goal?**

Kaitlyn will correctly copy notes (specifically two-column format) from the board into her 3 ring binder legibly 85% accuracy and minimal teacher assistance.
Kaitlyn will identify scientific method and use correctly with 85% accuracy and minimal teacher assistance.
Given teacher-generated questions and text on Kaitlyn's instructional level, she will locate the answer with 85% accuracy and decreasing teacher assistance.
Given a lab activity, Kaitlyn will construct graphs or data tables to record results 85% accuracy and minimal teacher assistance.
Given a lab activity, Kaitlyn will work  cooperatively with peers.
Given an assignment to complete a research

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson    DOB: 03/14/1989    ID#: 15821    Grade/Level: 10

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 9 | Specific Goal Focus: Social Studies |
|---|---|---|

**Current Performance Level: What can the student currently do?**

U.S. History

Kaitlyn's U.S. History class is a content area class focusing on the French and Indian War and the causes of the American Revolution.

Kaitlyn is working on notetaking skills, locating answers to comprehension questions using her notes, vocabulary skills, geography skills, research skills, writing skills, group discussion skills, organization skills, and homework and independent work skills.

Kaitlyn is able to orally identify the main ideas and details from a paragraph of text. She is able to copy main ideas and details from the board in two-column note form.

In a test setting, Kaitlyn is able to locate the answers to comprehension questions using her notes from class. She is then able to answer those questions in complete sentences.

Kaitlyn is able to use new vocabulary terms in her written work as well as orally in classroom discussion.

Kaitlyn can identify cardinal and intermediate directions on a compass rose and is able to use those directions to locate continents, oceans, the equator and the prime meridian. Kaitlyn is also able to use a map scale to measure the distance between two points on a map.

When doing research, Kaitlyn is able to use the internet and encyclopedia to locate information on a topic. In order to help Kaitlyn create questions based on that topic, she needs assistance to locate the topic sentence of each section and turn them into questions.

Kaitlyn is able to create paragraphs when provided with a structure to follow and teacher modeling. She is able to create topic and detail sentences as well as a concluding sentence. Using a 'web' helps her to organize her thoughts and write more complete sentences.

Kaitlyn enjoys participating in group discussions. She is able to follow a topic and contribute relevant knowledge. She is also respectful toward others.

**Measurable Annual Goal: What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?**

Kaitlyn will improve her skills in Social Studies as measured by passing grades.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives: What will the student need to do to complete this goal?**

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Use multiple copies of this form as needed.**

# Individualized Education Program

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson    DOB: ___03/14/1989___  ID#: 15821    Grade/Level: 10

## Current Performance Levels/Measurable Annual Goals

Given information, Kaitlyn will categorize the information with 80% accuracy and minimal teacher assistance.

Given a passage, Kaitlyn will identify and highlight the main idas and key details of the paragraphn with 80% accuracy and minimal teacher assistance.

Given a lecture, Kaitlyn will copy two column notes from the board accuractely and legibly with minimal teacher assistance.

Given notes and group discussion, Kaitlyn will answer with 85% accuracy questions on content area topic.

Given notes, Kaitlyn will outline an answer to an essay question with little teacher assistance.

Given an essay question, Kaitlyn will use a specific essay structure and an outline to compose a first draft with 80% accuracy and minimal teacher assistance.

Given a first draft, peer edits, and teacher edits, Kaitlyn will compose a final draft of an essay with 85% accuracy.

Given vocabulary terms from a theme unit, Kaitlyn will define vocabulary and accuractely use in context with minimal teacher assistance and 85% accuracy.

Given a specific map, Kaitlyn will use a mapkey with moderate teacher assistance.

Given a specific map, Kaitlyn will locate a specific place on a mapy with 80% accuracy.

Given a map, Kaitlyn will identify a specific location and plot a route with 85% accuracy and minimal teacher assistance.

Given a map of the United States, Kaitlyn will locate New England 90% of the time with no teacher assistance.

Given a specific map, Kaitlyn will identify and locate the seven continents with minimal teacher assistance 85% of the time.

Given a specific map, Kaitlyn will identify and locate the equator and the prime meridian with minimal teacher assistance and 85% accuracy.

Given a research topic, Kaitlyn will formulate questions, identify and locate research sources with 85% accuracy and minimal teacher assistance.

Given research information, Kaitlyn will paraphrase and record the information on notecards with 85% accuracy and minimal teacher assistance.

Kaitlyn will compose a first draft, edit with a checklist and compose a final draft with 85% accuracy and moderate teacher assistance.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
| --- | --- |

## Individualized Education Program

IEP Dates: from    9/1/04   to   6/30/05

Student Name: Kaitlyn Beth Tharaldson    DOB:   03/14/1989   ID#:   15821    Grade/Level:   10

# Current Performance Levels/Measurable Annual Goals

| Goal #: | 10 | Specific Goal Focus: Oral Expression |
|---|---|---|

**Current Performance Level:** **What can the student currently do?**

Oral Expression

Kaitlyn has made steady progress in Oral Expression throughout the first semester. With initial teacher conferencing Kaitlyn can generate notecards and interview questions, as well as use the questions to conduct an interview. Kaitlyn can appropriately sequence information with the formal First, Next, Then, After That, and Finally. Kaitlyn benefits from teacher conferencing and setting daily goals to organize her time and research material.

With regular reminders Kaitlyn has shown significant improvement in practicing appropriate vocal rate, volume, eye contact and body language when speaking publicly and within a conversational setting. She is presently focusing on rehearsing her speeches to improve her clarity and knowledge of her subject. With the use of leading questions and prompting, Kaitlyn can recognize and respond to a topic. She benefits from direct assistance to request clarification to identify the specific assistance she requires.

With daily reviews Kaitlyn can often recall and retain new vocabulary on a regular basis. Leading questions are an effective way to assist her in using appropriate grammar and referents in class related terms. Kaitlyn works best when directions are presented to her orally and in generating antonyms and synonyms during daily vocabulary activities.

When taking notes from oral lectures Kaitlyn benefits from the assistance of note-taking templates that identify key words that signal her to transition from point to point and organize the information into an appropriate category. In addition to the template, brief teacher check-ins assist her in self-advocating during oral notetaking. She is often able to locate main ideas in a text after receiving brief teacher modeling. Kaitlyn requires regular teacher refocusing to remain on takd for long periods of time.

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's oral expression and vocabulary skills will increase as evidenced by one year's grade level growth in fluency and vocabulary development. This goal is in support of the Language Arts Curriculum language strand, learning standard 13, 18, 27,4,6,7.8,, 1, and 3.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports        .

**Benchmark/Objectives:** What will the student need to do to complete this goal?

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal?<br>2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

**Individualized Education Program**

IEP Dates: from  9/1/04  to  6/30/05

Student Name: Kaitlyn Beth Tharaldson          DOB:  03/14/1989   ID#:  15821          Grade/Level:  10

## Current Performance Levels/Measurable Annual Goals

Given a specific topic, Kaitlyn locate topic and key information in reading assignments 80% of the time with decreasing teacher assistance.

Given a specific interview , Kaitlyn will develop interview questions and conduct an interview with increasing confidence and minimal teacher assistance.

Given a specific presentation, Kaitlyn will create notecards for the presentation 100% of the time with minimal teacher assistance.

Given a specific presentation, Kaitlyn will create visual and audiovisual aids for the presentation with minimal teacher assistance.

Given a presentation activity, Kaitlyn will use appropriate eye contact, posture, appropriate vocal rate and volume with minimal teacher assistance.

Given a specific conversation, Kaitlyn will use appropriate grammar, stay on topic and ending with 85% accuracy and minimal teacher assistance.

Given a specific class activity, Kaitlyn will use appropriate expressions of information and directions with 85% accuracy and minimal teacher assistance.

Given a specific class activity, Kaitlyn will use appropriate expression of feelings and ideas with 85% accuracy and decreasing teacher assistance.

Given a class activity Kaitlyn will correctly question, agree and disagree with appropriately 85% of the time.

Given an activity, Kaitlyn will identify idioms, figurative meanings and defince course-related terms with 85% accuracy and decreasing teacher assistance.

When given a class activity, Kaitlyn will use self-advocating skills when confronted with difficulty material 90% of the time.

| | |
|---|---|
| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |

| Student Name: | Kaitlyn Beth Tharaldson | DOB: | 03/14/1989 | ID#: | 15821 | Grade/Level: | 10 |

# Service Delivery

**What are the total service delivery needs of this student?**

Include services, related services, program modifications and supports (including positive behavioral supports, school personnel and/or parent training/supports). Services should assist the student in reaching IEP goals, to be involved and progress in the general curriculum, to participate in extracurricular/nonacademic activities and to allow the student to participate with nondisabled students while working towards IEP goals.

School District Cycle:   [x] 5 day cycle   [ ] 6 day cycle   [ ] 10 day cycle   [ ] Other _____

| A. Consultation (Indirect Services to School Personnel and Parents ) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
| 1-6 | LD Consultant | Counsultant | 1 x 30 | 9/1/2004 | 6/30/2005 |

| B. Special Education and Related Services in General Education Classroom (Direct Service) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
| | | | | | |

| C. Special Education and Related Services in Other Settings (Direct Service) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
| 1-10 | Reading Tutorial | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-10 | Language Arts | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-10 | Math | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-10 | Social Studies | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-10 | Oral Expression | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-10 | Science | Special Education Teacher | 5 x 50 | 9/1/2004 | 6/30/2005 |
| 1-5 | Speech/Language | Speech Staff | 1 x 30 | 9/1/2004 | 6/30/2005 |

Massachusetts DOE/Individualized Education Program    IEP5

## Individualized Education Program

IEP Dates: from 09/01/2004 to 06/30/2005

Student Name: Kaitlyn Beth Tharaldson    DOB: 03/14/1989    ID#: 15821

# Nonparticipation Justification

Is the student removed from the general education classroom at any time? (Refer to IEP5 – Service Delivery, Section C.)

☐ No    ☒ Yes    If yes, why is removal considered critical to the student's program?

Kaitlyn's academic needs require a more intense instruction in a small group setting to enhance her ability to learn successfully.

> IDEA '97 Regulation §300.550(b)(2):"... removal of children with disabilities from the regular educational environment occurs *only if* the nature of the severity is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (Emphasis added.)

# Schedule Modification

**SHORTER:** Does this student require a *shorter school day* or *shorter school year*?

☒ No    ☐ Yes -- shorter day    ☐ Yes -- shorter year    If yes, answer the questions below.

**LONGER:** Does this student require a longer school day or longer school year to prevent substantial loss of previously learned skills and / or substantial difficulty in relearning skills?

☒ No    ☐ Yes -- longer day    ☐ Yes -- longer year    If yes, answer the questions below.

How will the student's schedule be modified? Why is this schedule modification being recommended?
If a longer day or year is recommended, how will the school district coordinate services across program components?

# Transportation Services

Does the student require transportation as a result of the disability(ies)?

☒ No    Regular transportation will be provided in the same manner as it would be provided for students without disabilities. If the child is placed away from the local school, transportation will be provided.

☐ Yes    Special transportation will be provided in the following manner:

☐ on a regular transportation vehicle with the following modifications and/or specialized equipment and precautions:

☐ on a special transportation vehicle with the following modifications and/or specialized equipment and precautions:

> After the Team makes a transportation decision and after a placement decision hs been made, a parent may choose to provide transportation and may be eligible for reimbursement under certain circumstances. Any parent who plans to transport their child to school should notify the school district contact person.

Massachusetts DOE/Individualized Education Program    IEP6

**Individualized Education Program**

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson          DOB: ___03/14/1989___ ID#: ___15821___          Grade/Level: ___10___

# State or District-Wide Assessment

Identify state or district-wide assessments planned during this IEP period:

MCAS

Fill out the table below. Consider any state or district-wide assessment to be administered during the time span covered by this IEP. For each content area, identify the student's assessment participation status by putting an "X" in the corresponding box for column 1, 2, 3.

| CONTENT AREAS | 1. Assessment participation: Student participates in on-demand testing under routine conditions in this content area. | 2. Assessment participation: Student participates in on-demand testing with accommodations conditions in this content area. (See 1 below) | 3. Assessment participation: Student participates in alternate assessment in this content area. (See 2 below) |
|---|---|---|---|
| | COLUMN 1 | COLUMN 2 | COLUMN 3 |
| English Language Arts | ☐ | ☒ | ☐ |
| History and Social Sciences | ☐ | ☐ | ☐ |
| Mathematics | ☐ | ☒ | ☐ |
| Science and Technology | ☐ | ☐ | ☐ |
| Reading | ☐ | ☐ | ☐ |

1. For each content area identified by an "X" in column 2 above: note in space below, the content area and describe the accommodations necessary for participation in the on-demand testing. Any accommodations used for assessment purposes should be closely modeled on the accommodations that are provided to the student as part of his/her instructional program.

(01) Administer test in short periods with frequent breaks

(02) Administer test at a time of day that takes into account the student?s medical or learning needs

(03) Administer test in a small group setting (i.e., 3-5 students)

(09) Student wears noise buffers (after directions have been given using routine administration procedures)

(11) Test administrator reads and/or clarifies or sign-language interprets general administration instructions and test directions only

(14) Student uses a place marker

(15) Test administrator assists the student in tracking and/or sequencing test items (e.g., moving from one test question to the next; or redirecting the student's attention to the test)

(17) Test administrator reads the ELA Composition writing prompt, Mathematics, Science and Technology/Engineering, and/or History and Social Science test items/questions to the student; or student uses text-reader software, such as the Kurzweil 3000 or similar electronic textreader already in use by the student, for these tests. Readers must read all test items/questions and text word-for-word exactly as written and may not clarify, elaborate, or provide assistance to the student regarding the meaning of words, intent of test questions, or responses to test items.

(20) Student uses a template, organizer or checklist

(22) Test administrator monitors placement of student responses in the student's Answer Booklet.

(23) Student uses assistive technology (e.g., word processor, typewriter, or similar device or system) to type the ELA Composition and/or answers to open-response questions. The spell- and grammar-checking device must be turned off/disabled for the ELA Composition.

(26) Reading aloud the ELA Language and Literature test or the Grade 3 Reading Test to a student; or student uses text-reader software, such as Kurzweil 3000 or similar electronic text-reader already in use by the student for these particular tests. Readers must read test items/questions and reading passages to the student word-for-word exactly as written. Readers may not clarify, elaborate, or provide assistance to the student regarding the meaning of words, intent of test questions, or responses to test items/questions. (See Note below #27.)

(29) Student uses a calculator, number chart, arithmetic table, or manipulatives on non-calculator sections of the Mathematics Test

(30) Student uses a spell- or grammar-checking device on a word processor, or a hand held spellchecker for the ELA Composition; or word prediction software, provided that the "predictahead" and "predict on line" functions are turned off. (If

# Individualized Education Program

IEP Dates: from    9/1/04    to    6/30/05

Student Name: Kaitlyn Beth Tharaldson     DOB:    03/14/1989    ID#:   15821      Grade/Level:   10

a word processor or typewriter is used for the ELA Composition or for an open-response question, specific instructions listed under Accommodation # 23 must be followed.)

2.   For each content area identified by an "X" in column 3 above: note in space below, the content area, why the on-demand assessment is not appropriate and how that content area will be alternately assessed. Make sure to include the learning standards that will be addressed in each content area, the recommended assessment method(s) and the recommended evaluation and reporting method(s) for the student's performance on the alternative assessment.

> **N O T E**
>
> When state model(s) for alternate assessment are adopted, the district may enter use of state model(s) for how content area(s) will be assessed.

