## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DAVID T. As parent and next friend of** | ) |
| **KAITLYN T.** | ) |
| **Plaintiff** | ) |
| | ) **CIVIL ACTION NO. 05-30158** |
| **v.** | ) |
| | ) |
| **CITY OF CHICOPEE acting through** | ) |
| **CHICOPEE PUBLIC SCHOOLS,** | ) |
| **and MASSACHUSETTSDEPARTMENT** | ) |
| **OF EDUCATION** | ) |
| **Defendants** | ) |
| | ) |

## PARENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT, CHICOPEE PUBLIC SCHOOLS MOTION FOR PRELIMINARY INJUNCTION

The Plaintiffs, ("parents"), hereby opposes the Defendant's ("School District") request for a preliminary injunction on several grounds: (1) the Defendants have failed to exhaust administrative remedies before the Bureau of Special Education Appeals which would address the disputed issues; (2) White Oak School is the current educational placement for the purposes of "stay-put" pursuant to the Individuals with Disabilities Education Act and relevant case file; (3) the Defendants have failed to meet her burden of proof in establishing the requisite elements for injunctive relief.

### FACTUAL BACKGROUND AND PREVIOUS LEGAL PROCEEDING

Kaitlyn Tharaldson has been diagnosed as having a specific learning disability under the umbrella of a language based learning disability. She is currently enrolled at the White Oak School in the eleventh grade.

In September of 2003 the parents rejected the school district's proposed IEP which involved the use of the READ 180 program as the main component of its program located at

1

Chicopee High School.  The parents then unilaterally placed Kaitlyn at the White Oak School.

Upon unilaterally placing Kaitlyn at the White Oak School in September 2003 the parents agree

that the White Oak School, at that time, was not Kaitlyn's stay put placement.  Shortly thereafter,

the parents brought a request for hearing Before the BSEA asserting that the IEP offered failed to

offer FAPE and that the White Oak decision was the appropriate placement.  On April 7th 2004

in BSEA matter 04-0093 (*Kaitlyn's freshman year2003-2004 school year*) rendered a decision in

favor of the parents.

Within thirty days after the decision was rendered by the BSEA, the matter was appealed

by the school district to the United States District Court.

In April 2004 the parents were forced to file Motions for Non-compliance because the

school district was failing to recognize White Oak as the current placement.  The School District

asserted before the BSEA that it was their position that because they filed an appeal of the

underlying BSEA decision they did not have to pay for White Oak or provide transportation.

On May 21, 2004 the BSEA heard the matter and issued a decision for the parents citing

the *Burlington* cases.  The decision also made reference to the underlying decision which states

in it that an appeal of the BSEA decision does not act as a stay.

In July 2004 the TEAM convened at White Oak and the school district announced they

were creating a new program for the fall 2004 called the Brighter Beginnings Program.  The

parents were presented with an IEP shortly thereafter, and due to concerns that the same READ

180 program was being used, the parents rejected the proposed IEP.

In December 2004, the School District filed for a new hearing with respect to the 2004-

2005 school year *(BSEA 05-2029).*

The appeal of first BSEA decision (*case number 04-30087 MAP*) ensued throughout

Kaitlyn's sophomore year. In May 2005, Judge Ponsor, heard the parties' motions for summary judgment and ultimately held for the parents on appeal.

Also in May 2005 the BSEA heard the matter BSEA 05-2029 over four days of hearing. On June 7th of 2005 the BSEA issued a decision for the School District finding that the new IEP offered FAPE. Because the decision for the 2004-2005 was not issued until June 7th Kaitlyn remained at the White Oak School throughout the 2004-2005 school year pursuant to stay put protection 20 U.S.C. 1415(j) at the school district's expense.

With thirty days of the June 7, 2005 BSEA decision, the parents appealed the decision of the BSEA case to the United Stated District Court (05-30158-MAP).

In December of 2005 the attorney for the parents contacted the attorney for the school district regarding the school districts failure to continue paying for the White Oak School and provide transportation. The school district attorney responded by asserting that it was their belief that because they had prevailed at the last hearing that stay put no longer applied. The parents responded that White Oak was still the stay put placement given that it was the last agreed upon placement between the parents and the state and that BSEA decision, wherein the school district had prevailed, had been appealed. The school district disagreed with the parent's interpretation of stay put.

In late December 2005, the parties agreed to request an advisory opinion from the BSEA regarding this issue. The BSEA responded that it could not render an advisory opinion with out a formal request for hearing. (BSEA 06-3347).

On January 10th 2006, the parent's attorney filed a formal request for hearing before the BSEA regarding the pure legal issue of the stay put placement.

The parties then agreed to proceed utilizing the advisory opinion process. This process

consists of a BSEA hearing officer hearing limited testimony and rendering an advisory opinion. In this case the parties agreed that the decision would be non-binding.

On March 22, 2006 the parties convened in Worcester before BSEA hearing Officer Raymond Oliver to participate in the advisory process. The parties had previously submitted memorandums regarding their respective positions. *See attached hereto as "Exhibit A."* The parties presented oral arguments then the hearing officer drafted a brief opinion in favor of the parents.

The parents did not hear from the school district regarding whether they would abide by the advisory opinion or whether they would continue to hearing. The matter had been scheduled for hearing on April 24th 2006. In addition to not hearing from the school district the parent's attorney had not heard from the BSEA regarding time and location for the hearing. As such the parent's attorney filed a request to postpone the hearing for purposes of ascertaining the school district's position and clarify the hearing details with the BSEA. The postponement was granted and Sara Berman was assigned to the matter.