Massachusetts DOE/Individualized Education Program      IEP7

# Individualized Education Program

IEP Dates: from 9/1/04 to 6/30/05

Student Name: Kaitlyn Beth Tharaldson    DOB: 03/14/1989    ID#: 15821    Grade/Level: 10

## Additional Information

☐ Include the following transition information: the anticipated graduation date; a statement of interagency responsibilities or needed linkages; the discussion of transfer of rights at least one year before age of majority; and a recommendation for Chapter 688 Referral.

Anticipated Graduation Date: _____

Statement of Interagency Responsibilities or Needed Linkages:

Transfer of Rights Discussed: (at least one year before age of majority)    ☐ Yes    ☐ No    ☐ N/A

Chapter 688 Referral:    ☐ Recommended    ☐ Not Recommended    ☐ N/A

☐ Document efforts to obtain participation if a parent and/or student did not attend meeting or provide input.

☒ Record other relevant IEP information not previously stated.

Kaitlyn will take mandated physical education courses and elective courses with the advisement of her guidance counselor. The Team will remeet to determine placement after review of IEP.

## Response Section

**School Assurance**

I certify that the goals in this IEP are those recommended by the Team and that the indicated services will be provided.

_____    _____
Signature and Role of LEA Representative    Date

**Parent Options/Responses**

**It is important that the district knows your decision as soon as possible. Please indicate your response by checking at least one (1) box and returning a signed copy to the district. Thank you.**

☐ I accept the IEP as developed.    ☐ I reject the IEP as developed.

☐ I reject the following portions of the IEP with the understanding that any portion(s) that I do not reject will be considered accepted and implemented immediately. Rejected portions are as follows:

IEP Accepted Date: _____

_____

_____

☐ I request a meeting to discuss the rejected IEP or rejected portion(s).    _____

_____    _____
Signature of Parent, Guardian, Educational Surrogate Parent, Student 18 and Over*    Date
*Required signature once a student reaches 18 unless there is a court appointed guardian.

**Parent Comment:** I would like to make the following comment(s) but realize any comment(s) made that suggest changes to the proposed IEP will not be implemented unless the IEP is amended.

_____

_____

_____

Massachusetts DOE/Individualized Education Program    IEP8

**School District Name:** Chicopee Public Schools
**School District Address:** 180 Broadway Chicopee, MA 01020
**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Team Determination of Educational Placement

IEP Dates: from ___9/1/04___ to ___6/30/05___

Student Name: Kaitlyn Beth Tharaldson _____  DOB: __03/14/1989__ ID#: __15821__

| Team Recommended Educational Placement | Corresponding Placement | |
|---|---|---|
| The Team identified that IEP services are provided outside the general education classroom less that 21% of the time (80% inclusion). | ☐ | Full Inclusion Program |
| The Team identified that IEP services are provided outside the general education classroom at least 21% of the time but no more than 60% of the time. | ☐ | Partial Inclusion Program |
| The Team identified that IEP services are provided outside the general education classroom for more than 60% of the time. | ☒ | Substantially Separate Classroom |
| The Team identified that all IEP services should be provided outside the general ed. classroom and in a separate school that only serves students with disabilities.. | ☐ | Day School |
| The Team identified that IEP serves require a 24-hour education program. | ☐ | Residential School |
| The Team identified home-based IEP services for a student who is 3 to 5 years of age. | ☐ | Home-based Early Childhood Program |
| The Team identified IEP services provided in a program outside of the home for a student who is 3 to 5 years of age. | ☐ | Center-based Early Childhood Program |
| The Team has indentified a mix of IEP services that are not provided in primary school-based settings. | ☐ | Other: |

| Other Authority Required Placements (Non-Educational) | Corresponding Placement | |
|---|---|---|
| The placement has been made by a state agency to an institutionalized setting for non-educational reasons. | ☐ | Institutionalized Setting Specify Agency: |
| A doctor has determined that the student must be served in a home setting. | ☐ | Home-based Program |
| A doctor has determined that the student must be served in a hospital setting. | ☐ | Hospital-based Program |

## Placement Consent Form

Specific Program Locations and Dates:

| Parent Options / Responses |
|---|

It is important that the district knows your decision as soon as possible. Please indicate your response by checking at least one (1) box and returning a signed copy to the district along with your response to the IEP. Thank you.

☐ I consent to the placement decision.

☐ I refuse the placement decision.

☐ I request a meeting to discuss the refused placement decision.

_____          _____
Signature of Parent, Guardian, Educational Surrogate Parent, Student 18 and Over*          Date
*Required signature once a student reaches 18 unless there is a court appointed guardian.

Massachusetts DOE/Team Determination of Educational Placement - **Revised (11/02)**          PL1

School District Name: Chicopee Public Schools
School District Address: 180 Broadway Chicopee, MA 01020
School District Contact Person/Phone #: Mr. Daniel Schreier /

# Administrative Placement/Environment Information - PL2
### (For school district record keeping only)

**Student:**   Kaitlyn Beth Tharaldson

**DOB:** 03/14/1989    **SASID#:** 1092212303    **IEP Dates:** 09/01/2004  to 06/30/2005

## SPECIAL EDUCATION CLASSIFICATION SUMMARY

| DOE036 Nature of Primary Disability | DOE037 Eligibility Determination | DOE034 Educational Environment | DOE038 Level of Need | DOE032 Private Placement | DOE015 School ID Number |
|---|---|---|---|---|---|
| **08** - Specific Learning Disabilities | **02** - SPED & Related services or SPED | **50** - All ages, Private Separate Day School | **02** - Low-2 hours or more per week of services | **500** - Does not apply | **61505** - Chicopee High |
| 01-Intellectual 02-Sensory/Hearing Impaired or Deaf 03-Communication 04-Sensory/Vision Impaired or Blind 05-Emotional 06-Physical 07-Health 08-Specific Learning Disabilities 09-Sensory-Deafblind 10-Multiple Disabilities 11-Autism 12-Neurological 13-Developmental Delay | 01-(Found eligible for) related services only 02-(Found eligible for) specially designed instruction with or without related services | **3-5 Year Olds ONLY:** 08-100% services in general education classroom 09-100% services in separate classroom **ALL AGES:** 10-Full Inclusion, less than 21% outside general education 20- Partial Inclusion, 21%-60% outside general education 40- Substantially Separate, outside general education more than 60% 41-Public Separate Day 50-Private Separate Day 60-Residential School 70-Homebound/Hospital (Not home schooled) 90-Public Residential Facility | 01-Low-less than 2 hours of services per week 02-Low-2 hours or more of services per week 03-Moderate 04-High | 00-Enrolled in a private school placed by public school district 01-Enrolled in a private school placed by parent or guardian 500-Does not apply to student | ☐ **Check if the student is receiving any special education services from the district but is NOT EDUCATED in district** (Includes a student receiving services only who is at a private expense, home-schooled, or Pre-K etc, and is not educated by the district. School Code, DOE015, must be 08990000 for these students.) |

**Specific Program Location:**

## Determining Level of Need

Level of need refers to the amount of special education services that a student receives in all environments (e.g. *inside and/or outside of the general education classroom, or outside the district*).
*Check one box in each on the following columns that best describes the student's program.*

| | Primary Setting(s): | | Service Provider(s): | | Level of Services |
|---|---|---|---|---|---|
| 1 | ☐ in general education classroom | ☐ | general educators and paraprofessionals with consultation | ☐ | under 25% of program time |
| 2 | ☒ in and out of general education classroom | ☒ | combination of general educators, paraprofessionals, special educators and related service providers | ☒ | between 25% and 75% of program time |
| 3 | ☐ out of general education classroom | ☐ | special educators and related service providers | ☐ | over 75% of program time |

■ If two or three boxes are checked in Row 1, indicate **low**. If two or three boxes are checked in Row 2, indicate **moderate**.
  If two or three boxes are checked in Row 3, indicate **high**.
■ If one box is checked in each row, check either **moderate or high** depending on the need of the child. If the student's program cannot be rated against the listed criteria, use professional judgment in estimating level of need.

| Level of Need | ☐ Low - less than 2 hours of services per week | ☒ Low- 2 hours or more of services per week | ☐ Moderate | ☐ High |
|---|---|---|---|---|

Please refer to MASSDE web site at http://www.doe.mass.edu/infoservices/data/ for expanded definitions.    **PL2** - Revised (07/27/04)

June 8, 2005

**COMMONWEALTH OF MASSACHUSETTS**
**BUREAU OF SPECIAL EDUCATION APPEALS**

---

**IN RE: CHICOPEE PUBLIC SCHOOLS**

**BSEA # 05-2920**

---

**WILLIAM CRANE, HEARING OFFICER**

**DEREK BEAULIEU, ATTORNEY FOR PARENTS**

**CLAIRE THOMPSON, ATTORNEY FOR CHICOPEE PUBLIC SCHOOLS**

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

**In Re: Chicopee Public Schools**                                          **BSEA # 05-2920**

## DECISION

This decision is issued pursuant to M.G.L. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. 794 and the regulations promulgated under those statutes. A hearing was held on May 2, 2005 at the offices of Catuogno Reporting Services in Worcester, MA; May 5, 2005 at the offices of Catuogno Reporting Services in Springfield, MA.; and May 6, 2005 at the offices of Catuogno Reporting Services in Worcester, MA. Those present for all or part of the hearing were:

| | |
|---|---|
| Mother | |
| Father | |
| Robert Kemper | Speech-Language Pathologist, Psycholinguistics Associates |
| Jeff Kimball | Teacher, Chicopee Public Schools |
| Terry Shotland | Teacher, Chicopee Public Schools |
| William Mattavi | Teacher, Chicopee Public Schools |
| Judith Souweine | Psychologist |
| Andrea Stolar | Special Education Supervisor, Chicopee Public Schools |
| Daniel Schreier | Director of Special Education, Chicopee Public Schools |
| Derek Beaulieu | Attorney for Parents |
| Andrea MacGovern | Advocate for Parents |
| Claire Thompson | Attorney for Chicopee Public Schools |
| William Crane | Hearing Officer, BSEA |

The official record of the hearing consists of documents submitted by both parties (joint exhibits) and labeled as exhibits J-1 through J-40; documents submitted by the Parents and labeled as exhibits P-1 through P-19; documents submitted by the Chicopee Public Schools (Chicopee) and labeled as exhibits S-1 through S-7; selected portions of a transcript of testimony of Daniel Schreier from the previous BSEA Hearing[1] (transcript of Schreier testimony);[2] selected portions of a transcript of testimony of David Drake from the previous BSEA Hearing (transcript of Drake testimony);[3] and three days of recorded oral testimony and argument. The parties submitted written closing arguments on May 27, 2005, and the record closed on that date.

---

[1] The previous BSEA Hearing was between the same parties on January 29 and 30, 2004 and February 3 and 4, 2004, resulting in a decision by a BSEA Hearing Officer. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158 (April 7, 2004).

[2] The transcript of this witness admitted into the record is volume IV, pages 189-191, 204--210, 219-222, 227-230, 233, 235-243, 245-253, 262, 272-276, 284 -287, and 289-302.

[3] The transcript of this witness admitted into the record is volume III, pages 19-43, 64-66, 85-111, and 118-127.

## Issues

1. Whether the 2004-2005 individualized education program (IEP)[4] developed by Chicopee is reasonably calculated to provide a free, appropriate public education to Nelida[5] in the least restrictive setting?

2. If not, whether additions or other modifications can be made to the IEP in order to satisfy this standard?

3. If not, whether placement at the White Oak School would satisfy this standard?[6]

## Profile, IEP and History

A. Profile.

Student is a sixteen-year-old young woman (date of birth 3/14/89) who resides with her parents in Chicopee, MA. During this school year, as well as the previous school year, she has attended the White Oak School, a private day school in Westfield, MA, providing educational services to students with language-based or specific learning disabilities. Student is currently completing her 10th grade. Testimony of Parent; exhibits J-1, P-15.

Student has been diagnosed with a language-based or specific learning disability that is manifested in difficulties with oral language expression, reading and written expression. Testing indicates that she has average cognitive abilities, with a discrepancy between her achievement and intellectual abilities. Testimony of Kemper, Souweine; exhibits J-1, J-40.

B. Individualized Education Program (IEP).

Chicopee has proposed an individualized education program (IEP) for Nelida for the period 9/1/04 to 6/30/05. The IEP calls for consultation services from a learning disabilities consultant for 30 minutes, once each week. The IEP further calls for each of the following direct services to be provided by a special education teacher for 50 minutes, 5 times each week: reading tutorial, language arts, math, social studies, oral expression and science. In addition, the IEP calls for speech/language services to be provided by speech staff for 30 minutes, once each week. Exhibit J-1.

Chicopee's proposed IEP further explains the specially designed instruction to be provided Nelida, as well as accommodations to be provided, including multi-sensory instruction, multi-step tasks broken down, teacher prompts, mnemonics, study guide, webbing, template, use of word processor, word banks, semantic mapping, flashcards, visualization techniques,

---

[4] Exhibit J-1.
[5] Nelida is a pseudonym selected by the previous Hearing Officer to protect the privacy of the Student in publicly-available documents. The use of this pseudonym is continued within this Decision
[6] During the Hearing, Chicopee stated that in the event Parents prevail on the first two of the above-stated three issues, it would agree that Parents should prevail regarding the third issue. Therefore, no evidence or argument was provided relative to this third issue.

and vocabulary development in all areas of the curriculum. Parents have not accepted this IEP. Exhibit J-1.

It is this IEP for the 2004-2005 school year (Nelida's 10th grade year) that is the subject of the instant dispute.

C. Previous Hearing and Decision.

In January and February 2004, Parents and Chicopee (the same parties as in the instant dispute) litigated the appropriateness of the then-proposed IEP for Nelida for her 9th grade year. The BSEA Hearing Officer issued a decision, dated April 7, 2004, finding that Chicopee's IEP was not reasonably calculated to provide Nelida with a free, appropriate public education, and ordering Chicopee to reimburse Parents for expenses associated with their placement of Nelida at the White Oak School.[7] Chicopee appealed the BSEA decision to federal District Court, resulting in a decision favorable to Parents.

The subject of the previous dispute, as in the instant dispute, is a particular IEP proposed by Chicopee for Nelida. Each IEP is unique, reflecting the services and placement that Chicopee believes to be appropriate for Nelida for the particular period of time covered by the IEP. The IEP that was the subject of the previous Hearing is not before me, and neither party has requested that it be admitted into the record of the instant dispute.

Each BSEA decision is decided only on the basis of the evidentiary record and argument for that particular dispute. As I made clear to both parties at the outset of the Hearing in the instant dispute, other than these portions of the previous record that have been explicitly entered into the record of the instant dispute, I do not consider the evidentiary record of the previous dispute.[8]

Within the previous BSEA decision, there are several findings that relate to the instant dispute. I consider these findings below, and in several instances, I adopt them. However, for the reasons already explained, the previous findings cannot, by themselves, be determinative regarding the appropriateness of Chicopee's currently-proposed IEP.

**Summary of the Evidence**

1. Nelida's father: Parent testified that Chicopee proposed that his daughter be placed in a program (recently developed by Chicopee for learning disabled students) called the Brighter Beginnings program. He explained that he first became aware of this program at a Team meeting in the summer of 2004. He explained that although Chicopee staff spoke about the program, he did not receive enough information about the program to understand it. He noted that he asked about teachers and their qualifications, and was told that Chicopee did not yet have the teachers in place and that Chicopee was

---

[7] In Re: Chicopee Public Schools, BSEA # 04-0093, 10 MSER 158 (April 7, 2004).
[8] In order to reduce the time of the testimony in the instant dispute and at my suggestion, each party requested that portions of the testimony of one of its witnesses from the previous Hearing be entered into the evidentiary record of the instant dispute where that testimony continues to be relevant to Chicopee's READ 180 program.