On April 26, 2006, the school district's attorney filed a motion for preliminary injunction in the U.S. District Court.

On April 28, 2006 Sara Berman of the BSEA held a conference call to discuss the case before the BSEA. The school district attorney stated that she had no desire to proceed to hearing on the issue. The parent's attorney stated that they wanted a decision as soon as possible. The parents stated that "stay put" is an automatic injunction and that the school district should be paying and providing transportation until such time they have been successfully granted a stay. The parents asserted that they, as the complainants, were entitled to the hearing. The parents also argued that a Decision of the BSEA would have to been immediately followed by the school

district thus ending this dispute.  The BSEA hearing officer agreed that the parents were entitled

to a hearing.  She attempted to set dates for hearing, but the school district was not sure if they

were going to go forward.  The school district's attorney stated that she would file a motion to

dismiss the BSEA proceeding.  This document has not been received by the parents as yet.

## LAW AND ARGUMENT

I. This Motion Should Be Denied Because The School District Has Failed To Exhaust All

Administrative Remedies To Resolve The Disputed Issues.[1]

A party seeking relief under the Individuals with Disabilities Education Act ("IDEA")

ordinarily must exhaust administrative remedies before the BSEA before filing suit in federal

court. See, Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993). The BSEA has

jurisdiction to adjudicate disputes arising pursuant to the IDEA, 20 U.S.C. §1401 et. seq.,

including the "stay-put" provision of § 1415 (j).

Pursuant to the exhaustion requirements when dealing with rights emanating from the

IDEA, the parents have requested a hearing before the BSEA and have a BSEA hearing officer

ready to adjudicate the issue of "stay-put."  In the event that the school district disagrees with a

ruling of the BSEA, then it would then be free to appeal that ruling to state or federal court.  It

would also be at that time it could request a request to stay its obligations.

"[U]nder certain circumstances exhaustion of administrative remedies is not required

before district court action may be taken. Traditionally, such cases have been limited to

situations where the school has denied the plaintiff access to the administrative remedies."

Christopher W. v. Portsmouth School Committee, 877 F.2d 1089 (1st Cir. 1989). See e.g.,

Manecke v. School Board ofPinellas County. Florida. 762 F.2d 912, 918 (11th Cir. 1985), cert.

---

[1] The language and legal cites from the above argument has been taken liberally from a previous motion
in opposition to preliminary injunctive relief filed by attorney Thompson regarding a different matter.

denied, 474 U.S. 1062 (1986) (School board denied Plaintiff access to judicial and administrative mechanisms when due process hearing requested.); <u>Mrs. W. v. Tirozzi</u>, 832 F.2d 748, 759 (2d Cir. 1987) (Defendants refused to consider and resolve complaints of system-wide violations.); <u>Honig v. Doe</u>, 484 U.S. 305 (1988) (Student denied all access to education when suspended indefinitely.). <u>Henry v. School Administrative Unit No. 29</u>, 70 F. Supp.2d 52, 60 (N.H. 1999) (Administrative hearing officer refused to address "stay put" determination until after federal action filed.). According to these cases an exception would be warranted if the parents were seeking a preliminary injunction on the school district. However, given that the parents are not seeking a preliminary injunction at this time, the school district should not be able to proceed in this court.

The policy behind the exhaustion of administrative remedies was set out in <u>Christopher W. v. Portsmouth School Committee</u>, a case dealing with the IDEA'S predecessor in name only, the Education for all Handicapped Children Act ("EHA"), as follows:

> The exhaustion of administrative remedies doctrine has long been held to mean that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. This doctrine enables the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy. (citations omitted) 877 F.2d 1089, 1094-95 (1st Cir. 1989).

Courts do not apply the exhaustion doctrine "inflexibly." <u>Christopher W.</u>, 877 F.2d at 1094. As a consequence, exceptions to the exhaustion doctrine have developed, "e.g., when the issue is a pure matter of law, or when exhaustion will work severe harm upon the litigant, or when future agency proceedings may be futile, only delaying an ultimate resolution and that the legislative history of the Act reflects understanding that exhaustion is not a rigid requirement." Id at 1095. An analysis of the exhaustion doctrine and its exceptions under the facts of the case at bar,

demonstrate that the school district has neither exhausted the available administrative remedies nor shown the applicability of an exception. To avoid preclusion of the injunction on an exhaustion basis, therefore, the School District must demonstrate qualification under an exception.

### (1) Is the issue "a pure matter of law?"

The "stay put" question presented is a pure matter of law. The parents do not dispute this fact. However, the parents assert that the issues of transportation and reimbursement for costs are not. The parents have been providing transportation for Kaitlyn the entire year. As such they are entitled to a monetary reimbursement based on the state rate of forty-one (.41) cents per mile. Before the parents can be reimbursed this money the BSEA must take into evidence the number of days involved, the number of miles traveled and if applicable other costs associated with providing the transportation. This is a purely factual determination. The amount of money involved is a substantial amount of money to the parent. Without an order from the BSEA the parents would have no mechanism with which to force the school district to reimburse them.

There is also the issue of attorney's fees. The parents have incurred legal fees in order to force the school district to abide by its stay put obligation. The parents should be entitled to be deemed the prevailing party before the BSEA so that they can proceed to U.S. District court with a proper motion for an award of attorney's fees.

### (2) Futility

The school district has not demonstrated that exhausting its administrative remedies would be futile. Assuming that the administrative hearing before the BSEA were to continue, a

decision would resolve the "stay put" determination.  As stated earlier, a decision of the BSEA acts as an automatic injunction.  Chicopee would be bound by an order of the BSEA and would have to immediately comply with the Bureau's determination as to Kaitlyn's "stay put" placement and the transportation reimbursement.