3

continuing to work on this. He stated that he rejected Chicopee's proposed IEP because he wanted to observe the program before deciding whether it would be appropriate.

2. Parent testified that after repeated attempts, he and his daughter (Nelida) visited Brighter Beginnings with Ms. MacGovern (Parents' advocate) on February 16, 2005; he also accompanied Dr. Kemper on his visit to the program. He explained that during the February visit, his daughter was at first "a bit" nervous, and then during the course of the visit became quite anxious. He stated that she told him that (1) she felt sorry for the students in the program, (2) she felt there would be a stigma attached to being with other children who do not have her learning disability, (3) the class would likely be distracting (because of students' talking to each other and students' not paying attention) and therefore would be a difficult environment within which to learn, and (4) she does better in a school with greater structure than she observed. Parent further testified that by the end of the visit, his daughter was highly agitated; by the end of the day, she was bothered by the whole experience.

3. Parent testified that a month after the February 16, 2005 visit to the Brighter Beginnings program, he again spoke with his daughter about the visit, and she explained to him that (1) her biggest fear was that she would not be able to learn in this program because the environment is highly distracting, (2) the program is not sufficiently structured for her, (3) the program does not utilize grammar templates which she needs, and (4) she would not fit into the program emotionally. Parent also noted that his daughter said that she benefits from a program where all the children have dyslexia.

4. Parent testified that his daughter is doing extremely well at White Oak, where she is popular and happy. Parent explained that she is making educational progress toward her goal of attending a four-year art college in order to pursue her goal of becoming an artist. He also stated that he is concerned that if Nelida attends the Brighter Beginnings program, she will fail to thrive and make progress, will not be able to access the curriculum, and will not be admitted to a quality college.

5. Andrea MacGovern: Ms. Andrea MacGovern testified that she is familiar with Nelida, having first been contacted by Parents at the end of Nelida's 4th grade to assist and advise them regarding additional testing and educational services for her. Ms. MacGovern explained that she has been providing this kind of assistance to over 1,000 students and their families over the past 16 years.

6. Ms. MacGovern testified that she is generally familiar with the Brighter Beginnings program through the program description and through one of her other clients. She testified that she observed the program for an entire day on February 16, 2005. During the visit, she spoke with several teachers.

7. In her testimony, she described the number of students and number of teacher(s) in each class that she observed. She also described her attempts to try out, as though she were a student, the reading program used by Brighter Beginnings (READ 180) during her visit.

4

8. <u>David Drake</u>: Parts of the transcript of Mr. David Drake's testimony from the previous BSEA Hearing were admitted into evidence in the current dispute.[9] When he testified in the previous Hearing, Mr. Drake was the Headmaster of White Oak School. The transcript does not describe Mr. Drake's education or work experience. Mr. Drake did not testify in the present dispute.

9. Mr. Drake's testimony was that he became familiar with the reading program used by Chicopee at its Brighter Beginnings program (READ 180) through review of (1) a demonstration compact disc, (2) written materials (including exhibits in the previous BSEA Hearing) and (3) the READ 180 website. Mr. Drake made clear that he is not familiar with the manner in which READ 180 would be implemented by Chicopee, nor is he familiar with the needs of Nelida, but rather he considered the appropriateness of this program more generally for use at his school (White Oak School).

10. Mr. Drake's testimony was that READ 180 appears, from the literature, to be most effective for students in regular education, next most effective for students with English as a second language, and, finally, of benefit for students with disabilities, but without indication of the specific nature of the disabilities of the students whom it would benefit. He further explained that READ 180 appears to help most with comprehension and vocabulary, which are areas where one would expect to see growth for educationally-deprived students. He concluded that READ 180 is best understood as a "wide-scale sort of public-health kind of response rather than a highly-targeted medical kind of response". Within READ 180, Mr. Drake "saw very little of what I would consider to be typical highly-recommended, state-of-the-art rule-based instruction or even rule-based analysis in this material."

11. In his testimony, Mr. Drake seemed most concerned by the inability of a computer to replicate what a teacher would (hopefully) do to listen to and analyze a particular student's successes and errors and then provide an appropriate response -- a response that requires "significant adaptability" on the part of the teacher and further requires an immediate response from the teacher in order to preserve the learning moment. Mr. Drake's testimony continued: "It's that individualization, that knowledge and insight that you get with training and sensitivity and experience of a teacher rather than the canned response of a cookbook, a page-turner manual or a machine-based instructional imitation".

12. Mr. Drake's testimony concluded that READ 180 "was not, at this point, even close to being a desirable program" for White Oak School, as compared to other, available programs.

13. <u>Robert Kemper</u>: Dr. Robert Kemper testified that since 1992 he has been President of Psycholinguistic Associates, Inc. where currently his exclusive work is performing psycholinguistic evaluations of children with a learning disability or dyslexia. Dr. Kemper also has provided consultation to programs serving learning disabled students,

---

[9] The parts of the transcript of this witness admitted into the record from the previous BSEA Hearing are volume III, pages 19-43, 64-66, 85-111, and 118-127.

including White Oak. Dr. Kemper has held a variety of other positions as reflected in his resume (exhibit J-41). Dr. Kemper holds a PhD in speech language pathology, which he received in 1985.

14. Dr. Kemper testified that a psycholinguistic evaluation is a comprehensive evaluation of all areas of language necessary to be successful in school. He explained that language can be understood as represented by a triangle, with the base of the triangle (and foundation of language) being listening comprehension, the middle level of the triangle (which is built upon the foundation of listening) being reading, and the top of the triangle (which is built on listening and reading) being written expression. He stated that this triangle model reflects the theoretical underpinnings of psycholinguistics.

15. Dr. Kemper testified (and his written evaluation report reflects) that he conducted a psycholinguistic evaluation of Nelida on April 22, 2003, administering a variety of oral language, reading and written expression tests, as well as a test of phonological processing. He testified (and his report reflects) that he concluded that Nelida presents with a language-based learning disability that is manifested in difficulties with oral expression, reading and written expression. He noted that his diagnosis of "language-based learning disability" indicates that the underpinning for Nelida's deficits is a disorder in language.[10]

16. Dr. Kemper testified that Nelida also has dyslexia, which is a more specific disorder than (and is included within) language-based learning disability. Dr. Kemper explained that his written report does not indicate a diagnosis of dyslexia because Nelida's test scores were not so low as to justify this diagnosis, and he has not evaluated Nelida since his original evaluation of April 22, 2003. He stated that he reached the conclusion that Nelida has dyslexia based upon his having "suspicions" (based upon testimony at the previous BSEA hearing between these parties) that Chicopee administered the Comprehensive Test of Phonological Processing (CTOPP) in a manner that was inappropriate with the result that there may have been a greater "practice effect" than he previously realized. As noted in Dr. Kemper's evaluation report, Chicopee administered CTOPP to Nelida shortly before Dr. Kemper administered this same test. Dr. Kemper testified that his scores for Nelida may therefore have been inflated. From this, Dr. Kemper concluded that Nelida should be diagnosed as having dyslexia.

17. Dr. Kemper's report states that Nelida would not likely be successful in accessing a typical ninth grade curriculum, even with "abundant" modifications and accommodations, and he therefore recommended that Nelida be educated in an alternative educational program. Dr. Kemper explained in his testimony and report that he recommended that this alternative educational program be a substantially-separate, multi-sensory, language-intensive program that includes the following components:

---

[10] The decision in the previous BSEA dispute considered the same evaluation report of Dr. Kemper as is being considered in the instant dispute. That decision provides a useful summary of the report. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 160, par. 7 (April 7, 2004).

- presentation of information that stimulates all sensory modalities;
- implementation within a substantially separate school that is devoted to addressing the needs of children who have significant language impairments;
- student/teacher ratio no greater than eight to one;
- direct teaching performed in a systematic manner;
- continuous review of previously learned information;
- teaching of skills across various contexts in order to facilitate generalization;
- all teachers trained sufficiently to provide instruction in a multi-sensory, structured language program setting;
- a daily, individual tutorial with a multi-sensory, code emphasis for reading, spelling and written language instruction.

18. Dr. Kemper's report made a number of more specific recommendations, including but not limited to the LiPS program, a code emphasis reading approach that uses an Orton-Gillingham methodology, and a reading comprehension program such as Visualizing and Verbalizing, in addition to the comprehension strand of Project Read.

19. Dr. Kemper testified that a language-based program with systematic, rule-based methodologies is important because children with a language-based learning disability have not been able to learn language through normal systems, and therefore language needs to be taken out of context and specific rules explicitly taught – for example, rules as to how words are spelled, or how words are pronounced. He stated that these rules should be taught systematically and proactively, moving through a progression of rules.

20. Dr. Kemper testified as to what he meant when he stated that teaching should be systematic – that is, using a scope and sequencing methodology, move from one skill to another building from what has been learned. He explained that teaching should be multi-sensory so that all senses are being activated and so that there is a redundancy of teaching that would not be necessary with typical students. He recommended the use of Project Read as it is structured and systematic in terms of scope and sequencing for students with a language learning disability or dyslexia.

21. Dr. Kemper testified that, in his opinion, his recommendations for Nelida from his April 2003 evaluation and report would be valid currently for the following reasons: as a "rule of thumb", with a student who has a language learning disability, after one year of appropriate instruction, one sees qualitative but not quantitative changes; by the end of the second year, one sees small quantitative changes; by the end of the third year, one sees statistically significant changes; and a fourth year is needed to coalesce the student's skills.

22. Dr. Kemper testified that the June 2004 test results reflected within the currently proposed IEP (exhibit J-1, page 2 of 26) are significantly above the test scores that he obtained but that the IEP test scores may be inflated because of a practice effect from his testing in April 2003. He also noted that he used a more recent version of the Gray Oral test (version # 4) than was used by White Oak in obtaining test scores reflected in the IEP (White Oak used version # 3), and because the two tests are normed on different

7

populations, the test scores may not be compared. He therefore discounted the more recent test scores and concluded, based on his general experience regarding the progress made by children with Nelida's profile, that Nelida's educational needs have not changed and the educational services recommended in his written evaluation report continue to be necessary and appropriate.

23. Dr. Kemper testified that for children with Nelida's educational needs, it would be important that a separate class be taught regarding oral expression, in addition to the teaching of oral expression being infused in the curriculum.

24. Dr. Kemper testified that he found that the amount of consulting time allocated in part A of the service delivery grid of the proposed IEP (exhibit J-1, page 20 of 26) to be insufficient. He recommended that there be at least two hours per week of consultation.

25. Dr. Kemper testified that he is familiar with READ 180 through a review of several exhibits in this dispute (S-4, S-5, S-6, S-7, P-17, P-18, P-19), through reading the READ 180 website, and observing the use of READ 180 during his visit to Brighter Beginnings program on March 11, 2005. Dr. Kemper concluded that READ 180 is designed primarily for inner city youths who do not have a neurological reading pathology but because of lack of exposure to reading and poor education, have not become good readers. He opined that READ 180 is used to help these students "catch up".

26. Dr. Kemper testified that his visit and observation of the Brighter Beginnings program on March 11, 2005 lasted four hours, including a half hour for lunch. Dr. Kemper testified regarding his observations. He found it "disconcerting" that what a student was learning on the computerized part of the READ 180 program was not related to what was being taught in that classroom. He noted that what he observed was insufficient continuity regarding scope and sequencing; rather, he saw more isolated teaching of skills, which is not consistent with principles of language-based teaching. He further noted that in his observation of a science class, he did not see any teaching that he would consider to be language-based. Dr. Kemper testified that he reached his conclusions regarding the Brighter Beginnings program on the basis of his observations during his visit on March 11, 2005, including "sporadic" conversations with Mr. Shotland and Mr. Kimball during the visit. He stated that he did not speak with others involved with the Brighter Beginnings program.

27. Dr. Kemper testified that earlier during the Hearing day, he had read the IEP of a student at the Brighter Beginnings program, as reflected in exhibit P-2. He stated that he had also been shown a neuropsychological evaluation of this student that indicated a full-scale IQ score of 75. Dr. Kemper said that he did not know when the neuropsychological evaluation was conducted. He concluded that a child with an IQ of 75 would not be an appropriate peer for Nelida.

28. Dr. Kemper testified that, in his opinion, the Brighter Beginnings program would be appropriate for a student who has difficulty with learning and who does not do well in a content-area class. He found that Brighter Beginnings is not a language-based program in that it is missing a number of essential ingredients, including certain criteria regarding

methodology, teaching techniques and student enrollment. He concluded that because the Brighter Beginnings program does not constitute a language-based program, it would not be appropriate for Nelida.

29. <u>William Mattavi, Terry Shotland and Jeffrey Kimball</u>: Three special education teachers from the Brighter Beginnings program – Mr. William Mattavi, Mr. Terry Shotland and Mr. Jeffrey Kimball – testified. Because of the similarities in their background and experience, their current responsibilities and their testimony regarding the Brighter Beginnings program, I summarize their testimony together, noting where their testimony differs.

30. All three teachers were employed as special education teachers of children with learning disabilities at the White Oak School in Westfield, MA, from September 1999 to June 2004. White Oak serves students in grades 4 through 12. The primary educational characteristic of students at White Oak is a significant language-based learning disability or a specific learning disability, despite average or above-average intellectual potential. Testimony of Mattavi, Shotland, Kimball; exhibit P-15.

31. All three teachers were then hired by Chicopee and have been teaching at the Brighter Beginnings program since September 2004. Additional information regarding their experience and background is provided in their resumes and licenses. Testimony of Mattavi, Shotland, Kimball; exhibits J-5, J-8, J-11.

32. This current school year (2004-2005) at Brighter Beginnings, Mr. Mattavi teaches a math course. Mr. Shotland teaches social studies, reading and language arts. Mr. Kimball teaches reading. All of the classes utilize small group instruction, with no more than five students in the classroom at a time. Testimony of Mattavi, Shotland, Kimball.

33. The teachers testified that at the Brighter Beginnings program, they use approaches and strategies similar to those that they learned and implemented in classrooms for learning disabled students at White Oak. These approaches and strategies include an emphasis on the following:

- teaching specific skills (e.g., note-taking, vocabulary, spelling and oral expression);
- use of organization tools (e.g., posting a daily agenda on the board so that students know what to expect, graphic organizers and web diagrams);
- consistent routines in the classroom, breaking down tasks into smaller steps and determining the specific parts of a task that an individual student does/does not understand;
- utilizing steps and sequencing in order to help students organize complicated tasks;
- individualizing expectations and assistance for each student, using manipulatives and models (i.e., hands-on teaching) in the classroom;
- giving multi-modal presentations (e.g., presenting material to the students orally and in writing);
- rule-based strategies (e.g., when teaching spelling);
- templates to provide a routine and to assist students to organize their thoughts;

- teaching at a slower, more methodical pace with greater opportunities for student participation; and
- spiraling back and forth between material currently being taught and material previously taught to ensure that a student understands, retains and can apply the learned material.

34. The teachers further testified that within the classroom, the following programs are utilized: verbalization/visualization elements of Orton-Gillingham, Story Grammar Marker, the Lindamood Phoneme Sequencing (LiPS) Program, and the READ 180 program. They explained that they teach oral expression as an integrated part of their classes rather than as a separate instruction block. Testimony of Mattavi, Shotland, Kimball.

35. The teachers testified that within their classrooms all of the students have learning disabilities, there are no students who present any significant conduct or behavioral issues, nor are there any students with any significant emotional issues. They noted that Brighter Beginnings has access to a school adjustment counselor and psychologist in the event difficulties arise in these areas. They further explained that all students appear to have average to above-average intelligence although one student's IQ scores are lower than average. Testimony of Mattavi, Shotland, Kimball.