The only reason the school district is proceeding to federal court is because is suspects the decision (and injunction) will not be in its favor.  This is not valid justification for skipping over the administrative process.   Thus, the school district's failure to allow the administrative process to come to fruition demonstrates forum shopping, not the avoidance of an exercise in futility. Such litigious strategies are contrary to the policy considerations underpinning the doctrine of exhaustion of remedies.

**(3) Severe harm to the litigant.**

The School District presents no evidence to support a finding of severe or irreparable harm if the federal court does not take immediate action. As demonstrated in the analysis of futility, timely administrative procedures have been and are available to the school district via the BSEA to resolve her "stay put" question since the beginning of the school year. Resolution of the "stay put" question, whether made by this Court or the BSEA will require the same factual inquiries and will have the same effect - to determine what was the child's stay put placement and for how long. Given the equality of effect the two avenues of resolution afford, the school district fails to show any harm in relying on administrative procedures. Policy considerations in this case - agency expertise, judicial economy etc... - are in full favor of administrative resolution of the issue.

II. <u>Traditional Preliminary Injunction Analysis</u>

It is the parent's position that this Court need not engage in a traditional analysis of the

elements for a preliminary injunction at this time. The parents discuss the traditional components of a preliminary injunction, however, with confidence that the Court will find the school districts request for injunctive relief to be premature and inappropriate.

A. Preliminary Injunction Standards

Over time, the First Circuit has developed a quadripartite test for determining whether litigants are entitled to preliminary injunctive relief. See Narragansett Indian Tribe, 934 F. 2d at 5. The party seeking preliminary injunction must show: (1) that it has a substantially likelihood of success on the merits; (2) that it faces a significant potential for irreparable injury in the absence of immediate relief, (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e. that the issuance of an injunction will not impose more of a burden on the nonmovant that its absence will impose on the movant; and (4) that the granting of prompt injunctive relief will promote (or at least not denigrate) the public interest. McGuire et al v. Rielly et al, 260 F. 3d 36, 42 (1st Cir. 2001).

A preliminary injunction is a drastic remedy that a Court should not grant unless the movant, by a clear showing, carries its burden of persuasion. Charles Wright and Arthur Miller. 11 Fed. Prac. & Pro., 2948 at 129-130 (1995). With these analytical principles in mind, the factual allegations and legal arguments presented by the school district clearly do not meet the requirements for a preliminary injunction.

B. The School District Is Not Likely To Succeed On The Merits.

The school district must satisfy all prongs of the four-part test to be entitled to injunctive relief. The "sine qua non" of that formulation is whether the school district is likely to succeed on the merits. Weaver, et al v. Henderson. et al, 984 F. 2d 11, 12 (1st Cir. 1993). The "likelihood of success cannot be woven from the gossamer threads of speculation and surmise". Weaver, et al

v. Henderson, et al, 984 F. 2d 11, 12 (1st Cir. 1993).

As already evidenced by the Advisory Opinion rendered by the BSEA, the school district is unlikely to succeed on the merits of the issue. It clearly has failed to avail itself of the administrative remedies available to address special education disputes before the Bureau of Special Education Appeals. Proceeding with an administrative hearing before the BSEA would not be futile since the Bureau regularly addresses issues of "stay-put", renders expedited decisions regarding interim placements and makes factual findings relative to the appropriateness of special education programs. BSEA hearing officers have a vast amount of experience in evaluating special education programs and could readily address the "stay-put" issue on an expedited basis if necessary.

Please see the attached memorandum "Exhibit A" for a detailed analysis of the legal issues the parents have put before the BSEA.   Based on the stay put statute within the IDEA and the overwhelming case law in support of the parent's position it is clear that the school district is not likely to succeed.

C. There is no risk of irreparable harm to the School District.

A preliminary injunction requires not only a substantial likelihood of success on the merits but also showing that denial would "subject the moving party to substantial risk of irreparable harm." Dos-Simons of Warrick Inc., 102 F. 3d 12, 18 (1st Cir. 1996). There is no risk of irreparable harm if the injunction is not granted because the plaintiff has yet to exhaust all administrative remedies.

As stated in parent's memorandum "Exhibit A," the case law in support of the parent's position is abundant.  In fact, the case law primarily consists of U.S. District Court Decisions which were appealed to the respective Appeals Court.  However, the underlying basis of many of

the appeals were brought as a request for preliminary injunctive relief. As such the analysis in these decisions, applying the prongs requisite to obtain preliminary injunction specifically regarding the stay put issue, is readily available a valuable precedent.  The parents specifically rely on five case, <u>School Committee Town of Burlington v. Department of Education Massachusetts Et Al.</u> 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385, 53 U.S.L.W. 4509 (1985) , <u>Board of Education of Montgomery of Montgomery County v Brett Y.</u>, *et al*., 959 F. Supp. 705; 1997 U.S. Dist. LEXIS 9932 (US Dist Ct MD 1997).;  <u>Susquenita Sch. Dist. v. Raelee.S.</u>, 96 F.3d 78, 82 (3d Cir. 1996); <u>Drinker, v Colonial School District</u>, 78 F.3d 859; ( 3rd Cir 1996)  U.S. App. LEXIS 4613.; <u>Clovis Unified Sch. Dist. v. California Office of Admin. Hearings</u>, 903 F.2d 635 (9th Cir. 1990).