36. All three teachers testified that they taught Nelida at White Oak during the 2003-2004 school year. They stated that Nelida has a similar profile to the students whom they teach this year at the Brighter Beginnings program. They opined that the Brighter Beginnings program would be able to meet all of her educational needs and that she would fit in well. Testimony of Mattavi, Shotland, Kimball.

37. Mr. Mattavi testified that Wanda Cronin (the science teacher at Brighter Beginnings) is teaching a curriculum that he developed. He explained that as with the other teachers in this program, Ms. Cronin teaches a skills-based program.

38. The three teachers testified that they (and the fourth teacher, Ms. Cronin) meet formally every Monday for 45 to 90 minutes to discuss individual students and curriculum, as well as to do problem solving.

39. Mr. Shotland and Mr. Kimball testified that they each teach a tutorial during which the READ 180 program is used. Mr. Shotland testified that the tutorial addresses reading, written language and spelling. Mr. Shotland and Mr. Kimball testified that at White Oak they had used another reading program (Let's Read) and when hired by Chicopee and introduced to READ 180, they both were skeptical of its appropriateness. Both teachers were trained on READ 180 for two days during the summer of 2004, and both teachers utilize this program as part of the reading instruction at Brighter Beginnings. Mr. Kimball stated that he has also tried out the program as though he were a student.

40. Mr. Shotland and Mr. Kimball testified that READ 180 is a comprehensive, rule-based instructional program that addresses reading comprehension, oral fluency, phonetics,

vocabulary, writing (through a separate component of the program) and independent reading. Part of the program is computer-based, with the teacher serving as facilitator, for 15 to 20 minutes during the reading tutorial. They explained that READ 180 is an instructional, rather than a remedial, program. They concluded that READ 180 and Let's Read (the reading program that they utilized at White Oak) are similar (for example, both programs are used to teach fluency, decoding and spelling) but use different approaches. They opined that both reading programs are effective for learning disabled students, although Mr. Shotland indicated that READ 180 would not likely be effective for a student whose reading level is not at least at the 4th grade level. Mr. Shotland added that Nelida's reading ability is significantly above the 4th grade level.

41. Mr. Kimball testified that the READ 180 program is more challenging than the Let's Read program, and that in his opinion, the READ 180 program would be more appropriate for Nelida than the Let's Read program at White Oak. Mr. Shotland and Mr. Kimball testified that based on testing of their students during the school year, all of the students except one are making significant reading progress. Mr. Kimball added that it is uncertain why the one student is not making progress.

42. Andrea Stolar: Dr. Andrea Stolar testified that she received her doctorate degree in education (EdD) in 2001, she worked as a tutor at Curtis Blake School (which is similar to White Oak School) for one year, she taught at the high school level in Springfield for eight years and she has been in her current position with Chicopee as Supervisor of Special Education for seven years. She explained that in her current position, she has been involved with the Brighter Beginnings program. See also exhibit S-2 (affidavit of Stolar).

43. Dr. Stolar testified that the Brighter Beginnings program was created for the purpose of educating students who have a language learning disability. She stated that she is part of a team that developed the Brighter Beginnings program, including its classes, so that it be would be appropriate for language learning disabled students. She noted that this team selects the students and teachers for the program. She stated that she is continually meeting with the Brighter Beginnings program teachers, Sue Fino (a consultant whom Chicopee brought in to assist with the development and implementation of the program) and others to determine how to improve the program.

44. Dr. Stolar testified that she frequently observes and checks to ensure that the instruction follows a cohesive model, including continuity, consistency and scope and sequencing of instruction. She added that she works to ensure that language-based instruction is infused throughout the curriculum. She noted that she has observed the Brighter Beginnings teachers use many of the strategies utilized at White Oak; and that classes are kept small in order to minimize distractibility.

45. Dr. Stolar testified that staff concluded, after significant discussion, that for high school students, it is more effective to infuse oral expression throughout the curriculum rather than to teach it separately. She explained that she and others concluded that it is too difficult for high school students to become interested and engaged in oral expression when it is taught separately.

46. Dr. Stolar testified that she is familiar with the student at Brighter Beginnings who has a full scale IQ of 75. She indicated that she has talked with the Brighter Beginnings teachers about how well this student is performing and has reviewed the student's IEP, including parts of the IEP that indicate that she is performing relatively close to grade level. She noted that she and the Brighter Beginnings teachers concluded that this student is appropriately placed within the Brighter Beginnings program.

47. Dr. Stolar testified that she believes that READ 180 is appropriate for language learning disabled students since it addresses areas of need, including spelling, comprehension and fluency. She also noted that READ 180 is a small component of the overall reading program (at Brighter Beginnings) that includes rule-based instruction in decoding, syllabication, Meta words, comprehension, oral reading and phonemic awareness.

48. <u>Daniel Schreier</u>: Mr. Daniel Schreier testified at the Hearing. In addition, portions of the transcript of his testimony from the previous BSEA Hearing were entered into the evidentiary record of the present dispute.[11] Mr. Schreier testified that for the past two and one-half years, he has been the Director of Special Education for Chicopee. Previously, he worked for the state Department of Education in Program Quality Assurance. He holds a masters degree in student personnel administration and a law degree (JD).

49. Mr. Schreier testified that he has done a significant amount of research and review regarding reading programs. He stated that READ 180 is an engaging, interactive and motivating reading program that provides continuing feedback on how a student is performing with his or her spelling, decoding phonemic awareness and comprehension. He explained that the program is instructional in that it includes what would normally be taught within an English language course. He noted that research indicates that students with specific learning disabilities have made progress using this program.

50. Mr. Schreier testified that READ 180 identifies material for each student to read that is at that particular student's reading level, allowing continuing mastery to occur through the process of reading. He noted that READ 180 is a remedial program in that it targets the needs of the struggling reader. He also noted that with an older reader (for example, a high school student), it becomes quite important to find a reading program that is motivating and not demeaning in order to engage the student sufficiently. He explained that this is a strength of READ 180.

51. Mr. Schreier testified that READ 180 would not be appropriate for a student whose reading ability is so low that he or she has not mastered any of the concepts or underpinnings of reading – for example, a student who is struggling with the ability to understand a phoneme (such as the "k" sound in the word "cat"). He noted that Nelida's reading level is not so low as to make READ 180 inappropriate for her.[12]

---

[11] The parts of the transcript of this witness admitted into the record from the previous Hearing are volume IV, pages 189-191, 204–210, 219-222, 227-230, 233, 235-243, 245-253, 262, 272-276, 284 -287, and 289-302.

[12] The decision in the previous BSEA dispute provides a useful summary of Mr. Schreier's prior testimony regarding READ 180. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 161, par. 12 (April 7, 2004).

52. Judith Souweine: Dr. Judith Souweine testified, and her resume reflects, that she worked for several years as a special education teacher prior to beginning her practice as a psychologist and neuropsychologist in 1984. She received her EdD in 1977. She explained, and her resume reflects, that since 1986 she has been a psychologist at the Children's Clinic in Northampton, MA. She noted that during the past 25 years, she has observed approximately 100 programs for students with language-based learning disabilities. She added that as a psychologist and neuropsychologist, she is regularly asked to consult both to school districts and to parents regarding students with language-based learning disabilities. She has also taught college-level courses regarding language-based learning disabilities. Exhibit J-3 (resume).

53. Dr. Souweine testified that prior to the previous BSEA Hearing between these parties, she reviewed all prior evaluations and school records, including IEPs, and observed Nelida at the White Oak School on October 31, 2003. She explained that in preparation for the present hearing, she reviewed all of the joint exhibits (J-1 through J-41), the progress reports from White Oak School, an initial testing report administered in June 2004, and all of the Parents' exhibits (P-1 through P-16). She noted that she has never evaluated Nelida.

54. Dr. Souweine testified that Nelida's particular special education needs, as reflected within the evaluations, are weaknesses primarily in the language area formulating oral and written expression, with some needs in reading decoding, and additional difficulties with math computation and concepts. She noted that Nelida's deficits are moderate, not severe.

55. Dr. Souweine testified (and her observation report reflects) that on November 10, 2004, she spent the day at the Brighter Beginnings program, observing all of the special education classes to which Nelida would have been assigned (had she attended this program pursuant to the current IEP) and spoke with staff, including Mr. Kimball, Dr. Stolar and Mr. Schreier, as well as Susan Fino (the consultant to the program). She stated that her impressions of Brighter Beginnings were very positive. Exhibit J-2 (Dr. Souweine's observation report).

56. Dr. Souweine testified that in order for a program to be successful with students with a language-based learning disability, a program needs to be well-organized and paced in a way that ensures that the students have a number of different opportunities to understand and learn the same material. She explained, in general, that for students with core deficits with language learning disabilities, the Brighter Beginnings program, as designed and implemented, was particularly strong and included all of the elements she expect to see in a program for these students.

57. Dr. Souweine's testimony and observation report indicated that the curriculum approach is individualized, with small class sizes of 4 or 5 students in each class. She observed a significant amount of remedial instruction in all core academic areas (including the use of READ 180 and the Lindamood Bell program). She noted that the students were well invested in their academic work, with instructional materials that the students found

13

engaging (particularly, READ 180). She testified that she found the teaching materials to be appropriate for learning disabled students and the staff to be well versed in the students' learning deficits. She concluded that the program was organized and well thought-out for purposes of meeting the needs of students with learning disabilities. Exhibit J-2 (Dr. Souweine's observation report).

58. Dr. Souweine testified, more specifically, that during her visit to the program, she observed that the teachers were proficient at providing experiences and materials that allowed the students to learn using a variety of formats (including a significant amount of multimodal presentations) in a variety of contexts (for example, orally, on the board and in homework). She noted that the teachers used techniques (for example, cuing, opportunities for students to ask questions and reviewing) to ensure that that the students successfully learned the material presented so that they could do the work independently, and other techniques typical of a program for learning disabled children (including, for example, templates and organizational tools, review of previous materials and connecting previously learned material with currently taught material).

59. Dr. Souweine testified that there was continuity of teaching (that is, using the same methodology, skill content and approach) from one class to another throughout the day -- for example, each class was observed to include techniques of modeling, cueing and reviewing. She noted that continuity is enhanced through the program's consultant (Ms. Fino) who works with all of the teachers, providing them feedback.

60. Dr. Souweine testified that three of the four teachers in the program have a significant amount of experience working with learning disabled students, while the 4th teacher (Ms. Cronin) has less experience. She noted that Ms. Fino (the program consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area. She also noted that Ms. Cronin teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students. Dr. Souweine concluded that with Ms. Fino's assistance to Ms. Cronin, all four of the teachers are sufficiently qualified and experienced to teach learning disabled students at the Brighter Beginnings program.

61. Dr. Souweine testified that the teachers were working together as a team and there was an opportunity (built into the schedule) for staff to meet together on a regular basis for planning and coordination.

62. Dr. Souweine testified with respect to the READ 180 program that is used at Brighter Beginnings. She noted that she has not been trained on this program but has observed it and learned about it during both of her visits to the Brighter Beginnings program.

63. Dr. Souweine testified that READ 180 is a reading instructional program that begins with an assessment of the student and then provides the student with a variety of reading material at his/her level with accompanying word study materials on the computer, advancing a student sequentially as the student learns skills. She explained that READ 180 includes oral reading, silent reading, reading comprehension, phonological awareness and spelling all in one program. She also noted how engaged, invested and enthusiastic

the students were when she observed them participating in the reading instruction at the Brighter Beginnings program, something that is difficult to achieve with high school students learning the "tedious work of remediating spelling and reading comprehension". She concluded in her observation report that READ 180 provides an effective remedial approach for learning disabled students. Exhibit J-2.

64. Dr. Souweine testified that READ 180 is not a rule-based program but explained that adding a rule-based program is something that is done when a student is not able to gain the information in a more intuitive or more natural way, but it is not recommended that a rule-based program be used when it is not needed since it is an additional layer. She opined that methods other than a rule-based reading program can lead to quicker generalization and acquisition of reading skills. She explained that methods using rapid word recognition techniques can be very effective in improving decoding skills and fluency. She noted and referenced a significant amount of literature that supports the use of rapid word recognition techniques and believes a significant advantage of the READ 180 program is that these techniques are embedded within it.

65. Dr. Souweine concluded that she has no doubts regarding the appropriateness of READ 180 for Nelida, and believes READ 180 to be an appropriate and strong part of the language reading component of the Brighter Beginnings program.

66. Dr. Souweine testified that the Brighter Beginnings program allows for the opportunity for the special education students in the program to participate in regular education activities (for example, after school activities and lunch) and regular education electives and/or core academic courses (when able to do so) in the Chicopee High School. She noted the importance of these opportunities so that the program would be the least restrictive appropriate to meet a student's special education needs.

67. Dr. Souweine testified that her "impression" (from reviewing IEPs) was that all of the students currently in the Brighter Beginnings program have average intellectual ability and have learning disabilities that manifest themselves in reading, writing and/or math. She did not find any primary emotional or behavior disorders with these children, nor did she observe any of these disorders when she visited the program. She further noted that students in the Brighter Beginnings program may have social, emotional and/or behavioral issues as these normally would occur as a secondary disability with students at this age with learning disabilities – that is, it is not an entirely homogeneous population nor would one expect it to be in a learning disability program -- but that there are no areas of concern that would be disruptive to the program. She further noted that there is some difference in ages and grade levels of the students in Brighter Beginnings, but because of the very small size of the classes at the program, the instruction can be easily individualized, particularly in the core academic areas of language arts and math.

68. Dr. Souweine concluded, after reviewing Chicopee's proposed IEP for the current school year, that the proposed services within the IEP would provide Nelida with an appropriate and comprehensive program that would address each of her particular special education needs. She further opined that these proposed services and program would likely result in "substantial" progress regarding her special education needs. By "substantial"

progress, she stated that Nelida would likely acquire the skills needed to be successful in high school. She explained that Nelida would likely be able to be mainstreamed into regular education classes at the Chicopee High School as her skill level increases.

69. Dr. Souweine testified that only in one area did she have any concerns regarding the appropriateness for Nelida of the program that she observed at Brighter Beginnings. She explained it is possible that the science class that she observed at Brighter Beginnings would not be appropriate for Nelida with respect to the content of and skills taught, given the science classes that Nelida has already taken at White Oak.

70. Dr. Souweine testified that she has reviewed the recommendation section of the evaluation conducted by Dr. Kemper (exhibit J-40, page 12) and concluded that (1) the Brighter Beginnings program is substantially separate because all academic classes are taught separately in small classes of special needs students by special education teachers; (2) the program is language intensive as there is a great deal of attention given to the way information is delivered linguistically, together with remedial strategies and methodologies that ensure that students understand and are able to manipulate the material taught; and (3) using a variety of approaches and modalities (including multi-sensory presentation of information) the program provides direct remedial instruction (for example, the language arts class uses templates and organizational tools, the math class uses multi-sensory approaches, the reading class uses READ 180, Lindamood Bell, repeated reading methods and oral reading methods, and the science class uses a multi-sensory game task to teach science vocabulary).

71. Dr. Souweine further testified with respect to Dr. Kemper's recommendations that she observed in Brighter Beginnings that (1) the student:teacher ratio is better than the 8:1 ratio recommended by Dr. Kemper; (2) teaching is performed in a systematic manner (that is, it is provided in an appropriate sequence and paced in a way that students can gain information and gain mastery); (3) the teachers provide review of previously learned material and overtly connect previously learned information and new information in a variety of ways; (4) the program teaches skills in a variety of contexts in order to promote generalization (that is, the same skills are used in different classes so that the information is generalized from one class to another); and (5) all of the teachers are adequately trained to provide the above-described instruction to learning disabled students. She further noted that the program utilizes an individual tutorial for each student for language arts.