The school district on the other hand stated before the BSEA that it could find no relevant case law.  It could only argue that it would be financially harmed by the enforcement of the stay put provision.  The <u>Susquenita</u> case discussed this same argument in the context of determining whether the school district could school irreparable harm.  In determining whether the parties met their burden for preliminary injunctive relief the Court in <u>Susqenita</u> held "**The only harm which we can conceive of is the financial burden which will be borne by the district during the pendency of this appeal**. Id. (emphasis added).  The court even considered the fact that pursuant to <u>Burlington</u> "that, [*81] under current case law, the district would not be entitled to recover funds expended to maintain Raelee in private school even if it were to prevail on appeal."  The court, found "Taken together, we find that the relevant considerations do not justify granting the stay requested by the district."

The case law is overwhelmingly in support of the child's right to remain their stay put placement until such time the matter is resolved.  The school district's only argument, that it

would be financially harmed, has already been decided and considered not to meet the burden of irreparable harm.

D. The balancing of relative equities weighs in favor of the parents.

The case law as illustrated in "Exhibit A" clearly discusses this issue. In essence the school districts argument is financial, whereas the parent's argument pertains to the appropriateness of programming for their child.

As discussed in the case law, if a parent were to prevail on appeal it would be hollow victory given that years of lost time and instruction would not be able to be recouped. The school district is requesting the stay yet no decision has been rendered by the Federal Court regarding the outcome of the appeal. The school district is presuming it will win the appeal. In the event that the school district loses the appeal Kaitlyn's placement would be White Oak. Thus, at this time the only argument the school district can put forward is a financial argument which as discussed above has already been found to be lacking. The school district also is presuming that the parents, if they should lose at the district court level, will not appeal to the first circuit court of appeals. The parents assert that the school district is putting the cart before the horse.

E. The school district's request for preliminary injunctive relief is in contrast to the public policy reasons of the IDEA.

The public interest will be served by denial of the request for the injunction given the intent of the legislature in enacting the Individuals with Disabilities Education Act. The Act clearly encourages parties to pursue administrate remedies.

The public policy reasons for denying a school district's motion for preliminary injunctive relief regarding stay put issues has been thoroughly discussed by the U.S. Supreme

Court in <u>Burlington,</u> then further discussed and clarified by the circuit courts. *See Exhibit A.* All of these courts have clearly said that the IDEA is a law written to protect parents and children. The stay put provision which specifically says it applies when parents and the state agree has been specifically been found to exclude the possibility of agreement between the school district and the state. Again, these courts have balanced the equities in numerous cases and clearly and unanimously held that although it can seem financially unfair to school districts to be funding placements while the matter is on appeal for years at a time, this is what the IDEA intended. Therefore, at this time, given that the appeal is still ongoing, a preliminary injunction would be in contrast to the public policy philosophies as embodied in the IDEA.

Based on the foregoing reasons, the Parents respectfully requests that the School District's Motion for Preliminary Injunction be denied.

Respectfully Submitted
Kaitlyn T. by her attorney

May 1, 2006

**Derek M. Beaulieu /s/**
Derek M. Beaulieu, Esq.
P.O. Box 60452
Longmeadow MA 01116
BBO# 644185

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF EDUCATION**
**BUREAU OF SPECIAL EDUCATION APPEALS**

| | |
|---|---|
| **KAITLYN T.; DAVID THARALDSON;** ) | |
| **DIANE THARALDSON** ) | |
| ) | **BSEA NO.    06-3347** |
| **Parents** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CHICOPEE PUBLIC SCHOOLS and** ) | |
| **THE CITY OF CHICOPEE** ) | |
| **School District** ) | |

## PARENT'S MOTION TO ENFORCE STAY PUT PROVISION

### FACTS

Kaitlyn Tharaldson has been diagnosed as having a specific learning disability under the umbrella of a language based learning disability. She is currently enrolled at the White Oak School in the eleventh grade.

In September of 2003 the parents rejected the school district's proposed IEP which involved the use of the READ 180 program as the main component of its program located at Chicopee High School. The parents then unilaterally placed Kaitlyn at the White Oak School. Upon unilaterally placing Kaitlyn at the White Oak School in September 2003 the parents agree that the White Oak School, at that time, was not Kaitlyn's stay put placement. Shortly thereafter, the parents brought a request for hearing Before the BSEA asserting that the IEP offered failed to offer FAPE and that the White Oak decision was the appropriate placement. On April 7th 2004 in BSEA matter 04-0093 (*Kaitlyn's freshman year2003-2004 school year*) rendered a decision in favor of the parents.

Within thirty days after the decision the matter was appealed by the school district to the United States District Court.  In April 2004 the parents were forced to file Motions for Non-compliance because the school district was failing to recognize White Oak as the current placement due to the fact that they filed an appeal of the underlying decision.  On May 21, 2004 the BSEA heard the matter and issued a decision for the parents citing the *Burlington* cases and the underlying decision which states in it that an appeal of the BSEA does not act as a stay of the BSEA decision.

In July 2004 the TEAM convened at White Oak and the school district announced they were creating a new program for the fall 2004 called the Brighter Beginnings Program.  The parents were presented with an IEP shortly thereafter, and due to concerns that the same READ 180 program was being used, the parents rejected the proposed IEP.

The District Court appeal that followed occurred throughout Kaitlyn's sophomore year (*case number 04-30087 MAP*).  However, before the District Court ruled on the appeal, in December 2004, the School district filed for a new hearing with respect to the 2004-2005 school year.  In May 2005 the District Court, namely Judge Ponsor, heard the parties' motions for summary judgment and ultimately held for the parents on appeal.  Also in May 2005 The BSEA heard the new matter.  On June 7th of 2005 (BSEA 05-2029) the BSEA issued a decision for the School District finding that the new IEP offered FAPE.  Because the decision for the 2004-2005 was not issued until June 7th Kaitlyn remained at the White Oak School throughout the 2004-2005 school year pursuant to stay put protection 20 USC 1415(j) at the school district's expense.