72. Dr. Souweine testified that, in her opinion, the Brighter Beginnings program is in substantial conformance with Dr. Kemper's recommendations as described above. She explained that the only significant differences are where Dr. Kemper makes additional, specific recommendations (pages 13 to 17 of his report), the Brighter Beginnings program utilizes, in certain instances, different teaching methodologies which Dr. Souweine believes to be appropriate.

73. READ 180: The record includes a number of articles and other materials regarding READ 180. These include the following. Exhibit S-3 describes how READ 180 correlates to Massachusetts English Language Arts. Exhibit S-4 provides a course

description of READ 180. Exhibit S-5 is a study of the results of READ 180 being used with special education students in Iowa from 2000-2002. Exhibit S-6 is an excerpt from a book by Sally Shaywitz, MD, which makes reference to READ 180 as an appropriate reading program for students with dyslexia. Exhibit S-7 is material prepared by the makers of READ 180 relative to READ 180 in general, as well as its appropriateness with students who have special education needs. Exhibit P-17 is materials developed by the maker of READ 180 describing the research, testing and development of the program. Exhibit P-18 is materials developed by the maker of READ 180 describing, in detail, the various components of the program. Exhibit P-19 is a summary of efficacy studies using READ 180 dated January 2002 and prepared by Policy Studies Associates.

## Findings and Conclusions

Nelida is an individual with a disability, falling within the purview of the Individuals with Disabilities Education Act[13] and the state special education statute.[14] As such, Nelida is entitled to a free appropriate public education (FAPE).[15] Neither her eligibility status nor her entitlement to FAPE is in dispute.

In general, FAPE is intended "to open the door of public education to handicapped children"[16] rather than to require the "best" educational services for a student.[17] More specifically under state and federal special education law, FAPE requires that a student's individualized education program (IEP) be tailored to address the student's unique needs in a way reasonably calculated to enable the student to make meaningful and effective educational progress in the least restrictive environment.[18] The question of whether the student's educational progress is meaningful or effective is gauged in relation to the potential of the particular student.[19]

---

[13] 20 USC 1400 *et seq.*

[14] MGL c. 71B.

[15] MGL c. 71B, ss. 1 (definition of FAPE), 2, 3.

[16] *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043 (1982).

[17] See, e.g., *Lt. T.B. ex rel. N.B. v. Warwick Sch. Com.*, 361 F.3d 80, 83 (1st Cir. 2004) ("IDEA does not require a public school to provide what is best for a special needs child, only that it provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law.").

[18] For a more complete explanation of this standard and the legal authorities upon which it is based, see *In re: Arlington*, 37 IDELR 119, 8 MSER 187, 193-195 (SEA MA 2002). See also the following regulations not referenced in *Arlington*: 603 CMR 28.05(4)(b) (Student's IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum"); 603 CMR 28.02(9) ("An eligible student shall have the right to receive special education and any related services that are necessary for the student to benefit from special education or that are necessary for the student to access the general curriculum."); 603 CMR 28.02(18) ("*Progress effectively in the general education program* shall mean to make documented growth in the acquisition of knowledge and skills, including social/emotional development, within the general education program, with or without accommodations, according to chronological age and developmental expectations, the individual educational potential of the child, and the learning standards set forth in the Massachusetts Curriculum Frameworks and the curriculum of the district.").

[19] *Deal v. Hamilton County Board of Education*, 104 LRP 59544 (6th Cir. 2004) ("IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue"); *In re: Arlington*, 37 IDELR 119, 8 MSER 187, 194, nn. 18, 19 and 20 (SEA MA 2002) (collecting authorities).

2/3

The initial issue presented is whether the programming and specialized services embodied in the Chicopee's proposed IEP for Nelida for the 2004-2005 school year are consistent with this legal standard. Chicopee has the burden of proof with respect to this issue.[20]

A. Recommended educational services for Nelida.

I note, at the outset, that the BSEA Hearing Officer in her Decision from the previous Hearing with these same parties reached the following conclusion regarding the recommended educational services and placement for Nelida for her 9th grade year (the 2003-2004 school year):

> The only comprehensive set of recommendations available to the Team for this Student's 9th grade special education program are found in the evaluation report of Dr. Kemper. His findings were consistent with the findings of the school psychologist, and were not seriously challenged by other Team members. (P-4, S-5) He recommended that [Nelida] be placed in a substantially separate, language based, multi-sensory program geared to meeting the learning needs of students with specific language learning disabilities, including dyslexia. He wrote that [Nelida] needed small class sizes, of no more than eight students, with direct and consistent instruction by teachers trained to remediate language learning disabilities. Dr. Kemper also found that [Nelida] required a daily tutorial that focused on instruction in a rule based, systematic reading program. (See ¶ 7) There are no contrary or alternate recommendations in the record.[21]

With the exception of the reference to the rule-based reading program (which will be addressed separately below in the discussion regarding READ 180), I find this statement of the previous BSEA Hearing Officer to be consistent with the evidence in the instant dispute relevant to what services and placement are recommended for Nelida's 10th grade IEP (the 2004-2005 school year). Therefore, the present dispute, as was the previous dispute, will be resolved on the basis of whether Chicopee's IEP proposes services and placement that satisfy these recommendations.

B. Credibility of the witnesses.

I begin with a consideration of the credibility and persuasiveness of Dr. Kemper's expert testimony, in comparison with the expert testimony of Dr. Souweine – the two learning disability experts in this proceeding.

On the basis of Dr. Kemper's testimony, evaluation report and resume, I conclude that he has substantial expertise regarding the educational needs of students who are diagnosed with a language-based or specific learning disability, and how those educational needs should be

---

[20] The federal First Circuit Court of Appeals has explained that "the school district always bears the burden in the due process hearing of showing that its proposed IEP is adequate." *T.B. v. Warwick School Committee*, 361 F.3d 80, 82 n.1 (1st Cir. 2004) and cases cited therein. The school district bears this burden even when a change in a Student's IEP is sought by the parents. *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034-1035 (3rd Cir. 1993), cited with approval in *T.B. v. Warwick School Committee*, 361 F.3d 80, 82 n.1 (1st Cir. 2004).

[21] *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).

addressed in order that the student will likely make effective and meaningful educational progress. Also, of all the expert witnesses, Dr. Kemper was the only person who has evaluated Nelida although the relevance of this consideration is lessened somewhat by the fact that Dr. Kemper's evaluation occurred April 22, 2003, which is more than two years prior to his testimony. I found Dr. Kemper to be a very intelligent, articulate and gracious witness.

Notwithstanding his expertise, in combination with his knowledge of Nelida, I found that Dr. Kemper's testimony raised concerns relative to his credibility.

Perhaps most troublesome was Dr. Kemper's diagnosis of Nelida as having dyslexia. This diagnosis does not appear in Dr. Kemper's evaluation report (exhibit J-40). Dr. Kemper has not evaluated Nelida since April 22, 2003 when he conducted his evaluation of Nelida.

Dr. Kemper testified that a diagnosis of dyslexia was justified subsequent to his evaluation on the basis of his later "suspicion" that Chicopee administered a test in an inappropriate manner, thereby possibly leading to a greater practice effect, thereby likely resulting in an inflated score when Dr. Kemper administered this same test at a later time. With all due respect to Dr. Kemper, I suggest that he has made a diagnosis important to Nelida's educational without sufficient credible basis.

Dr. Kemper does not know whether Chicopee in fact administered the test improperly (he has only a "suspicion"), nor does he know with any certainty what the impact, if any, might be on his own testing if in fact the test was administered inappropriately by Chicopee. At most, Dr. Kemper may call into question the validity of the scores that he obtained on a particular test, with the result that he may no longer be able to rely on this test in determining Nelida's deficits and needs.

For Dr. Kemper to predict that his scores on this test would have been sufficiently lower so as to change his diagnosis of Nelida and on the basis of this projected test score, conclude she has dyslexia is, I suggest, speculative. Yet, Dr. Kemper testified with apparent certainty as to Nelida's having dyslexia. Dr. Kemper's diagnosis of dyslexia is not supported by any other part of the record. I find his diagnosis to be not credible.

Second, Dr. Kemper testified that Nelida's special education needs are no different on May 6, 2005 when he testified in the instant dispute than on April 22, 2003 when he evaluated her. The basis for this conclusion was his "rule of thumb" that after one year of appropriate instruction, one sees qualitative but not quantitative changes in a student with a language-based learning disability, and by the end of the second year, one sees small quantitative changes. It is not disputed that Nelida has a language-based learning disability, and is now in her second year of receiving appropriate special education services at White Oak School.

On cross-examination, Dr. Kemper was shown test scores (apparently for the first time) reflected in Nelida's current IEP. The test scores were obtained from tests (several of which are the same as those administered by Dr. Kemper in April 2003) administered by White Oak in June 2004, which would have been at or near the end of her first year there (her 9th grade). A comparison of the test scores indicates that Nelida may have made significant growth in

her language skills. For example, the scores from the Gray Oral Reading Tests given by Dr. Kemper and White Oak reflect an improvement from 5.2 grade equivalent to 9.2 grade equivalent in comprehension. Scores from the Slosson Oral Reading Test given by Dr. Kemper and White Oak reflect an improvement from 5.7 grade equivalent to 7.5 grade equivalent.

In his testimony, Dr. Kemper correctly pointed out the difficulty of relying on grade equivalent scores, and he further noted correctly that White Oak used an earlier version (and normed on a different population) than his version of the Gray Oral Reading Test. Instead of factoring these test scores into his understanding of Nelida's current educational deficits and needs (or even acknowledging the possibility of their relevance), he preferred to rely solely on his (above-stated) "rule of thumb" to support his conclusion that Nelida's educational deficits and needs had remained unchanged over the course of two years. What was concerning was Dr. Kemper's apparent intent to disregard completely the relevance of the White Oak test scores, thereby allowing him to conclude that her learning needs had not changed.

Dr. Souweine has significant experience and expertise regarding students with a language-based learning disability.[22] She also has the advantage of consulting both to school districts and parents. Dr. Souweine has the disadvantage (as compared to Dr. Kemper) of not having evaluated Nelida, but has the advantage of having reviewed more recent test scores from June 2004 (as explained above, Dr. Kemper did not take into consideration these more recent test scores) and of having observed Nelida at the White Oak School on October 31, 2003 (Dr. Kemper has not observed Nelida in an academic setting).

I also found Dr. Souweine to have a more detailed and more complete understanding of the Brighter Beginnings program than Dr. Kemper. Her observation was for a longer period of time and (as compared to Dr. Kemper's sporadic discussions with two teachers), Dr. Souweine had substantive discussions with Mr. Kimball (a teacher), Dr. Stolar (supervisor of special education at Chicopee), Susan Fino (the consultant to the program) and Mr. Schreier (director of special education for Chicopee) regarding the Brighter Beginnings program. I found Dr. Souweine to be an intelligent, thoughtful and careful witness with sufficient understanding of Nelida. I fully credit her testimony.

C. The parties' disagreements.

There is relatively little significant difference between the two competing learning disability experts (Dr. Kemper and Dr. Souweine) as to what kind of a program Nelida needs, including the various ingredients of that program. Both experts recommend a substantially separate, language-based program with qualified teachers, small class sizes to ensure individualized instruction and an appropriate grouping of student who have a learning

---

[22] Parents do not dispute Dr. Souweine's credentials and qualifications regarding students with language-based learning disabilities. See Parents' closing written argument, page 1.

disability, average to above-average cognitive abilities, and no significant emotional or behavioral deficits.[23]

There is virtually no dispute that the Brighter Beginnings program has qualified teachers who teach all academic courses in small classes (no more than five students).

The principal disagreements between the parties are as follows: (1) whether the Brighter Beginnings program is, in fact, a language-based, substantially-separate program, (2) whether READ 180 is an appropriate program for Nelida, (3) whether there is an appropriate grouping of students, (4) whether oral expression must be taught as a separate class, and (5) whether there is sufficient consultation provided to the program. Each of these disagreements will be addressed separately below.[24]

D.  Whether the Brighter Beginnings program is a substantially-separate, language-based program.

Parents argue that the instruction is not provided within a substantially-separate learning environment. However, the undisputed facts are that all of the students with whom Nelida would be placed at Brighter Beginnings are learning disabled, and that all of the academic courses are taught by special education teachers. Notwithstanding Parents' arguments to the contrary, the substantially-separate nature of the Brighter Beginnings program does not change when one or more students in the program take some of their courses with mainstream students in the high school – that is, outside of the Brighter Beginnings program. Summary of the Evidence, pars. # 35, 43, 67.

I now turn to the more substantive dispute as to whether the instruction is language-based.

The learning disability experts (Dr. Kemper and Dr. Souweine) do not disagree regarding the following basic ingredients of a language-based program: (1) teaching is performed in a systematic manner (that is, it is provided in an appropriate sequence and paced in a way that students can gain information and gain mastery); (2) presentation of information is done so that it stimulates all sensory modalities; (3) teachers provide review of previously learned material and overtly connect previously learned information and new information in a variety of ways; (4) the program consistently teaches skills in a variety of contexts in order to promote generalization (that is, the same skills are used in different classes so that the information is generalized from one class to another); and (5) there is sufficiently

---

[23] By comparison, in the previous BSEA Hearing, the principal dispute was what kind of educational services and program Nelida needs. In that dispute, Parents argued for essentially the same services and program as they are seeking in the current dispute. Chicopee, however, proposed an inclusion model of services, with academic courses to be provided to Nelida in mainstream 9th grade classes with modifications to be provided by a special educator. *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).

[24] There is also a possible disagreement as to whether the content of the science and math courses at Brighter Beginnings would have been appropriate for Nelida, and Dr. Souweine (in par. 69 of the Statement of Evidence) shares this concern. However, I do not view this as a substantive dispute in light of Chicopee's apparent willingness to adjust the content of these courses, as necessary, and its ability, through a very low student:teacher ratio to individualize instruction. Testimony of Schreier, Mattavi.

individualized instruction with additional remediation in core academic areas. The principal dispute in this case is whether the Brighter Beginnings program includes these ingredients.[25]

The testimony of the three teachers (Mattavi, Shotland and Kimball) provided a detailed description of what occurs within their classrooms on a day-to-day and week-to-week basis. Their testimony was supported by the testimony of the supervisor of the program (Dr. Stolar) as well as the testimony of Dr. Souweine based on her observations and discussions with staff, including a discussion with the consultant to the program (Ms. Fino). It is apparent that the Chicopee witnesses have a comprehensive picture of what is occurring within the program. I have no reason to doubt the accuracy or completeness of their testimony regarding what is being taught (and more importantly, how it is being taught) within the Brighter Beginnings program.

This testimony made clear that each of the above-stated five ingredients of a language-based program are present within the classes taught by Mr. Mattavi, Mr. Shotland and Mr. Kimball. Summary of the Evidence, pars. # 33, 34, 37, 43, 44, 57, 58, 59, 70, 71, 72.

What is also noteworthy was the ability of the three teachers (Mattavi, Shotland and Kimball) to comment on the appropriateness of this language-based program for Nelida specifically. All three have significant experience teaching learning disabled students (all three taught at White Oak, in a language-based learning environment, for five years before being employed by Chicopee to teach learning disabled students). All three teachers actually taught Nelida at White Oak during the 2003-2004 school year, which is the year that the previous Hearing Officer determined White Oak to be an appropriate placement for Nelida. And, all three opined that the language-based program at Brighter Beginnings would appropriately address all of her special education needs. I fully credit their testimony. Summary of the Evidence, pars. # 30, 31, 36, 60.