With thirty days of the June 7, 2005 BSEA decision, the parents appealed the decision of the BSEA case to the United Stated District Court (05-30158-MAP).  That matter is still pending.

## ARGUMENTS AND LAW

I. THE WHITE OAK SCHOOL IS STILL THE STAY PUT PLACEMENT

The parents assert that while the appeal of the underlying BSEA decision is still pending the financial responsibility for that placement at the White Oak School is still on the school district. The parent assert that the language from 20 U.S.C. §1415(j) specifically contemplates decision where the state agrees with the parents and excludes language creating this type of agreement and the protections that follow when the school district and the state agree. The case law also supports this conclusion.

The School District's position is that the decision of the BSEA in June 2005 has settled the placement issue and that Kaitlyn's placement for the 2005-2006 school year is at Chicopee High School and as such they have no responsibility to pay for her tuition at the White Oak School for the 2005-2006 school year. The parents disagree with this position as being inconsistent with the language of the statute and the case law, and now seek the automatic preliminary injunctive relief that is afforded them pursuant to 20 U.S.C. §1415(j) .

A. THE IDEA AND THE CASE LAW REGARDING THE STAY PUT PROVISION ARE CLEAR AS TO WHEN "STAY PUT" IS INVOKED, HOW LONG IT WILL LAST AND OCCUR AND WHAT CONSITUTES AGREEMENT BETWEEN PARENTS AND BSEA.

Despite the school district's statement that there are no cases or precedent on this issue, the parents attorney was able to find a plethora of case law, exactly on point legally and factually, including the Supreme Court decision, in *Burlington*, which came through the 1st circuit.

The parents specifically rely on five case, S*chool Committee Town of Burlington v. Department of Education Massachusetts Et Al*. 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385, 53 U.S.L.W. 4509 (1985) , *Board of Education of Montgomery of Montgomery County v Brett*

*Y., et al.*, 959 F. Supp. 705; 1997 U.S. Dist. LEXIS 9932 (US Dist Ct MD 1997).; *Susquenita Sch. Dist. v. Raelee.S.*, 96 F.3d 78, 82 (3d Cir. 1996); *Drinker, v Colonial School District,* 78 F.3d 859; ( 3rd Cir 1996) U.S. App. LEXIS 4613.; *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990).

In the actual case of Brett Y the Plaintiff Board of Education of Montgomery County (board) appealed a decision of an administrative law judge (ALJ) that defendant student was denied a free and appropriate public education under the Individuals with Disabilities Education Act (IDEA), 20.U.S.C.S. § 1400 et seq.. The student and the parents sought a preliminary Injunction to enforce the placement at the private school.

Factually the case as bar is very similar to the Brett Y case.  In Brett Y. the parents  the rejected the proposed IEP, unilaterally placed their child and requested a due process hearing challenging the school district's failure to provide the student with a free appropriate public education (FAPE) as required by the Individuals with Disabilities Education Act (IDEA). At the due process hearing, the ALJ found that the board had committed serious procedural violations that denied the student a FAPE and further found that his placement at the residential school was appropriate. The court granted the student and the parents a preliminary injunction requiring the school district to pay for the student's private placement through the end of the school year pending the school district's appeal of the ALJ's decision.

The following legal anaylisis portions found below are taken entirely from Brett Y.  and are unaltered with little or no discussion or  comparison to the present case.  This was done purposfully because the facts and legal analysis as prensented in this case is  so closly related the parents felt court decision speaks for itself as it clearly discusses all the issues and nicely incorporates and discusses all the relevant cases on this subject.

I.  "DISCUSSION A. IDEA STATUTORY FRAMEWORK

A. THE "STAY PUT" PROVISION

"Disputes often arise over the proper placement and educational program for a disabled student and the review process described above can be cumbersome and lengthy. Therefore, a child's placement during the course of administrative and judicial proceedings typically has great significance for all concerned. Susquenita Sch. Dist. v. Raelee.S., 96 F.3d 78, 82 (3d Cir. 1996); see also Burlington, 471 U.S. at 361 ("important practical questions arise concerning [*709] interim placement of the child and financial responsibility for that placement").

The IDEA requires that during the course of administrative and judicial proceedings, "unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement. [**10] . . ." 20 U.S.C. § 1415(e)(3). This requirement has come to be known as the IDEA'S "pendent placement" or "stay put" provision. Susquenita, 96 F.3d at 82. This provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. Drinker v. Colonial Sen. Dist., /8 h.Jd 8b9, 864-65 (3d Cir. 1996) (citing Woods v. New Jersey Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)). Courts have held, …, that ""the "stay put" provision affords an "automatic" preliminary injunction to maintain the child's placement, eliminating the need for parents to make the usual showing required for obtaining preliminary injunctive relief. See Honig, 484 U.S. at 326; see also, e.g., King v. Pine Plains Cent. Sen. Dist., 918 F. Supp. 772, 783 (S.D.N.Y. 1996); Cochran v. District of Columbia, 660 F. Supp. 314, 319 (D.D.C. 1987); Saleh v. District of Columbia, 660 F. Supp. 212, 215 (D.D.C. 1987)."