Dr. Kemper disagreed that Brighter Beginnings is language-based. He found it "disconcerting" that what a student was learning on the computerized READ 180 program was not related to what was being taught in that classroom. He noted that what he observed in the teaching was insufficient continuity regarding scope and sequencing; rather, he saw more isolated teaching of skills, which is not consistent with principles of language-based teaching. He further noted that in his observation of a science class, he did not see any teaching that he would consider to be language-based. Summary of the Evidence, pars. # 26, 28.

Dr. Kemper's conclusions as to what is (and is not) occurring within the Brighter Beginnings program were based on a 3½ hour observation of the classrooms on March 11, 2005, including sporadic conversation with two of the teachers and no discussions with anyone else connected to the program. As I find the testimony of the Chicopee witnesses (in particular, the three teachers) to be consistent and credible, I conclude that where Dr. Kemper has

---

[25] It appears that the only substantive area of disagreement between these two experts with respect to what should be included in a language-based program is the extent to which rule-based instruction is required. Parts of the Brighter Beginnings program are rule-based – for example, rule-based reading instruction using Lindamood Bell methods and strategies relative to syllabication and suffixes – but the reading program (READ 180) is not. I address the appropriateness of READ 180 separately below.

drawn factual conclusions regarding what is actually occurring within the classrooms at this program and where those factual conclusions are at odds with the testimony of the three teachers (and where the teachers' testimony is consistent with the testimony of Dr. Stolar and Dr. Souweine), then Dr. Kemper's factual conclusions are not as reliable and not as persuasive as those of the Chicopee witnesses.

I note, more specifically, that Dr. Kemper's particular concerns (from his observation) regarding scope and sequencing, and consistency of teaching, as well as his generally-stated concern that teaching is not being done according to language-based principles were effectively rebutted by the testimony of the Chicopee witnesses. Summary of the Evidence, par. # 33, 44, 57, 58, 59.

Accordingly, I discount Dr. Kemper's criticisms regarding the classes taught by Mr. Mattavi, Mr. Shotland and Mr. Kimball. However, I credit his observations of the science class taught by Ms. Cronin. It is not disputed that Ms. Cronin does not have the experience or expertise of the other three teachers. Clearly, this is a weakness of the Brighter Beginnings program. However, I do not view it as a fatal weakness. As Dr. Souweine credibly explained in her testimony, Ms. Cronin, who is a certified special education teacher, teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students. Also, Ms. Fino (the program consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area. Exhibit J-14. Summary of the Evidence, par. # 60.

For these reasons, I find that Brighter Beginnings provides language-based instruction in a substantially-separate learning environment, and that the instruction and environment are appropriate for Nelida.

E. Whether READ 180 is an appropriate program for Nelida.

Perhaps the most contentiously disputed issue is whether the READ 180 program is appropriate for Nelida. The question, at the outset, has been phrased more generally by the parties – that is, whether this particular program is effective for language learning disabled students, and there was significant testimony and documents relative to this point. Although I will address this more general question, ultimately the only relevant issue is the appropriateness of the READ 180 program for Nelida.

I note, at the outset, that this is a disagreement regarding the methodology utilized as one part of the overall program of instruction at Brighter Beginnings. A school district is generally given discretion to determine the appropriate methodology so long as the selected methodology is likely to allow the student the opportunity to receive FAPE. Chicopee need not persuade me that READ 180 is the best or even the preferred reading program for Nelida, but only that this reading program is consistent with Chicopee's overall responsibility to provide Nelida with an education program that is tailored to address her unique needs in a

way reasonably calculated to enable her to make meaningful and effective educational progress – that is, to provide her with FAPE.[26]

Part of the evidentiary record in the instant dispute relevant to READ 180 is taken from the previous BSEA Hearing – in particular, parts of the previous testimony of David Drake and parts of the previous testimony of Daniel Schreier. In addition, a number of documents were admitted in the instant dispute are the same as in the previous dispute. There was also live testimony in the present dispute from Dr. Kemper and Dr. Souweine regarding READ 180, both of whom testified in the previous BSEA Hearing.

The previous BSEA Hearing Officer made the following finding regarding READ 180:

> The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. (P-14, 15; S-3, 4, 7, 29, 27, 31; Schreier; Souweine; Drake) There is no evidence, however, that it is a targeted, rule-based, phonetic system designed to remediate individual reading disabilities.

The evidentiary record in the present dispute includes credible testimony in support of the above-quoted finding. Although there is also conflicting testimony, I have insufficient reason to depart from this finding, and therefore adopt it. In particular, I adopt this finding because I am persuaded that READ 180 is not rule-based, at least as that term is used by Dr. Kemper, Dr. Souweine and Mr. Drake. The evidence regarding the question whether READ 180 is "designed to remediate individual reading disabilities" is more complex since it appears that this may not have been the primary purpose of the program, but from the testimony of the two teachers and Dr. Souweine, discussed below, I conclude that READ 180 would likely provide remediation for Nelida's individual reading deficits. Summary of the Evidence, pars. # 10, 11, 12, 25, 26, 63, 64, 65.

I turn now to the question of whether Chicopee may utilize the READ 180 program as part of its proposed educational services for Nelida notwithstanding the fact that it is not rule-based and that it may not have been designed with the primary purpose of remediating individual reading disabilities.

I note, at the outset, that none of the above-named witnesses (other than the teachers) who testified regarding READ 180 (that is, Mr. Drake, Mr. Schreier, Dr. Kemper and Dr. Souweine) has ever actually used this reading program, nor has any of them received formal training regarding the program. Their opinions are derived from reading literature, reviewing a demonstration compact disc and/or observing (for a brief time) it's being utilized at Brighter Beginnings. I do not doubt their ability to assess this program generally – for example, to determine whether it is rule-based or whether it is instructional or remedial, but I consider none of these witnesses to have extensive knowledge or expertise regarding READ

---

[26] Compare *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 862 (6th Cir. 2004) ("there is a point at which the difference in outcomes between two methods can be so great that provision of the lesser program could amount to denial of a FAPE") with *E.S. v. Independent School District, No. 196*, 135 F.3d 566 (8th Cir. 1998) ("As long as a student is benefiting from her education, it is up to the educators to determine the appropriate methodology.").

180. I turn to the testimony of other witnesses to provide more specific guidance regarding its appropriateness for Nelida within the context of the Brighter Beginnings program.

There were two witnesses in the present dispute who demonstrated extensive knowledge and understanding of this reading program – they are two teachers (Mr. Shotland and Mr. Kimball) at Brighter Beginnings. Mr. Shotland and Mr. Kimball were trained on this reading program for two days in the summer of 2004. They have been implementing this program on a daily basis with learning disabled students in the Brighter Beginnings classroom during the 2004-2005 school year. Summary of the Evidence, pars. # 39, 40, 41.

I do not suggest that these teachers have the same depth of understanding as other witnesses regarding the reading needs of learning disabled students in general and how those needs should be met in general. However, the two teachers have sufficient experience and expertise to judge the usefulness and effectiveness of READ 180, in combination with the other educational techniques and programs, for the learning disabled students that they have been teaching at White Oak for five years and now at Brighter Beginnings.

Both teachers are also familiar with the educational deficits and needs of Nelida, having taught her at White Oak School during the 2003-2004 school year, and are able to have an informed opinion regarding the appropriateness of READ 180, again in the context of an overall program, for Nelida. Both teachers have the further advantage of having used another reading program at White Oak (which presumably was an appropriate reading program), and thus have a point of reference for purposes of judging the appropriateness of READ 180. Mr. Shotland and Mr. Kimball left no doubt in their testimony that they believe that READ 180 would be an appropriate and effective reading program for Nelida, when combined with the other parts of the Brighter Beginnings program. Summary of the Evidence, pars. # 36, 39, 40, 41.

I find their testimony to be persuasive. .

In addition, I note that there is an underlying methodological dispute regarding READ 180. Dr. Kemper and Mr. Drake believe that an effective and appropriate language-based program requires the systematic teaching of rules in a specific order of progression. A principal concern of Dr. Kemper and Mr. Drake regarding READ 180 is that, as the formal reading program utilized at Brighter Beginnings, it is not rule-based. Summary of the Evidence, pars. # 10, 11, 12, 25, 26.

Dr. Souweine disputes this contention. She takes the position that adding a rule-based reading program is something that is done when a student is not able to gain the information in a more intuitive or more natural way, but it is not recommended that a rule-based program be used when it is not needed since it is an additional layer. She opined that methods other than a rule-based program can lead to quicker generalization and acquisition of reading skills. She explained that methods using rapid word recognition techniques can be very effective in improving decoding skills and fluency. She noted and referenced a significant amount of literature that supports the use of rapid word recognition techniques and believes a significant advantage of the READ 180 program is that these techniques are embedded within it. In particular, Dr. Souweine opined that, on the basis of her understanding of

25

Nelida's language deficits, READ 180 would be appropriate for her. Summary of the Evidence, pars. # 63, 64, 65.

Dr. Souweine had the advantage of considering Nelida's most recent test scores (June 2004) that Dr. Kemper did not consider, and the advantage of having observed Nelida in an academic setting. I also note that Mr. Drake was careful to testify regarding the appropriateness of READ 180, in general, rather than its appropriateness for Nelida in particular. Summary of the Evidence, pars. # 9, 15, 53.

I conclude that Dr. Souweine's testimony provides additional, persuasive support for the appropriateness of READ 180 as implemented within the Brighter Beginnings program for Nelida.

For these reasons, I find READ 180 to be an appropriate part of Nelida's proposed IEP.

F.  Whether there is an appropriate grouping of students.

There is no disagreement between Dr. Kemper and Dr. Souweine that an appropriate grouping of students for a language-based program for Nelida would be that all students have a learning disability, all students have average to above-average cognitive abilities, and no student has a significant emotional or behavior deficit that would likely interfere with the learning of the other students.

The testimony of Mr. Mattavi, Mr. Shotland, Mr. Kimball, Dr. Stolar and Dr. Souweine, as well as the redacted IEPs of the students in this program, support the contention that each of the students in the Brighter Beginnings program has a learning disability, and that the students otherwise reflect an appropriate grouping for a language-based program. Exhibits J-1 through J-9; Summary of the Evidence, pars. # 35, 36, 46, 67.

Parents argue to the contrary for several reasons. Parents note that there is one student in this program with an IQ of 75 and that, on the basis of Dr. Kemper's testimony, a student with this IQ would not be an appropriate peer in the Brighter Beginnings program. Dr. Kemper reviewed the IEP of this student (exhibit P-2) as well as an evaluation indicating an IQ of 75. Dr. Kemper testified that he did not know when the IQ test was administered. Summary of the Evidence, par. # 27.

Dr. Stolar made clear in her testimony that she is familiar with this student whose IEP is exhibit P-2. Her responsibilities include review of each student prior to admission to Brighter Beginnings to determine appropriateness of placement. She explained that achievement testing indicates that he is one year (or less) behind his grade level in reading. The IEP indicates that his most significant weaknesses are in math skills, which were over a year delayed. The IEP does not reflect any significant cognitive limitations. Dr. Stolar further testified that there was an IEP Team meeting regarding this student that reviewed his placement. She has spoken to his teachers who believe that he is appropriately placed. Dr. Stolar concluded that she believes this student's cognitive level of functioning is appropriate for this program. Summary of the Evidence, pars. # 43, 46.

I find Dr. Stolar's testimony (together with a reading of the student's IEP) to be more persuasive than Dr. Kemper's conclusion that is based solely on a single IQ score from a test of unknown date.

Parents have also raised concerns that several of the IEPs of students at Brighter Beginnings reflect goals and objectives relative to emotional or behavioral needs. For example, Parents point to exhibit P-2, which includes a goal addressing social skills and objectives relative to awareness and understanding of emotional issues. However, the IEP makes no reference to any significant behavioral or emotional issues, nor do there appear to be any specialized services in the IEP to address emotional or behavioral deficits. Rather, the IEP indicates that this student is polite and respectful, and interacts appropriately with others. Exhibit P-2.

Parents also point to exhibit P-6, which includes a behavior goal, as well as a number of related objectives. This IEP reflects potential difficulties regarding occasional behavior in class. However, I note that the IEP expired 12/9/04. Exhibit P-6.

I conclude from the testimony by the Chicopee witnesses (referenced above) that none of the students, including the students reflected in exhibits P-2 and P-6, has a primary emotional or behavioral deficit, that none of these students has emotional or behavioral needs that are disruptive to the program, and that it is not unusual that leaning disabled students will develop emotional or behavioral deficits secondary to their learning deficits as a result of frustration at not being able to learn in the same way as other students.

For these reasons, I find that there is an appropriate grouping of students for a language-based program for Nelida at the Brighter Beginnings program.

G.  Whether oral expression must be taught as a separate class.

The IEP calls for oral expression to be taught by a special education teacher for 50 minutes, 5 times each week. Exhibit J-1. There was testimony that this does not occur within the Brighter Beginnings program. Oral expression is taught as an integrated part of their classes rather than as a separate instruction block. Summary of the Evidence, par. # 45.

Dr. Kemper testified that for children with Nelida's educational needs, it would be important that a separate class be taught regarding oral expression, in addition to the teaching of oral expression being infused in the curriculum. Summary of the Evidence, par. # 23.

Dr. Stolar testified that staff concluded, after significant discussion, that for high school students, it is more effective to infuse oral expression throughout the curriculum rather than to teach it separately. She explained that she and others concluded that it is too difficult for high school students to become interested and engaged in oral expression when it is taught separately. Dr. Stolar presented as a credible witness with expertise in this area. Summary of the Evidence, par. # 45.

It appears that Chicopee has carefully considered what approach is appropriate for teaching oral expression to its high school learning disabled students, and has made a decision that is reasonable likely to succeed with Nelida.

For these reasons, I find that oral expression may be taught as an integrated part of the classes, rather than as a separate instruction block, and the IEP may be modified accordingly.[27]

H.  Whether there is sufficient consultation provided to the program.

The IEP calls for consultation services from a learning disabilities consultant for 30 minutes, once each week.  Exhibit J-1 (page 20 of 26).

Dr. Kemper testified that he found this amount of consulting time allocated in part A of the service delivery grid of the proposed IEP to be insufficient.  He recommended that there be at least two hours per week of consultation.  Summary of the Evidence, par. # 24.

I am not persuaded for the following reasons.

The Brighter Beginnings program is fortunate to have three teachers who have significant experience teaching students with learning disabilities (Mattavi, Shotland, Kimball).  These three teachers are responsible for all of the most important academic courses.  The fourth teacher, Ms. Cronin, teaches a subject (science) for which it is not as important that the teacher be highly qualified regarding the needs of learning disabled students.  Ms. Fino (the consultant) has been meeting and working individually with Ms. Cronin to increase her abilities in this area.  Ms. Cronin is a certified special education teacher.  Exhibit J-14.

The four teachers meet every Monday for 45 to 90 minutes to discuss individual students and curriculum, as well as to do problem solving.  The teachers have the further support and participation of Dr. Stolar who frequently observes and checks to ensure that the instruction follows a cohesive model, including continuity, consistency and scope and sequencing of instruction, and who works to ensure that language-based instruction is infused throughout the curriculum.  Summary of the Evidence, pars. # 30, 31, 38, 43, 44, 60, 61.

Within this context, I find that it is sufficient to have a half hour per week of consulting from a learning disabilities consultant (Susan Fino) for Nelida, as reflected in Chicopee's IEP.[28]

I.  Nelida's and her Parents' perspectives.

Nelida's father (Parent) provided testimony describing why he and his wife rejected the most recently-proposed IEP.  He also testified in some detail regarding Nelida's reactions to her observation of the Brighter Beginnings program and, in particular, her concerns regarding the structure, methodology (grammar templates) and students.  She expressed some anxiety to her father that she found the program so distracting that she would not be able to learn.  Summary of the Evidence, pars. # 2, 3.