The central question thus becomes: what is Brett's "current educational placement"

C. CURRENT EDUCATIONAL PLACEMENT

"Given the protective purpose underlying the "stay put" provision, it is typically invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district; the provision is used to block school districts from effecting unilateral change in the child's educational program. Susquenita, 96 F.3d at 83; cf. also Honig, 484 U.S. at 323 ("We think it clear . . . that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school"); Burlington, 471 U.S. at 373 ("We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings"). ln cases of this type, "the dispositive factor in deciding a child's 'current educational placement' should be the Individualized Education Program . . . actually functioning when the 'stay put' is invoked." Drinker, 78 F.3d at 867 (quoting [**12] Woods, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) at 440)."

5

"The instant case is quite different from the typical case, however. In this case, it is the parents who advocate change. The Yaders had no desire for Brett to continue at Richard Montgomery, nor, apparently, did they want him to attend RICA. Instead, the Yaders chose to place Brett at Grove at their own expense and seek reimbursement. The Yaders apparently would concede that Richard Montgomery, or perhaps RICA, would have been the appropriate pendent placement within the meaning of the IDEA at the time that they unilaterally placed Brett at Grove. They argue, however, that when the administrative Decision rendered her decision in their favor, Grove became Brett's pendent placement. The Board apparently takes the position that Brett's current educational placement is Richard Montgomery, but, in any event, that it is not Grove. As noted above, the "stay put" provision reads as follows: "During the pendency of any proceedings conducted pursuant to this sections, unless the state or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement . . . [**13] ." 20 U.S.C. § 1415(e)(3) (emphasis added). In Burlington, although the issue was the parents' entitlement to reimbursement, the Supreme Court had occasion to consider what constitutes "agreement" by the state for purposes of this provision. In Burlington, the Town argued that the parents were not entitled to reimbursement, in part because [*710] they violated the "stay put" by unilaterally placing their child in a private school. In considering this argument, the Court stated that "the[appellate panel]'s decision in favor of the [parents] and the [private school] placement would seem to constitute agreement by the State to the change of placement." 471 U.S. at 372. The Court went on to hold that as of the date that the state administrative decision was rendered in the parents' favor, the parents were no longer in violation of §1415(e)(3). Id. The only two United States Courts of Appeals to have squarely addressed the issue have concluded that the Supreme Court's decision in Burlington compels the conclusion that "once parents receive a state administrative decision that the offered public placement was inadequate and their unilateral private placement was appropriate, [**14] the private placement becomes the "current educational placement," and the school system is financially responsible for the cost of that placement during the pendency of the underlying litigation. See Susquenita, 96 F.3d 78; Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635 (9th Cir. 1990). n2

In Susquenita, a case very similar to the instant case, the Court of Appeals for the Third Circuit was called upon to decide whether the parents of a child with disabilities were entitled to have their daughter's private school placement funded by the local public school district prior to the conclusion of litigation establishing the propriety of that placement. [**15] Relying on § 1415(e)(3) and Burlington, the court of appeals held that the parents were so entitled.

In Susquenita, the parents rejected the school system's proposed IEP for their daughter Raelee, withdrew her from public school, and placed her in a private school for the learning disabled. The parents then invoked their right to a due process hearing in order to determine whether Raelee had been properly placed and, accordingly, whether they were entitled to tuition reimbursement. The hearing officer found that the IEP which Susquenita had proposed was appropriate and denied reimbursement. The parents appealed this decision to a three member state special education appeals panel. n3 The panel reversed the hearing officer's decision, finding that the IEP was deficient and that the program offered by the private school was appropriate for Raelee. The panel then stated, in dicta, that unless their order were overturned in

a state or federal court, the private school! placement would constitute Raelee's pendent placement. Susquenita appealed the panel's decision to the United States District Court for the Middle District of Pennsylvania, and requested a stay of the panel's decision [**16] pending its appeal. The district court denied the motion for a stay, effectively directing that the student remain in the private school placement and that this placement be funded by the school district pending resolution of the merits of the underlying litigation. Susquenita appealed, and the Third Circuit held that the district court properly declined to enter a stay.

The parents argued, and the Third Circuit agreed, that the panel decision constituted "agreement" by the State to a change of placement, and that therefore a new pendent placement was created for which the school district was obligated to pay. The court reasoned as follows: The decision of the Supreme Court in Burlington established that a ruling by the education appeals panel in favor of the parents' position constitutes agreement [**17] for purposes of section 1415(e)(3). . . .Susquenita argues that a pendent placement appropriate at the outset of administrative proceedings is fixed for the duration of the proceedings and cannot be altered by an administrative ruling in the parents' favor. Accepting this position [*711] would contravene the language of the statute and the holding in Burlington. Furthermore, it would mean that the panel decision in favor of the parents is of no practical significance unless and until it is affirmed by a decision that cannot be or is not appealed. As we have explained, section 1415(e)(3) was drafted to guard the interests of parents and their children. We cannot agree that this same section should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate. It is undisputed that once there is state agreement with respect to the pendent placement, a fortiori, financial responsibility on the part of the local school district follows. Thus, from the point of the panel decision forward -- academic year 1995-1996 and following -- Raelee's pendent placement, by agreement [**18] of the state, is the private school and Susquenita is obligated to pay for that placement. Susquenita, 96 F.3d at 83-84 (footnote omitted).

In addition to relying on the statutory language and the Supreme Court's Burlington decision, the Susquenita court found that the policies underlying the IDEA and its administrative process supported its conclusion:

 In this case, as in many other cases, where parents who disagree with an IEP proposal for their child wait for the merits of their case to be addressed through the process of administrative and judicial review, they must make a choice. They may have the child remain in what they believe to be an inappropriate placement or they may elect to pay for what they deem appropriate. This choice is real only for parents who have the financial wherewithal to pay for alternative placement. While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position. The purpose of the Act, which is to ensure that every child receive a "free and appropriate education" [**19] is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education. The burden that such an approach would place on many families is overwhelming. . . . Without interim financial support, a parent's "choice" to have his child remain in what the state has determined to be an appropriate private

[sic] placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consolidation to a parent who cannot pay the toll at the outset.