---

[27] In their written closing argument, Parents do not argue to the contrary.
[28] In their written closing argument, Parents do not argue to the contrary.

I do not discount this testimony.  For obvious reasons, the perspective of a sixteen-year-old student may be the most important consideration with respect to how easily she might adjust to and feel comfortable in a new learning environment.  However, my responsibility is to seek to ensure that the services and placement offered by Chicopee are reasonably likely to address satisfactorily Nelida's educational needs in the least restrictive environment even though they may not fully address her educational desires.

J. Conclusion.

In the previous dispute, Parents sought an educational program consistent with the recommendations contained within Dr. Kemper's April 2003 evaluation report – that is, a substantially separate, language based, multi-sensory program with small class sizes of no more than eight students, and direct and consistent instruction by teachers trained to remediate language learning disabilities, all geared to meeting the learning needs of students with specific language learning disabilities.  Chicopee, however, then proposed an inclusion model of services, with academic courses to be provided to Nelida in mainstream 9th grade classes with modifications to be provided by a special educator.  The BSEA Hearing Officer in that dispute agreed with Parents, finding that their proposed model of services should be provided.[29]

Subsequent to that decision, Chicopee developed its own substantially separate program for learning disabled students – that is, the Brighter Beginnings program.

For the reasons explained throughout this Decision, I conclude that Chicopee has succeeded in developing an IEP that is generally consistent with the recommendations contained within Dr. Kemper's evaluation report and that is tailored to address Nelida's unique needs in a way reasonably calculated to enable her to make meaningful and effective educational progress in the least restrictive environment.

### Order

I find the 2004-2005 IEP[30] developed by Chicopee to be reasonably calculated to provide a free appropriate public education to Nelida in the least restrictive setting, with the following modification.  Oral expression may be taught as an integrated part of the classes, rather than as a separate instruction block.  The IEP may be modified accordingly.

By the Hearing Officer,

William Crane
Dated: June 8, 2005

---

[29] *In Re: Chicopee Public Schools*, BSEA # 04-0093, 10 MSER 158, 163 (April 7, 2004).
[30] Exhibit J-1.



**School District Name:** Chicopee Public Schools
**School District Address:** 180 Broadway Chicopee, MA 01020
**School District Contact Person/Phone #:** Mr. Daniel Schraier /

# Administrative Data Sheet

**STUDENT INFORMATION:**

Full Name: Kaitlyn Beth Tharaldson          Local ID #: 15821          SASID: 1092212303

Birth Date: 3/14/1989    Place of Birth: SPRINGFIELD          Age: 16    Grade/Level: 11

Primary Language: 267 - English          Language of Instruction: 267 - English

Address: 182 Poplar Chicopee, MA 01013

Home Telephone: 413-592-0471

Sex: ___ Male    X Female

If 18 or older:        Acting on Own Behalf          Court Appointed Guardian:

            Shared Decision-Making          Delegate Decision-Making

**PARENT/GUARDIAN INFORMATION:**

Name: DAVID/DIANE THARALDSON          Relationship to Student: Parent

Address: 182 Poplar  Chicopee, MA 01013

Home Telephone: 413-592-0471          Other Telephone: 413-785-6313

Primary Language of parent/guardian: 267 - English          Secondary Language:

**PARENT/GUARDIAN INFORMATION:**

Name:          Relationship to Student:

Address:

Home Telephone:          Other Telephone:

Primary Language of parent/guardian:          Secondary Language:

**MEETING INFORMATION:**

Date of Meeting: 9/9/05    Type of Meeting: IEP Development-Annual Review, Placement,

Next Scheduled Annual Review Meeting: 9/8/06    Next Scheduled Three Year Reevaluation Meeting: 6/11/06

**ASSIGNED SCHOOL INFORMATION: (Complete after a placement has been made.)**

School Name: Chicopee High          Telephone: 413-594-3576

Address: 820 Front St.  Chicopee, MA 01020

Contact Person: Marisa McCarthy          Role: Team Chairperson          Telephone: 413-594-1857

Cost-Shared Placement:    [x] No    Does not apply

            [ ] Yes    Does not apply

After a meeting, attach to an IEP, an IEP Amendment or an Extended Evaluation Form.

School District Name: Chicopee Public Schools

School District Address: 180 Broadway  Chicopee, MA  01020

School District Contact Person/Phone #: Mr. Daniel Schreier /

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: Kaitlyn Beth Tharaldson                    DOB: 03/14/1989    ID#: 15821                    Grade/Level: 11

## Parent and/or Student Concerns

*What concern(s) does the parent and/or student want to see addressed to enhance the student's education?*

Mr. and Mrs. Tharaldson are concerned with Kaitlyn's learning disability and how that interfers with her inability to read.  The parents would like Kaitlyn to be serviced so that the impact of her reading disability (educationally, socially and emotionally) may be mitigated as much as possible.

## Student Strengths and Key Evaluation Results Summary

*What are student's educational strengths, interest areas, significant personal attributes and personal accomplishments?*
*What is the student's type of disability(ies), general education performance*
*including MCAS/district test results, achievement towards goals and lack of expected progress, if any?*

Kaitlyn's team meets today to review progress, discuss parent concerns, update her IEP as mandated by state guidelines, and to develop a plan of services that will provide support through the coming year.
Kaitlyn is scheduled to take the MCAS, with modifications,this upcoming school year.

Cognitively, standardized test results indicate that Kaitlyn has solidly average cognitive abilities (performance=106, and full scale IQ=96, and verbal IQ=88). Kaitlyn has been diagnosed with a Specific Learning Disability.  WISC testing shows Kaitlyn to be functioning in the average range cognitively.  There is a discrepancy between Kaitlyn's achievement and intellectual ability.  This discrepancy requires specially designed instruction.

Stanford achievement Test in June of 2004 report the following:
Total Reading:  Grade Equiv. 8.5
Reading Voc:    Grade Equiv. PHS
Reading Comp:  Grade Equiv. 7.3
Total Math:     Grade Equiv. 6.5
Concepts of Num:Grade Equiv. 6.2
Math Comp:     Grade Equiv. 5.3
Math App:       Grade Equiv. 7.7
Slosson Oral Reading Test;
Grade Equivalent: 7.5
Gray Oral Reading Test;
Comp. Grade Equiv. 9.2
Passage Grade Equiv. 8.4

Kaitlyn is described as a friendly, hardworking young lady who has made gains in her skill development this past school year at White Oak.  Kaitlyn consistently passes in all of her homework, participates in class discussions, is proactive in seeking out help with difficult classwork and has overall made a smooth and positive transition to White Oak.

According to teacher reports Kaitlyn confuses syllables, has difficulty with grammar and its usage, and needs to be guided through a reading passage.  Kaitlyn reads novels, is able to identify plots, details and main ideas.  Kaitlyn can get meaning from the context and can self correct at times. She is not successful with making predictions and she is not able to transfer isolated skills into more global content areas.  Kaitlyn has difficulty summarizing and knowing what important information to extract from given reading passage.

Kaitlyn makes use of strategies that increase reading skills such as teacher prompts, modeling, leading questions, given repeated assignments directions to follow, word lists, webbing, outlines, study guides, mnemonic devises and works best with a rule based, multi sensory approach.

**School District Name:** Chicopee Public Schools

**School District Address:** 180 Broadway  Chicopee, MA  01020

**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Individualized Education Program

IEP Dates: from    9/9/05    to    9/9/06

Student Name:  Kaitlyn Beth Tharaldson                    DOB:    03/14/1989    ID#:  15821                    Grade/Level:    11

**Vision Statement:** What is the vision for this student?
*Consider the next 1 to 5 year period when developing this statement. Beginning no later than age 14,*
*the statement should be based on the student's preferences and interests,*
*and should include desired outcomes in adult living, post-secondary and working environments.*

Kaitlyn was not at todays meeting, therefore the TEAM did not have her input as to what her goals and vision maybe.  Mr. and Mrs. Tharaldson stated that Kaitlyn is very creative and artistic and they would like to see her go to a four year college to pursue her interest in theatre, the arts and graphic design.  Mr. and Mrs. Tharaldson would also like Kaitlyn to meet all qualifications for a four year college.

Mr. and Mrs. Tharaldson want Kaitlyn to be able to read and pass the MCAS test to earn her High School diploma.  Their hope is that Kaitlyn will become a well rounded, independent person who enjoys all cultural activities that are available to her.

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: __Kaitlyn Beth Tharaldson__    DOB: __03/14/1989__   ID#: __15821__    Grade/Level: __11__

## Present Levels of Educational Performance
## A: General Curriculum

Check all that apply.

| | General Curriculum Area(s) affected by this student's disability(ies): |
|---|---|
| [X] English Language Arts | Consider the language, composition, literature (including reading) and media strands. |
| [X] History and Social Science | Consider the history, geography, economic and civics and government strands. |
| [X] Sciences and Technology | Consider the inquiry, domains of science, technology and science, technology and human affairs strand. |
| [X] Mathematics | Consider the number sense, patterns, relations and functions, geometry and measurement and statistics and probability strands. |

[X] Other Curriculum Area    Specify: ___electives___

---

**How does the disability(ies) affect progress in the curriculum area(s)?**

The severity of Kaitlyn's specific learning disability with grade-appropriate reading, writing, and organizational skills interferes with her ability to access skill and content in Massachusetts Curriculum Frameworks, and thus negatively affects progress through the curriculum areas.

---

**What type(s) of accommodation, *if any*, is necessary for the student to make effective progress?**

Kaitlyn works best with a multisensory approach to instruction; repeated directions, multistep tasks broken up into manageable steps, teacher prompts, mnemonics, study guide, webbing, template, use of word processor, word banks, semantic mapping, use of flashcards, use of visualization techniques, vocabulary development in all areas of the curriculum, constant review and spiraling.

Information should be presented using the Orton Gillingham approach to teaching.

---

**What type(s) of specially designed instruction, *if any*, is necessary for the student to make effective progress?**

Throughout the school day, remedial, rule based, multisensory instruction for language-based skills needs to be provided concurrently with Curriculum Frameworks-based contextual instruction. Kaitlyn requires that information be presented in small, incremental units to assist with organization and overall acquisition of newly learned skills. Information should be presented using the Orton Gillingham style of learning.

Check the necessary instructional modification(s) and describe how such modification(s) will be made.

[X] Content:
   A phonetic approach to reading, written expression, and math will be taught at Kaitlyn's instructional level.

[X] Methodology/Delivery of Instruction:
   Remediation, rate of instruction, and repetition of Massachusetts Curriculum Frameworks is needed for instruction so that Kaitlyn is able to develop and maintain newly learned skills and incorporate that into her overall knowledge base. Kaitlyn requires a small, structured setting with 1 to 1 support, Orton Gillingham.

[X] Performance Criteria:

   In those areas of instruction relating to remediation of language-based disabilities, performance criteria are identified in the goal/objective benchmark pages which follow this page. With reference to a specific language-based skills, the criterion by which performance is assessed is typically the degree to which the student can demonstrate master of a skill when working independently on grade-appropriate material.

---

# Individualized Education Program

IEP Dates: from __9/9/05__ to __9/9/06__

Student Name: __Kaitlyn Beth Tharaldson__    DOB: __03/14/1989__    ID#: __15821__    Grade/Level: __11__

## Present Levels of Educational Performance
## B: Other Educational Needs

Check all that apply.

**General Considerations**

- [ ] Adapted physical education
- [ ] Braille needs (blind/visually impaired)
- [x] Extra curriculum activities
- [ ] Social/emotional needs
- [ ] Other:

- [ ] Assistive tech devices/ services
- [x] Communication (all students)
- [ ] Language needs (LEP students)
- [ ] Travel training

- [ ] Behavior
- [ ] Communication (deaf/hard of hearing students)
- [ ] Nonacademic activities
- [ ] Skill development related to vocational preparation or experience

**Age-Specific Considerations**

- [ ] For children ages 3 to 5 - participation in appropriate activities
- [ ] For students ages 14+ (or younger if appropriate) - student's course of study
- [x] For students ages 16 (or younger if appropriate) to 22 -transition to post-school activities including community experiences, employment objectives, other post school adult living objectives and, if appropriate, daily living skills.

How does the disability(ies) affect progress in the indicated area(s) of other educational needs?

Kaitlyn demonstrates low average receptive and expressive language skills. She demonstrates weakness in her knowledge of synonyms, antonyms and temporal relationships. Kaitlyn appears to have a delay in her written language skills. Kaitlyn's specific learning disability also effects her progress in generating written language, vocabulary, processing information presented orally, understanding and computing mathematical problems, expressing herself orally and accessing social situations (both spoken and unspoken).

What type(s) of accommodation, *if any*, is necessary for the student to make effective progress?

Please see previous page for accommodations, methodology/delivery of instruction and performance criteria.

What type(s) of specially designed instruction, *if any*, is necessary for the student to make effective progress?

Check the necessary instructional modification(s) and describe how such modification(s) will be made.

- [ ] Content:

- [ ] Methodology/Delivery of Instruction:

- [ ] Performance Criteria:

# Individualized Education Program

Student Name: Kaitlyn Beth Tharaldson    DOB: 03/14/1989   ID#: 15821

IEP Dates: from 9/9/05 to 9/9/06

Grade/Level: 11

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 1 | Specific Goal Focus: Social Pragmatics |

**Current Performance Level:** What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn will improve social pragmatic skills.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a topic, Kaitlyn will develop formal and informal discussion techniques.

Given a class activity, Kaitlyn will use appropriate activity to explain a problem, persuade, or express feelings and ideas.

Given a specific situation, Kaitlyn will explain personal needs, interpret non-verbal cues, and advocate in an educational setting.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |

Use multiple copies of this form as needed.

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: Kaitlyn Beth Tharaldson    DOB: __03/14/1989__  ID#: __15821__    Grade/Level: __11__

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 2 | Specific Goal Focus: Note Taking |
|---------|---|----------------------------------|

**Current Performance Level:** What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn will improve her note taking skills in all classes.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a passage of text, Kaitlyn will identify the main ideas and key details and organize two-column notes with 80% accuracy.

Given a lecture, video, or auditory stimulus, Kaitlyn will record two-column notes with 80% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

# Individualized Education Program

Student Name: Kaitlyn Beth Tharaldson

IEP Dates: from    9/9/05    to    9/9/06

DOB:    03/14/1989    ID#:  15821

Grade/Level:   11

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 3 | Specific Goal Focus:  Writing Skills |

**Current Performance Level:**  What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's written composition skills will improve.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a specific writing assignment and a variety of pre-writing strategies, Kaitlyn will compose topic, detail, and conclusion paragraphs with 80% accuracy.

Given a specific writing assignment, Kaitlyn will edit her writing for content, spelling, punctuation, mechanics and grammar with 80% accuracy.

| | |
|---|---|
| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficent to enable the student to achieve the annual goal by the end of the IEP period? |

Use multiple copies of this form as needed.

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: Kaitlyn Beth Tharaldson  DOB: __03/14/1989__ ID#: __15821__  Grade/Level: __11__

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 4 | Specific Goal Focus: Reading Comprehension |
|---|---|---|

**Current Performance Level:** What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's reading comprehension skills will improve.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a specific passage of text at Kaitlyn's instructional level, Kaitlyn will identify the main idea and significant details of the text with 80% accuracy.