In Clovis, the Court of Appeals for the Ninth Circuit likewise considered parents' argument that a state administrative decision in favor of their unilateral placement decision created a "new" pendent placement for purposes of the "stay put" provision. Relying on Burlington, the court concluded that, under the "stay put" provision, the school district was responsible for maintaining the student's private placement after the administrative decision that the placement was appropriate, and until a court directed otherwise. Clovis, 903 F.2d at 641.The [**20] only potentially significant distinction between Susquenita and Clovis on the one hand and the instant case on the other, is that in those cases the challenges that led to the administrative decisions in the parents' favor were substantive, whereas the challenge in this case was procedural. In other words, in Susquenita and Clovis, the parents challenged the substantive adequacy of the school systems' proposed placements, and so the state administrative agencies had occasion to conclude that the school systems' proposed placements were inadequate and that the parents' choices of placement were proper. The panel in Susquenita even went so far as to state that the parents' choice of private placement should remain the student's pendent placement.

In this case, on the other hand, the Yaders won their administrative ruling on the ground that MCPS had committed serious procedural violations of the IDEA. The court does not think, however, [*712] that this distinction forecloses reliance on Susquenita and Clovis in this case. Significantly, Judge Sylvester did explicitly determine that Brett's placement at Grove was proper. This conclusion was necessary to her holding [**21] that the Yaders were entitled to reimbursement of the cost associated with their unilateral placement of Brett. See Florence, 510 U.S. at 15; Burlington, 471 U.S. at 369. Furthermore, there is no dispute among the parties that Richard Montgomery was not an appropriate placement, and while Judge Sylvester did not explicitly find that RICA would not be an appropriate placement (she had no occasion so to find, because a placement at RICA was not in effect at the time the Yaders unilaterally enrolled Brett at Grove), she did conclude that the Board's recommendation of an initial placement at Richard Montgomery with a transition to RICA would not have been feasible under the circumstances. In sum, given Judge Sylvester's conclusions that MCPS denied Brett a FAPE for the 1996-97 school year and that his placement at Grove was proper, the court believes that her ruling can be said to constitute state "agreement" to a change in placement to Grove, within the meaning of Susquenita and Clovis.

In light of the emerging case law in this area, as exemplified by Susquenita and Clovis, and the apparent lack of any contrary authority, the court is persuaded that the state administrative decision in favor of the Yaders constitutes "agreement" by the State to a change in Brett's educational placement to Grove within the meaning of the "stay put" provision of the IDEA, thereby entitling the Yaders to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the [**26] Board's expense.

D. SCOPE OF RELIEF

In sum, the court holds only that Judge Sylvester's December 1996 ruling constitutes an

agreement by the State to change Brett's educational placement to Grove, and that the Yaders therefore are entitled to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the Board's expense through the remainder of the school year.

III. CONCLUSION

For the foregoing reasons, Defendants' motion for a preliminary injunction is GRANTED. Plaintiff is ORDERED to maintain Brett Yader's current educational placement at Grove through the remainder of [**29] the 1996-97 school year at Plaintiff's expense. A separate order will be entered."

The next case the parent's cite is *Drinker, v Colonial School District* 78 F.3d 859; ( 3rd Cir 1996)  U.S. App. LEXIS 4613.   Although this case was cited in *Brett Y.* that decision excluded language which the parents now cite which they feel is relvant to the issues in this case. The *Drinker* decision factually has a few twists which shed additional light on the stay put provision and supports the parent's arguments.   The court stated the school district position which was "several-fold."  As the court states "Colonial interprets Pennsylvania's two-tier system of administrative review as providing for "finality" of decision at the "local" level of impartial hearing officer review to the extent that such a decision is not appealed to the state level. See at 10-11 (citing 20 U.S.C. § 1415(c) and (e)(l); 34 C.F.R. § 300.509). Decisions made at the state level, according to the school district, are final to the extent [**18] that they are not appealed for judicial review. Id. at 11 (citing 20 U.S.C. § 1415(e)(l); 34 C.F.R. § 300.510(d))."

In the present case it should be undisputed that the parents have appealed and litigation is still pending.  However, the reason this case is important is because the administrative decision in this case ordered a favorable decision for the school district, which provided for a transition back to the public school.  Although the school felt the transition period was too long and appealed it and although the parents did not appeal it, the Court still held that the parents contested the decision and thus it was within the spirit of the IDEA to uphold the stay provision

and mandate the school district to pay for the private school placement. The Court in Drinker held:

> "We will assume without deciding that the district court properly concluded that the underlying placement dispute was resolved when the Drinkers did not appeal Dr. Redfern's decision. Nevertheless, Colonial's conclusion that the court's application of the stay put provision of section 1415(e)(3) was inappropriate does not follow. Colonial makes the conceptual mistake of separately cabining the issues of placement and transition, concepts that cannot be so radically separated. nl5 While it is true that the Drinkers acquiesced in Dr. Redfern's placement decision, that decision included, as part and parcel of the plan, a nearly-one-year transition program for Daniel. In contrast, the appeals decision of March 1994 aimed to place Daniel at Whitemarsh by April 24, 1994, with barely a three-week transition period. Transition periods and timing of placement [**21] are integral elements of any educational program, elements that were not settled by any stretch of the imagination even were we to address Colonial's claim that the bare fact of placement at Whitemarsh had been decided as of March 17, 1994. Thus, Dr. Redfern's placement decision, though settling the issue of where Daniel ultimately would be placed, had not settled the timing and transition issues, since those elements were contested hotly through the time of the February 13, 1995 decision of the district court. Consequently, Colonial's claim that section 1415(e)(3)'s mandate to maintain the Gladwyne placement could not apply past the first appeals panel's decision is not an accurate statement of the section's application."