Given a class discussion of a specific passage of text, Kaitlyn will identify character traits, setting, and plot in the text with 80% accuracy.



| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

# Individualized Education Program

IEP Dates: from ____9/9/05____ to ____9/9/06____

Student Name: Kaitlyn Beth Tharaldson          DOB: __03/14/1989__   ID#: __15821__          Grade/Level: __11__

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 5 | Specific Goal Focus: Oral Reading Skills |
|---|---|---|

**Current Performance Level:** What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's oral reading skills will improve.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a specific passage of text at Kaitlyn's instructional level, Kaitlyn will reduce substitutions, observe punctuation, use appropriate enunciation and intonation with 80% accuracy.

Given a specific passage of text at Kaitlyn's instructional level, Kaitlyn will improve rate of speed with 80% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

# Individualized Education Program

IEP Dates: from    9/9/05    to    9/9/06

Student Name: Kaitlyn Beth Tharaldson        DOB:    03/14/1989    ID#:    15821        Grade/Level:  11

## Current Performance Levels/Measurable Annual Goals

| Goal #:    6 | Specific Goal Focus:  Vocabulary Skills |
|---|---|

**Current Performance Level:**  What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's vocabulary skills will improve.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given a specific vocabulary word and passage of text, Kaitlyn will define the word using dictionary skills, synonyms, and use the word accurately in oral and written form with 80% accuracy.

Given a specific vocabulary word and passage of text, Kaitlyn will define the word using dictionary skills, synonyms, and use the word accurately in oral and written form with 80% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

# Individualized Education Program

IEP Dates: from _____9/9/05_____ to _____9/9/06_____

Student Name: Kaitlyn Beth Tharaldson        DOB: __03/14/1989__  ID#: __15821__        Grade/Level: __11__

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 7 | Specific Goal Focus:  Spelling |
|---|---|---|

**Current Performance Level:**  What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn's spelling skills will improve.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Given an unfamiliar multisyllabic word, Kaitlyn will spell the word with 80% accuracy.

Kaitlyn will use a word processor, dictionary, and thesaurus to assist her with spelling, editing, and grammar.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

## Individualized Education Program

IEP Dates: from  9/9/05  to  9/9/06

Student Name: Kaitlyn Beth Tharaldson    DOB:  03/14/1989   ID#:  15821    Grade/Level:  11

## Current Performance Levels/Measurable Annual Goals

| Goal #: | 8 | Specific Goal Focus: Mathematics |
|---|---|---|

**Current Performance Level:**  What can the student currently do?

**Measurable Annual Goal:** What challenging, yet attainable, goal can we expect the student to meet by the end of this IEP period?

Kaitlyn will develop and improve her math skills.

**How will we know that the student has reached this goal?**

Quarterly Progress Reports

**Benchmark/Objectives:** What will the student need to do to complete this goal?

Kaitlyn will identify and apply formulas with 80% accuracy.

Kaitlyn will sequence steps to solve word problems with 80% accuracy.

Kaitlyn will calculate equations using the appropriate order of operations with 80% accuracy.

Kaitlyn will identify and apply mathematical language to describe relationships and patterns, solve problems orally and in writing, and translate mathematical symbols to support her answers with 80% accuracy.

| Progress Reports are required to be sent to parents at least as often as parents are informed of their nondisabled children's progress. Each progress report must answer the following two questions for each goal: | 1. What is the student's progress toward the annual goal? 2. Is the progress sufficient to enable the student to achieve the annual goal by the end of the IEP period? |
|---|---|

Use multiple copies of this form as needed.

# Individualized Education Program

|  |  |  |
|---|---|---|
| IEP Dates: from | 9/9/05 | to | 9/9/06 |

Student Name: **Kaitlyn Beth Tharaldson**    DOB: **03/14/1989**    ID#: **15821**    Grade/Level: **11**

## Service Delivery

**What are the total service delivery needs of this student?**

Include services, related services, program modifications and supports (including positive behavioral supports, school personnel and/or parent training/supports). Services should assist the student in reaching IEP goals, to be involved and progress in the general curriculum, to participate in extracurricular/nonacademic activities and to allow the student to participate with nondisabled students while working towards IEP goals.

School District Cycle:    [x] 5 day cycle    [ ] 6 day cycle    [ ] 10 day cycle    [ ] Other _____

| A. Consultation (Indirect Services to School Personnel and Parents ) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
| 1-5 | Speech/Language | Speech/Language Staff | 1 x 30 | 9/9/2005 | 9/9/2006 |
| 1-6 | LD Consultant | Counsultant | 1 x 30 | 9/9/2005 | 9/9/2006 |

| B. Special Education and Related Services in General Education Classroom (Direct Service) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
|  |  |  |  |  |  |

| C. Special Education and Related Services in Other Settings (Direct Service) | | | | | |
|---|---|---|---|---|---|
| Focus on Goal # | Type of Service | Type of Personnel | Frequency and Duration/Per Cycle | Start Date | End Date |
| 1-10 | Reading Tutorial | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-10 | Language Arts | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-10 | Math | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-10 | Social Studies | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-10 | Oral Expression | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-10 | Science | Special Education Teacher | 5 x 48 | 9/9/2005 | 9/9/2006 |
| 1-5 | Speech/Language | Speech Staff | 1 x 30 | 9/9/2005 | 9/9/2006 |

Massachusetts DOE/Individualized Education Program                    IEP5

# Individualized Education Program

IEP Dates: from  09/09/2005  to  09/09/2006

Student Name: Kaitlyn Beth Tharaldson

DOB:  03/14/1989   ID#:  15821

## Nonparticipation Justification

Is the student removed from the general education classroom at any time? (Refer to IEP5 -- Service Delivery, Section C.)

[ ] No   [X] Yes   If yes, why is removal considered critical to the student's program?

Kaitlyn's academic needs require intense instruction in a small group setting to enhance her ability to learn successfully.

IDEA '97 Regulation §300.550(b)(2):"... removal of children with disabilities from the regular educational environment occurs *only if* the nature of the severity is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (Emphasis added.)

## Schedule Modification

**SHORTER:** Does this student require a *shorter school day* or *shorter school year*?

[X] No   [ ] Yes -- shorter day   [ ] Yes -- shorter year   If yes, answer the questions below.

**LONGER:** Does this student require a *longer school day* or *longer school year* to prevent substantial loss of previously learned skills and / or substantial difficulty in relearning skills?

[X] No   [ ] Yes -- longer day   [ ] Yes -- longer year   If yes, answer the questions below.

How will the student's schedule be modified? Why is this schedule modification being recommended?
If a longer day or year is recommended, how will the school district coordinate services across program components?

## Transportation Services

Does the student require transportation as a result of the disability(ies)?

[X] No   Regular transportation will be provided in the same manner as it would be provided for students without disabilities. If the child is placed away from the local school, transportation will be provided.

[ ] Yes   Special transportation will be provided in the following manner:

[ ] on a regular transportation vehicle with the following modifications and/or specialized equipment and precautions:

[ ] on a special transportation vehicle with the following modifications and/or specialized equipment and precautions:

After the Team makes a transportation decision and after a placement decision hs been made, a parent may choose to provide transportation and may be eligible for reimbursement under certain circumstances. Any parent who plans to transport their child to school should notify the school district contact person.

# Individualized Education Program

| | | |
|---|---|---|
| IEP Dates: from | 9/9/05 | to 9/9/06 |

Student Name: Kaitlyn Beth Tharaldson    DOB: 03/14/1989    ID#: 15821    Grade/Level: 11

## State or District-Wide Assessment

Identify state or district-wide assessments planned during this IEP period:

**MCAS**

Fill out the table below. Consider any state or district-wide assessment to be administered during the time span covered by this IEP. For each content area, identify the student's assessment participation status by putting an "X" in the corresponding box for column 1, 2, 3.

| CONTENT AREAS | 1. Assessment participation: Student participates in on-demand testing under routine conditions in this content area.<br><br>COLUMN 1 | 2. Assessment participation: Student participates in on-demand testing with accommodations conditions in this content area.<br>(See 1 below)<br>COLUMN 2 | 3. Assessment participation: Student participates in alternate assessment in this content area.<br>(See 2 below)<br>COLUMN 3 |
|---|---|---|---|
| English Language Arts | ☐ | ☒ | ☐ |
| History and Social Sciences | ☐ | ☒ | ☐ |
| Mathematics | ☐ | ☒ | ☐ |
| Science and Technology | ☐ | ☐ | ☐ |
| Reading | ☐ | ☐ | ☐ |

1. For each content area identified by an "X" in column 2 above: note in space below, the content area and describe the accommodations necessary for participation in the on-demand testing. Any accommodations used for assessment purposes should be closely modeled on the accommodations that are provided to the student as part of his/her instructional program.

   (01) Administer test in short periods with frequent breaks
   (02) Administer test at a time of day that takes into account the student?s medical or learning needs
   (03) Administer test in a small group setting (i.e., 3-5 students)
   (09) Student wears noise buffers (after directions have been given using routine administration procedures)
   (11) Test administrator reads and/or clarifies or sign-language interprets general administration instructions and test directions only
   (14) Student uses a place marker
   (15) Test administrator assists the student in tracking and/or sequencing test items (e.g., moving from one test question to the next; or redirecting the student?s attention to the test)
   (17) Test administrator reads the ELA Composition writing prompt, Mathematics, Science and Technology/Engineering, and/or History and Social Science test items/questions to the student; or student uses text-reader software, such as the Kurzweil 3000 or similar electronic textreader already in use by the student, for these tests. Readers must read all test items/questions and text word-for-word exactly as written and may not clarify, elaborate, or provide assistance to the student regarding the meaning of words, intent of test questions, or responses to test items.
   (20) Student uses a template, organizer or checklist
   (22) Test administrator monitors placement of student responses in the student?s Answer Booklet.
   (23) Student uses assistive technology (e.g., word processor, typewriter, or similar device or system) to type the ELA Composition and/or answers to open-response questions. The spell- and grammar-checking device must be turned off/disabled for the ELA Composition.
   (26) Reading aloud the ELA Language and Literature test or the Grade 3 Reading Test to a student; or student uses text-reader software, such as Kurzweil 3000 or similar electronic text-reader already in use by the student for these particular tests. Readers must read test items/questions and reading passages to the student word-for-word exactly as written. Readers may not clarify, elaborate, or provide assistance to the student regarding the meaning of words, intent of test questions, or responses to test items/questions. (See Note below #27.)
   (29) Student uses a calculator, number chart, arithmetic table, or manipulatives on non-calculator sections of the Mathematics Test
   (30) Student uses a spell- or grammar-checking device on a word processor, or a hand held spellchecker for the ELA Composition; or word prediction software, provided that the 'predictahead' and 'predict on line' functions are turned off. (If a

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: Kaitlyn Beth Tharaldson        DOB: ___03/14/1989___  ID#: ___15821___        Grade/Level: __11__

(07) Familiar Test Administrator: Test administered by a test administrator familiar to the student

2.  For each content area identified by an "X" in column 3 above: note in space below, the content area, why the on-demand assessment is not appropriate and how that content area will be alternately assessed. Make sure to include the learning standards that will be addressed in each content area, the recommended assessment method(s) and the recommended evaluation and reporting method(s) for the student's performance on the alternative assessment.



Massachusetts DOE/Individualized Education Program                        IEP7

# Individualized Education Program

IEP Dates: from ___9/9/05___ to ___9/9/06___

Student Name: Kaitlyn Beth Tharaldson   DOB: __03/14/1989__   ID#: __15821__   Grade/Level: __11__

## Additional Information

☐ Include the following transition information: the anticipated graduation date; a statement of interagency responsibilities or needed linkages; the discussion of transfer of rights at least one year before age of majority; and a recommendation for Chapter 688 Referral.

Anticipated Graduation Date: _____

Statement of Interagency Responsibilities or Needed Linkages: _____

Transfer of Rights Discussed: (at least one year before age of majority)   ☒ Yes   ☐ No   ☐ N/A

Chapter 688 Referral:   ☒ Recommended   ☐ Not Recommended   ☐ N/A

☒ Document efforts to obtain participation if a parent and/or student did not attend meeting or provide input.

Kaitlyn Tharldson was invited to today's meeting, but was not in attendance.

☒ Record other relevant IEP information not previously stated.

Kaitlyn will take mandated physical education courses and elective courses with the advisement of her guidance counselor.

The school district will mail out a consent to evaluate to Mr. and Mrs. Tharaldson to update Kaitlyn's speech & language and psycho-educational testing.

## Response Section

### School Assurance

I certify that the goals in this IEP are those recommended by the Team and that the indicated services will be provided.

_____
Signature and Role of LEA Representative                                    Date

### Parent Options/Responses

**It is important that the district knows your decision as soon as possible. Please indicate your response by checking at least one (1) box and returning a signed copy to the district. Thank you.**

☐ I accept the IEP as developed.                    ☐ I reject the IEP as developed.

☐ I reject the following portions of the IEP with the understanding that any portion(s) that I do not reject will be considered accepted and implemented immediately. Rejected portions are as follows:

IEP Accepted Date: _____

_____

_____

☐ I request a meeting to discuss the rejected IEP or rejected portion(s).

_____
Signature of Parent, Guardian, Educational Surrogate Parent, Student 18 and Over*                Date
*Required signature once a student reaches 18 unless there is a court appointed guardian.

Parent Comment: I would like to make the following comment(s) but realize any comment(s) made that suggest changes to the proposed IEP will not be implemented unless the IEP is amended.

_____

_____

_____

**School District Name:** Chicopee Public Schools

**School District Address:** 180 Broadway Chicopee, MA 01020

**School District Contact Person/Phone #:** Mr. Daniel Schreier /

# Team Determination of Educational Placement

IEP Dates: from _____9/9/05_____ to _____9/9/06_____

Student Name: Kaitlyn Beth Tharaldson        DOB: __03/14/1989__   ID#: __15821__

| Team Recommended Educational Placement | Corresponding Placement | |
|---|:---:|---|
| The Team identified that IEP services are provided outside the general education classroom less that 21% of the time (80% inclusion). | ☐ | Full Inclusion Program |
| The Team identified that IEP services are provided outside the general education classroom at least 21% of the time but no more than 60% of the time. | ☐ | Partial Inclusion Program |
| The Team identified that IEP services are provided outside the general education classroom for more than 60% of the time. | ☒ | Substantially Separate Classroom |
| The Team identified that all IEP services should be provided outside the general ed. classroom and in a separate school that only serves students with disabilities.. | ☐ | Day School |
| The Team identified that IEP serves require a 24-hour education program. | ☐ | Residential School |
| The Team identified home-based IEP services for a student who is 3 to 5 years of age. | ☐ | Home-based Early Childhood Program |
| The Team identified IEP services provided in a program outside of the home for a student who is 3 to 5 years of age. | ☐ | Center-based Early Childhood Program |
| The Team has identified a mix of IEP services that are not provided in primary school-based settings. | ☐ | Other: |

| Other Authority Required Placements (Non-Educational) | Corresponding Placement | |
|---|:---:|---|
| The placement has been made by a state agency to an institutionalized setting for non-educational reasons. | ☐ | Institutionalized Setting Specify Agency: |
| A doctor has determined that the student must be served in a home setting. | ☐ | Home-based Program |
| A doctor has determined that the student must be served in a hospital setting. | ☐ | Hospital-based Program |

## Placement Consent Form

Specific Program Location and Dates:

**Parent Options / Responses**

**It is important that the district knows your decision as soon as possible. Please indicate your response by checking at least one (1) box and returning a signed copy to the district along with your response to the IEP. Thank you.**

☐ I consent to the placement decision.

☐ I refuse the placement decision.

☐ I request a meeting to discuss the refused placement decision.

_____          _____
Signature of Parent, Guardian, Educational Surrogate Parent, Student 18 and Over*          Date
*Required signature once a student reaches 18 unless there is a court appointed guardian.