This decision had the opportunity to discuss "agreement" between state and school district and clearly held that this combination does not create agreement as contemplated by stay put. This case clearly held for the parents asserting that a "then current placement" only applies when parents and the state agree pursuant to a BSEA decision or some of the court decision.

The School District has asserted that they believe stay put provision as applied in the manner the parents have suggested it to be applied to be unfair and that the parents are merely inferring what the statute says. First it should be clear from the decision above and the case law that decision cites, that when the BSEA finds for the parents it constitutes and agreement as contemplated in the statute. Similarly, it should also be clear from the case law and discussions

regarding the policy behind the IDEA that the same protections do not apply when the school

district is the prevailing party at the BSEA if that decision is appealed.

      B. THE SCHOOL DISTRICTS ARGUMENTS, CITING NO RELEVANT CASE LAW, AND ARGUMENTS RELYING ON EQUITY, IS INCONSISTENT WITH THE CASE LAW AND PUBLIC POLICY PROVISIONS OF THE IDEA

      The school district specifically has implied that it should not have to pay when they have

a program that has been found by the BSEA to be appropriate.  First, the parents would disagree

that the Brighter Beginnings Program is appropriate.  The issue of methodology, available classes

and the cognitive grouping of the students in that program is being hotly contested on appeal.

The parents assert that if Kaitlyn where denied the White Oak School she would suffer

emotionally as a result of being denied scientifically proven methodologies and an appropriate

peer group.   This is exactly why the stay put provision was created.  The school district is also

presumptuous that it will win on appeal.  In the event that the parents prevail on appeal and it is

demonstrated that White Oak is the appropriate placement, as many courts have stated it would

be a "hollow victory" for the parents because that time they lost is not something they can ever

recoup.

      The school district on the other hand can only argue that it would be financially harmed

by the enforcement of the stay put provision.  These factors have been previously weighed  and

discussed in *Susquenita*.  In determining whether the parties met their burden for preliminary

injunctive relief the Court in *Susqenita* held "**The  only harm which we can conceive of is the**

**financial burden which will be borne by the district during the pendency of this appeal**. Id.

(emphasis added).  The court even considered the fact that pursuant to *Burlington* "that, [*81]

under current case law, the district would not be entitled to recover funds expended to maintain

Raelee in private school even if it were to prevail on appeal." The court, found "Taken together, we find that the relevant considerations do not justify granting the stay requested by the district."

The School District includes strong language from *Mayo v, Baltimore,* 40 F. Supp 2d 331 (1999). However, the school district's reliance on the *Mayo* case to satisfy its argument, which appears to be an equitable argument, is unfounded. The parents assert that the facts and legal analysis in the *Mayo* case are totally distinguishable factually and legally. In *Mayo* the child was not found to be eligible for special education services by the school district prior to the unilateral placement by the parent. Thus, there was no IEP and because there was not special education eligibility, questionably there was no legal responsibility by the school district to afford the student the procedural protections afforded by the IDEA. Furthermore, this case involved issues pertaining to settlement agreements wherein the school district paid for the private school placement but specifically denied that the placement was appropriate using specifically contractual language to exclude stay put protections. Moreover, this case offers nothing in the form of guidance either legally or factually to the case at bar because the facts and issues are so disparate.

## IN CONCLUSION

The parent's assert that a BSEA decision in favor of a school district only becomes final and controlling when all litigation has been exhausted, concluded, or not appropriately acted upon. As such, the last decision wherein the parents and the state agreed was the first decision BSEA 04-0093 which specified White Oak as the appropriate placement. This legal distinction or "agreement" created the "then current placement" and it will remain so while the current "litigation is still pending" or the school and parents otherwise agree.

The White Oak was also her placement when the second BSEA case was initiated by the School District. As the Court of Appeals for the 6th Circuit has stated *Thomas v, Cincinnati Bd. of Educ.*, 918 F.2d bl8, b2b-2b (.6th Cir.) as cited in Drinker: "Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stay put provision. And where . . . the dispute arises before any IEP has been implemented, the 'current educational placement' will be the operative placement under which the child is actually receiving instruction at the time the dispute arises. Thomas v, Cincinnati Bd. of Educ., 918 F.2d bl8, b2b-2b (.6th Cir.)."

Therefore, while the BSEA decision 05-2029 is still on appeal, the stay put placement is still the White Oak School and the School District should still be paying for that placement and providing transportation.

WHEREFORE, Kaitlyn T. and her parents along with the School District respectfully request that the BSEA render an advisory opinion with respect to this matter so that this matter may be resolved.

Respectfully Submitted
Kaitlyn T. by her attorney

March 16, 2006                         _____

Derek M. Beaulieu, Esq.
P.O. Box 60452
Longmeadow MA 01116
BBO# 644185

**CERTIFICATE OF SERVICE**

  I, Derek M. Beaulieu, Attorney for Kaitlyn T. hereby certify that on this day of March, I delivered via facsimile and regular mail a copy of PARENT'S MOTION FOR STAY PUT to Claire Thompson, Esq., Doherty, Wallace, Pillsbury & Murphy, P.C., One Monarch Place Suite 1900, Springfield, MA 01144-1900

March 17, 2006

                ————————————————
                Derek M. Beaulieu, Esq.